

U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described**.

Signed September 23, 2008        **United States Bankruptcy Judge**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| TIMOTHY MICHAEL FRAZIN | § | Case No. 02-32351-bjh-13 |
| | § | |
| Debtor. | § | CHAPTER 13 |
| | § | |
| | § | |
| TIMOTHY MICHAEL FRAZIN, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | ADVERSARY NO. 08-3021-bjh |
| | § | |
| HAYNES AND BOONE, LLP, | § | |
| GRIFFITH & NIXON, P.C., | § | |
| SCOTT GRIFFITH, NINA CORTELL, | § | |
| AND WARREN DODSON, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION

The Court tried the above adversary proceeding on July 7-11 and 16, 2008. In his Amended

**Memorandum Opinion**

Complaint, Plaintiff Timothy Michael Frazin ("Frazin" or "Debtor") sued Defendants Haynes and

Boone, LLP ("Haynes and Boone"), Nina Cortell ("Cortell"), and Warren Dodson ("Dodson")

(collectively, the "H&B Defendants") and Defendants Griffith & Nixon, P.C. ("G&N") and Scott

Griffith ("Griffith") (collectively, the "G&N Defendants") (the H&B Defendants and the G&N

Defendants will be collectively referred to herein as the "Defendants") for negligence,

misrepresentation/deceptive trade practices, and breach of fiduciary duty in connection with their

representation of the Debtor as special trial and/or appellate counsel (collectively, the "Malpractice

Claims"). The Defendants dispute the validity of the Malpractice Claims and seek the final allowance

of the fees and expenses provided for in their respective retention agreements with the Debtor, along

with the fees and expenses they have incurred in defending themselves and their fee applications.

The Court has core jurisdiction over the Malpractice Claims and the fee applications pursuant to 28

U.S.C. §§ 1334 and 157(b). Pursuant to Federal Rule of Civil Procedure 52, Federal Rule of

Bankruptcy Procedure 7052, Local Rule 52.1 of the United States District Court for the Northern

District of Texas, and other applicable law, this Memorandum Opinion contains the Court's findings

of fact and conclusions of law.

## I.    FACTUAL BACKGROUND

### A.    Background related to the Frazin Bankruptcy Case.

On March 18, 2002, the Debtor filed his voluntary petition under Chapter 13 of the

Bankruptcy Code. Joint Pre-Trial Order, Docket No. 95 (the "Pre-Trial Order"), ¶ 11. In his

bankruptcy schedules, the Debtor represented that his claim against Lamajak, Inc. ("Lamajak") was

worth $6,000,000.00. *Id*.

During the pendency of his bankruptcy case, the Debtor was involved in litigation with

Lamajak styled *Tim Frazin v. Lamajak, Inc.,* 192nd District Court, Dallas County, Texas, Case No. 03-5672-K (the "State Court Action"). Pre-Trial Order, ¶ 12. In connection with the State Court Action, the Debtor filed his Application to Employ Special Counsel seeking to employ G&N to represent the Debtor in the State Court Action. Pre-Trial Order, ¶ 14. The engagement letter between the Debtor and G&N is attached to the G&N Application to Employ (the "G&N Engagement Letter"). *Id.* The G&N Engagement Letter does not relate to the Debtor's residence. *Id.* On February 12, 2004, this Court authorized the Debtor to employ G&N pursuant to 11 U.S.C. § 327(e) on a contingency fee arrangement and authorized G&N to seek fees under the proposed contingency arrangement pursuant to a fee application to be filed at the appropriate time.[1] *Id.*

Pursuant to the terms of his confirmed Chapter 13 Plan, the Debtor was to use a portion of the proceeds from any recovery in the State Court Action (the "Litigation Proceeds") to satisfy claims in the bankruptcy case. Pre-Trial Order, ¶ 13. On April 18, 2005, the Court entered its Order Discharging Debtor After Completion of Chapter 13 Plan. Pre-Trial Order, ¶ 15. The bankruptcy case remained open to allow for the possibility of additional distributions to unsecured creditors pursuant to the Chapter 13 Plan in the event the Debtor recovered damages in the State Court Action.[2] *Id.*

On June 13, 2005, a final judgment (the "Final Judgment") was entered in the State Court Action in favor of the Debtor, and the Debtor was awarded damages, as described more fully below. Pre-Trial Order, ¶ 16. Lamajak subsequently appealed the Final Judgment. *Id.*, ¶ 17.

---

[1] The parties stipulated in the Pre-Trial Order that the Court authorized the retention on February 11, 2004, but the Court's docket reflects that the Order was entered on February 12, 2004.

[2] The bankruptcy case was administratively closed, in error, on December 15, 2005. It was re-opened on December 21, 2007.

**Memorandum Opinion**                                                                                     **Page 3**

On October 10, 2005, the Debtor, G&N, and Haynes and Boone signed an engagement letter pursuant to which Haynes and Boone was retained as special counsel to represent the Debtor in connection with Lamajak's challenge to the Final Judgment in the State Court Action (the "Haynes and Boone Engagement Letter").  Pre-Trial Order, ¶ 18.  In negotiating the Haynes and Boone Engagement Letter, the Debtor was represented by G&N.  *Id*.  G&N had represented the Debtor for at least a year prior to Haynes and Boone's engagement, and Haynes and Boone had no involvement with the selection of G&N as counsel for the Debtor.  *Id*.  Nobody at Haynes and Boone had any conversations with the Debtor prior to the execution of the Haynes and Boone Engagement Letter.  *Id*.  The Haynes and Boone Engagement Letter did not relate to the Debtor's residence.  *Id*.

On October 12, 2005, the Debtor filed his Application to Employ Haynes and Boone, LLP as Special Counsel.[3]  Pre-Trial Order, ¶ 19.  On December 15, 2005, the Court entered its Order:  (A) Approving Employment of Haynes and Boone, LLP as Special Appellate Counsel and (B) Regarding Disbursement of Anticipated Proceeds from Litigation (the "Litigation Proceeds Order").[4]  Pre-Trial Order, ¶ 20.  Pursuant to the Litigation Proceeds Order, the Court approved the retention of Haynes and Boone and ordered that the firm's fees would be payable on the filing of a fee application and approval by the Court.  *Id*.

The Litigation Proceeds Order additionally memorialized "the procedures agreed to at the hearing for the ultimate disbursement of the Litigation Proceeds."  Pre-Trial Order, ¶ 21.  To that end, the Court implemented the following procedures with respect to the Litigation Proceeds:

---

[3] The parties stipulated in the Pre-Trial Order that the application to employ was filed on October 12, 2005, but the Court's docket reflects that it was filed on October 13, 2005.

[4] The parties stipulated in the Pre-Trial Order that the Litigation Proceeds Order was entered on December 15, 2005, but the Court's docket reflects that it was entered on December 19, 2005.

**Memorandum Opinion**                                                                            **Page 4**

ORDERED, that the Litigation Proceeds, if and when the same become payable to the Debtor by virtue of a final nonappealable order, settlement or otherwise, shall be paid to and held in trust by the Firm, who shall promptly notify the Chapter 13 Trustee and Debtor's counsel of the receipt of the funds; and it is further

ORDERED, that the Chapter 13 Trustee shall, upon receipt of such notice, promptly calculate the portion of the Litigation Proceeds to which the estate is entitled, in order to satisfy the allowed claims in the case pursuant to the plan, plus interest on the claims as permitted by law, which portion is approximately $180,000 inclusive of the claim of Michael A. Cohen (and exclusive of interest on the claims as permitted by law), and will not exceed $200,000 (exclusive of interest on the claims as permitted by law), and shall file a report with the Court so indicating; and it is further

ORDERED that, by virtue of the Debtor having agreed in the confirmed plan to pay in a portion of the Litigation Proceeds to the estate, the Debtor has essentially assigned its rights in such portion of the proceeds to the estate and is deemed to have completed payments under the Plan, subject to complying with the mechanics set forth in this Order.

*Id*.

## B.      **Overview of the State Court Action and Lamajak appeal**.

In the State Court Action, the Debtor was initially represented by other counsel who were replaced by G&N. Pre-Trial Order, ¶ 22. When G&N was first retained as counsel in the State Court Action, the limitations deadline by which Joseph M. Frazin, Inc. could have been added as a party had lapsed. *Id*. At trial, the Debtor sought recovery from Lamajak for breach of contract, promissory estoppel and quantum meruit – all growing out of work done by the Debtor in connection with the sale of Beanie Babies for the benefit of Lamajak. *Id*. The jury awarded the Debtor three alternative recoveries: (1) $4,000,000 for breach of contract; (2) $1,400,000 for promissory estoppel; and (3) $1,125,000 in quantum meruit. *Id*. The final judgment, signed on June 13, 2005, provided recovery on the breach of contract claim ($4,000,000 for damages, $1,600,000 for

trial attorneys' fees and $50,000 for appellate fees), and $1,508,383.10 in prejudgment interest.[5] *Id.*

The Debtor's position at trial was that he had an oral agreement with Lamajak under which he was to provide "certain services to Lamajak in an effort to maximize Lamajak Inc.'s profits from the sale of Beanie Babies and other Ty products during 1998" in return for which "Lamajak, Inc. would pay him all gross profits in excess of $6,000,000.00 which were earned by Lamajak, Inc. from the sale of Beanie Babies and other Ty products during 1998." Pre-Trial Order, ¶ 23. The Debtor said he struck the deal during a conversation with Michael Cohen ("Cohen"), Lamajak's president, in January 1998.[6] *Id.*

Cohen denied the existence of the claimed oral agreement. *Id.*; Pre-Trial Order, ¶ 38. No third party heard the conversation. Pre-Trial Order, ¶¶ 23, 38.

The State Court Action was hotly and vigorously contested. *Id.*, ¶ 23. As noted previously, the Debtor sought to recover on claims for breach of contract, promissory estoppel, and quantum meruit. *Id.* Lamajak asserted numerous defenses including, but not limited to, statute of limitations, res judicata, and statute of frauds. *Id.* Pretrial discovery went on for almost two years, during which approximately seventeen fact and expert depositions were taken, numerous motions to strike experts and compel discovery were filed, and the defendants filed a motion for summary judgment with four amendments thereto. *Id.*

The State Court Action culminated in a two-week long jury trial with witness preparation,

---

[5]As subsequently determined by the Dallas Court of Appeals, the prejudgment interest was improperly calculated because the accrual date was based upon the wrong statute; the correct prejudgment interest calculation on a $4 million claim was $710,132.40 and not $1,508,383.10.

[6]According to Frazin's testimony at the trial of the Malpractice Claims, this conversation lasted between 20 and 40 minutes.

preparation of jury charge and motion in limine, as well as numerous pretrial and trial briefings on the relevant legal issues. Pre-Trial Order, ¶ 24. Moreover, there were additional motions during trial and after the jury's verdict seeking to amend pleadings and modify or disregard the jury's findings (*e.g.*, motion for judgment notwithstanding the verdict, motion for directed verdict, motion for trial amendment, and motion for new trial). *Id*. Each such motion required extensive briefing, research, and preparation in submitting written responses to the court. *Id*.

The Debtor's trial court damages expert opined that Lamajak's gross profits during 1998 were over $11.5 million. Pre-Trial Order, ¶ 25. The CFO for Lamajak testified that he took the Debtor's expert report, did his own calculations based upon that report, and came up with a figure of $10 million in profits from the sale of Beanie Babies in 1998. *Id*. The jury awarded the Debtor $4 million on his oral agreement claim. *Id*.

On appeal, Lamajak contended that Frazin was not entitled to recovery on any of his theories. Pre-Trial Order, ¶ 26. Lamajak's lead argument was that, based upon the doctrine of res judicata, all of Frazin's claims were barred as a matter of law. *Id*. Lamajak relied in part upon a prior suit brought by Frazin against Lamajak and Cohen and an earlier Dallas Court of Appeals opinion (*Frazin v. Cohen*, 2005 WL 1634913 (Tex. App. – Dallas July 13, 2005)), wherein the Dallas Court of Appeals sustained a res judicata argument, finding that similar claims raised by Frazin against Cohen were barred as a matter of law. *Id*. The Debtor appealed the adverse ruling in *Frazin v. Cohen* to the Texas Supreme Court but that court declined to review the Debtor's appeal, making the take-nothing judgment in *Frazin v. Cohen* final. *See Frazin v. Cohen*, No. 05-03-01706-CV, 2005 WL 1634913 (Tex. App.--Dallas, July 13, 2005, pet. denied). *Id*. Gary Schepps ("Schepps") was the Debtor's counsel before both the Dallas Court of Appeals and the Texas Supreme Court in

the *Frazin v. Cohen* appeal. *Id*.

In addition to asserting the res judicata bar, Lamajak presented numerous other arguments in its appeal of the judgment in the State Court Action, asserting that Frazin was entitled to a take-nothing judgment on a number of grounds, including: (1) no-evidence arguments as to all claims; (2) legal arguments that the breach of contract claim was without basis (including no meeting of the minds on material terms, void for want of mutuality, lacked consideration, and was insufficiently definite); (3) arguments that the Debtor employed a speculative damage model on the breach of contract claim and absence of evidence of damages for all claims; (4) statute of limitations bar to the quantum meruit claim; and (5) absence of proof of reliance damages by the Debtor on the promissory estoppel claim. Pre-Trial Order, ¶ 27. With regard to Frazin's attorneys' fee award, Lamajak argued no evidence, failure to segregate, and excessiveness. *Id*. With regard to the prejudgment interest award, Lamajak argued that the trial court used the wrong accrual date under the applicable statute and case law. *Id*.

Haynes and Boone responded with a brief on the merits and additionally provided the Dallas Court of Appeals with multiple supplemental letter briefs (all of which were filed with the court) both before and after oral argument. Pre-Trial Order, ¶ 28. Oral argument was presented to the Dallas Court of Appeals on March 14, 2007. Pre-Trial Order, ¶ 29.

On July 6, 2007, the appellate court issued an opinion reversing and rendering in part and affirming in part the trial court judgment (*Lamajak, Inc. v. Frazin*, 230 S.W.3d 786 (Tex. App.–Dallas 2007)).[7] Pre-Trial Order, ¶ 30. The appellate court set aside the contract award for lack

---

[7] On August 22, 2007, the court of appeals issued a judgment *nunc pro tunc* conforming the judgment to reflect the jury's award of quantum meruit damages of $1.125 million. Pre-Trial Order, ¶ 30, fn 6.

**Memorandum Opinion**                                                                                       **Page 8**

of evidence ("there is no evidence that the parties agreed to what services Frazin would provide in return for his share of the gross profits"), found that Frazin could not personally recover promissory estoppel reliance damages incurred by his company ("a corporate stockholder, even of a wholly owned corporation, cannot recover damages personally for a wrong done to the corporation"), and reduced the prejudgment interest award, but awarded Frazin recovery on his quantum meruit claim, attorneys' fees and pre and postjudgment interest, for a total recovery of approximately $3.4 million. *Id*.

Lamajak filed a motion for rehearing seeking reversal and remand of the $1.6 million attorneys' fee award, arguing in part that the jury had awarded a contingency based upon the $4 million claim and not based upon the lower $1.125 million quantum meruit recovery.  Pre-Trial Order, ¶ 31.  The Debtor filed a brief opposing the motion for rehearing, Lamajak filed a reply, and the court of appeals denied the motion for rehearing.  *Id*.

Following denial of its motion for rehearing, Lamajak began the process of seeking review in the Texas Supreme Court.  Pre-Trial Order, ¶ 32.  Pending further appellate review by the Texas Supreme Court, Lamajak and Frazin agreed to settle the approximate $3.4 million appellate judgment for $3.2 million.  Pre-Trial Order, ¶ 33.

**C.     The underlying Lamajak appeal and Frazin's legal Malpractice Claims**.

As noted previously, the underlying case is about Beanie Babies – small stuffed-animal toys popular in the late 1990s.  Pre-Trial Order, ¶ 34.  The alleged oral contract arose from a private conversation the Debtor had with Cohen sometime in January 1998.  *Id*.  At that time, Cohen was president, chief executive officer, and part owner of Lamajak, and was a personal friend of the Debtor.  Cohen established Lamajak in the early 1980s as a series of gift shops in hospitals doing

business as "Lori's Hospital Gift Shops."  *Id*.  In addition to running a pizza restaurant, the Debtor sold comic books through his store, "Awesome Comics."   The Debtor considered himself knowledgeable about "collectibles," such as baseball cards, comics, lunch boxes, action figures, and other toys.  *Id*.

Beanie Babies are manufactured by Ty, Inc.  Pre-Trial Order, ¶ 35.  Frazin testified at trial in the State Court Action that Ty limited the companies to which it would sell Beanie Babies, as well as the number of Beanie Babies any one retailer could order.  *Id*.  Frazin attempted unsuccessfully to purchase Beanie Babies directly from Ty.  *Id*.  In 1997, Frazin learned that Cohen sold Beanie Babies through Lamajak's Lori's shops.  *Id*.  Frazin began to purchase Beanie Babies from Cohen and sold them at higher prices at Awesome Comics.  *Id*.  In September, 1997, Frazin formed a corporation named after his father—Joseph M. Frazin Partners, Inc.—through which he thereafter operated his Beanie Baby business.  *Id*.[8]  At the end of 1997, Lamajak sold Frazin a quantity of "Princess Bear" Beanie Babies, and shared the profits for subsequent sales of those Beanie Babies for prices above a defined price.  *Id*.

Frazin testified he made an oral agreement with Cohen when he visited Cohen's office in January 1998 to discuss the future of the Beanie Babies market.  Pre-Trial Order, ¶ 36.  At the trial of the State Court Action, Frazin described the meeting with Cohen as follows:

> Q.    [By Griffith, Frazin's counsel]:  Did Mr. Cohen ask you what you thought would happen in the Beanie Babies market in – at that – in '98 –
>
> A.    [By Frazin]:  Yes.

---

[8] The parties disagree about whether Frazin operated some or all of his Beanie Baby business through Joseph M. Frazin Partners, Inc.

**Memorandum Opinion**                                                                **Page 10**

Q.      - what the future looked like?

A.      Absolutely.

Q.      And what – did he express an opinion to you as to what he thought?

A.      Yes.

Q.      What was that?

A.      He expressed that he felt it was just a Christmas fad, that he'd been in the gift business long enough to see one, and that they were going to be over and it was going to be pretty much dead, and that was, you know, what we saw – Christmas was over and sales were going to be dead and they were going to cut back on their Ty [the manufacturer of Beanie Babies] ordering, and that was the – crux of the beginning of our conversation.

Q.      And did you express your opinion with him?

A.      I told – I told Mr. Cohen that I'd crunch the numbers and I'd look at – you know, I looked at – I did my homework and I looked at how much they had been getting and what my store sales were still doing in the first week or two of '98 and I expressed to him – I told him that Lamajak could make over $10 million in profits from Beanie Babies.

Q.      And during what period of time?

A.      During 19 – 1998, for that year.

Q.      And what was his reaction?

A.      He was surprised and didn't really believe it.

Q.      Well, what did he say?

A.      He said that there was – there was absolutely no way that four million – he'd be happy with 4 or $5 million dollars, he'd actually be ecstatic with $5 million dollars.  And then he proceeded to say, "Well, anything over 6, you can have."

And then I stopped and I said, "Anything over 6 million in – in profits over – for Lamajak, I can have?"  And he stated, "Yeah."

So after I reiterated it one more time, I said, "All the profits, two-fifty a unit,

**Memorandum Opinion**                                                    **Page 11**

anything over $6 million dollars, I can have."

And he said, "No, no, hold on, wait a second." He stopped me and he said, "We've got other expenses. It's – you know, there's – there's warehouse help and all that stuff. We're going to add ten cents a unit for – for warehouse and shipping and any other expenses."

So then I reiterated it again. I said, "Any – all the profits over $6 million dollars, minus the cost of the – of the Beanie Baby and minus the cost of the shipping and warehouse, all the profits that exceed six million, I can have?" And he said, "Yeah." And I said, "Done." And I stood up and we shook hands.

Defendants' Exhibit 63, Reporter's Record, volume 3, pp. 92-94.[9] Shortly after this testimony at trial in the State Court Action, Frazin added one more statement that he said he made before he said "done," and Cohen and he shook hands. That statement was:

Q.      [By Griffith]  And did you understand that to mean the sale of all Beanie Babies through [Lamajak's own] stores or through warehouse sales?

A.      Actually, all of them. Because that's the – that's what we were talking about previously, was all the store sales and – and all the wholesale sales, and that's why he was not going to order his full allotment is because he thought, you know, "It's January and they're going to cool off. I don't want to be stuck holding all this merchandise. The – the fad's over; we're done with it; we're going to cut back." And that's when I, you know, expressed to him, "Look, I have all these contacts. I can help you sell them and I can help – you know, I have the outlets, I can move them through the outlets. I'm telling you, you can – the market's going to stay hot and I can help you do all this stuff."

DX 63, RR 3:94-95.

During the trial of the State Court Action, portions of Frazin's previously sworn deposition testimony from a deposition he had given in 2002 were read into the record, again detailing

---

[9]Hereinafter, the Defendants' Exhibits will be referred to as "DX" followed by the exhibit number; the Reporter's Record will be referred to as "RR," followed by volume number and page references – i.e., this cite would be DX63, RR 3:92-94.

Frazin's account of the "deal." That testimony was:

Q:   Was there anything – well, let me – you've used the word "felt" and "sensed". Let me get away from those words and get *in the words of what someone sitting there would have heard* or seen, you know, in the 3-D world where people hear things and see things. *In the 3-D world* where people hear things and see things, *what exactly was said* – or to the best of your memory, what was said about this transaction?

A:   I think we went over this before. I can reiterate it for you. Late in January of '98 – and I think we're referring to the $6 million deal?

Q.   Yes. I think that's what you were asked.

A:   Okay. I told Mike that – Mike had felt strongly that Beanie Babies were a fad and that they were done and there wasn't very much more money to make in that market. I expressed to Mike that I thought he was going to make – I believe my statement was that – I recall that "You're going to make $10 million this year, you know, with my help." And he said, "There's no way," that he'll be happy if he makes $5 million. And then I said – I was persistent. I said, "No, you're going to make a lot more than that." And he said, "Well, anything over six you can have." I said, "Fine, because you're going to make it."

Q:   *I want to be clear. In the world where people could hear– if they were sitting in the room, they could hear things, was there anything more or additional said other than what you've just said?*

A:   I mean, I'm sure there was a few more things said. *I don't recall those specific things.* That was the essence. And I do recall – I mean, trying to remember specific words from several years ago is somewhat difficult. The essence, I think, was a little more able to be retained.

     I do remember specifically the fact that I said, "I think you're going to make $10 million." I know that's a fact. I said that. He said there's no way, he'd be happy – he said he'd be happy he said for a fact he said there's no way he was going to make $10 million in Beanie Babies. I said – he said for a fact that he'd be happy if he made $5 million. For a fact, he said, "Anything over six million, you can have."

Q:   All right. And to which you said, I think – anything else you said in response to that?

**Memorandum Opinion**                                                                **Page 13**

A:     I got – I got very excited.  I was like "All right."  I was like, "That's a deal." I was very excited because I truthfully felt that he would make $10 million, and so that was quite a bit more money for me.  More money than I've ever hoped for.

Q:     *And, again, in the words that went through the ear, you to him or him to you, do you remember anything more that was said either generally or specifically?*

A:     *I don't – I don't think I remember* – I was – I remember being very excited, so –

Q:     *Okay.  But I'm trying to get away from feelings and – and talk about exchanges between you.  Any more in terms of an exchange?*

A:     *I don't remember specifically any other exchanges at that time.*

Q:     And you're saying that was January '98?

A:     I believe the end of January '98.

Q:     Okay.  Now Mr. Frazin, you testified on direct examination that you do recall talking about an establishment of some – some – some costs, shipping and handling costs.

A:     That's correct.

Q:     And – and – and you didn't say that right there.

A:     I left that out, yes.

Q:     Tell the jury what you recall about that conversation.

A:     After – after we – we did the deal – well, after he said "Anything over 6 million, you can have" and I reiterated it, he then said, "Wait, hold on, hold on, we've got shipping and warehouse costs and there's going to be – you know, we've got some other expenses.  It's 10 cents – let's just count 10 cents a unit additional."

And I said fine, and then we reiterated it again, and – and that's what I was kind of referring to there.  I believe I said, "That's a deal," and we shook hands and we got up and that was – that was – you know, I may have said –

Q:     And –

**Memorandum Opinion**                                    **Page 14**

A:     -- "You're going to owe me a lot of money," but that was – that was the end of the – there was nothing else after that.

Q:     And in the discussion in adding the 10 cents a unit, was that over and above the – Lamajak's cost to Ty of $2.50 per unit?

A:     Right. I was – I mean, we had discussed – I'll just go over everything again. We discussed a cost of two-fifty a unit, and that's where we got the base from the – the gross profits over 6 million, and then when I reiterated that part, he said, "Hold on, hold on. Well, we've got – there's other expenses, there's other costs," and then he added in the 10 cents per unit for warehouse or shipping or any other costs. And then I reiterated, "Okay, the two-fifty per unit as the cost of the product." So I added the ten cents on, and then we said, "Deal" and we shook hands – stood up and shook hands.

Q:     Have you ever told anybody at any time, depositions or otherwise, anything other than that?

A:     No.

DX 63, RR 5:37-41 (emphasis added).

When asked the same question during the trial of the Malpractice Claims here (some 6 years

later), Frazin's testimony is much more detailed. Specifically, at the trial of the Malpractice Claims,

Frazin testified as follows:

Q:     Now Mr. Frazin, if, at the time of trial, you had been asked the question, "Tim, what did you agree to do for Lamajak, Inc. in exchange for this promise of profits over $6 million dollars at the time that the agreement was made, which you earlier said was January, 1998, " what would you have responded?

A:     I would have said "I agreed to give my customer list, I agreed to help in pricing, I agreed to open more store locations, I agreed to advise in what to order and what not to order, I agreed to advise in shipping, and especially drop shipping, and I agreed to give my advice and expertise in the market in general."

Audiotape, hearing held 7/10/08 at 10:59:35 - 11:00:28 (on file with the Court). While Frazin could

not recall the exact words he had spoken to Cohen, reminding the Court that the meeting occurred

**Memorandum Opinion**                                                        **Page 15**

some 10 years earlier, he described the essence of what he had orally said to Cohen during the January 1998 meeting in significant detail.  Frazin also testified at the trial of the Malpractice Claims that he had told the G&N Defendants these details of his oral conversation with Cohen prior to the trial in the State Court Action and that the only reason he never testified about the details of his conversation with Cohen at trial in the State Court Action is that he was never asked the question.

The G&N Defendants testified to the contrary.  Griffith testified that one of the most significant hurdles that had to be overcome in the trial of the State Court Action was the brevity of Frazin's conversation with Cohen in January 1998 and Frazin's inability to articulate specific things he had orally promised to do during that conversation in exchange for Cohen's promise (on behalf of Lamajak) to give Frazin all profits in excess of $6 million from Lamajak's sale of Beanie Babies in 1998.  According to Griffith, Frazin had never indicated to the G&N Defendants that he had orally agreed to do anything other than what he testified to at the trial of the State Court Action (*see infra* pp. 52-54) during his brief conversation with Cohen in January 1998.  However, Griffith testified that he believed Frazin subjectively intended to do all of the things he ultimately did do in exchange for Cohen's promised excess profits.  Finally, Griffith testified that because he recognized the "indefiniteness" problem with the oral contract claim Frazin asserted, G&N added an alternative quantum meruit claim after it was retained to represent Frazin in the State Court Action.[10]

The G&N associate, Mark Walsh ("Walsh"),[11] who had assisted Griffith in preparing Frazin's

---

[10]Prior counsel had pled both breach of contract and promissory estoppel claims, which G&N retained in the amended petition it filed on Frazin's behalf once it was retained as Frazin's counsel in the State Court Action.

[11]Walsh is no longer with G&N.  Because he was out of the country during the trial of the Malpractice Claims, he testified by video-deposition.  Walsh was not sued by Frazin in this adversary proceeding and, because he is no longer affiliated with G&N, Walsh has no economic interest in the outcome of this trial.  Walsh is one of the few witnesses (other than the parties' experts) who does not have an economic interest in the outcome of this trial.  Walsh's testimony was very credible.  It was clear he was the G&N lawyer most actively involved in Frazin's case on a day-to-day basis during the trial

case for trial and at trial, testified similarly.  When asked at his deposition in this adversary proceeding if he had any recollection of what Frazin said he promised Cohen he would do at the January 1998 meeting, Walsh's recollection of Frazin's description of the January 1998 meeting was essentially what Frazin had testified to at the trial of the State Court Action (*see supra* at pp. 54-55). Plaintiff's Exhibit 271, p. 27, lines 5-25, & p. 28, lines 1-2.[12]  Walsh also testified that his "recollection of [Frazin's] version of that story was always the same." *Id*. at 27: 7-8.  When asked again if Frazin's account of the January 1998 meeting with Cohen ever varied, Walsh testified that he didn't "recall [Frazin's] version of that story ever changing until – I think there was a slight variation at the trial itself." *Id*. at 28: 15-17.[13]  Finally, like Griffith, Walsh testified that Frazin had trouble putting in words what he had agreed to do and what he did as a result of his January 1998 meeting with Cohen. Specifically, when asked if Frazin ever had any problems expressing or recalling what he did, Walsh testified that his "recollection is [that Frazin] had difficulty with that both before trial – and – and at trial.  That was a concern in that Tim had difficulty articulating the deeds that he actually did for Lamajak, as opposed to the general, I helped Lamajak.  You know, I – I went out and sold these – these helped them sell these Beanie Babies.  And so I recall there being an issue in attempting to get [Frazin] to drill down deeper and – and recount the actual things that he did on a day-to-day basis

---

preparation stage of the case.  While Walsh did not examine any witnesses at trial (other than Griffith on attorneys' fees), he also assisted Griffith at the trial of the State Court Action.

[12]Hereinafter, Plaintiff's Exhibits at trial will be referred to as "PX," followed by the page reference and then the line reference.  This citation would be PX 271:27,5-25 & 28:1-2.

[13]Walsh testified that he prepared notes each evening while they were in trial, capturing things that had happened that day that might need to be addressed further during trial.  DX 322 is a copy of Walsh's "Wednesday afternoon notes" from trial, where he observed "[e]xpansive account of 'deal' in direct was wordier and more detailed than in previous depositions." DX 322, p. G&N 12822.  According to Walsh, he was concerned that Frazin's testimony about the January 1998 meeting with Cohen during Griffith's direct examination had been more expansive than Frazin's prior deposition testimony and that Frazin needed to be prepared for that on cross-examination.

for Lamajak." *Id.* at 33: 8-18. Walsh further testified that in preparing responses to Lamajak interrogatories, it was difficult to get Frazin to articulate clearly what he had done for Lamajak. Specifically, Walsh testified that "I have some recollections of preparing these interrogatory responses. This was an issue for us, getting [Frazin] to really think about what it was that he'd done and speaking with [Frazin] about those things. And I remember it being kind of a – a trying process to go through that and get him to articulate and get it down on paper." *Id.* at 73:13-20.

In fact, to assist Frazin's memory and his trial testimony, both Griffith and Walsh testified that Frazin was given an index card with a list of the items that he had actually done in furtherance of his alleged oral agreement with Cohen (taken from Frazin's prior discovery responses in the State Court Action). Walsh testified that Frazin was given this card "so that he could, you know, clearly articulate things that he actually did, but that he'd just had trouble being able to recount out loud without prompting. And that was the issue was – as I recall it, was to not lead [Frazin] during his testimony and have him be able to just spout forth what he did." *Id.* at 34: 2-8.

Frazin did not try to put anything about his alleged oral contract in writing. Pre-Trial Order, ¶ 37. Frazin defended his failure to obtain written confirmation by saying that, had Frazin requested something in writing, Cohen would have been insulted and "probably would have just canceled everything right there." *Id.* Frazin also noted that the 1997 "Princess Bear" deal had also been an oral agreement. *Id.*

At the trial of the State Court Action, Frazin introduced the testimony of two friends (Blake and Melissa Versiga) with whom Frazin had lived and who had been employees of Joseph M. Frazin Company to testify in support of his oral agreement claim. Pre-Trial Order, ¶ 39. But, to overcome hearsay objections, the Versigas could not testify as to the truth of the matter asserted. *Id.* Subject

**Memorandum Opinion**                                                                              **Page 18**

to that limitation, the Versigas testified that Frazin changed the business plan for his own businesses in reliance on the alleged oral agreement. *Id*. The new business plan executed by Joseph M. Frazin, Incorporated was to open new kiosk outlets in shopping malls throughout the nation to sell as many Beanie Babies as possible. *Id*.

Frazin had another friend (Brian Slack) testify at the trial of the State Court Action. Pre-Trial Order, ¶ 40. Slack testified that he witnessed a later conversation between Frazin and Cohen concerning sums owed to Frazin under the oral agreement. *Id*. Slack testified that Cohen did not seem surprised or deny the existence of an agreement. *Id*

At the trial of the State Court Action, Cohen testified regarding a Summer 1998 Beanie Baby deal from which he received the names of some of Frazin's confidential contacts. Pre-Trial Order, ¶ 41. That testimony is contained in DX 63, RR 8:41-44, 122-125, 131.

In the Brief of Appellee, Haynes and Boone described the oral agreement by explaining that Frazin had accepted Cohen's offer "that, in return for Frazin's assistance and use of his contacts and stores to maximize Lamajak's sales of Beanie Babies, Lamajak would pay Frazin all of Lamajak's gross profits over $6 million (if any) from the sale of Beanie Babies in 1998." Pre-Trial Order, ¶ 42. The Brief of Appellee also relayed the following evidence regarding Frazin's post-agreement performance to prove the existence of his claimed oral agreement:

    (1)    Frazin provided Lamajak with a list of the secondary collectibles market customers to which Frazin had sold Beanie Babies wholesale, one of which became Lamajak's biggest wholesale customer;

    (2)    Frazin made changes to his business plan, expanding the number of Joseph M. Frazin Partners, Inc.'s locations to sell Beanie Babies, opening approximately 40 kiosks in malls across the country during 1998;

    (3)    Frazin used Joseph M. Frazin Partners, Inc.'s stores to maximize Beanie Babies sales

**Memorandum Opinion**                                                                                   **Page 19**

in such a way that would enhance Lamajak's profits, even when that was to Frazin's detriment at the store level;

(4)    Frazin researched the Beanie Babies market to determine current market prices and advised Lamajak on which Beanie Babies could be sold at higher prices in the secondary collectibles market and at what prices Lamajak should sell them;

(5)    Frazin advised Lamajak of when the market price of a Beanie Babies model had changed, even when that meant paying Lamajak the higher price himself;

(6)    Frazin purchased Beanie Babies that Lamajak was unable to sell; and

(7)    Frazin advised Lamajak on how to distribute Beanie Babies to wholesale purchasers.

*Id*.

On March 14, 2007, prior to the appellate oral argument, Haynes and Boone provided an additional authority to the Dallas Court of Appeals, *Gaede v. SK Invs., Inc*., 38 S.W.3d 753 (Tex. App. – Houston [14th Dist.] 2001), accompanied with a letter brief that advised:

Breach of Contract

*Gaede v. SK Invs., Inc.*, 38 S.W.3d 753 (Tex. App.—Houston [14th Dist.] 2001, pet. denied). In this case, the appellant asserted that he had a contract with appellee to serve as its independent sales agent in a particular region and to receive commissions on sales. The appellee argued that because the parties' agreement did not obligate the appellant to do anything, there was no mutuality of obligation, and thus no enforceable contract. The court of appeals rejected this argument, holding that "the issue of whether a contract is unenforceable for want of mutuality of obligation must be determined as of the time of the alleged breach, not at the time of the making of the contract." *Id.* at 760. The court went on to conclude that the appellant's performance of service at his expense and to the appellee's benefit "constitute[d] sufficient consideration to establish mutuality of obligation." *Id*.

Pre-Trial Order, ¶ 43. This letter was delivered to the court on the morning of, and prior to, oral

**Memorandum Opinion**                                                                 **Page 20**

argument. *Id*.

At the appellate oral argument, Cortell explained to the court how Frazin's performance showed the existence of a clear and definite agreement. Cortell's detailed notes for the oral argument were introduced at the trial of the Malpractice Claims as DX 346.

Haynes and Boone also addressed the following argument in a letter brief following the appellate oral argument:

Contract

Unlike the cases cited by Lamajak, Frazin's testimony establishes the critical elements of a binding contract: (1) mutual obligation of services (expand Lamajak's Beanie Baby sales by providing contacts and a distribution network) in return for compensation (RR 3:95); (2) specific term of performance of one year (RR 3:93-94); and (3) defined compensation formula (RR 3:93-94, 5:40-41). Justice Morris inquired about whether this was a "could" or "would" situation, and the answer is that, although the conversation began as one in which Frazin was describing what he could do for Lamajak, by the end of the conversation, when Cohen confirmed the compensation formula and the two men shook hands (RR 3:93-95), it was objectively clear that Frazin was committing to provide the promised services, which he then did. Two employees received immediate notice of the agreement (RR 5:106-09, 123-26); a third witness (Brian Slack) witnessed a conversation between Frazin and Cohen about the agreement, which Cohen did not deny (RR 5:139); and Frazin indisputably performed his end of the bargain, providing additional evidence of the contract. In further response to a question posed by Justice Morris, had Frazin not provided his contacts and distribution network, as he promised to do, Lamajak would have had a breach of contract claim upon which it could have sued. *See* Brief of Appellee at 22-27.[14]

---

[14] The letter brief made the additional points about Frazin's performance in responding to Lamajak's post-oral argument letter brief on the quantum meruit argument:

Lamajak erroneously tries to diminish Frazin's services by describing them as efforts to run his own business. Lamajak seriously misses the mark. In performing his end of the bargain, Frazin did things that were antithetical to his business, including: (1) turning over his customers to Lamajak, so that Lamajak could sell directly to these customers, depriving Frazin of these direct sales; and (2) advising Lamajak on raising its prices, even though that meant that Frazin would have to purchase at the higher prices, hurting Frazin's ability to earn a profit from his direct sales, all for the sole purpose of

**Memorandum Opinion**                                                                                         **Page 21**

Pre-Trial Order, ¶ 44.

In addition to citing to evidence of performance, Frazin's appellate briefing cited multiple authorities for the proposition that such evidence supported the jury's finding of an oral agreement. Pre-Trial Order, ¶ 45. In addition to the *Gaede* case cited above, other authorities were cited, including *COC Services, Ltd. v. CompUSA, Inc.*, 150 S.W.3d 654 (Tex. App.—Dallas 2004); *America's Favorite Chicken Co. v. Samaras*, 929 S.W.2d 617, 623 (Tex. App.—San Antonio 1996); *Tanenbaum Textile Co.. v. Sidran*, 423 S.W.2d 635 (Tex. Civ. App.—Dallas 1967).

In its briefing, Lamajak attacked Frazin's oral agreement in many ways. Pre-Trial Order, ¶ 47. Among other things, Lamajak argued that there was no evidence specifying Frazin's obligations under the claimed oral agreement; thus, Lamajak argued: "According to Frazin, he was entitled to Lamajak's profits … in excess of six million dollars if Lamajak made such profits, even if he had sat on a beach in the South Pacific throughout 1998." *Id.*, citing DX 45, at 25.

In response to the performance arguments advanced by Frazin on appeal, Lamajak argued that performance does not cure the defects it highlighted for a number of reasons. Pre-Trial Order, ¶ 47. One reason advanced by Lamajak was that Frazin's performance was not "'unequivocably referable to the agreement and corroborative of the fact that a contract actually was made.'" *Id.*, citing DX 47, at 15-16, and further citing *COC Services, Ltd., supra*, which set the "unequivocably referable" standard. Lamajak explained: "Prior to January 1998, Frazin already took most, if not all, of the actions he claims he also took after the agreement. Thus, these actions were not referable *only*

---

increasing Lamajak's Beanie Baby sales, which ultimately reached the 2.3 million mark in 1998 (RR 6:36). *See* Brief of Appellee at 4.
Pre-Trial Order, ¶ 44, fn 8.

**Memorandum Opinion**                                                                 **Page 22**

to the claimed agreement. In 1997, before the alleged agreement, Frazin purchased Beanie Babies wholesale from Lamajak and sold them in his own retail outlets for profit. RR3:76-91. Frazin continued to purchase Beanie Babies from Lamajak (*and other suppliers)* in 1998 and to sell them . . . . Appellant's Br. at 8. That, indeed, was Frazin's occupation. 3RR:62." *Id*. Lamajak additionally pointed out that the referenced performance was by Frazin's company; if Lamajak is correct, then the performance would be referable, if at all, to an agreement between Lamajak and Joseph M. Frazin, Inc. and not between Lamajak and Frazin individually. *Id*.

The opinion of the Dallas Court of Appeals states that the Court "consider[ed] all the evidence" as part of its factual sufficiency review and says that it reached its holding on the oral agreement claim "[a]fter reviewing the record." Pre-Trial Order, ¶ 48. One part of the record that the court specifically noted was the performance testimony. *Id*. The court nevertheless found that Frazin's oral agreement claim failed because there was "no evidence to show what [Frazin's] obligations and liabilities were under the alleged contract." *Id*. The opinion states:

> After reviewing the record on appeal, we conclude Frazin presented no evidence to show what his obligations and liabilities were under the alleged contract. Although Frazin and other witnesses testified at length about the work Frazin did after the contract was allegedly formed, there is no evidence that the parties agreed to what services Frazin would provide in return for his share of the gross profits. The only evidence relating to Frazin's obligations under the alleged agreement is his testimony that he told Cohen he had contacts and outlets and he could "help [Lamajak] do all this stuff." This vague offer of help is not specific enough to constitute any evidence of an enforceable contract. *See Charles E. Beard, Inc. v. McDonnell Douglas Corp*., 939 F.2d 280, 283 (5th Cir. 1991).

*Id*.

The Dallas Court of Appeals also stated in its opinion that "[f]or an enforceable contract to exist, the legal obligations and liabilities of the parties must be sufficiently definite. The contract

**Memorandum Opinion** **Page 23**

must be certain and clear as to all essential terms or the contract will fail for indefiniteness. Although Texas courts favor validating contracts, we may not create a contract where none exists." DX 55, at p. 8 (internal citations omitted).

The Dallas Court of Appeals denied Frazin recovery of personal promissory estoppel reliance damages because his evidence of reliance damages related to corporate lost profits, not personal out-of-pocket damages. Pre-Trial Order, ¶ 49. The appellate court noted that "Frazin presented no testimony about any out-of-pocket expenses or other costs he incurred personally in reliance on Cohen's alleged promise." *Id*.

In the State Court Action, trial exhibits 101-107 were demonstrative exhibits that were attorney-notes written on a large flip-chart while a witness was testifying at trial, summarizing key points of the witness' testimony. Pre-Trial Order, ¶ 50.

**D.      Background facts regarding appellate counsel.**

The attorneys at Haynes and Boone who were the primary attorneys working on the case were Cortell and Dodson. Pre-Trial Order, ¶ 51. Dodson is a 2004 graduate of the University of Michigan Law School (magna cum laude) and formerly a clerk to Chief Judge Frederick J. Scullin, Jr., United States District Judge for the Northern District of New York. *Id*. As part of his duties working for Judge Scullin, Dodson worked on appellate cases, including appeals from magistrate decisions, appeals from bankruptcy court, and appeals in social security administrative decisions. *Id*. In addition, during Dodson's clerkship, Judge Scullin sat on the Second Circuit Court of Appeals by designation, and Dodson assisted him with four or five Second Circuit appeals. *Id*. When Judge Scullin was sitting on the Second Circuit Court of Appeals, there were two appeals of some size, a First Amendment case and a securities fraud case, where, as part of producing a memorandum in preparation for oral argument, Dodson summarized the testimony that was in the record. *Id*.

Dodson was assigned to assist Cortell on the Frazin appeal while he was in orientation at Haynes and Boone, and began work on that appeal after he completed his orientation. *Id*.

Cortell is a senior partner at Haynes and Boone who has practiced in the appellate section of the firm for the last 25 years. She was admitted to practice in 1976, DX 12, at p. 9, and has focused her practice on appellate work since the late 1980s. She is generally recognized as an appellate specialist and is a frequent author and speaker on appellate practice. She has also been elected to the American Academy of Appellate Lawyers. Audiotape, hearing held 7/9/08, at 10:49-10:50 (on file with Court).

Cortell and Dodson worked together on the appeal, each devoting approximately 300 hours to Haynes and Boone's representation of Frazin. Pre-Trial Order, ¶ 52. Dodson prepared a summary of the trial testimony and the initial draft of many sections of the briefing. *Id*. Cortell was lead appellate counsel for Frazin. She was ultimately responsible for Dodson's work and Haynes and Boone's representation of Frazin generally.

**E.**     **The settlement of the Lamajak suit.**

In response to a request to meet made by Lamajak's counsel, Griffith and Cortell met with Lamajak's counsel to discuss settlement on September 20, 2007. Pre-Trial Order, ¶53. At that meeting, Lamajak asked for a settlement demand from Frazin. *Id*. Griffith thereafter communicated to Frazin Lamajak's request for a settlement demand. *Id*.

On or about October 8, 2007, Griffith was advised by Frazin that – due to Frazin's girlfriend troubles, he was not thinking clearly. Pre-Trial Order, ¶ 54. Griffith was advised by Frazin to deal directly with Frazin's brother, Shawn Frazin ("Shawn"), and was further advised that Shawn had complete authority to act on Frazin's behalf in all respects and to make all decisions regarding the

Lamajak case. *Id.* In fact, Shawn is an attorney for Frazin who has provided Frazin with legal advice and counsel throughout the State Court Action, the appeal of the Final Judgment, and the settlement. *Id.*

On October 18, 2007, Griffith sent to Shawn, by a series of e-mails, copies of the appellate briefs in the Lamajak case, as well as a copy of the reporter's record from the trial of the State Court Action. Pre-Trial Order, ¶ 55.

On October 22, 2007, counsel for Lamajak sent Griffith a letter which stated a "take it or leave it" settlement offer of $3.2 million, with the settlement offer remaining open until October 26, 2007. Pre-Trial Order, ¶ 56. Griffith immediately forwarded the settlement offer to Shawn. *Id.*

At Shawn's request, Griffith procured and sent Shawn a report prepared by appellate attorney Doug Alexander ("Alexander"), who was hired to give an opinion regarding whether Frazin had a viable claim for breach of oral contract and whether to appeal to the Texas Supreme Court. Pre-Trial Order, ¶ 57. Alexander did not review the reporter's record from the trial. *Id.* Alexander concluded that (i) it was a "close call" on whether Frazin had a viable contract claim; and (ii) Frazin should not file a petition for review with the Texas Supreme Court if Lamajak did not file one. *Id.* Alexander also concluded that "[r]egardless of the relative strength of the evidence on the breach-of-oral contract issue, I believe that the chance of the Texas Supreme Court granting review and ruling in Frazin's favor are extraordinarily remote—less than 1%." *Id.*

By e-mail dated October 23, 2007, Shawn told Griffith that no settlement with Lamajak would be authorized unless Frazin netted a specified amount of money from the settlement, after payment of Frazin's other obligations. Pre-Trial Order, ¶ 58. That amount of money was not available unless (i) Haynes and Boone and G&N agreed to a fee reduction, (ii) Law Finance/group Inc. ("Law

Finance") agreed to further reductions of the amounts owed to them,[15] or (iii) Lamajak's "take it or leave it" settlement offer was negotiable.  Neither Griffith nor Cortell thought Lamajak's settlement offer was negotiable and Law Finance had already agreed to reduce the amounts owing to it.

On October 24, 2007, Frazin sent an e-mail to Cortell (copying Shawn and Griffith), telling her that because of certain personal issues, Frazin was giving Shawn full responsibility to make settlement decisions on the case, Frazin was authorizing Cortell to deal directly with Shawn about the case, and Frazin was giving Shawn full authorization to make or reject any settlement offers with Lamajak and to do anything else in the case in Frazin's place.  Pre-Trial Order, ¶ 59.  Such authorization had already been given to Griffith at G&N on October 8, 2007, and Griffith had already been dealing directly with Shawn since then.  *Id*.

On October 25, 2007, Shawn called Cortell to discuss the case and the proposed settlement. Pre-Trial Order, ¶ 60.  Cortell testified at the trial of the Malpractice Claims, without contradiction, that she told Shawn on October 25, 2007 that she had a summary of the trial transcript, but that Shawn did not ask for it.  Later, when Shawn saw a reference to a summary of the reporter's record in Haynes and Boone's fee application, Shawn asked for a copy of the summary, and it was provided immediately.  Pre-Trial Order, ¶ 60.

On October 26, 2007, G&N and Haynes and Boone reduced the fees they were owed under their contingent fee agreements by the total amount of $92,000.  Pre-Trial Order, ¶ 61.  The parties disagree on whether the reduction was volunteered by the firms or was agreed to based upon Shawn's continuing position that no settlement would be agreed to unless Frazin netted a specific

---

[15]G&N obtained monies from Law Finance, as did Frazin.  In exchange for these monies, Law Finance essentially took an assignment of a right to receive a portion of any monies received by G&N or Frazin, respectively, on a final  Lamajak judgment.  *See, e.g.*, DX 335 & 336.

**Memorandum Opinion**                                                                                    **Page 27**

amount of money. *Id*. The parties agree, however, that the fee reduction allowed the settlement with Lamajak to proceed. *Id*. By e-mail that same day, Griffith set forth the expected remittance to Frazin from the settlement and how it was computed. *Id*. That same e-mail expressly provided that Frazin would pay G&N $1,307,431 (inclusive of Haynes and Boone's fee) out of the settlement funds. *Id*. Griffith subsequently sent another e-mail to Shawn on October 26, 2007, clarifying the amount and calculation of the discount given and clarifying the distribution of settlement proceeds. *Id*.

No later than October 26, 2007, when the fee-reduction agreement was reached, and at least through the end of December 2007, Frazin received legal advice and assistance from Shawn, Schepps, and Rosemary Zyne ("Zyne"). Pre-Trial Order, ¶ 62. Schepps was Frazin's long-time family lawyer who reviewed legal issues with Frazin about the Lamajak case throughout the process and who had started reviewing the Lamajak appeal no later than October 23, 2007.[16] Zyne was Frazin's bankruptcy counsel.

On October 26, 2007, Frazin accepted Lamajak's settlement offer in the gross amount of $3.2 million. Pre-Trial Order, ¶ 63. On that date, the Defendants did not believe that Frazin had any intention to assert claims against them, and Frazin did not anticipate litigation against the Defendants. Pre-Trial Order, ¶ 64.

On October 26, 2007, Frazin also signed a Statutory Durable Power of Attorney, formally naming Lorraine Frazin (his mother) as his attorney-in-fact to act for him in any lawful way with respect to a number of matters, including "Claims and litigation." Pre-Trial Order, ¶ 65. The "Claims

---

[16]As noted previously, Schepps represented Frazin in the earlier related (and unsuccessful) Cohen appeal. *See supra*, pp. 7-8.

**Memorandum Opinion**                                                                                     **Page 28**

and litigation" power included the power to settle litigation, direct the management of his case, instruct attorneys to perform any action on his behalf, and the power to delegate and assign these powers to an assignee or successor. *Id*. Shortly after the Power of Attorney was signed, Lorraine Frazin formally named Shawn as "designee" of the attorney-in-fact. Pre-Trial Order, ¶ 66. Shawn is still the designee of the attorney-in-fact. *Id*.

F.     **Post-settlement facts.**

After the settlement had been accepted, Shawn asked Griffith to ask Cortell to forgo the entirety of the Haynes and Boone fee because of concerns about the quality of the appellate work done by Haynes and Boone. Shawn also asked Griffith to agree to let Frazin benefit from that forfeiture.[17] By e-mail dated November 2, 2007, Griffith responded to Shawn's request by refusing to ask Haynes and Boone to forego any more of its fee than what had already been conceded. Pre-Trial Order, ¶ 67. Griffith also notified Shawn that because Frazin was now trying to get even more money despite the October 26 fee reduction agreement, Frazin would be required to sign a written release to receive the fee reduction. *Id*.

By subsequent e-mail also dated November 2, 2007, Griffith sent the Defendants' proposed release to Shawn, copying Frazin. Pre-Trial Order, ¶ 68. The release contained the following language in all capital, bold letters that were larger in font size than the text in the rest of the release:

> **THE UNDERSIGNED FURTHER STATES THAT HE HAS CAREFULLY READ THE FOREGOING FINAL RELEASE AND KNOWS THE CONTENTS THEREOF, THAT HE HAS BEEN ADVISED TO SEEK ADVICE OF AN ATTORNEY CONCERNING THE CONTENTS AND LEGAL CONSEQUENCES OF THE EXECUTION THEREOF AND THAT HE**

---

[17]Since Haynes and Boone was to be paid out of G&N's contingency fee recovery, if Haynes and Boone forfeited its fee, Griffith would be the beneficiary of such reduction under the parties' agreements.

**EXECUTES THIS FINAL RELEASE OF HIS OWN FREE WILL**.

*Id*.

On November 6, 2007, Shawn called Griffith, and objected to the firms' request for a written release. Pre-Trial Order, ¶ 69. He also indicated that Frazin would not sign such a release. Shawn threatened to sue the firms if the Lamajak settlement was jeopardized by the firms' new demand.

By e-mail dated November 7, 2007, Griffith notified Shawn that the firms had reconsidered and that Frazin would not have to sign a written release to obtain the fee reduction originally agreed to on October 26, 2007. Pre-Trial Order, ¶ 70. Griffith forwarded a copy of the e-mail to Cortell. *Id*.

**G.      Implementation of the Lamajak settlement.**

On November 16, 2007, Frazin executed a formal settlement agreement and release (the "Settlement Agreement") with Lamajak to compromise and settle the State Court Action. Pre-Trial Order, ¶ 71. G&N did not receive or distribute the settlement proceeds of the State Court Action and was not tasked with doing so by this Court. *Id*. Rather, under the Settlement Agreement and in accordance with the Litigation Proceeds Order, Lamajak was to wire $3,200,000 into Haynes and Boone's trust account. Pre-Trial Order, ¶ 72. Haynes and Boone received the Litigation Proceeds on or about November 19, 2007. *Id*. Also in accordance with the Litigation Proceeds Order, Haynes and Boone promptly notified the Chapter 13 Trustee and the Debtor's bankruptcy counsel, Zyne, upon receipt of the Litigation Proceeds. *Id*.

The Litigation Proceeds Order contemplated that the Chapter 13 Trustee would file a report indicating the amount of the Litigation Proceeds that would be necessary to fund the Debtor's Chapter 13 Plan. Pre-Trial Order, ¶ 73. Haynes and Boone was aware that several parties had

interests with respect to the Litigation Proceeds. *Id*. These interested parties included: (i) the Chapter 13 Trustee for the benefit of creditors; (ii) the Debtor, (iii) Haynes and Boone and G&N with respect to payment of their professional fees and expenses, and (iv) Law Finance with respect to the repayment of certain postpetition advances of funds it made to Frazin and G&N. *Id*.

On November 19, 2007, Haynes and Boone filed a Motion for Order in Furtherance of the Distribution of Lamajak Litigation Proceeds (the "Distribution Motion"), seeking further guidance from this Court regarding disbursements of the Litigation Proceeds upon the Court's approval of the Settlement Agreement. Pre-Trial Order, ¶ 74. In the Distribution Motion (¶ 13), Haynes and Boone noted that it would file an application for approval of its fees. *Id*. The certificate of service on the Distribution Motion indicates that it was served by fax on Zyne, Debtor's bankruptcy counsel, on November 19, 2007. *Id*.

On November 19, 2007, Haynes and Boone also filed a request for an expedited hearing on the Distribution Motion. Pre-Trial Order, ¶ 75. The certificate of conference on the request reflects that Zyne did not oppose the request to expedite, but requested that the Distribution Motion be set after November 26, 2007. *Id*. The certificate of service on the request indicates that it was served by fax on Zyne on November 19, 2007. *Id*.

On November 21, 2007, Haynes and Boone filed an additional Certificate of Conference regarding the request to expedite. Pre-Trial Order, ¶ 76. This Certificate of Conference reflects that Zyne "does not oppose the Expedited Motion for Order in Furtherance of Distribution of Lamajak Litigation Proceeds (the "Motion") with respect to the Court issuing further orders regarding distribution of the Litigation Proceeds." *Id*. The certificate of service on the Certificate of Conference indicates that it was served by fax on Zyne on November 21, 2007. *Id*.

**Memorandum Opinion**                                                                                     **Page 31**

The Court denied the request to set the Distribution Motion for hearing on an expedited basis. The Distribution Motion was set for hearing on December 27, 2007.

**H.    Law firms file fee applications.**

In further compliance with the Litigation Proceeds Order, Haynes and Boone and G&N filed their respective applications requesting approval of fees pursuant to their contingency fee arrangement with the Debtor. Pre-Trial Order, ¶ 78. The Haynes and Boone fee application was filed on November 30, 2007. *Id*. The certificate of service in the fee application and the service list attached to the application reflect that the fee application, with exhibits, was served on Zyne on November 30, 2007, and was served on Frazin, without exhibits, on that same date. *Id*. The G&N fee application was filed on December 3, 2007. *Id*. The certificate of service in the fee application and the service list attached to the application reflect that the fee application was served on Zyne and Frazin, among others, on December 3, 2007. *Id*. The applications were set for hearing on December 27, 2007, the date previously set for the consideration of the Distribution Motion. *Id*. No motion to expedite the fee applications was filed. *Id*.

The fee statements attached to the Haynes and Boone fee application contained redactions to protect privileged information. Pre-Trial Order, ¶ 79. By e-mail dated December 6, 2007, Shawn asked Cortell for "a copy of the work detail report for the work billed." Pre-Trial Order, ¶ 80. Cortell responded immediately, indicating that she would have the fee application sent, which included the work detail. *Id*. A copy of the fee application was e-mailed to Shawn on December 7, 2007 by Kim Morzak ("Morzak"), a paralegal at Haynes and Boone. *Id*. Shawn responded by e-mail that same date, asking for a copy of the unredacted billing statements. *Id*. Morzak responded by e-mail on December 7, attaching a copy of Haynes and Boone's unredacted billing

statements. *Id*.

I.    **Debtor files motion to approve Lamajak settlement**.

On November 30, 2007, Zyne filed, on Frazin's behalf, a motion to approve the Lamajak

settlement (the "Settlement Motion"). Pre-Trial Order, ¶ 81. The Settlement Motion was set for

hearing on December 27, 2007.[18] *Id*.

J.    **Debtor files objections and commences litigation against the law firms.**

On December 20, 2007, through his attorney, Schepps, the Debtor filed an objection to the

fee application of Haynes and Boone and a motion to continue the hearing on both fee applications.

Pre-Trial Order, ¶ 82. In the motion to continue, the Debtor noted that he was going to file an

objection to the G&N fee application. *Id*. The Debtor filed an objection to the G&N fee application

on December 26, 2007, also through his attorney, Schepps. *Id*. Griffith was served with the

Debtor's objection to the G&N fee application at the December 27, 2007 hearing.

On December 27, 2007, this Court, Judge Hale presiding, held a hearing on the Distribution

Motion.[19] Pre-Trial Order, ¶ 83. Prior to the hearing, the parties agreed to continue the hearing on

the fee applications to February 4, 2008, when the undersigned could hear them. *Id*.

At the December 27 hearing, the Court approved the Settlement Motion. Pre-Trial Order,

---

[18]While the parties stipulate to this fact in the Pre-Trial Order, the Court does not believe it to be accurate. Rather, as Zyne testified at trial, the Settlement Motion was served out on negative notice, which permitted it to be granted in accordance with Local Rule 9007.1 once the deadline for objections had passed and no objections had been filed. Because no objection was filed to the Settlement Motion, Zyne asked the Court to sign an order granting the Settlement Motion at the December 27, 2007 hearing on the Distribution Motion.

[19]When the undersigned left for the Christmas holidays, it appeared that the Distribution Motion was unopposed. Accordingly, Judge Hale, who intended to be in Dallas over the holidays, was asked to hear the unopposed motion for the undersigned on December 27, 2007.

**Memorandum Opinion**                                                               **Page 33**

¶ 84.  After hearing the arguments of counsel on the Distribution Motion, Judge Hale took a recess, then took the bench again to announce his ruling with respect to the distribution of proceeds.  Pre-Trial Order, ¶ 85.  Judge Hale determined that the settlement funds were to be distributed as follows: (i) $221,026.34 to the Chapter 13 Trustee; (ii) $535,500 to Law Finance; (iii) $1,787,481.49 to remain in Haynes and Boone's trust account pending further order of the Court (this sum representing the total of the fee applications of Haynes and Boone and G&N plus (a) $300,000 to cover fees incurred by Haynes and Boone and G&N in connection with their fee applications and the Debtor's objections to the fee applications, and (b) $92,000, representing the discount that Haynes and Boone and G&N had agreed to give the Debtor on October 26, 2007); with (iv) the balance of $655,992.17 to be disbursed to the Debtor.  *Id.*

At the December 27 hearing, Robin Phelan ("Phelan"), counsel for Haynes and Boone, stated on the record: "One final thing, Your Honor.  Given that the settlement with Lamajak has been approved, I think that our work and Griffith & Nixon's work for the Debtor is now terminated. We no longer have any responsibilities to the Debtor, and would like the Court to confirm that at this point in time."  Pre-Trial Order, ¶ 86.  Judge Hale then asked if the Debtor had any problem with that, and the Debtor's bankruptcy counsel, Zyne, responded "No, Your Honor."  *Id*.  The Debtor was in the courtroom and heard these statements, and did not state a contrary position.  *Id*.  Judge Hale then said:

> 5 THE COURT: Okay. I don't know if that needs to be
> 6 memorialized in an order or not, but if you feel like it does,
> 7 you can --
> 8 MR. PHELAN: We'll present a separate order on that,
> 9 Your Honor.
> 10 THE COURT: Okay. Route that to me. Make sure that
> 11 gets routed to me, since it was said in this hearing. Okay?

12 MR. PHELAN: We'll do that.

*Id*.

Griffith also stated on the record at the December 27 hearing that he and G&N no longer represented the Debtor. Pre-Trial Order, ¶ 87. Judge Hale responded, "Okay." *Id*.

After the December 27 hearing, Scott Everett ("Everett"), an attorney for Haynes and Boone, conferred with Zyne regarding an order affirming the termination of the Defendants' representation of Frazin, but they were not able to reach agreement on a form of order. Pre-Trial Order, ¶ 88. Moreover, subsequent attempts between the parties to agree upon the terms of such an order were not successful because an agreement could not be reached as to when the representation ended. *Id*.

On January 7, 2008, the Debtor filed his second motion for continuance of the fee applications (the "Second Continuance Motion"), which were then scheduled for hearing on February 4, 2008. Pre-Trial Order, ¶ 89. Minutes before the January 30, 2007 hearing on the Second Continuance Motion, the Debtor filed his first complaint against the Defendants asserting the Malpractice Claims. *Id*. Three attorneys appeared for the Debtor at the January 30 hearing: Jerry Galow and Joe Martinec, trial counsel on the Malpractice Claims, and Schepps. *Id*.

## II.   LEGAL CONTENTIONS

### A.   Frazin's Claims.

In his first amended complaint, Frazin asserts claims of (1) negligence (on appeal and, in the alternative, at trial), (2) misrepresentation/deceptive trade practices (pursuant to a Texas statute), and (3) breach of fiduciary duty.[20] First Amended Original Complaint of Malpractice and to Determine

---

[20]The Complaint includes other counts which are essentially subsumed in Frazin's objection to the fee applications of Haynes and Boone and G&N. Specifically, Frazin asks this Court to (1) determine the amount of the Defendants' fee claims, after offset for the Debtor's claims against them, (2) find the Defendants estopped to claim a waiver of the

Claim and Objection to Claim, Docket No. 5 (the "Complaint"), DX 31, ¶¶ 18-31. Frazin also seeks to recover from the Defendants his reasonable attorneys' fees in bringing these claims. *Id.*, ¶¶ 26 & 27.

Regarding his appellate negligence claims, Frazin asserts that (1) the Defendants breached the applicable standards of care in presenting his case on appeal, (2) the Dallas Court of Appeals' rejection of the oral agreement claim and the promissory estoppel damage claim was proximately caused by the Defendants' negligence, and (3) Frazin suffered over $3 million of damages as a result of the Defendants' negligence.

Regarding his alternative trial negligence claim, Frazin asserts that the G&N Defendants failed to ask Frazin a sufficiently specific question at trial so that Frazin could detail all of the things he orally promised to do during the January 1998 conversation with Cohen in exchange for Cohen's oral promise, on Lamajak's behalf, to pay Frazin all Lamajak profits in excess of $6 million. In other words, according to Frazin, Griffith should have asked the question "What did you orally promise to do during the January 1998 meeting with Cohen in exchange for Cohen's oral promise, on Lamajak's behalf, to pay you all Lamajak profits in excess of $6 million," or words to that effect. According to Frazin, by not asking this question at trial, (1) the G&N Defendants breached the applicable standard of care in trying a civil lawsuit, (2) the loss of the breach of oral contract claim due to indefiniteness was proximately caused by the G&N Defendants' negligence, and (3) Frazin suffered over $3 million of damages as a result of the G&N Defendants' negligence.

Regarding his DTPA/misrepresentation claims, Frazin asserts that the Defendants (1) made

Malpractice Claims by the October 26, 2007 fee reduction, and (3) deny the Defendants' requested fees and costs because such fees and costs are excessive and unreasonable.

**Memorandum Opinion**

**Page 36**

various misrepresentations to Frazin about the quality of their work, (2) made express misrepresentations of material fact and failed to disclose known information in violation of Section 17.46(b)(23) of the Tex. Bus. & Com. Code, and (3) otherwise engaged in unconscionable actions and courses of action, including (i) causing confusion or misunderstanding as to the source of the services, (ii) causing confusion or misunderstanding as to the affiliation, connection or association between two of the service providers, (iii) representing that the services would have certain characteristics and benefits that they did not have, (iv) representing that the services were of a particular standard and quality when they were of another, and (v) representing that work or services had been performed when they had not. *See* Complaint, ¶¶ 24 & 25.

Regarding his breach of fiduciary duty claims, Frazin asserts that certain of the Defendants' actions breached their fiduciary duties of honesty, loyalty and disclosure to their client, Frazin. Specifically, Frazin asserts that the Defendants breached duties to Frazin when they (1) asserted that Frazin had waived his Malpractice Claims by accepting a fee reduction on October 26, 2007, (2) failed to disclose to this Court the fact that Frazin had refused to sign a release of his Malpractice Claims in connection with the agreed fee reduction, (3) requested an expedited fee hearing when they knew there was a fee dispute arising, (4) failed to inform Frazin that a fee hearing would act as a bar to any future malpractice complaints, (5) attempted to have an order signed by this Court allowing the Defendants to withdraw from representation when that withdrawal had not been ordered, (6) refused to allow Frazin to properly place his Malpractice Claims in issue, and (7) engaged in a pattern of practices and made a series of representations designed and intended to cover up their neglect and to convince the Debtor that a careful review of the record was conducted and all the evidence in the record which supports the Debtor's position in the appeal was briefed. Frazin does not allege that

**Memorandum Opinion** **Page 37**

the Defendants' breaches of fiduciary duty were a proximate cause of any actual damage to him. Rather, Frazin seeks to impose a complete fee forfeiture because, according to Frazin, of the seriousness of the Defendants' breaches of fiduciary duty. *See* Complaint, ¶¶ 14-16, 30-31.

### B. The Defendants' Claims.

Needless to say, the Defendants deny all of Frazin's claims. Specifically, (1) the Defendants deny any negligence during the appeal of the Final Judgment in the State Court Action, (2) the G&N Defendants deny any negligence at trial of the State Court Action, (3) the Defendants deny the applicability of the Texas Deceptive Trade Practices Act here at all (claiming that the claims are "fractured" negligence claims and are not cognizable other than as negligence claims and further claiming certain statutory defenses to the assertion of these claims), (4) assuming that their defenses fail, the Defendants deny that they made any misrepresentations to Frazin or committed any Deceptive Trade Practices Act violation, (5) the Defendants deny that they owed a duty to Frazin at the time of the alleged breaches of fiduciary duty (because the alleged duty is outside the scope of their respective representations and/or because their representation of Frazin had terminated prior to the act giving rise to the alleged breach), (6) assuming that they owed Frazin a duty, the Defendants deny having breached that duty by taking the claimed action, and (7) assuming a breach of duty occurred, fee forfeiture is not appropriate.

According to the Defendants, because Frazin's claims against them are without merit, they are entitled to the approval of their respective fee applications. Finally, the Defendants seek to recover the fees and expenses they have incurred in defending themselves and their fee applications in accordance with (1) Section 38.001 of the Texas Civil Practice and Remedies Code (apparently due to Frazin's breach of their respective contracts – *i.e.*, their respective engagement letters,

although that is not explicitly stated in their counterclaim), (2) Section 17.50(c) of the Texas

Deceptive Trade Practices Act, on the basis that Frazin's DTPA claims are "groundless in fact or law

or brought in bad faith, or brought for the purpose of harassment," and (3) under this Court's

General Order 2000-7 ("Standing Order Concerning Guidelines for Compensation and Expense

Reimbursement of Professionals") and 11 U.S.C. § 330 because a fee applicant in a bankruptcy case

is entitled to fees incurred in defending its fee application.[21]

C.      **Frazin's Response to the Fee Applications and Fee Defense Requests**.

Frazin does not believe that the fee applications filed by Haynes and Boone and G&N should

be approved because of their negligence, their DTPA violations and misrepresentations, and their

breaches of fiduciary duty.  Moreover, Frazin denies that the Defendants are entitled to recover the

fees and expenses they have incurred in defending themselves and their respective fee applications.

III.    **LEGAL ANALYSIS**

A.      **Negligence Claims.**

1.      **Appellate Negligence**.

As noted previously, Frazin asserts that the Defendants were negligent in responding to

---

[21]Prior to the Defendants' resting their respective cases, Frazin's counsel objected to the Court hearing evidence regarding any potential recovery of attorneys' fees and/or expenses by the Defendants (other than their fee applications) at that stage of the case.  In other words, while Frazin agreed that the Defendants were entitled to prove up their fee applications as part of their respective cases, Frazin asserted that the Defendants' requests to recover the fees and expenses they had incurred in defending against the Malpractice Claims or in defending against Frazin's objections to the fee applications should all be heard later in accordance with Federal Rule of Civil Procedure 54(d)(2).  While the Defendants were concerned about this procedure (in case their recovery of fees was by statute and might be considered a part of their substantive claims), Frazin's counsel stipulated that he would not make any such objections later (even assuming such an objection might be appropriate) and that all such fee requests should be made once the parties had the benefit of the Court's determination of the Malpractice Claims and the Defendants' fee applications.  The Court accepted this stipulation and thus, Frazin's request to recover fees and expenses in bringing the Malpractice Claims and the Defendants' requests to recover their defensive fees and expenses will be heard post-judgment in accordance with the procedures set forth in Federal Rule of Civil Procedure 54(d)(2).

Lamajak's appeal of the Final Judgment in the State Court Action. Specifically, Frazin asserts that "the Defendants failed to properly review the record, make appropriate citations to the Dallas Court of Appeals and properly brief and argue the case." Pre-Trial Order, p. 38 (contested issue of fact 2).[22] Frazin also asserts that Haynes and Boone was negligent in not filing a motion for leave to file their letter briefs with the Dallas Court of Appeals.[23] *Id*. (contested issue of fact 2(b)). Finally, Frazin asserts that the letter briefs were inadequate. *Id*.

To prove his negligence claim, Frazin was required to establish that there was a duty owed to him by the Defendants, a breach of that duty, that the breach proximately caused him injury, and that damages occurred. *Bed, Bath & Beyond, Inc. v. Urista*, 211 S.W.3d 753 (Tex. 2006) (plaintff bears the burden of proving the elements of negligence to establish tort liability); *Alexander v. Turtur & Assoc., Inc.*, 146 S.W.3d 113 (Tex. 2004); *Peeler v. Hughes & Luce*, 909 S.W.2d 494 (Tex. 1995) (a plaintiff seeking to recover in negligence must prove that the defendant's breach of a legal duty proximately caused his damages).

To attempt to prove his appellate negligence claim, Frazin offered the expert testimony of Charles McGarry ("McGarry"), a former Chief Justice of the Fifth District Court of Appeals of

[22]Although there was a dispute about this shortly before the commencement of the trial of the Malpractice Claims, part of Frazin's argument about a lack of proper briefing and argument is that Haynes and Boone failed to properly brief or argue that the oral agreement was sustainable as a unilateral contract or an implied in fact contract.

[23]At the conclusion of Frazin's case, the Defendants moved for judgment on various claims, including the negligence claims surrounding the letter briefs, the missing exhibits, and the promissory estoppel claims. The Court granted the motion as to the letter briefs and the missing exhibits. With regard to his claim that leave of court was required to file letter briefs with the Dallas Court of Appeals, Frazin simply failed to introduce any evidence to support this claim. In fact, Cortell testified without contradiction that such briefs were common practice before the court, as did Haynes and Boone's expert, Luke Ashley. Moreover, the missing exhibits were simply summaries of other evidence in the appellate record. There was no evidence to suggest that the absence of these exhibits proximately caused any damage to Frazin. Finally, Frazin failed to offer any expert (or other) testimony supporting his promissory estoppel negligence claims. After the Defendants moved for judgment as a matter of law with respect to Frazin's promissory estoppel negligence claims, Frazin's counsel withdrew them, eliminating the need for the Court to rule with respect to that issue.

Texas, who is board certified in civil appellate law and who is currently in private law practice emphasizing civil appellate litigation. McGarry testified as to the applicable standard of care, agreeing with the Defendants that the appropriate standard of care for attorneys in Texas is set forth in *Cosgrove v. Grimes*, 774 S.W.2d 662 (Tex. 1989):

> A lawyer in Texas is held to the standard of care which would be exercised by a reasonably prudent attorney. The jury must evaluate his conduct based on the information the attorney has at the time of the alleged act of negligence. In some instances an attorney is required to make tactical or strategic decisions. Ostensibly, the good faith exception was created to protect this unique attorney work product. However, allowing the attorney to assert his subjective good faith, when the acts he pursues are unreasonable as measured by the reasonably competent practitioner standard, creates too great a burden for wronged clients to overcome . . . If an attorney makes a decision which a reasonably prudent attorney *could* make in the same or similar circumstance, it is not an act of negligence even if the result is undesirable. Attorneys cannot be held strictly liable for all of their clients' unfulfilled expectations. An attorney who makes a reasonable decision in the handling of a case may not be held liable if the decision later proves to be imperfect. The standard is an objective exercise of professional judgment, not the subjective belief that his acts are in good faith.

*Cosgrove*, 774 S.W.2d at 664-665 (emphasis in original). McGarry then opined that *Dodson* breached the applicable standard of care and was negligent in (1) failing to properly review the reporter's record, (2) failing to cite all of the evidence in the record that would support the specificity of the terms of the oral agreement, including evidence that established specific obligations on Frazin's part, and (3) failing to research and cite to the court the legal authorities that best supported the legal contention without materially distinguishable facts. McGarry found only Dodson negligent based upon certain factual assumptions upon which his opinions were based.

Because Frazin offered no expert testimony to support his appellate negligence claims against Cortell, Haynes and Boone, and the G&N Defendants, those claims fail as a matter of law.

*Alexander v. Turtur & Assoc.,* Inc., 146 S.W.3d 113 (Tex. 2004) (expert testimony is required on causation where causal connection between attorney's acts and client's injuries was neither obvious nor a matter within the common understanding of lay person); *Zenith Star Ins. Co. v. Wilkerson*, 150 S.W.3d 525 (Tex. App. – Austin 2004) (expert testimony is usually required in legal malpractice action to establish compliance with standard of skill and care ordinarily exercised by an attorney); *James V. Mazuca & Assoc. v. Schumann*, 82 S.W.3d 90 (Tex. App. – San Antonio 2002) (expert testimony is generally required to establish the standard of care in a legal malpractice action); *Ersek v. Davis & Davis, P.C.*, 69 S.W.3d 268 (Tex. App. - Austin 2002) (same).[24] Even assuming that McGarry's opinions can be extrapolated to the other H&B Defendants,[25] such that McGarry correctly stated the applicable standard of care and opined that the H&B Defendants breached that standard of care in the same ways that he testified Dodson did, the Court disagrees after considering the record as a whole.

Before proceeding further, the Court must address a threshold issue raised at trial with respect to Haynes and Boone's expert, Luke Ashley ("Ashley").[26] Frazin objected to any testimony by

---

[24] Expert testimony is not required if the attorney's lack of care and skill is so obvious that the trier of fact can find negligence as a matter of common knowledge. *James V. Mazuca & Assoc. v. Schumann*, 82 S.W.3d 90 (Tex. App. – San Antonio 2002); *see also F.W. Indust. Inc. v. McKeehan*, 198 S.W.3d 217 (Tex. App. – Eastland 2005) (expert testimony not required as to causation when causation is within the jury's common understanding). This is not such a case.

[25] McGarry concluded that the G&N Defendants were entitled to rely on Haynes and Boone to handle the appeal. As noted above, because Frazin failed to offer any expert testimony to support his appellate negligence claims against the G&N Defendants, those claims fail as a matter of law. *Alexander v. Turtur & Assoc.,* Inc., 146 S.W.3d 113 (Tex. 2004); *Zenith Star Ins. Co. v. Wilkerson*, 150 S.W.3d 525 (Tex. App. – Austin 2004); *James V. Mazuca & Assoc. v. Schumann*, 82 S.W.3d 90 (Tex. App. – San Antonio 2002).

[26] Ashley specializes in appellate law at Thompson & Knight, LLP and is board certified in civil appellate law, civil trial law and personal injury trial law. He graduated with honors from the University of Texas School of Law in 1974, following which he served as a law clerk at the Fifth Circuit Court of Appeals. The Court finds Ashley's expert opinions credible and persuasive. It was obvious that he had carefully and thoughtfully reviewed the relevant pleadings, reporter's record excerpts at issue here (and other necessary portions of the reporter's record), depositions, and other necessary documents in order to offer his expert opinions regarding Frazin's claims of negligence in the handling of the appeal. His

**Memorandum Opinion** **Page 42**

Ashley at trial, on the ground that Ashley's expert report fails to comply with Rule 26, is deficient in several respects, and therefore all of his trial testimony should be excluded.

Rule 26(a)(2) provides, in relevant part:

(A) In General. In addition to the disclosures required by Rule 26(a)(1), a party must disclose to the other parties the identity of any witness it may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705.

(B) Written Report.   Unless otherwise stipulated or ordered by the court, this disclosure must be accompanied by a written report – prepared and signed by the witness – if the witness is one retained or specially employed to provide expert testimony in the case . . . . The report must contain:

> (i) a complete statement of all opinions the witness will express and the basis and reasons for them;
> (ii) the data or other information considered by the witness in forming them;
> (iii) any exhibits that will be used to summarize or support them;
> (iv) the witness's qualifications, including a list of all publications authored in the previous ten years;
> (v) a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and
> (vi) a statement of the compensation to be paid for the study and testimony in the case.

Specifically, Frazin argues that Ashley's report fails to comply with Rule 26 because it does not set forth the standard of care that Ashley applied to evaluate Haynes and Boone's performance, in either a global sense or with respect to the specific tasks which Haynes and Boone performed.

---

testimony was unequivocal and withstood cross-examination.  Ashley testified that the H&B Defendants' conduct in the handling of the appeal met or exceeded the applicable standard of care.  In particular, Ashley persuasively addressed all of the allegedly missing record citations relied upon by McGarry for his negligence opinion and explained why a reasonably prudent attorney could have decided not to cite that testimony on appeal – *i.e.*, either because it was cumulative, irrelevant, or contradictory. As noted previously, the Court finds those explanations credible and persuasive. Ashley also addressed Cortell's use of Dodson to assist her on the appeal, finding it to be customary and appropriate.  In other words, Ashley found Cortell's decision to use Dodson to assist her on the appeal to be something a reasonably prudent attorney could have decided to do; and thus, not a breach of the applicable standard of care.  In short, Ashley testified that the H&B Defendants' work on the Frazin appeal met or exceeded the applicable standard of care in all respects.

**Memorandum Opinion**                                                                    **Page 43**

Frazin further argues that Ashley's opinions as contained in his report are conclusory and thus unreliable, because Ashley's report does not set forth with specificity what acts Haynes and Boone performed which he opines met the standard of care or how he drew his conclusions. In other words, Frazin's challenge to Ashley's report is that it fails to contain "a complete statement of all opinions the witness will express and the basis and reasons for them."[27] Frazin argues that because Ashley's report does not cite to the *Cosgrove* case or use the words that the *Cosgrove* court used in describing the standard of care, he is left to guess what standard of care Ashley applied when testing Haynes and Boone's conduct. Frazin also argues that Ashley's report must state with specificity how *Cosgrove* would apply to each of the alleged deficiencies in Haynes and Boone's performance. For example, Frazin asserts that not only must the Ashley report either cite to *Cosgrove* or use *Cosgrove's* language, the Ashley report must further state that a reasonably prudent attorney would do "X" when reviewing the appellate record, and Haynes and Boone did "X" and therefore met *Cosgrove's* standards.

Haynes and Boone argues that the purposes of Rule 26 are to give fair notice to the opponent of the substance of an expert's testimony in order to avoid an ambush at trial with wholly new opinions and or bases therefore, and to assist the Court in its gate-keeping function of admitting only reliable expert testimony under Federal Rule of Evidence 702 and the standards set forth by the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).[28] Haynes

---

[27]Frazin does not argue that the Ashley report fails in any other fashion to comply with Rule 26. The Ashley report lists the information which Ashley considered in forming his opinions, includes a description of his qualifications and a list of publications he has authored, states that he has not testified as an expert in the previous four years, and includes a statement of compensation paid to him.

[28] The Supreme Court in *Daubert* defined the court's role as gatekeeper in determining both the reliability of persons intending to offer testimony in scientific matters and the relevancy of that proposed testimony, and the court's role encompasses the proposed testimony of all designated experts. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999).

**Memorandum Opinion**                                                                                          **Page 44**

and Boone further argues that although the Ashley report does not cite to the *Cosgrove* case as the applicable standard of care, the report adequately sets forth Ashley's opinion as to Haynes and Boone's conformance with the standard of care and the reasons for his opinion. Moreover, Haynes and Boone points out that Ashley is a rebuttal expert, called to rebut Frazin's own expert, McGarry, and McGarry's supplemental report, and McGarry himself identified the appropriate standard of care for attorneys in Texas – *i.e.,* the standard identified in the *Cosgrove* case – and neither party disputes that *Cosgrove* sets forth the applicable standard of care. *See, e.g., Brawhaw v. Marine Health Care, Inc.*, No. 2:04CV322-P-B, 2008 WL 2004707 (N.D. Miss. May 8, 2008) (stating that an expert's conclusion that the standard of care evinced in a patient's medical records did not conform to the proper standard of care is not a unique theory requiring testing, nor is it a subjective, conclusory approach under *Daubert*).

The Court agrees with Haynes and Boone, and does not believe that Rule 26 requires the sort of specificity that Frazin would demand. The Court's role as a gatekeeper "is not intended as a replacement for the adversary system . . . vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. Instead, Rule 26 requires that the expert disclose his opinions and the basis and reasons for those opinions, and the Court believes that Ashley has done so here.

---

In examining the qualifications and reliability of designated experts, the Court uses the *Daubert* standards as a starting point, and may supplement those factors with other considerations tending to establish the reliability and relevance of the proposed testimony. *Tanner v. Westbrook*, 174 F.3d 542 (5th Cir. 1999). Under Federal Rule of Evidence 702, a qualified expert may testify if the testimony is based upon sufficient facts or data, the testimony is the product of reliable principles and methods, and the witness has applied the principles and methods reliably to the facts of the case. Fed. R. Evid. 702.

Experts must give a factual predicate for the opinions in their reports, *Sierra Club v. Cedar Point Oil Co.*, 73 F.3d 546 (5th Cir. 1996), and expert reports should be "detailed and complete" so as to "avoid the disclosure of 'sketchy and vague' expert information." *Space Maker Designs, Inc. v. Weldon F. Stump and Co.*, No. 3:02-CV-0378-H, 2003 WL 21805274 (N.D. Tex. Mar. 13, 2003) (*quoting Sierra Club,* 73 F.3d at 571).   In other words, the expert report must contain some discussion of the expert's reasoning and the thought process that led him to his ultimate opinion. *Elder v. Tanner*, 205 F.R.D. 190 (E.D. Tex. 2001).

Here, Ashley's report concludes that Haynes and Boone has satisfied "the minimum standard of care for appellate lawyers practicing in this jurisdiction under the same or similar circumstances." The basis for his opinion, and the factual predicate for it, is that

> the quantity and quality of the appellate work . . . was clearly appropriate and reasonable under the then-existing facts and circumstances.  Haynes and Boone adequately reviewed the appellate record for evidence supporting the jury's breach of contract and promissory estoppel findings, identified and presented appropriate arguments with appropriate legal authorities in support of the trial court's judgment within the page limits for the appellee's brief, and made appropriate supplemental submissions to the Court of Appeals.

Ashley also notes that Haynes and Boone referenced record evidence concerning the Debtor's performance of the alleged agreement with Lamajak in its statement of facts, specifically argued that such evidence was legally sufficient to support the jury's breach of contract finding, and made appropriate record references and arguments in attempting to support the jury's promissory estoppel findings.  Ashley further disputes some of McGarry's conclusions.  He sets forth which of McGarry's conclusions he disagrees with, and why.  That is all that Rule 26 requires, and Frazin was able to address his concerns about the adequacy of Ashley's analysis during cross-examination. *Malibu Consulting Corp. v. Funair Corp.*, No. SA-06-CA-735-XR, 2007 WL 2317263 (W.D. Tex.

Aug. 9, 2007); *In re Vioxx Products Liability Litigation*, 401 F. Supp. 2d 565, 593 (E.D. La. 2005) (refusing to exclude plaintiff's expert testimony although the expert report was 'quite short and conclusory" where the defendant could cross-examine the expert at trial).  The fact that Ashley did not use the magic words used by the *Cosgrove* court in his report is not dispositive.  *Thompson v. Doane Pet Care Co.*, 470 F.3d 1201, 1203 (6th Cir. 2006) (overruling objection to expert report because expert "did not expressly use the magic words 'based on generally accepted accounting principles'" in his report and stating that in the absence of an alternative accounting convention pertinent to the case, it may be assumed that CPAs base their opinions on the normal general standards of their profession).  This is particularly true where there is no dispute between the parties that *Cosgrove* supplies the appropriate standard of care in Texas.  *Muldrow v. Re-Direct, Inc.*, 493 F.3d 160 (D.C. Cir. 2007) (the purpose of Rule 26 is to avoid unfair surprise to the opposing party).

Frazin relies primarily upon *Sharpe v. U.S.*, 230 F.R.D. 452 (E.D. Va. 2005) in support of his objections to Ashley's expert testimony.  In the *Sharpe* case, the district court excluded a plaintiff's expert testimony and granted summary judgment for the defendant because plaintiff's expert report did not comply with Rule 26.  The *Sharpe* case, however, is distinguishable.  At issue in the *Sharpe* case was a medical expert who opined that had the plaintiff's husband's lung cancer been diagnosed earlier, he would have survived.  After describing the medical records which he had reviewed and giving a chronology of the patient's complaints and corresponding medical treatment prior to the cancer diagnosis, the expert made the following conclusion: "There are numerous opportunities where further investigation may have led to an earlier diagnosis of cancer and may have resulted in the possibility of more definitive treatment and increased survival as a result.  That is my opinion to a reasonable degree of medical certainty."  The district court excluded this report for failure to

comply with Rule 26's requirement that an expert report contain a complete statement of all opinions to be expressed and the basis and reasons therefor, because the expert did not give *any* reason or factual basis for his opinion that (1) further investigation of the patient's condition would have led to an earlier diagnosis, or (2) an earlier diagnosis would have resulted in more successful treatment.

Here, in contrast, Ashley's report gives his reasons for his conclusion that Haynes and Boone met the standard of care – *i.e.*, Haynes and Boone adequately reviewed the appellate record and identified and presented appropriate legal arguments with appropriate citations to the record and relevant legal authority. Accordingly, the Court concludes that (i) Ashley's report satisfies Rule 26 and his testimony at trial was therefore properly admissible, (ii) there was no unfair surprise to Frazin, and (iii) Frazin could remedy any alleged deficiencies in the report through cross-examination.[29] Thus, the Court concludes that Ashley's trial testimony is admissible.

After carefully reviewing the evidence, including the expert testimony of McGarry and Ashley, the various appellate briefs filed by both Lamajak and Frazin, and the supposedly missing record citations,[30] the Court concludes that the H&B Defendants acted in accordance with the standard of care applicable to lawyers handling appeals. They made decisions that a reasonably prudent attorney could make in the same or similar circumstances. They properly reviewed the record, made appropriate record citations to the Dallas Court of Appeals, and properly briefed and

---

[29] The Court permitted Ashley to testify at trial subject to Frazin's oral motion to exclude his testimony, with the understanding that if the Court ultimately ruled that Ashley's testimony should be excluded, the testimony given at trial would be treated as an evidentiary proffer.

[30] While Frazin asserts that the wrong cases were argued on appeal, neither he nor McGarry offer any specific cases that should have been cited instead.

**Memorandum Opinion** **Page 48**

argued the case on appeal.[31]  It was not negligence for Cortell to assign to Dodson the task of summarizing the reporter's record and preparing initial drafts of certain sections of the appellee brief. In fact, it was entirely reasonable for Cortell to do so, provided that she properly supervised his work. The Court is satisfied that Cortell properly supervised Dodson's work on the Frazin appeal.  While Frazin complains about the adequacy and accuracy of Dodson's summary, Cortell testified that the summary was simply a tool that was used to assist in the preparation of the appellee brief.  She testified that she thoroughly reviewed the record herself during her preparation of the statement of facts, her editing of Dodson's work product, and her drafting of other sections of the appellee brief. The record citations proffered by McGarry were either included in the appellate briefing or were cumulative, irrelevant, or contradictory and thus, to the extent those citations were excluded, there was no violation of the applicable standard of care.

Moreover, Frazin failed to establish by a preponderance of the evidence that any claimed negligence proximately caused the damages he claims.  As counsel for the appellee, the H&B Defendants responded to Lamajak's arguments that there was no legally or factually sufficient evidence to support the jury's findings on breach of contract.  The Dallas Court of Appeals' opinion expressly recites that the court reviewed the entire record on appeal.  There is no reason to believe that the court misstated what it did in resolving the appeal against Frazin on the oral contract claim (for lack of definiteness).  Under these circumstances, there is no objective basis for concluding that different legal authorities or record citations would have caused the court to reach a different result.

In addition, even assuming that the jury's finding of an oral agreement was upheld (with

---

[31]With regard to Frazin's unilateral contract and implied contract claims, the Court agrees with the legal analysis of the H&B Defendants as set forth on pp. 3-7 of their Response to Plaintiff's Trial Brief, Docket No. 107.

McGarry's preferred record cites included in the appellee's brief), there were other issues raised on appeal by Lamajak (which the Dallas Court of Appeals did not reach in its opinion) that could have also resulted in a reversal of the jury's verdict on the breach of contract claim. In an appellate malpractice case such as this one, the determination of causation requires determining whether the appeal in the underlying action would have been successful, and the "plaintiff must show that but for the attorney's negligence the client would have prevailed on appeal." *Millhouse v. Wiesenthal*, 775 S.W.2d 626, 627 (Tex. 1989). The determination of causation in an appellate legal malpractice case is a question of law.

> The question of whether an appeal would have been successful depends on an analysis of the law and the procedural rules . . . a judge is clearly in a better position to make this determination. Resolving legal issues on appeal is an area exclusively within the province of judges; a court is qualified in a way a jury is not to determine the merits and probable outcome of an appeal. Thus, in cases of appellate legal malpractice, where the issue of causation hinges on the possible outcome of an appeal, the issue is to be resolved by the court as a question of law.

*Millhouse*, at 628.

In this case, the parties agreed to a bifurcated trial process, and agreed that at "Phase I" of the trial,

> the Debtor will also attempt to prove, among other things, that but for the alleged negligence of [the Defendants], the outcome on appeal of the Lamajak case would have been different. The Bankruptcy Court could potentially conclude, among other things, that:
> a. the outcome on appeal would have been the same (*i.e.*, a partial affirmance of the trial court judgment);
> b. the outcome on appeal would have been an affirmance of the trial court judgment; or
> c. the outcome on appeal would have been a reversal and remand to the trial court for a new trial (the "Appellate Remand Conclusion"), in which event the Bankruptcy Court would then have to determine whether at a subsequent theoretical retrial at the trial court Debtor would have prevailed and would have suffered compensable damages (the "Retrial after Remand").

**Memorandum Opinion**                                                                 **Page 50**

*See Agreed Order Regarding Mot. To Strike . . . Disclosures of Griffith & Nixon, P.C.*, Docket No. 74.

The parties further agreed that proof with respect to any Retrial after Remand would be deferred and considered by the Court at a potential Phase II, only if this Court made an Appellate Remand Conclusion. *Id*. In other words, the parties stipulated that Frazin would bear the burden to prove, in Phase I, that but for the alleged negligence of the Defendants, the outcome on the appeal of the Lamajak case would have been different.

After carefully considering the record, the Court concludes that Frazin failed to carry his burden of proof, as he failed to establish that he would have won on all of the other issues that Lamajak raised on appeal. Accordingly, Frazin's appellate negligence claim also fails for lack of causation.

## 2. Trial Negligence.

As noted previously, Frazin asserts (in the alternative to his appellate negligence claim) that the G&N Defendants failed to ask the proper questions at trial to establish contract formation – *i.e.*, a sufficiently definite oral agreement between Lamajak and Frazin.[32] Like his appellate negligence claims, to prove his trial negligence claim, Frazin was required to establish that there was a duty owed to him by the G&N Defendants, a breach of that duty, that the breach proximately caused him injury, and that damages occurred. *See supra* at p. 40.

---

[32] In the Complaint, Frazin also asserted that the G&N Defendants were negligent at trial by failing to ask the proper questions to establish promissory estoppel damages. As noted previously, at the conclusion of Frazin's case, the Defendants moved for judgment as a matter of law on the promissory estoppel claims. While the Court was prepared to grant the Defendants' motion regarding the promissory estoppel claims (both on appeal and at trial) due to the absence of any evidence to support such claims, Frazin's counsel stated that he was withdrawing his promissory estoppel negligence claims against the Defendants, eliminating the need for the Court to so rule.

**Memorandum Opinion**                                                                 **Page 51**

To attempt to prove his claim that the G&N Defendants were negligent at trial, Frazin offered the expert testimony of Broadus A. Spivey ("Spivey").  Spivey graduated from the University of Texas Law School in 1962, and is board certified in trial law and personal injury trial law.  He is a fellow of the American College of Trial Lawyers, the International Society of Barristers, and the International Academy of Trial Lawyers, and past President of the State Bar of Texas, the Texas Trial Lawyers Association, and the Capital Area Trial Lawyers Association, and the International Academy of Trial Lawyers. He is a frequent author and lecturer in the filed of trial law.  Spivey testified as to the applicable standard of care for trial lawyers.  Spivey then opined that Griffith breached the applicable standard of care and was negligent in failing to ask Frazin the following question at trial: "Tim, what did you agree to do in January 1998 in exchange for Lamajak's profits above $6 million dollars" or a question to that effect.  According to Spivey, that question was an "absolute requirement" and as a result of Griffith's failure to ask this (or a similar) question, which would have supported clear and certain consideration by Frazin, the record is subject to interpretation as to the clarity of Frazin's consideration.  Spivey concludes that Frazin could have answered this question in a sufficiently specific way so as to ensure that the oral agreement could be found sufficiently definite by looking to certain testimony given by Frazin in an earlier deposition when he was being examined by Lamajak's counsel, Stein.  Spivey also opined that Griffith breached the applicable standard of care by failing to use a checklist at trial to ensure that he had sufficient evidence in the record with respect to each of the elements of each claim on which Frazin had gone to trial.

In contrast, Griffith testified that he elicited the best available evidence at trial regarding Frazin's oral contract claim.  Griffith testified that one of the most significant hurdles that had to be

overcome at trial was the brevity of Frazin's conversation with Cohen in January 1998 and Frazin's inability to articulate specific things he had orally promised to do during that conversation in exchange for Cohen's promise to give Frazin all Lamajak profits in excess of $6 million from Lamajak's sale of Beanie Babies in 1998. According to Griffith, Frazin had never indicated to the G&N Defendants that he had orally agreed to do anything other than what he actually testified to at the State Court trial (*see supra* pp.10-12) during his brief conversation with Cohen in January 1998. In short, Griffith disputes that Frazin ever told him or any other G&N attorney[33] about all of the things Frazin now claims that he orally promised to do during his approximately 30-minute conversation with Cohen in January 1998. Griffith's testimony is consistent with Frazin's 2002 deposition testimony, in which Frazin was asked to describe the "deal" with Cohen and did so in very general terms. After giving this description, Frazin was asked "Have you ever told anybody at any time, depositions or otherwise, anything other than that?" And he responded, "No." In other words, in his 2002 deposition, Frazin testified that he had never described the "deal" to anyone in any manner other than as he described it during his deposition.

Rather, Griffith distinguished between what Frazin subjectively intended to do (either during the meeting with Cohen or later while performing in reliance upon Cohen's oral promise to pay Frazin all Lamajak profits in excess of $6 million) from what Frazin orally promised to do *out loud* in his conversation with Cohen. Griffith acknowledged that Frazin *actually did* many things in furtherance of (or in reliance upon) what Frazin believed to be his oral agreement with Cohen. According to Griffith, paragraph 9 of the state court petition (whether the original pleading or an

---

[33]As noted previously, Walsh testified at the trial of the Malpractice Claims. Walsh also testified that Frazin had never described the January 1998 meeting with Cohen any differently than he described it at the trial of the State Court Action. *See supra*, pp. 16-18.

**Memorandum Opinion**  **Page 53**

amended one), *see, e.g.,* DX 340; Frazin's responses to Lamajak's request for disclosure number 3

(whether the third or fourth amended response), *see, e.g.*, PX 7 & 8;[34] and Frazin's response to

Lamajak's interrogatory numbers 3 and 5, *see* DX 188, all describe what Frazin *actually did* do as

opposed to what he *orally promised* to do during the January 1998 meeting with Cohen.[35]  Griffith

contends that this distinction was drawn by Frazin's prior counsel as well because, for example, even

the original petition filed by another firm on Frazin's behalf spoke of Cohen's oral promise at the

January 1998 meeting, but never used the "oral promise" descriptor in connection with Frazin,

focusing instead on Frazin's performance under the contract.  See PX 6, ¶¶ 15 - 17.[36]

Walsh, the former G&N attorney who was actively involved in preparing Frazin's case for

trial and sat second chair at trial, testified similarly.  As noted previously, Walsh is not a named

defendant in this adversary proceeding and has no financial interest in the outcome of this

---

[34]Among other things, Frazin relies on the changes to Frazin's fourth amended response to Lamajak request for disclosure number 3 as drafted by G&N to support his contention that the G&N Defendants knew prior to the trial of the State Court Action that Frazin had made numerous oral promises to Cohen at the January 1998 meeting.  The fourth amended response as drafted by G&N was amended to read as follows: "In January, 1998, Lamajak and Frazin entered into an agreement whereby Frazin agreed to perform consulting services for Lamajak in exchange for an agreement to share profits realized from the sale of the Ty products. *Specifically*, Frazin agreed to offer his expertise, as well as time and consulting services to Lamajak during the year 1998.  These services included, but are not limited to, advising Lamajak as to the purchase of Ty products, the price and other factors in the secondary market for said products, how to establish prices for said products, the purchase of said products, to whom to sell said products, as well as other matters.  (Generally see Response to Interrogatory Nos. 3 and 5.)."  PX 8, p. 2 (emphasis added).  At the trial of the Malpractice Claims, Frazin's counsel made special note of G&N's use of the predicate "specifically" in the fourth amended response, again suggesting that the use of that word evidenced the fact that the G&N Defendants knew of Frazin's many oral promises and just forgot to ask Frazin about them at the trial of the State Court Action.

[35]At the trial of the Malpractice Claims, Frazin's counsel points to paragraph 9 of the state court petition, Frazin's response to Lamajak request for disclosure number 3, Frazin's response to Lamajak interrogatory numbers 3 and 5, and various Frazin deposition excerpts to support his contention that the G&N Defendants knew of Frazin's many, specific oral promises to Cohen at the January 1998 meeting.

[36] Paragraph 15 of the original petition alleges that "Defendants orally promised Plaintiff all profits made by the Defendants in excess of six million dollars during the calendar year 1998.  This oral contract was to be performed within one year from the time it was agreed."  Paragraph 16 alleges "Frazin performed under the contract by doing business with, consulting with, revealing trade secrets and clients to, and purchasing products from the Defendants."  Paragraph 17 alleges that "Frazin contributed significant and continuous efforts over the course of 1998 to facilitate, enable and assist the Defendants' sale of the Ty products in order to reach the $6,000,000 gross profit split mark."

proceeding. Walsh also distinguished between what he described as the "short deal" at the January 1998 meeting – *i.e.*, the words actually spoken during Frazin's oral conversation with Cohen – and what Frazin actually did in furtherance of the "short deal." *See, e.g*, PX 271: 85, 3-21 (in discussing the more detailed fourth response to request for disclosure number 3).[37] For example, in discussing Frazin's fourth amended response to Lamajak's request for disclosure number 3, Walsh testified that "[w]hat you're talking about here is what the specific tasks were that [Frazin] actually performed later, and as to those, yeah, perhaps we did get more specific there as to what those tasks were. But I think we started getting challenged on that stuff, if I'm remembering correctly." PX 271, 85:16-21. Walsh further testified that Frazin never told him that Frazin had actually spoken the words used in the fourth amended response to Lamajak's request for disclosure number 3 during the January 1998 meeting with Cohen. *Id*., 119:2-14. Rather, Walsh testified that the words used in that amended response were what Frazin meant to do or what Frazin subjectively intended to do during the January 1998 meeting, *id*., 119:15-23, and what Frazin then actually went on to do in reliance upon Cohen's oral promise to him. *Id*., 85:16-21.

The G&N Defendants also offered the expert testimony of Russell Serafin ("Serafin") at trial. Serafin is an experienced litigator who has practiced on both sides of the aisle. He was a significant player on the defense side of the docket while a partner in the tort litigation section at Vinson & Elkins, LLP ("V&E") in Houston, Texas. His trial expertise while at V&E was in the defense of clients in personal injury and wrongful death actions, although he also represented clients in commercial litigation matters and in arbitrations. In February, 2001, Serafin left V&E to join a

---

[37]The context of the cited exchange is further explained starting on page 82, line 24 of PX 271.

**Memorandum Opinion**                                                                 **Page 55**

prominent plaintiff's firm in Texas – *i.e.*, the Gallagher Law Firm, where his practice now involves representing individuals and entities that have suffered damages as a result of the actions of third parties.  Although Frazin's counsel objected to the admission of Serafin's expert testimony at trial on a number of grounds, and the Court heard Serafin's testimony subject to those objections, for the following reasons, the Court overrules Frazin's objections and admits Serafin's expert testimony into evidence.

Like his arguments about the admissibility of Ashley's expert testimony, Frazin argues that Serafin failed to set forth the standard of care by which he measured the G&N Defendants' conduct, in either the global sense – *i.e.*, by reciting the standard from the *Cosgrove* case – or as specifically applied to the alleged deficiencies in the G&N Defendants' conduct at trial.  For example, Frazin argues that Serafin's report does not set forth how the *Cosgrove* standard applies "in any specific situation like examining a witness, or preparing for trial, or creating legal memos."  Transcript, hearing held 7/11/08, p. 19:1-16.  Frazin also argues that Serafin's expert report is conclusory and does not explain the bases for Serafin's opinion.[38]

For substantially the same reasons the Court concluded that Ashley's expert testimony is admissible, the Court concludes that Serafin's expert testimony is admissible.  *See supra* at pp. 45-48.  First, the Court notes that Serafin's report does list the *Cosgrove* case among the materials that Serafin reviewed in connection with preparing his report.  As noted earlier, the parties do not dispute that *Cosgrove* supplies the appropriate standard of care for attorneys in Texas, and Frazin's own experts applied that standard.  Second, the reasons for Serafin's opinion - that the G&N Defendants

---

[38] The Court permitted Serafin to testify at trial subject to Frazin's oral motion to exclude his testimony, with the understanding that if the Court ultimately concluded that the testimony was inadmissible, Serafin's testimony would be treated as an evidentiary proffer.

met or exceeded the applicable standard of care – are set forth briefly in his report. For example, Serafin notes as the factual predicate for his opinion that the G&N Defendants conducted an adequate review of the prior pleadings, discovery and court rulings in the Lamajak case, the following facts: the G&N Defendants reviewed (i) answers and amendments to same, (ii) prior depositions of Cohen and Frazin, (iii) prior written discovery materials and responses, (iv) Cohen's motion for summary judgment, and (v) the trial court's order granting Cohen's summary judgment motion. Similarly, as the factual predicate for his opinion that the G&N Defendants met or exceeded the standard of care in conducting reasonable and necessary investigation and discovery in preparation for trial, Serafin notes that the G&N Defendants (i) took 14 depositions, (ii) drafted discovery requests, and (iii) inspected documents at Lamajak's offices.

As the factual predicate for Serafin's opinion that the G&N Defendants met or exceeded the standard of care in conducting research and briefing in preparation for trial, he notes that the G&N Defendants researched and briefed legal issues involving (i) the statute of limitations, (ii) res judicata, (iii) ratification, (iv) statute of frauds, and (v) fraudulent concealment. Serafin further notes that the G&N Defendants conducted the "usual and customary" trial preparation, including (i) preparing deposition summaries, (ii) witness lists, (iii) responses to motions to strike experts, (iv) a motion in limine, and (v) trial binders. Serafin's report then discusses Frazin's deposition testimony and explains why Serafin believes that the G&N Defendants introduced the best available evidence at trial regarding contract formation given the constraints of Frazin's prior deposition testimony and what Frazin had previously communicated to Griffith.

For substantially the same reasons set forth above in connection with the Court's discussion of the admissibility of Ashley's testimony, *see supra* at pp. 45-48, the Court concludes that (i)

Serafin's report satisfies Rule 26 and his testimony at trial was therefore properly admissible, (ii) there was no unfair surprise to Frazin, and (iii) Frazin could remedy any alleged deficiencies in the report through cross-examination. Serafin testified to the standard of care as set forth in *Cosgrove*. Next, Serafin refuted Spivey's testimony about the G&N Defendants' failure to use a checklist, stating that he had reviewed a checklist prepared by the G&N Defendants during his review of the G&N Defendants' files and, in his opinion, that checklist met the applicable standard of care. *See* DX 320. Serafin also testified that the G&N Defendants met or exceeded the standard of care in responding to discovery and in preparing for trial. Most importantly, Serafin also refuted Spivey's testimony that Griffith failed to adduce all of the evidence relevant to contract formation at trial in the State Court Action. Specifically, Serafin refuted Spivey's contention that Griffith should have asked Frazin "Tim, what did you agree to do in January 1998 in exchange for Lamajak's profits above $6 million dollars," or a question to that effect, at trial in the State Court Action.[39] The way

---

[39] Frazin objected to this line of questioning during the trial of the Malpractice Claims, contending that this testimony was beyond the scope of Serafin's expert report. Specifically, Frazin argued that "nowhere in [the expert report] at all does Mr. Serafin ever express an opinion that it was not below the standard of care to not ask that question or express any reasons why. Transcript, 7/11/08, p. 38:14-16. The Court disagrees. First, Frazin takes too narrow a view of the permissible questioning following an expert report. Rule 26(a)(2)(B) "does not limit an expert's testimony simply to reading his report. No language in the rule would suggest such a limitation. The rule contemplates that the expert will supplement, elaborate upon, explain and subject himself to cross-examination upon his report." *Thompson v. Doane Pet Care Co.*, 470 F.3d 1201, 1203 (6th Cir. 2006); *see also Muldrow v. Re-Direct, Inc.*, 493 F.3d 160 (D.C. Cir. 2007) (stating that allowing expert testimony beyond that in an expert report is harmless under Rule 37 where the testimony is an elaboration of a written report). Here, Serafin's report contains his opinion that the G&N Defendants "introduced all of the evidence relevant to all issues and did not commit professional negligence in failing to offer any evidence and therefore, met and/or exceeded the applicable standard of care in that the Defendants put into evidence all testimony and evidence regarding the formation of an oral contract and Frazin's consideration for the oral contract, given the constraints of Frazin's prior deposition testimony and what he had communicated to Scott Griffith." The Court views Serafin's trial testimony as an elaboration of his professional opinion as contained in his report, not as a wholly new, previously unexpressed opinion. Moreover, this opinion in Serafin's report was in direct written response to the Spivey report (offered by Frazin). The Spivey report opined that the G&N Defendants fell below the standard of care because Griffith never asked the question of Frazin in trial of "Tim, what did you agree to do in exchange for Lamajak's promise to pay you all profits above $6 million" or any question to that effect. By stating in his report that he was responding to Spivey's opinion, surely Serafin's report put Frazin on notice that Serafin's expert opinion as expressed in his report included the contention that it was not negligent to fail to ask that question. Further, Frazin himself uses broad language in his pleadings, contending that G&N failed to introduce all appropriate evidence, and does not plead with specificity that G&N failed to ask a particular question at trial which a reasonably prudent attorney would have asked. The Court therefore

Serafin explained it, the G&N Defendants inherited a case which had already been through several lawyers and in which there were extensive prior proceedings. Serafin explained that Frazin had been deposed on two occasions prior to G&N taking the case, and Frazin's testimony with respect to his recollection of the conversation with Cohen (or, more accurately, lack of recollection) had been "locked down" during those depositions. Serafin explained that in his opinion, asking Frazin a "what did you agree to do" question would have opened Frazin up to significant impeachment, with the potential for a zero verdict. Moreover, Serafin testified that even if asking such a question would not open Frazin up to impeachment, it would open the door to further questioning, which then may lead to impeachment. Serafin testified that it was completely consistent with the standard of care to *not* ask such a question, because in his opinion, Griffith had a judgment call to make, based upon all of the things that had gone on prior to G&N taking the case. Serafin testified that Griffith had to consider the possible result of asking a more specific question, in deciding whether to ask it, and that in his opinion, Griffith was correct to not ask the question because the potential consequences were too risky, given Frazin's prior deposition testimony. In summary, Serafin testified that the G&N Defendants met or exceeded the standard of care, and that all of the evidence that could have been adduced at trial on the issue of contract formation was adduced, and that the G&N Defendants did not breach the standard of care by failing to ask a more specific question at trial.[40]

---

overrules Frazin's objection and admits Serafin's direct testimony on this point. For the same reason, the Court also overrules Frazin's objection that Serafin's testimony about Frazin's prior deposition testimony meant Frazin would be subject to impeachment. Serafin's expert report clearly put Frazin on notice that Serafin was relying upon the prior deposition testimony in forming his opinions, because it is quoted extensively in his expert report.

[40] Serafin testified that hypothetically, even if Frazin had told the G&N Defendants before trial that Frazin had orally promised to do a laundry list of tasks for Lamajak during his conversation with Cohen, that a reasonably prudent attorney could still make a decision not to ask about those extra details at trial, given Frazin's prior sworn deposition testimony establishing Frazin's lack of recall about details of the conversation with Cohen. Further, Serafin testified that it would be within the standard of care for the G&N Defendants to have told Frazin during preparation for trial that Griffith would

While there are undoubtedly nuances, from the Court's perspective, after carefully considering all of the evidence and the parties' arguments, Frazin's trial negligence claim boils down to what the G&N Defendants actually knew when they went to trial in the State Court Action. If Frazin had told the G&N Defendants prior to trial in the State Court Action that he had orally promised to do the specific things he testified to here during his January 1998 meeting with Cohen (and Griffith had no reason to believe that was perjured testimony),[41] Griffith should have ensured that questions were asked that would have elicited this testimony from Frazin at the trial of the State Court Action. That information would have clearly been helpful to Frazin's breach of oral contract claim.

However, if, as Griffith and Walsh contend, Frazin had never told the G&N Defendants that he had orally promised to do the specific things he testified to here during his January 1998 meeting with Cohen, then Griffith had a judgment call to make. Should he shine a bright light on the weakness of his case – i.e., the brevity of the January 1998 meeting between Cohen and Frazin and Frazin's inability to testify as to specific oral promises he made during that meeting – or should he focus on the strength of his case – i.e., the things Frazin actually did in furtherance of what Frazin believed to be an oral agreement with Cohen? According to Griffith, because Frazin had not told his lawyers about specific oral promises he made at the January 1998 meeting with Cohen, Frazin's

---

ask Frazin a very open-ended question, and that Frazin should respond by giving all the details he could truthfully testify to.

[41]Another expert offered by the G&N Defendants, Frederick C. Moss – a law professor at the Dedman School of Law at Southern Methodist University – testified as to the complications the G&N Defendants would have faced ethically if a G&N attorney believed that Frazin perjured himself at trial in the State Court Action. Frazin objected to the admission of this testimony on essentially the same grounds as he objected to the expert testimony of Serafin and Ashley. For the reasons set forth above in connection with the Court's discussion of the admissibility of the testimony of Serafin and Ashley, the Court concludes that Moss's testimony was also admissible at trial, although it was not terribly relevant to the negligence issues.

**Memorandum Opinion**                                                              **Page 60**

various law firms in the State Court Action, including the G&N Defendants,[42] tried to "finesse"[43] the shortcomings of Frazin's oral contract case by artfully wording various pleadings (*e.g.*, the state court petition, disclosure responses, interrogatory responses, various Frazin affidavits, etc.) to emphasize what Frazin actually did *in exchange for* or *in return for* Cohen's oral promise to pay Lamajak profits in excess of $6 million to Frazin, as opposed to what Frazin had orally promised to do at the January 1998 meeting with Cohen.[44]

Frazin now points to this "in exchange for" or "in return for" language in these pleadings to attempt to prove that Griffith and the other G&N Defendants knew that Frazin had made various oral promises to Cohen during the January 1998 meeting and negligently failed to ask the right question at trial to elicit a more complete response. Frazin also finds Griffith's remarks to the jury panel during voir dire especially significant in demonstrating that Griffith allegedly knew about Frazin's

---

[42]Griffith's testimony was express about the conduct of the G&N Defendants. However, upon sustaining Frazin's objection to Griffith testifying about what motivated Frazin's prior counsel to do, or not do, certain things, Griffith simply noted the careful wording used in various Frazin pleadings prior to the retention of G&N as substitute counsel for Frazin in the State Court Action. For example, while the Affidavit of Timothy Frazin prepared by prior counsel for Frazin in the State Court Action, PX 276, which affidavit was then essentially re-used by G&N on other occasions thereafter, refers to Cohen having "orally promised and agreed to pay [Frazin] all gross profits . . . from the sale of Beanie Babies and other Ty products by Lamajak in the year 1998 which exceeded $6,000,000," the affidavit then goes on to simply state that this oral promise by Cohen was "in return for [Frazin's] skill, services (including but not limited to introductions, instruction and joint merchandising of Beanie Babies and related Beanie Babies products) and expertise ("Beanie Babies Oral Agreement")," without ever stating that Frazin orally promised anything to Cohen at the January meeting. PX 276, ¶ 3.

[43]Finesse is the Court's word, not Griffith's. However, from the Court's perspective, it appears that the "finesse" worked, at least at trial – with both the jury and the judge.

[44]Griffith also testified that because he recognized the indefiniteness problem with the oral contract claim Frazin asserted, G&N kept the promissory estoppel claim pled by Frazin's prior counsel and added a quantum meruit claim once G&N substituted in as Frazin's counsel in the State Court Action. According to Griffith, evidence of what Frazin did in exchange for (or in return for) Cohen's oral promise was also helpful to these alternative claims.

**Memorandum Opinion**                                                                                         **Page 61**

oral promises to Cohen at the January 1998 meeting prior to trial in the State Court Action.[45]  For the reasons explained more fully below, the Court disagrees.

After carefully considering all of the evidence and the parties' arguments, the Court finds that Frazin did not tell the G&N Defendants about the more specific oral promises he now claims he made to Cohen at the January 1998 meeting until his deposition in this adversary proceeding, including, without limitation, that Frazin (1) would give Cohen his client list, (2) would help with shipping, (3) would open more locations, (4) would sell merchandise through those locations, at a higher price than Lamajak could on its own, (5) would help with ordering, and (6) would consult with Lamajak the whole time.  In making this finding, the Court rejects Frazin's testimony at the trial of the Malpractice Claims to the contrary, which the Court did not find credible for at least the following reasons.

First, Frazin's malpractice trial testimony about the January 1998 meeting differs materially from his prior testimony about this meeting (three prior depositions, two of which were taken when other counsel represented him in the State Court Action, and at the trial of the State Court Action). Frazin's prior sworn testimony was given closer in time to the January 1998 meeting than Frazin's testimony here, some ten years after the fact.  Based upon a careful of review of Frazin's prior sworn

_____

[45]The Court does not find Griffith's voir dire statements to the jury as devastating as Frazin's counsel suggests. Specifically, Frazin's counsel points to Griffith's statements at DX 63, RR 2:40-42.  According to Griffith, he was "play acting" for the jury how the conversation with Cohen had gone.  While one could argue (as Frazin's counsel does here) that the statements Griffith made to the prospective jurors go a bit beyond what he now says he knew at the time of trial, what is significant to the Court is that Griffith never tells the prospective jurors about any specific oral promises that Frazin made to Cohen during the fateful meeting.  Rather, Griffith talks about Frazin's offer to help Cohen sell Beanie Babies.  Then, Griffith talks about Frazin's statements that Cohen/Lamajak could sell millions of Beanie Babies in 1998. Then, Griffith talks about Frazin's offer to "help, and – and I'll show you how to do it, and I'll give – lend my expertise, and I'll not only do that, I'll be one of the – I'll purchase a whole bunch from you, I'll you know, that was all part of the deal.  And I'll introduce other people to you who will come and purchase like me.  That – that was all part of the deal." *Id.*, p. 41:20-25.

**Memorandum Opinion**                                                                                          **Page 62**

testimony, and the credible testimony of Walsh, a witness with nothing to gain from his testimony here, it is clear to the Court that Frazin had previously been unable to articulate *specific* things he had orally promised Cohen that he would do during the January 1998 meeting in exchange for Lamajak profits over $6 million. Madole's so-called "3-D world testimony"[46] (from Frazin's 2002 deposition) read into the record at trial on cross-examination (*see supra* pp. 12-15), which comes after earlier deposition testimony by Frazin where he described all of the things he actually did for Lamajak in reliance upon what Frazin thought to be an oral agreement, puts that prior testimony into the proper context. Accordingly, the Court concludes that Frazin's current testimony (at trial in this adversary proceeding) about his January 1998 meeting with Cohen has been "informed" by the opinion of the Dallas Court of Appeals. Frazin now understands the effect of the lack of specificity of his obligations to Lamajak (a loss of $3 million in damages according to the Dallas Court of Appeals) and his memory of what he actually said to Cohen at the January 1998 meeting (and orally promised to do) has "improved" accordingly.

Second, Griffith and Walsh both testified that Frazin was very actively involved in the preparation of his case for trial. Moreover, Griffith, Cortell and Dodson testified about various meetings they had to discuss the issues on appeal, their strategy for responding to those issues, and to receive comments and suggestions on various drafts of the appellee brief that Haynes and Boone was preparing. Frazin was present at these meetings and fully able to participate in them. According to Griffith and Cortell, the reporter's record was available during these meetings while they all worked to find the best evidence to cite to the Dallas Court of Appeals in support of Frazin's

---

[46]The parties all used this descriptor at trial – both with witnesses and in argument. As a result, the Court will use it here.

**Memorandum Opinion**                                                                 **Page 63**

arguments on appeal.  While Frazin is not an attorney, from the Court's observations of him at trial, he is obviously a bright young man who has apparently run various businesses successfully, including Awesome Comics (which, according to Griffith's comments during his voir dire examination of the jury at trial, Frazin apparently started at a very young age).  If Frazin had actually told the G&N Defendants prior to trial in the State Court Action about the oral promises he now claims to have made to Cohen at the January 1998 meeting, why is it that he didn't simply ask his lawyers (Griffith and Cortell) why all of those oral promises were missing from the draft appellee brief during one or more of his meetings with them?  Lamajak's appellate arguments that the alleged January 1998 oral agreement should not be enforceable against it because of a lack of specificity of obligation on Frazin's part and indefiniteness are not overly complex.  It seems that a businessman such as Frazin would ask his lawyers what all this fuss was about on appeal given what Frazin now claims he specifically said to Cohen during that January 1998 meeting and what he claims the G&N Defendants knew prior to trial.  Yet, Frazin never asked why his specific oral promises were not listed in the drafts of the appellee's brief or in the Brief of Appellee as finally filed.

Third, even assuming that Frazin was not astute enough to notice the absence of his alleged specific oral promises to Cohen in the Brief of Appellee, Frazin had at least one other lawyer looking over the G&N Defendants' shoulders throughout this case – *i.e.*, his brother, Shawn.  Frazin is obviously close to Shawn, having testified as to his brother's specific help with the Lamajak case and Frazin's other business dealings more generally.  The Court finds it incredible that in his many discussions with Shawn about the January 1998 meeting (and the resulting "deal" Frazin claimed with Cohen/Lamajak), that Frazin would not have told Shawn about his specific oral promises to Cohen, assuming any were made to Cohen as Frazin now contends.  So, if Shawn was aware of

**Memorandum Opinion**                                                                 **Page 64**

specific oral promises Frazin made to Cohen in January 1998, why is it that he never questioned why the appellee brief didn't simply respond to Lamajak's arguments that the alleged oral agreement lacked specificity and mutuality of obligation in a more straight-forward manner – *i.e.*, why don't you simply tell the Dallas Court of Appeals about all of the specific oral promises that Frazin made to Cohen at the January 1998 meeting? Or, if all of those oral promises had really been made by Frazin to Cohen at the January 1998 meeting, and Frazin had really told the G&N Defendants about those promises prior to trial in the State Court Action, why is it that Frazin did not anticipate litigation against the G&N Defendants on October 26, 2007 when he accepted the Lamajak settlement offer? *See* Pre-Trial Order, ¶ 64 (where Frazin so stipulates). It seems that someone (Shawn or Frazin himself) would have noted the significance of the allegedly missing evidence from the trial record much sooner.[47]

Fourth, because some of Frazin's testimony at the trial of the Malpractice Claims was simply incredible, it is hard to give much credence to other of his testimony. For example, Frazin's testimony about his several week trip to Connecticut starting in mid-October 2007, including his side trip to New York City in late October/early November, 2007 and his telephone conversation with Griffith while in New York City, is, on balance, unbelievable. While it is not surprising or unbelievable that Frazin would take a trip with his girlfriend to Connecticut and New York City as he testified, it is unbelievable that he could take such a long trip and have no physical evidence to

---

[47]In fact, Griffith testified at trial that as late as December 18, 2007 (in a telephone conversation they had), Shawn offered to not object to G&N's final fee application if G&N would amend that fee application to delete references to its work in connection with the appeal. According to Griffith, Shawn was troubled by the appellate work of Haynes and Boone and intended to object to its fee application, but did not want to object to G&N's fee application, having been well satisfied with G&N's representation of Frazin at trial. Griffith testified that he declined to amend his fee application, because to do so would not have been correct factually (as the firm had been involved in the appellate work). DX 334 is Griffith's handwritten notes of this conversation with Shawn. Griffith's testimony was not controverted at trial.

**Memorandum Opinion** **Page 65**

support the existence of the trip other than a single piece of paper. Specifically, the only evidence

that Frazin has of the existence of this several-week trip is a copy of a receipt from the Travel Inn in

New York City for one night's stay, arriving on October 29 and departing on October 30, 2007. DX

338. No airplane ticket receipts, no restaurant receipts, no other hotel receipts, nothing. So, even

without more, Frazin's testimony about this trip is odd at best.

What makes it appear that Frazin is simply lying (or has severe memory problems that cast

doubt upon his "new" testimony about significant, specific oral promises he made to Cohen during

the January 1998 meeting) is that while he was supposedly on this Connecticut/New York City trip,

he apparently signed a notarized document in Dallas. Specifically, Frazin signed a Statutory Durable

Power of Attorney, formally naming his mother as his attorney-in-fact to act for him in connection

with the Lamajak litigation (among other things), on October 26, 2007. DX 96; Pre-Trial Order, ¶ 65

(where Frazin so stipulates). The Statutory Durable Power of Attorney was notarized by Schepps,

bearing a State of Texas, County of Dallas acknowledgment.[48] When asked about this inconsistency

at the malpractice trial, Frazin could offer no explanation.

Moreover, Frazin testified that he had a telephone conversation with Griffith while he was

---

[48]The only other possible explanation is that Schepps falsely notarized the Statutory Power of Attorney for Frazin while he was on his trip. That possibility is equally unappealing, as it casts doubt on the merits of Frazin's Malpractice Claims. It was Schepps who first asserted that Haynes and Boone had displayed a "shocking level of neglect" in the handling of Frazin's appeal. *See* DX 15, p. 3. Frazin asserted that Haynes and Boone's review of the record "was so neglectful that even after the 4 months of work they billed to the case, they were unaware that the record was incomplete and all of the Plaintiff's large exhibits are missing from the record. This fact was discovered within 180 *minutes* when another attorney was asked to give a second opinion about the Court of Appeals' decision and made a cursory review of the record. Beyond establishing that Haynes and Boone neglected a careful and systematic review (the absence of all of Plaintiff's large exhibits sticks our [sic] like a sore thumb in a review of the record looking for evidence of contract formation), the fact that the record was incomplete could have allowed for remedies (remand instead of reversal) to the benefit of the estate and Debtor." *Id.* at p. 4. As to G&N, Schepps asserted that "in gross violation of the legal, ethical, and fiduciary duties they owed to Debtor as their client, Scott Griffith and Griffith & Nixon stopped representing Debtor's interest." *See* DX 17, p. 2. If Schepps was prepared to falsely notarize a significant legal document for Frazin, one would have to question the bases for the Malpractice Claims against the Defendants since it was Schepps who first asserted those claims against the Defendants. DX 15, 17.

in New York City about the release the firms demanded after Shawn had asked Griffith to ask Cortell about a complete fee forfeiture by Haynes and Boone (due to Shawn's concerns over the quality of its appellate work). Frazin testified that he had a voicemail message from Griffith and then ultimately spoke to Griffith on November 2, 2007 (while still in New York City), when Griffith couldn't reach Shawn after having emailed the release to Shawn. Frazin expressed surprise about the call from Griffith, since he knew nothing about the release and had previously told Griffith to speak to Shawn about all matters during this time period.

However, the documentary evidence, Griffith's testimony, and the unusual circumstances surrounding Frazin's testimony[49] cause the Court to conclude that Frazin's testimony about his telephone conversation with Griffith about the release was false. The documentary evidence establishes that Griffith emailed the release to Shawn on November 2, 2007. DX 248. Griffith testified that from October 8, 2007 (when Frazin told him to deal exclusively with Shawn) until November 16, 2007 (when the Settlement Agreement was signed), he spoke to Frazin on only one occasion.[50] Specifically, Griffith testified that he spoke to Frazin on the phone on October 30, 2007. According to Griffith, however, the subject of that call was Frazin's social security number, not the release. Griffith explained why he had spoken to Frazin on that date. Specifically, Griffith testified that Lamajak's counsel, Cindy Timms ("Timms") called him on October 30, 2007 asking for two things: (1) wiring instructions for Haynes and Boone (for the settlement funds), and (2) Frazin's

---

[49]Among these unusual circumstances are Frazin's inability to recall what days he was in New York City, where he stayed, the fact that he has no receipts for this trip except the one receipt for the night of October 29, 2008 from the Travel Inn, and the fact that the number of days he stayed in New York City kept changing as he testified to try to make his story internally consistent.

[50]Griffith clarified his testimony to note that it was possible that he spoke to Frazin on November 15, 2007, in making arrangements for Frazin to come to his office the next day to sign the settlement documents.

**Memorandum Opinion**                                                                 **Page 67**

social security number.   Griffith introduced his handwritten notes of his call with Timms into evidence, *see* DX 352, which corroborate his oral testimony.   Griffith further testified that he emailed Frazin on October 30, 2007 (with a copy to Shawn) trying to get Frazin's social security number. DX 239 is Griffith's email to Frazin, which also corroborates Griffith's testimony, and DX 240 is an email from Griffith on October 30, 2007 to Dodson at Haynes and Boone, responding to Dodson's inquiry about "our ability to contact Tim" about his social security number.   In his response to Dodson, Griffith states that "I have sent emails to Tim and Shawn and have left voicemail messages for both.   I have sent your wiring instructions to Cindy Timms.   I will search my files for Tim's SS#, I may have it.   I will let you know as soon as I hear from Tim or Shawn."   DX 240.   Finally, Griffith testified at trial that he actually spoke with Frazin on October 30 and got Frazin's social security number.   DX 241 is an email from Griffith to Dodson advising Haynes and Boone that he had spoken to Frazin and that Frazin "gave me his SS# . . . ."

For at least these reasons, Frazin's testimony at the trial of the Malpractice Claims is simply not credible.   Moreover, based upon the Dallas Court of Appeals determination of what is required to support the formation of an oral contract between Frazin and Lamajak, this Court finds that there is no credible evidence from the January 1998 meeting that is legally sufficient to support the formation of an oral contract between Frazin and Lamajak.   During the January 1998 meeting with Cohen, the only spoken promise by Frazin was to help Lamajak sell Beanie Babies and maximize Lamajak's profits during 1998.   No other specific promises were made or spoken by Frazin at that time.   All of the credible material evidence known to the G&N Defendants as to what Frazin said during his January 1998 meeting with Cohen was entered into evidence at the trial of the State Court Action.   In making the record at the trial of the State Court Action, the G&N Defendants'

**Memorandum Opinion**                                                                                   **Page 68**

representation of Frazin did not fall below the applicable standard of care.[51] Frazin's credibility at the trial of the State Court Action was critical to the success of the oral contract claim. The G&N Defendants were aware of this. The G&N Defendants were also aware of the law relative to formation of an oral contract before trial. A reasonably prudent attorney, faced with the circumstances facing the G&N Defendants at the time of the trial of the State Court Action, could have made the decision not to ask Frazin a more specific question about what he orally promised to do during the January 1998 meeting with Cohen. In fact, as Serafin testified, a reasonably prudent attorney would have made the same decision. In short, and stated another way, Frazin failed to prove, by a preponderance of the evidence, that the record of the trial of the State Court Action failed to include all material, relevant, and credible evidence that could have been presented regarding the issue of contract formation.

As noted previously, Spivey also opined that a reasonably prudent trial attorney would have a checklist at trial, containing all of the elements of all of the claims on which the plaintiff was going to trial. This checklist would ensure that sufficient evidence was introduced with respect to each element of the plaintiff's claims. Based upon certain assumed facts,[52] Spivey opined that Griffith was

---

[51]Serafin's expert testimony about the quality of the G&N Defendants' trial work was very credible. Serafin, an experienced trial attorney, testified that the G&N Defendants' failure to ask Frazin "Tim, what did you agree to do in January 1998 in exchange for Lamajak's profits above $6 million dollars," or a question to that effect, at trial in the State Court Action did not fall below the standard of care, because Frazin's prior sworn deposition testimony established Frazin's lack of recall about the details of his conversation, and asking such a question would have subjected Frazin to significant impeachment and/or opened the door for further questions on cross-examination which would have led to impeachment. Serafin testified that it was completely consistent with the standard of care to *not* ask such a question, because in his opinion, Griffith had to consider the possible result of asking the question, in deciding whether to ask it. In summary, Serafin testified that the G&N Defendants' conduct at trial met or exceeded the standard of care, and that all of the evidence that could have been adduced on the issue of contract formation was adduced.

[52]Oddly, Spivey comes to this checklist negligence opinion prior to Frazin's counsel having gone through the G&N Defendants' files. So, Spivey had no way of knowing whether such a checklist existed when offering his expert opinions and neither did Frazin's malpractice trial counsel.

**Memorandum Opinion**                                                     **Page 69**

negligent in not having (and utilizing) such a checklist at the trial of the State Court Action.

However, Griffith testified that he had such a checklist (or element outline) and, in fact, used it at the trial of the State Court Action. Serafin confirmed that he had seen and reviewed Griffith's element outline while going through the G&N Defendants' files during his document review in preparation for the giving of his expert testimony here. While Serafin agreed with Spivey that a reasonably prudent trial attorney will prepare and use such a checklist or element outline at trial, he disagreed with Spivey's negligence opinion because Spivey's factual predicate was simply wrong – *i.e.*, there was no evidence to support Spivey's factual assumption about Griffith's alleged failure to use a checklist or an element outline at trial. Accordingly, Serafin testified that the G&N Defendants' conduct at trial satisfied the applicable standard of care in all respects and that the G&N Defendants were not negligent at trial.

Based upon its own review of the evidence and its own legal analysis, the Court agrees. Frazin's trial negligence claims fail.

### B.    DTPA/Misrepresentation Claims

Next, Frazin contends that the Defendants committed certain violations of the Texas Deceptive Trade Practices-Consumer Protection Act ("DTPA"), Tx. Bus. & Comm. Code § 17.41 *et seq* (Vernon 2002), and made various misrepresentations to him or his agent, Shawn. Under Section 17.50 of the DTPA,

> a consumer may maintain an action where any of the following constitute a producing cause of economic damages or damages for mental anguish:
> > (1) the use or employment by any person of a false, misleading, or deceptive act or practice that is:
> > > (A) specifically enumerated in a subdivision of Subsection (b) of Section 17.46 of this subchapter; and

(B) relied on by a consumer to the consumer's
detriment;
(2) breach of an express or implied warranty;
(3) any unconscionable action or course of action by any person; or
(4) the use or employment by any person of an act or practice in
violation of Chapter 541, Insurance Code.

In order to prevail on his DTPA/misrepresentation claims, Frazin must prove that he is a

consumer,[53] that the Defendants have committed a false, misleading, or deceptive act or practice

within the meaning of Section 17.46 of the DTPA,[54] breached an express or implied warranty, or

engaged in an unconscionable action or course of action,[55] and that these acts were the producing

cause of Frazin's actual damages.[56]  *Brittan Commun. Intern. Corp. v. Southwestern Bell Telephone*

*Co.*, 313 F.3d 899 (5th Cir. 2002); *MacDonald v. Texaco, Inc.*, 713 S.W.2d 203 (Tex. App. – Corpus

Christi 1986).

The Complaint asserts that the Defendants represented to Frazin that Haynes and Boone and

---

[53] The DPTA defines a "consumer" as an individual, partnership, corporation, this state, or a subdivision or agency of this state who seeks or acquires by purchase or lease, any goods or services, except that the term does not include a business consumer that has assets of $25 million or more, or that is owned or controlled by a corporation or entity with assets of $25 million or more.  The term "services" means work, labor, or service purchased or leased for use, including services furnished in connection with the sale or repair of goods.  *See* Tex. Bus. & Comm. Code § 17.45 (Vernon 2002 & Supp. 2008).  No one disputes that Frazin is a "consumer" within the meaning of the DTPA.

[54] The acts enumerated in Section 17.46(b) of the DTPA are known colloquially as the "laundry list" violations.

[55] The DTPA defines the phrase "unconscionable action or course of action" as an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience or capacity of the consumer to a grossly unfair degree.  *See* Tex. Bus. & Comm. Code § 17.45(5) (Vernon 2002 & Supp. 2008).  To prove an unconscionable action or course of action, a plaintiff must show that the defendant took advantage of his lack of knowledge and that the resulting unfairness was glaringly noticeable, flagrant, complete and unmitigated."  *Brittan Commun. Intern. Corp. v. Southwestern Bell Telephone Co.*, 313 F.3d 899, 907 n. 4 (5th Cir. 2002) (*citing Bradford v. Vento*, 48 S.W.3d 749, 760 (Tex. 2001)).

[56] The phrase "producing cause" is not defined by the DTPA.  Texas courts have defined it as "being a substantial factor in bringing about an injury, and without which the injury would not have occurred," and have stated that the essential components of "producing cause" are "that (1) the cause must be a substantial cause of the event in issue, and (2) it must be a but-for cause, namely one without which the event would not have occurred."  *Ford Motor Co. v. Ledesma*, 242 S.W.3d 32, 46 (Tex. 2007).

**Memorandum Opinion**                                                                                      **Page 71**

G&N would and did conduct its work in a diligent manner; that such representations were designed to induce the Debtor into retaining Haynes and Boone and then in not questioning its work, and that Haynes and Boone and G&N wholly failed to perform as represented. The Complaint further alleges that the attorneys made "express misrepresentations of material fact and failed to disclose known information in violation of Section 17.46(b)(23) [sic] of the Tex. Bus. & Com. Code; and the attorneys engaged in unconscionable actions and courses of action and breached [an] express warranty made about the quality of the work provided." Complaint, ¶ 25. Specifically, the Complaint alleges several DTPA "laundry list" violations – that the attorneys (i) caused confusion or misunderstanding as to the source of the services (as enumerated in Section 17.46(b)(2)), (ii) caused confusion or misunderstanding as to the affiliation, connection or association between two of the service providers (as enumerated in Section 17.46(b)(3)), (iii) represented that the services would have, and did have characteristics and benefits which they did not (as enumerated in Section 17.46(b)(5)), (iv) represented that the services were of a particular standard or quality when they were of another (as enumerated in Section 17.46(b)(7)), (v) represented that work or services had been performed when they had not (as enumerated in Section 17.46(b)(22)), and (vi) failed to disclose information (as enumerated in Section 17.46(b)(24)).

In the Pre-Trial Order, the parties identify eight contested issues of fact in connection with these claims: (1) whether the Defendants misrepresented facts to Frazin on whether they had thoroughly reviewed the record; (2) whether the Defendants misrepresented facts to Frazin on whether they had thoroughly briefed the arguments; (3) whether the Defendants misrepresented the role of Cortell and Dodson in the appeal; (4) whether the Defendants misrepresented Dodson's qualifications; (5) whether the Defendants misrepresented the work they had done on the appeal; (6)

**Memorandum Opinion**                                                              **Page 72**

whether the Defendants misrepresented the information available in their files to Shawn; (7) whether the Defendants properly kept Frazin informed and complied with all reasonable requests for information in order to permit Frazin to make informed decisions with respect to the case;[57] and (8) whether Frazin was independently represented by other counsel when G&N was retained by Frazin.[58] Pre-Trial Order, pp. 38-39.

Before analyzing the merits of these alleged misrepresentations in light of Frazin's burden of proof, the Court must address certain defenses raised by the Defendants to defeat these claims as a matter of law. First, the Defendants assert that Frazin's DTPA/misrepresentation claims are re-stated claims of negligence and are thus not legally cognizable under the common law.[59] Second, the Defendants assert that the DTPA/misrepresentation claims are claims for damages based on the rendering of a professional service, the essence of which is the providing of advice, judgment, opinion, or similar professional skill, and thus the acts/misrepresentations they are alleged to have committed are exempt under the "professional services" exemption of the DTPA. These first two defenses are inter-related and will be analyzed together. Third, the Defendants assert that Frazin's claims are barred by two DTPA exemptions for large transactions. *See* Section 17.49(f) and (g).

Under Texas common law, a plaintiff may not fracture what is essentially a negligence claim into claims for DTPA violations, breach of fiduciary duty, and other claims. *Murphy v. Gruber*, 241

---

[57] For the reasons set forth below, *see infra* at pp. 95-96, the Court concludes that Frazin did not establish by a preponderance of the evidence any facts supporting this claim.

[58] For the reasons set forth below, *see infra* at p. 83, the Court finds that Frazin was represented by Zyne when he hired G&N, and she reviewed the G&N Engagement Letter on his behalf.

[59] The "professional services" exemption found in DTPA Section 17.49(c) is properly characterized as an affirmative defense. *Brennan v. Manning*, No. 07-06-0041-CV, 2007 WL 1098476 (Tex. App. – Amarillo Apr. 12, 2007).

**Memorandum Opinion**                                                                 **Page 73**

S.W.3d 689, 693 (Tex. App. – Dallas 2007) (hereinafter *Murphy*); *Kimleco Petroleum, Inc. v. Morrison v. Shelton*, 91 S.W.3d 921, 924 (Tex. App. – Forth Worth 2002) (hereinafter *Kimleco*). Where the gravamen of a plaintiff's complaint is that the lawyer inadequately represented the plaintiff in some fashion, the DTPA will not apply. *Murphy*, 241 S.W.3d at 693. However, when the facts of a case support claims against a lawyer for something other than professional negligence, clients have been allowed to pursue those other claims. *Id*. at 695. For example, in *Latham v. Castillo*, 972 S.W.2d 66 (Tex. 1998), the client sued an attorney who failed to file a medical malpractice action and alleged claims for breach of contract, fraudulent misrepresentation, and DTPA violations. The plaintiffs also alleged, however, that the attorney misrepresented to them that he had filed the claim and was actively pursuing it. The Supreme Court noted that this additional allegation "is the difference between negligent conduct and deceptive conduct. To recast this claim as one for legal malpractice is to ignore this distinction. The Legislature enacted the DTPA to curtail this type of deceptive conduct." *Latham*, 972 S.W.2d at 69.

Texas courts have long applied the rule against the "fracturing" of what are essentially claims for malpractice into multiple claims for malpractice, breach of fiduciary duty, violations of the DTPA, and the like, noting that

> Nothing is to be gained by fracturing a cause of action arising out of bad legal advice or improper representation into claims for negligence, breach of contract, fraud or some other name. If a lawyer's error or mistake is actionable, it should give rise to a cause of action for legal malpractice with one set of issues which inquire if the conduct or omission occurred, if that conduct or omission was malpractice and if so, subsequent issues on causation and damages. Nothing is to be gained in fracturing that cause of action into three or four different claims and sets of special issues . . . [t]he real issue remains one of whether the attorney exercised that degree of care, skill and diligence as lawyers of ordinary skill and knowledge commonly possess and exercise . . . the ultimate issue is whether there has been a breach of duty which causes damage.

*Sledge v. Alsup*, 759 S.W.2d 1, 2 (Tex. App. – El Paso 1988).

Texas has further expressed its policy against re-casting a malpractice claim as a DTPA claim in a 1995 amendment to the DTPA, which added Section 17.49(c) to the DTPA. Section 17.49(c) of the DTPA, entitled "Exemptions," provides:

> Nothing in this subchapter shall apply to a claim for damages based on the rendering of a professional service, the essence of which is the providing of advice, judgment, opinion or similar professional skill. This exemption does not apply to:
>
> > (1) an express misrepresentation of a material fact that cannot be characterized as advice, judgment, or opinion;
> > (2) a failure to disclose information in violation of Section 17.46(b)(24);
> > (3) an unconscionable action or course of action that cannot be characterized as advice, judgment or opinion;
> > (4) breach of an express warranty that cannot be characterized as advice, judgment or opinion; or
> > (5) a violation of Section 17.46(b)(26).

The exemption, when read together with Section 17.50, thus provides that professional services which constitute advice, judgment, opinion or similar professional skill will be entirely exempt from the DTPA. Bivens, et al. *The 1995 Revisions to the DTPA: Altering the Landscape*, 27 Tex. Tech. L. Rev. 1441, 1451 (1996) (authored in part by bill's sponsors). The intent of its drafters was "to remove the DTPA as a vehicle for professional malpractice claims." *Id.*

In analyzing Frazin's claims to determine whether they are in fact re-stated negligence claims, this Court is not bound any labels Frazin has used. *Murphy* at 697; *Goffney v. Rabson*, 56 S.W.3d 186 (Tex. App. – Houston [14th Dist.] 2001). Rather, the Court must look to the language of the Complaint and the Pre-Trial Order to make its determination. *Murphy,* at 698.

The Court concludes that the DTPA claims, to the extent premised upon the conduct alleged in paragraphs 7, 8, 11, 12 and 13 of the Complaint are simply re-stated negligence claims which

**Memorandum Opinion**                                                                              **Page 75**

violate Texas's common law rule against the "fracturing" of claims, and are thus not cognizable under the DTPA. For the same reason, since these allegations relate to the quality of the Defendants' legal work, they are claims based on the rendering of a professional service, the essence of which is the providing of advice, judgment, opinion or similar professional skill and are thus exempt under DTPA Section 17.49(c). The allegations that Cortell was not adequately involved in the appeal, Complaint, ¶ 7; that the Defendants did not carefully review the record, *id.* at ¶ 8; that the Defendants did not properly brief or argue contract formation, *id.* at ¶11; that the idea of performance as a means to prove contract was first raised in a post-argument letter, *id.*; that Haynes and Boone failed to notice that several large exhibits were missing from the appeal record and failed to correct the omission, *id.*; that G&N did not create a proper trial record, *id.* at ¶¶ 12, 13; and that Haynes and Boone failed to raise all evidence in the record on appeal, *id.* at ¶ 13 (and as are set forth in contested issues of fact nos. 1-5 in the Pre-Trial Order) all clearly relate to the quality of representation and are therefore professional negligence claims. The claims that the Defendants[60] misrepresented the quality of work that Haynes and Boone would perform, *id.* at ¶ 7; that Cortell promised but did not deliver heavy involvement in the appeal, *id.*; and that Haynes and Boone and Cortell misrepresented that they would or did carefully review the record, *id.* at ¶ 8 (and as are set forth in contested issues of fact nos. 1-5 in the Pre-Trial Order); fall into the category of "misrepresentations," but they are so closely related to issue of work quality as to be claims for professional negligence rather than claims for breach of fiduciary duty. *See, e.g., Aiken v. Hancock*, 115 S.W.3d 26, 28–29 (Tex. App. – San Antonio 2003).

---

[60]Or possibly only G&N. It is impossible to tell because of Frazin's use of the passive voice: "Specific representations were made to Frazin . . ." Complaint, ¶ 7.

**Memorandum Opinion**                                                                                    **Page 76**

Similarly, the allegations in paragraph 17, that G&N and Haynes and Boone misrepresented that (1) the record was carefully and completely reviewed, (2) all of the evidence which supports the judgment was briefed; (3) the attorneys were aware of and understood all of the relevant law, and it was briefed; and (4) the Debtor's case was weak, and the defendant's case was strong, all of which Frazin complains induced him into entering into the settlement and prevented him from questioning the results, are allegations respecting the quality of the Defendants' work and involve their advice, judgment or legal opinions to him, and are thus re-stated negligence claims that are either not cognizable under the DTPA under Texas's common law rule against "fracturing" or are exempt from its application under Section 17.49(c). *See Brennan v. Manning*, No. 07-06-0041-CV, 2007 WL 1098476 (Tex. App. – Amarillo Apr. 12, 2007) (unpublished) (incorrect advice to plaintiff in a divorce proceeding that she was not entitled to any interest in funds owed to her husband exempt under the DTPA as the essence of the services provided was the provision of advice, judgment or opinion); *Rangel v. Lapin*, 177 S.W.3d 17 (Tex. App. – Houston [1st Dist.] 2005) (plaintiff's claim that attorney created confusion as to the source of services by representing that he was board certified when he was not, and by leading plaintiff to believe that a paralegal was an attorney, which plaintiff claimed caused him to weigh the firm's advice with undue favor, was barred by Section 17.49(c)); *Head v. U.S. Inspect DFW, Inc.*, 159 S.W.3d 731 (Tex. App. – Fort Worth 2005) (a DTPA claim premised on representations by a home inspection company that a licensed real estate inspector would do the inspection, when an unlicensed apprentice was used, was a claim that the inspector was negligent in rendering an erroneous opinion based upon an apprentice's unsupervised inspection, and was therefore an inseparable part of the professional services and was barred by the DTPA); *Greathouse v. McConnell*, 982 S.W.2d 165 (Tex. App. – Houston [1st Dist.] 1998) (alleged false representation

that legal services were of competent quality was a re-stated negligence claim not cognizable under the DTPA).

Certainly, the Defendants' "representations" about the relative strength and weaknesses of Frazin's case against Lamajak is appropriately characterized as "advice, judgment or opinion." The Defendants' "representations" about their review of the record and the adequacy of their briefing cannot, "by artful pleading . . . [be] recast . . . in order to avoid the adverse effect of a statute." *Head*, 159 S.W.3d at 742.

In sum, the Court concludes that the allegations in the Complaint regarding "representations" about the quality and adequacy of the Defendants' services are re-stated negligence claims and that Frazin's complaints are, in essence, complaints about "the rendering of a professional service, the essence of which is the providing of advice, judgment, opinion or similar professional skill," and are thus barred by Section 17.49(c). Moreover, the representations about which Frazin complains do not fall within the exception set forth in Section 17.49(c)(1) (*i.e*,, they are not express misrepresentations of a material fact that cannot be characterized as advice, judgment, or opinion).

Frazin also complains that the conduct alleged in the Complaint constitutes a failure to disclose information in violation of Section 17.46(b)(24) (which is exception (2) to the Section 17.49(c) exemption for professional services).

> To prevail on a claim for failure to disclose, [the plaintiff] must prove four elements:
>
> (1) a failure to disclose information concerning goods or services, (2) which was known at the time of the transaction, (3) such failure was intended to induce the consumer into a transaction, (4) which the consumer would not have entered had the information been disclosed.

Tex. Bus. & Comm. Code § 17.46(b)(24) (Vernon 2002 & Supp. 2008); *Head v. U.S. Inspect DFW,*

*Inc.*, 159 S.W.3d 731 (Tex. App. – Fort Worth 2005). The transaction occurs when the consumer enters into the contract with the defendants. *Head*, 159 S.W.3d at 744 (plaintiff claiming that home inspection company did faulty inspection had to prove that the inspection company withheld material information with the intent to induce her into the written agreement to inspect the house, *not* when she accepted their inspection report); *Kahlig v. Boyd*, 980 S.W.2d 685 (Tex. App. – San Antonio 1998) (claim that attorney failed to disclose an affair with client's wife failed where there was no evidence that the attorney withheld that information prior to the attorney's engagement).

Here, the only possible allegations that could constitute a failure to disclose under Section 17.46(b)(24) at the time Frazin hired Haynes and Boone are (i) the allegations in the Complaint that Cortell promised that she would be heavily involved in all aspects of the appeal, and (ii) the contested issues of fact listed in the Pre-Trial Order as (1) whether the Defendants misrepresented the role of Cortell and Dodson in the appeal, and (2) whether the Defendants misrepresented Dodson's qualifications. Pre-Trial Order, p. 38, ¶ 3. First, as noted above, these allegations are so closely related to the quality of legal work provided as to be both re-stated negligence claims and within the professional services exemption, thus barring their assertion. Moreover, the Court concludes that Frazin may not simply re-characterize a claim that the Defendants misrepresented a fact to him as a failure to disclose in order to bring it within the "failure to disclose" exception to the professional services exemption. *Kahlig v. Boyd*, 980 S.W.2d 685 (Tex. App. – San Antonio 1998) (claim that attorney failed to disclose an affair with the client's wife was not a "failure to disclose" DTPA claim, but rather a re-stated malpractice claim). The same policy underlying the Texas rule prohibiting the fracturing of professional negligence claims into DTPA, breach of fiduciary duty or misrepresentation claims also supports the conclusion that Frazin may not label an alleged misrepresentation as a failure

to disclose in order to bring the conduct within the exception to the DTPA's professional services exemption.

The "failure to disclose" cases cited by Frazin are distinguishable. *See, e.g., Francisco v. Foret*, No. 05-01-00783-CV, 2002 WL 535455 (Tex. App. – Dallas Apr. 11, 2002 (attorneys failed to disclose that they had settled claim without client's consent and had personal financial interest in the settlement). In addition, for the reasons set forth below, *see infra* at pp. 89-92, the Court concludes that Cortell *was* heavily involved in all aspects of the appeal, and Frazin was told that Dodson would be working on the appeal with her. Frazin failed to prove at trial that the roles and qualifications of Cortell and Dodson were not disclosed to him or that Dodson's alleged lack of qualifications was not disclosed to him or that Haynes and Boone intended to induce Frazin into hiring the firm by virtue of their alleged nondisclosures.

Frazin further contends that the conduct alleged in the Complaint constitutes an unconscionable action or course of action within the meaning of Section 17.50 and within the exception to exemption set forth in Section 17.49(c)(3). To prove an unconscionable action, Frazin must show that the Defendants took advantage of his lack of knowledge and that the resulting unfairness was "glaringly noticeable, flagrant, complete, and unmitigated." *Head*, 159 S.W.3d at 745. Furthermore, even an unconscionable action is exempt from liability under the DTPA where it can properly be characterized as "advice, judgment or opinion." Tex. Bus. & Comm. Code § 17.49(c)(3).

Once again, Frazin does not specifically identify in the Complaint which conduct of the Defendants he contends constitutes an unconscionable action or course of action. However, a review of the allegations in the Complaint and of the contested issues of fact identified in the Pre-Trial Order

leads the Court to conclude that Frazin has not alleged any conduct of the Defendants which is both unconscionable and which cannot be characterized as "advice, judgment or opinion." *Greathouse v. McConnell*, 982 S.W.2d 165 (Tex. App. – Houston [1st Dist.] 1998) ( a claim that an attorney engaged in an unconscionable course of conduct was a re-stated negligence claim where the allegation was that there was a gross disparity between the value of legal services received and the amount paid for them because the services had no value). Once again, the unconscionability cases cited by Frazin are distinguishable. *See, e.g. Bellows v. San Miguel*, No. 14-00-00071-CV, 2002 WL 835667 (Tex. App. – Houston [14th Dist.] May 2, 2002) (attorney's actions were unconscionable under the DTPA where attorney induced client to settle case by mis-stating the settlement amount and telling the client an affidavit existed when it did not). For the reasons more fully set forth below, *see infra* pp. 88-96, Frazin has not shown how his lack of knowledge was taken advantage of to a grossly unfair degree by any of the Defendants.

Frazin lastly contends that the conduct alleged in the Complaint constitutes breach of an express warranty under Section 17.50 (which is also exception (4) to the Section 17.49(c) exemption for professional services). As noted above, the Court concludes that Frazin's claims are, in essence, re-stated negligence claims. Moreover, the claims fall within the DTPA's exemption for the rendition of professional services, the essence of which is the provision of advice, judgment, opinion or similar professional skill. The only possible factual allegation which could fall within exception (4) to the Section 17.49(c) exemption is that the Defendants made express warranties about the quality of their work. In order to recover for breach of an express warranty under the DTPA, Frazin must prove that a warranty was made, the warranty was breached, and as a result of the breach, an injury occurred. *Head*, 159 S.W.3d 731 at 746. An express warranty is created when a seller makes an affirmation

of fact or a promise to the purchaser that relates to the sale and warrants a conformity to the affirmation as promised. *Id*. A warranty has been defined under the U.C.C. as "any representation of fact or promise as to the title, quality, or condition of existing or future goods or services." *Id*. (*quoting Enterprise-Laredo Assoc. v. Hachar's, Inc.*, 839 S.W.2d 822, 830 (Tex. App. – San Antonio 1992)).

The Court concludes that Frazin's allegations, had they been proven at trial, *could* have supported a claim for breach of an express warranty under the DTPA and formed the basis for an exception to the DTPA's exemption for professional services. *See Head*, 159 S.W.3d 731 at 747 (trial Court erred in applying the professional services exemption to bar a claim for breach of an express warranty where the contract promised a licensed home inspector and an unlicensed inspector performed the work). However, for the reasons set forth below, *see infra* pp. 88-96, the Court concludes that Frazin has not proven that an express warranty was made or breached.

One final defense to Frazin's DTPA claims asserted by the Defendants must be addressed. Specifically, the Defendants assert that all of Frazin's DTPA claims are barred by § 17.49(f) of the DTPA. That statute provides:

> Nothing in the subchapter shall apply to a claim arising out of a written contract if:
> (1) the contract relates to a transaction, a project, or a set of transactions related to the same project involving total consideration by the consumer of more than $100,000;
> (2) in negotiating the contract the consumer is represented by legal counsel who is not directly or indirectly identified, suggested, or selected by the defendant or an agent of the defendant; and
> (3) the contract does not involve the consumer's residence.

Frazin concedes that he has a written contract with all of the Defendants. The parties have stipulated that neither Haynes and Boone's nor G&N's engagement letters related to Frazin's

residence, and thus the third prong of the exemption is easily satisfied as to all of the Defendants. Further, the parties have stipulated that in negotiating the engagement with Haynes and Boone, Frazin was represented by G&N, G&N had represented Frazin for at least a year prior to Haynes and Boone's engagement, and Haynes and Boone had no involvement in the selection of G&N as counsel for Frazin. Thus, the second prong of the exemption is satisfied as to Haynes and Boone. Frazin hired G&N in 2003, DX90, and Zyne, Frazin's bankruptcy counsel, reviewed the proposed engagement agreement for Frazin. Changes to the G&N Engagement Letter were made at Zyne's request. Audiotape, hearing held 7/8/08 at 10:09:57- 10:10:44 (on file with Court). As G&N first met Frazin in 2003, G&N had no hand in identifying, suggesting or selecting Zyne. Thus, the second prong of the exemption is also satisfied as to G&N. The parties' dispute centers around the first prong – namely, whether the contracts (which were contingency fee contracts) "related to a transaction, a project, or a set of transactions related to the same project involving total consideration by the consumer of more than $100,000."

The Court notes that if the monetary cap as set forth in Section 17.49(f) applies to bar Frazin's claims against the G&N Defendants here, then so does the monetary cap as set forth in Section 17.49(g),[61] and so the Court's analysis applies with equal force to both of the DTPA exemptions as to G&N. Further, if the monetary cap as set forth in Section 17.49(f) applies to bar Frazin's claims against Haynes and Boone, the Court need not reach the question of whether the monetary cap of Section 17.49(g) applies to bar his claims against Haynes and Boone, since they will

---

[61] Section 17.49(g) has a $500,000 cap for transactions other than those involving a consumer's residence and it does not require a written contract.

be barred by Section 17.49(f).[62]  Finally, the Court notes that the purpose of both of these exemptions is to maintain the DTPA as a viable source of relief for consumers in small transactions and to remove litigation between businesses over large transactions from the scope of the DTPA.  *East Hill Marine, Inc. v. Rinker Boat Co.*, 229 S.W.3d 813 (Tex. App. – Fort Worth 2007) (*citing Citizens Natl' Bank v. Allen Rae Invs., Inc.*, 142 S.W.3d 459 (Tex. App. – Fort Worth 2004)).

The Defendants argue that Frazin's claims arise out of a transaction involving total consideration by Frazin of at least several million dollars – *i.e.*, the total amount of fees for Frazin's trial and appellate counsel.  Since Frazin agreed to pay G&N 45% of any recovery, and agreed by written letter to pay Haynes and Boone 11% of any recovery (which was to come out of G&N's 45%), then Haynes and Boone argues that whether that recovery was the $7.1 million final judgment, or the $3.2 million settlement amount, Frazin's "total consideration" to his counsel was well over $500,000.  Haynes and Boone also argues, citing *East Hill Marine*, 229 S.W.3d at 820, that the fact that the precise amount of total consideration was uncertain at the time Frazin hired the Defendants doesn't save his claims from the Section 17.49 exemption.  Defs' Mot. For Partial S.J., pp. 30-32.

In response, Frazin argues that

[n]othing about the consideration of the transaction between Mr. Frazin and Defendants was known or quantifiable; in fact, any payment to Defendants was going to be, by definition, contingent, and in this case, it involved a double contingency
. . . the double contingency to payment wasn't the possible percentage of a percentage that they would be earning through a successful appeal; the double contingency here involved (1) obtaining a favorable ruling from the Dallas Court of Appeals, and (2) having this Court approve a fee application.  At the inception of any legal representation, whether that representation involves an hourly or contingent fee,

---

[62] Moreover, if the Section 17.49(f) monetary cap does *not* operate to bar Frazin's claims against Haynes and Boone, then neither will the Section 17.49(g) exemption.

**Memorandum Opinion**                                                                                                  **Page 84**

the total amount of attorney's fees that will be earned or paid is inherently unknown
. . . [s]ince almost no contract for legal services has a 'set' fee, and may exceed the
DTPA limits at some time, Defendants' argument must fail or the DTPA could never
apply to legal services.

Debtor's Resp. To Defs' Jt. Mot. For Partial S.J. and Br. In Supp., pp. 27-28.

The Court concludes that Frazin's argument takes the statute beyond its logical conclusion.

The fact that a contract for legal services may not quantify the value of those services in the contract

itself does not mean that they should be quantified for DTPA purposes at less than $100,000 (such

that the Section 17.49(f) exemption won't apply) instead of being quantified at more that $100,000

(such that the Section 17.49(f) exemption will apply) – it simply means that quantification for DTPA

purposes must be done by looking at something other than the monetary value as stated in the

parties' contract.

Neither the parties nor the Court have located any Texas cases discussing the application of

Section 17.49(f) in the context of a contingency fee agreement.   In the absence of either statutory

provision or guidance from the Texas courts, this Court must opine on what a Texas court would do

when faced with this issue.

The Court first notes that the DTPA must be liberally construed and comprehensively applied

to promote its underlying purpose, which is the protection of consumers. Tex. Bus. & Comm. Code

§ 17.44 (Vernon 2002 & Supp. 2008) ("this subchapter shall be liberally construed and applied to

promote its underlying purposes, which are to protect consumers against false, misleading, and

deceptive business practices, unconscionable actions, and breaches of warranty and to provide

efficient and economical procedures to secure such protection"); *Head v. U.S. Inspect DFW, Inc.*,

159 S.W.3d 731 (Tex. App. – Fort Worth 2005).  The logical corollary to this proposition is that

exemptions should be narrowly construed. Skeels, *The DTPA's Professional Services Exemption: Let 'Em Be Doctors and Lawyers and Such*, 55 Baylor L. Rev. 783, 791 (Spring 2003).

However, nothing in the statute suggests that only non-lawyer defendants may avail themselves of the exemption set forth in Section 17.49(f), or that lawyers must look solely to Section 17.49(c) for solace. While the Court expresses no view on whether the Legislature intended such a result, the Court concludes that any such intent remains unexpressed in the plain words of the statute. The exemptions appear to be stand-alone exemptions, not alternatives to one another.

In order to assess whether the total consideration for a transaction, project or set of transactions exceeds the statutory caps set forth in Section 17.49(f) and (g), Texas courts generally, although not exclusively, look to the face amount of the contract. *See, e.g., Aluchem Inc. v. Sherwin Alumina, L.P.*, No. C-06-183, 2007 WL 1100473 (S.D. Tex. Apr. 11, 2007) (dismissing DTPA action where the face amount of the contract exceeded $500,000); *Space Maker Designs, Inc. v. Weldon F. Stump & Co.*, No. 3:02-CV-0378-H, 2003 WL 21414726 (N.D. Tex. June 16, 2003) (same). The *Space Maker Designs* court noted:

> The DTPA does not define the term 'total consideration.' Therefore, the Court must determine what the Legislature meant when it adopted this language. When the language of a statute is unambiguous, the Court should apply the ordinary meaning of the words being construed. Black's Law Dictionary defines consideration as 'the inducement to a contract.' [The defendant] was clearly 'induced' to enter into the contract by the promise of $519,000 in payment for the manufacturing equipment it was to deliver and install. The fact that the actual value to be conveyed may have changed after the contract was entered into does not change the value of the consideration promised by the consumer at the time of contracting. Furthermore, applying an *ex ante* approach rather than an *ex post* one allows parties to a contract to know with certainty whether their contract will fit within the coverage of the DTPA.

*Space Maker Designs*, at *2.

**Memorandum Opinion**                                                    **Page 86**

Where a contract does not state a face dollar amount, but nevertheless contemplates a transaction which will in the future involve consideration of more than $100,000, the Court concludes that the Section 17.49(f) and (g) exemptions apply and bar relief.  While not directly on point, other Texas courts have come to similar conclusions.  For example, in *Texas Motor Coach, L.C. v. Blue Bird Body Co.*, No. 4:05CV34, 2005 WL 3132482 (E.D. Tex. Nov. 22, 2005), a motor coach dealer entered into a franchise dealership agreement with a manufacturer.  The motor coach dealer constructed improvements on real property, obtained floor plan financing to operate the franchise, hired employees, and expended funds on advertising.  Later, the manufacturer delivered three motor coaches, which were determined to be defective and were returned.  The court dismissed the plaintiff's DTPA claims, finding that because the contract "assumed delivery" of three motor coaches, the cost of which were in excess of $200,000 each, the exemptions under Section 17.49(f) and (g) barred relief.  Similarly, in *East Hill Marine, Inc. v. Rinker Boat Co.*, 229 S.W.3d 813 (Tex. App. – Fort Worth 2007), the parties entered into a dealership agreement, with no minimum purchase requirement.  The plaintiff, however, ultimately ordered boats from the defendant worth more than $859,000.  The court ruled that the Section 17.49(g) exemption applied to bar the plaintiff's claims. The plaintiff argued that at the time the dealer relationship was established, there was no promise to pay more than $500,000; rather, the plaintiff argued, there was merely an agreement under which it might never purchase anything.  The court rejected that argument, and stated:

> This argument fails to address the fact that within months after [plaintiff] established its initial agreement with [defendants], [plaintiff] promised to pay at least $859,513 for new boats. Hence, [plaintiff] did not apply to sell . . . boats so that it could simply have that option and never use it; it applied to be a . . . boat dealer so that it could purchase boats and then sell them in its showroom for profits.

*East Hill Marine*, 229 S.W.3d at 821.

Memorandum Opinion                                                                                    **Page 87**

Similarly, at the time Frazin hired the Defendants, he hired them to pursue claims on his behalf and agreed to pay a percentage of any recovery to them.  When Frazin filed his bankruptcy case, prior to his retention of either G&N or Haynes and Boone, he valued his claim against Lamajak at $6 million which, if he had recovered that sum, would have resulted in legal fees well in excess of $500,000.[63]  When Frazin hired Haynes and Boone, he had been awarded a multi-million dollar judgment which, if it had been upheld, would have resulted in legal fees well in excess of $500,000. At the time Frazin asserted the Malpractice Claims against the Defendants, he had settled the case against Lamajak for $3.2 million dollars, resulting in legal fees well in excess of $500,000 as being owed to G&N, and nearly $300,000 to Haynes and Boone.

Nor does it matter that the funds have not yet been paid.  As Frazin is *contractually* obligated to pay them, the unpaid balance contractually owed to the Defendants is included in the calculation. *Citizens Nat'l Bank v. Allen Rae Invest., Inc.*, 142 S.W.3d 459 (Tex. App. – Fort Worth 2004) (ruling that a transaction involved "total consideration" of more than $500,000 where the plaintiff had paid $122,000 at closing on a loan, $22,000 in interest on a note before defaulting, and the unpaid balance of principal and interest due on the note at the time of its foreclosure was $463,000).

Accordingly, the Court believes that a Texas court, when faced with this issue, would conclude that although the contracts at issue do not contain a "face amount," the contracts involve a transaction with total consideration in excess of $100,000 (and/or, in G&N's case, $500,000), such that the DTPA exemption applies and bars Frazin's relief.

However, even assuming that none of the DTPA exemptions apply and the claims are not

---

[63] Frazin listed the claim as an account receivable owed by "Mike and Loris" on Schedule B of his petition. DX 2.

re-stated negligence claims, such that Frazin may proceed on his claims against the Defendants under the DTPA,  the Court concludes that Frazin has failed to prove any of his claims by a preponderance of the evidence.  At the outset, the Court notes that all of the alleged misrepresentations complained of by Frazin concern acts or events during the pendency of the appeal or thereafter.  Each will be discussed in turn, although several become factually intertwined.

First, Frazin complains that the Defendants misrepresented that they had thoroughly reviewed the reporter's record in connection with the appellate briefing undertaken on Frazin's behalf.[64]  Frazin relies upon the Haynes and Boone detailed billing statements included within its fee application to support his contention that Cortell did not spend adequate time reviewing the reporter's record.  Thus, according to Frazin, when the Defendants stated to Frazin that they had "poured over the record," (or words to that effect) in preparing the appellate briefing, they misrepresented the true facts to him.

Based upon a careful review of the evidence and the parties' arguments, the Court finds no such misrepresentation by Cortell or any of the other Defendants.  Cortell testified that she reviewed the trial record extensively during her work with Dodson in editing and drafting the appellee's brief and in preparing to argue Frazin's case on appeal.  Dodson obviously reviewed the trial record thoroughly, as he prepared a summary of that record, the adequacy of which formed the basis of a prior, rejected negligence claim by Frazin.  *See supra* at pp. 25, 48.  Griffith also testified about the thoroughness of Dodson's review of the trial record.  Specifically, Griffith testified that he was impressed with Dodson's familiarity with the trial record and that he observed Dodson's ability to

---

[64]The Court notes that it has already rejected Frazin's claim of negligence in reviewing the record and in making appropriate citations to the Dallas Court of Appeals.

**Memorandum Opinion**                                                                                          **Page 89**

recall what evidence was in the record firsthand during the various meetings the Defendants had with Frazin while they all brainstormed together about the best way to respond to Lamajak's appellate arguments and commented upon various drafts of the appellee's brief. According to Griffith, Dodson was able to accurately recount what was actually in the record and then find desired portions of that record with relative ease.

While Cortell was cross-examined from Haynes and Boone's billing statements with respect the number of hours she spent reviewing the record as specifically detailed there under the description of "record review" (or similar descriptors), the Court is satisfied with Cortell's explanation that her time records do not detail every instance of record review that can be recognized as such. Specifically, Cortell testified that when she was working on the statement of facts or otherwise working on the appellee's brief, she would be immersed in the trial record, reviewing it for the best and most appropriate record cites in support of Frazin's arguments on appeal.

After years of preparing fee applications and reviewing other parties' fee applications (when the undersigned was in private practice) and now reviewing fee applications in thousands of bankruptcy cases as the judge required to approve such requests for fees and expenses, the Court finds Cortell's testimony credible. It is hard to write billing entries that capture all of what was done at a given time. It makes perfect sense that in drafting the statement of facts or other portions of the appellee's brief, Cortell would be reviewing the trial record. So, while there may not be extensive stand-alone entries showing Cortell simply reading the trial record from cover to cover in one or more settings, the Court is satisfied that she thoroughly reviewed the trial record in connection with her work on Frazin's appeal.

Obviously, the G&N Defendants were thoroughly familiar with the record on appeal, as they

**Memorandum Opinion**                                                          **Page 90**

were the trial lawyers who were present during the creation of that record. Frazin does not contend otherwise.

Next, Frazin complains that the Defendants misrepresented the extent of the legal briefing done on his behalf on appeal and the Defendants' understanding of that briefing.[65] Frazin testified that the Defendants told him that they had thoroughly briefed all of the legal issues on appeal. Although it is not completely clear, the Court believes that Frazin's Complaint focuses on (i) the Defendants' failure to make the unilateral contract or implied in fact contract arguments that Frazin advanced here, and (ii) concerns over the adequacy of the performance arguments advanced by the Defendants on appeal.

Based upon a careful review of the record and the parties' arguments, the Court finds no misrepresentation by the Defendants regarding the thoroughness of their legal briefing. The issues on appeal were carefully researched, understood, briefed, and argued by the Defendants. As noted previously with regard to the allegedly missing arguments – *i.e.*, unilateral contract and implied in fact contract – those arguments were simply not applicable here. *See supra* at fn 31. Moreover, the implications of Frazin's performance were adequately addressed in the legal briefing and at oral argument.

Next, Frazin complains that the Defendants misrepresented the role of Cortell and Dodson in the appeal and Dodson's qualifications. Frazin testified at trial that he intended to hire Cortell as his lead appellate lawyer.[66] In essence, Frazin testified that he wanted Cortell's talents, and if she was

---

[65]The Court has previously rejected Frazin's claim that the Defendants were negligent in their briefing on appeal.

[66]Frazin had a friend who worked at the Dallas Court of Appeals. Frazin got a list of 5-6 appellate lawyers (not firms) from this friend. Cortell was on the list.

not prepared to be his lawyer on the appeal, he would not have retained Haynes and Boone. Specifically, Frazin testified that he was extremely disappointed to learn (apparently after the appeal was partially lost) that Dodson was a brand-new lawyer, barely out of associate orientation at Haynes and Boone following his federal judicial clerkship, when asked to work on Frazin's appeal by Cortell. According to Frazin's lawyer, because Dodson had worked before returning to law school, he appeared older and more worldly, misleading Frazin into believing that he was a more experienced lawyer. Frazin also claims that Cortell specifically told him that Dodson was an "experienced appellate lawyer."

Cortell denies making this statement. She testified that Dodson was present during her meetings with Frazin and that she simply told Frazin at the outset of the Haynes and Boone representation that Dodson would be assisting her on the appeal. According to Cortell, Frazin's claim of a specific misrepresentation about Dodson's experience makes no sense. Cortell had been told that Frazin was interested in hiring her. There was no reason for her to misrepresent Dodson's level of experience. Moreover, Dodson's status as a new associate was clearly revealed on the firm's website, so she could have never expected "to get away with" such a misrepresentation, again casting doubt as to why she would make such a statement.

Based upon a careful review of the record and the parties' arguments, the Court finds no such misrepresentations by any of the Defendants. Frazin got exactly what he wanted. Cortell was his lead appellate lawyer. She worked extensively on Frazin's appeal – thoroughly reviewing the trial record, editing and drafting the appellee's brief, meeting with Frazin and Griffith (and others) to ensure that all appropriate arguments and evidence were advanced on appeal, and then making the oral argument to the Dallas Court of Appeals.

**Memorandum Opinion**                                                                 **Page 92**

Next, Frazin complains that the Defendants misrepresented the work they had done on the appeal. While stated as a separate contested issue of fact, the Court understands this complaint to be little more than a restatement of the prior issues – *i.e.*, that the Defendants misrepresented the thoroughness of their (i) review of the reporter's record, and (ii) legal briefing, including the citation of all relevant and non-cumulative record references and legal authorities. Although not expressly stated as such, the only other thing that Frazin might be complaining about is Cortell's appellate oral argument and some misrepresentation about the extent of her preparation for that argument.

For the reasons previously stated, the Court rejects Frazin's alleged misrepresentation claims based upon either the thoroughness of the Defendants' record review or legal briefing. *See supra* pp. 89-91. Moreover, to the extent Frazin is complaining about some misrepresentation about Cortell's level of preparation for her oral argument before the Dallas Court of Appeals, the record more than adequately demonstrates that Cortell thoroughly prepared for her appellate oral argument. Cortell's oral argument outline was introduced into evidence as DX 346. A review of Cortell's outline leaves no doubt that she was thoroughly prepared for her oral argument before the Dallas Court of Appeals. In short, there is no credible evidence to support Frazin's claim that the Defendants misrepresented the work they had done on the appeal.

Next, Frazin complains that misrepresentations were made to Shawn about the information available in the Defendants' files. Since Shawn did not appear at trial, Frazin's evidence of such alleged misrepresentations comes from email traffic among the parties. The new complaints here involve alleged misrepresentations about the existence of a "matrix" of the evidence and whether the Defendants had a computer searchable copy of the reporter's record.

To put this claim in context, Frazin essentially asserts that a cover-up was underway.

According to Frazin's arguments at trial, the Defendants knew by October 8, 2007 (when Frazin told the G&N Defendants to deal with Shawn in connection with the appeal and other related legal matters), that they had blundered – either on appeal (by not citing the correct record cites and authorities and by not making the correct legal arguments) or at trial (by not asking the right questions of Frazin on contract formation).[67]  Once Shawn (a former lawyer) got involved, so Frazin's story goes, the Defendants became concerned that Shawn might figure it out, so they did everything in their power to make it difficult for Shawn to uncover the Defendants' mistakes, including making misrepresentations about the thoroughness of their work in connection with the appeal (and the other subsumed misrepresentations) and the "new" misrepresentations about the lack of an evidence matrix and a computer searchable form of the reporter's record.

While it is certainly true that Shawn asked Griffith for a matrix of the evidence at trial and a computer searchable copy of the trial record, there is no other credible evidence to support the balance of this claim.  Griffith responded to Shawn that he didn't have either of the requested items. Based upon the Court's review of the record, when Griffith made those statements to Shawn they were true; Griffith did not have an evidence matrix,[68] nor did he have a computer searchable copy of the trial record.  While a computer searchable version of the trial record could have been obtained, it wasn't.  Moreover, while Haynes and Boone had prepared a summary of the reporter's record as part of its work on the appeal (not quite the "matrix" Shawn had described, but close), when Griffith made the statement to Shawn, he was unaware of the Haynes and Boone summary.

---

[67]Although this argument is at odds with the stipulated fact in the Pre-Trial Order that on October 26, 2007, when the Lamajak settlement was accepted, the Defendants did not believe that Frazin had any intention to assert claims against them, and Frazin did not anticipate litigation against the Defendants.  Pre-Trial Order, § 64.

[68] Frazin admits in ¶ 8 of the Complaint that "[n]o evidence matrix was prepared . . . ."

As regards the H&B Defendants, Frazin notified the H&B Defendants that they were authorized to deal directly and exclusively with Shawn on October 24, 2007. Pre-Trial Order, ¶ 59. It is undisputed that Shawn and Cortell spoke by telephone on October 25, 2007. Pre-Trial Order, ¶ 60. Cortell testified, without contradiction, that she told Shawn about the Haynes and Boone summary during this telephone conversation and that Shawn did not ask her for a copy of the summary at that time. Moreover, while there is no evidence that Shawn asked Cortell for a computer searchable copy of the reporter's record, the H&B Defendants did not have one either.

Accordingly, the Court concludes that Frazin failed to prove an essential element of this misrepresentation claim as against each of the Defendants. To the extent that Frazin is complaining that a matrix *should* have been prepared, or that a computer searchable copy of the reporter's record *should* have been obtained, that claim is a negligence claim not cognizable under the DTPA.

Finally,[69] Frazin complains that the Defendants failed to keep him informed and failed to comply with all reasonable requests for information in order to permit him to make informed decisions with respect to the case. There is simply no credible evidence to support this claim. Frazin or his designee was kept appropriately informed by the Defendants at every stage of the representation – *i.e.*, at trial, on appeal, after the Dallas Court of Appeals' decision was received and during the settlement discussions with Lamajak. Moreover, Frazin or his designee actively participated in the representation or had the opportunity to fully participate in the representation. Frazin did not testify at the trial of the Malpractice Claims that he was somehow misled into settling

---

[69]Although one more contested issue of fact is contained in the Pre-Trial Order, it relates to whether Frazin was independently represented by other counsel when G&N was retained. That issue relates solely to the applicability of one of the G&N Defendants legal defenses to the DTPA/misrepresentation claims and is discussed there. *See supra* at p. 83.

**Memorandum Opinion** **Page 95**

with Lamajak,[70] or that he was unhappy with the settlement in some way. In fact, Frazin clearly wanted the settlement to be consummated and now wishes to recover from the Defendants the monies he claims he "lost" on appeal (due to the Dallas Court of Appeals' decision to reverse the Final Judgment in part) due to the Defendants' alleged negligence, DTPA violations/misrepresentations, and breaches of fiduciary duty.

Additionally, based upon its review of the record, the Court finds that the Defendants did not (i) cause confusion or misunderstanding as to the source of the services, (ii) cause confusion or misunderstanding as to the affiliation, connection, or association between the service providers, (iii) represent that the services would have, and did have, characteristics and benefits which they did not have, (iv) represent that the services were of a particular standard or quality when they were of another, (v) represent that work or services had been performed when they had not, (vi) fail to disclose information concerning services, intending to induce Frazin into a transaction he would not have entered had the information been disclosed, (vii) withhold information from Frazin pertaining to the quality of the appellate work, the extent of the appellate work, or pertaining to the evidence in the reporter's record in the State Court Action, (viii) fail to disclose material information to Frazin, (ix) make any misrepresentation or omission of material fact in discussing with Frazin or Shawn whether to accept the Lamajak settlement offer, (x) make or breach any express or implied warranty, (xi) engage in unconscionable conduct, and/or (xi) knowingly or intentionally engage in any deceptive trade practices, commit a breach of warranty, or act unconscionably. Accordingly, the Court concludes that Frazin's DTPA/misrepresentation claims fail.

---

[70]There is no credible evidence to suggest that the Defendants misrepresented the relative strengths of the parties' respective cases on appeal to attempt to entice Frazin to settle with Lamajak.

C.    **Breach of Fiduciary Duty Claims.**

In general, in order to prevail on his breach of fiduciary duty claims, Frazin must prove (1) the existence of a fiduciary duty, (2) a breach of that duty, (3) which proximately causes, (4) damages to himself. *Floyd v. Hefner*, 556 F.Supp.2d 617, 661 (S.D. Tex. 2008) (citing *Abetter Trucking Co. v. Arizpe*, 113 S.W.3d 503, 508 (Tex. App. 2003)) (hereinafter *Abetter*); Restatement (Third) of The Law Governing Lawyers § 49 (2000) (requiring that the breach be "a legal cause of the [claimant's] injury")); *Kira, Inc. v. All Star Maintenance*, No. A-03-CA-950 LY, 2006 WL 2193006 *14 (W.D. Tex. July 31, 2006); *Texas First Nat. Bank v. Ng*, 167 S.W.3d 842, 857 (Tex. App. – Houston [14 Dist.] 2005) (citing *Abetter* at 508). Frazin has the burden of proving each element by a preponderance of the evidence. *Sealed Party v. Sealed Party*, No. CIV-A-H-04-2229, 2006 WL 1207732 (S.D. Tex. May 4, 2006); *Wagner ex rel. Nationwide Mut. Texas Employees v. Nationwide Lloyds*, No. 03-07-00292-CV, 2008 WL 537484 at *2 n4 (Tex. App. – Austin Feb. 27, 2008).

Before analyzing the merits of Frazin's breach of fiduciary duty claims, the Court must address a defense raised by the Defendants to defeat these claims as a matter of law. Specifically, the Defendants argue that Frazin cannot recover on his breach of fiduciary duty claims because those claims are simply re-stated negligence claims and, as such, they are not legally cognizable as breach of fiduciary duty claims. As noted earlier in connection with the analysis of Frazin's DTPA claims, under Texas law, a plaintiff may not fracture what is essentially a negligence claim into claims for DTPA violations, breach of fiduciary duty, and other claims, and the Court is not bound by any labels Frazin has used. *See supra* at p. 75. On the other hand, the hallmark of a claim for breach of fiduciary duty in the attorney-client context is that the attorney received an improper benefit by, for

example, "subordinating his client's interests to his own, retaining the client's funds, using the client's confidences improperly, taking advantage of the client's trust, engaging in self-dealing, or making misrepresentations." *Kimleco Petroleum*, *Inc. v. Morrison & Shelton*, 91 S.W.3d 921, 923 (Tex. App. – Fort Worth 2002) (citing *Goffney v. Rabson*, 56 S.W.3d 186, 193 (Tex. App. 2001)) (noting several examples of breach of fiduciary duty, including "failure to deliver funds belonging to the client").

Other than the facts set forth in paragraphs 14 and 15 of the Complaint, Frazin does not indicate specifically which other factual allegations he relies upon to state his breach of fiduciary duty claims. Rather, he points to "Defendants' actions as outlined above." Complaint, ¶ 31. The Court will therefore analyze all of the Defendants' alleged acts as described in ¶¶ 1–29 of the Complaint. Also, the Pre-Trial Order contains a summary of Frazin's breach of fiduciary duty claims. Pre-Trial Order, ¶ I.3. To the extent not duplicative of the factual allegations in the Complaint, the Court will analyze the acts alleged there too.

As noted earlier in connection with the Court's analysis of Frazin's DTPA claims, the allegations in ¶¶ 7, 8, 11, 12 and 13 of the Complaint all clearly relate to the quality of the Defendants' representation of Frazin and are therefore professional negligence claims. Similarly, the factual allegations that the Defendants "misrepresented" the quality of work that Haynes and Boone would perform, that Cortell "misrepresented" her role in the appeal, and that Haynes and Boone and Cortell "misrepresented" that they would or did carefully review the record  fall into the category of "misrepresentations," but they are so closely related to issue of work quality as to be claims for professional negligence rather than claims for breach of fiduciary duty. *See supra* at p. 76.

Frazin's remaining allegations require greater scrutiny to determine whether they are proper

**Memorandum Opinion**                                                                 **Page 98**

breach of fiduciary duty claims or are simply re-stated negligence claims. As previously noted, the only facts specifically pled as breaches of fiduciary duty are found in paragraphs 14 and 15 of the Complaint. In addition, the Pre-Trial Order contains eight statements of fact asserted to give rise to a breach of fiduciary duty claim, two of which are not duplicative of facts alleged in the Complaint. In those paragraphs, Frazin argues that one or more of the Defendants breached their fiduciary duties to him by: (1) requesting that he release claims against all of the Defendants in exchange for the previously-volunteered fee reduction, Complaint, ¶ 14; (2) arguing that he had waived his claims against the Defendants by accepting a $92,000 fee reduction when in fact he had specifically refused to sign the release, *id*.; (3) failing to inform him that they would continue to make such a claim, *id*.; (4) representing to this Court[71] that a waiver had occurred without revealing that Frazin had specifically rejected the release, *id*. at ¶¶ 14, 15; (5) requesting an expedited fee hearing upon learning that Frazin was troubled by the quality of their work, *id*. at ¶ 15; (6) failing to inform Frazin that a fee hearing would bar certain claims Frazin might wish to bring against the Defendants, *id*.; (7) attempting to include the Defendants' withdrawal from representation in a proposed order to be signed by Judge Hale, even though withdrawal had not been ordered by Judge Hale, *id*.; (8) refusing to allow Frazin to properly place his claims against the Defendants in issue, *id*.; (9) inducing Frazin to settle by misrepresenting the quality of the Defendants' work and the strength of the case on appeal, Pre-Trial Order, ¶ I.3.g; and (10) misrepresenting to Shawn what material was available for his review, so he could make an informed decision on whether to settle the case or appeal it further, *id*. at ¶ I.3.h (collectively, the "Fiduciary Duty Allegations").

---

[71]Sitting through both the undersigned judge and Judge Hale.

**Memorandum Opinion**                                                                 **Page 99**

After carefully considering the parties' arguments, the Court concludes that allegations 1, 2, 4, 5, 7, and 9 of the Fiduciary Duty Allegations are not re-stated professional negligence claims. In making those allegations, Frazin is not concerned about the quality of representation he received. Rather, Frazin alleges that the Defendants put their own interests ahead of his and sought a benefit to which they were not entitled at his expense. Allegations 3, 6, and 10 of the Fiduciary Duty Allegations involve failures to inform Frazin or his legal representative. Failing to inform a client of pertinent information could represent professional negligence. But, here again, Frazin is not so much concerned about the quality of representation (whether or not he learned the information) as he is concerned that his attorneys were withholding the information in an attempt to further their goals over his own. Likewise, an allegation—such as allegation 8 of the Fiduciary Duty Allegations—that attorneys refused to let the client properly place his claims in issue could represent professional negligence. But, where the claims in question are claims against the attorneys themselves, loyalty rather than quality of representation is the overriding concern. For these reasons, the Fiduciary Duty Allegations are properly pled as claims for breach of fiduciary duty.

Having determined that certain of Frazin's allegations are not re-stated professional negligence claims, the Court must now determine whether the conduct described in the Fiduciary Duty Allegations amounts to a breach of the Defendants' fiduciary duties to Frazin. Allegations 1 through 4 are interrelated and deal, in various respects, with the Defendants' demand for a release from Frazin and the subsequent waiver argument advanced by the Defendants before this Court. A reminder of the relevant facts is required to put these acts into perspective.

As noted previously, after the Lamajak settlement offer had been accepted, Shawn asked Griffith to ask Cortell to forgo the entirety of the Haynes and Boone fee because of concerns about

the quality of the appellate work done by Haynes and Boone. Shawn also asked Griffith to agree to let Frazin benefit from that forfeiture.[72] By email dated November 2, 2007, Griffith responded to Shawn's request by refusing to ask Haynes and Boone to forego any more of its fee than what had already been conceded – *i.e.*, its share of the agreed $92,000 fee reduction. Pre-Trial Order, ¶ 67. Griffith also notified Shawn that because Frazin was now trying to get even more money despite the October 26 fee reduction agreement, Frazin would be required to sign a written release to receive the fee reduction. *Id*. The release was Cortell's idea.

By subsequent e-mail also dated November 2, 2007, Griffith sent the Defendants' proposed release to Shawn, copying Frazin. Pre-Trial Order, ¶ 68. The release contained the following language in all capital, bold letters that were larger in font size than the text in the rest of the release:

> **THE UNDERSIGNED FURTHER STATES THAT HE HAS CAREFULLY READ THE FOREGOING FINAL RELEASE AND KNOWS THE CONTENTS THEREOF, THAT HE HAS BEEN ADVISED TO SEEK ADVICE OF AN ATTORNEY CONCERNING THE CONTENTS AND LEGAL CONSEQUENCES OF THE EXECUTION THEREOF AND THAT HE EXECUTES THIS FINAL RELEASE OF HIS OWN FREE WILL.**

On November 6, 2007, Shawn called Griffith, vigorously objecting to the firms' request for a written release and indicating that Frazin would not sign such a release. Pre-Trial Order, ¶ 69. Shawn threatened to sue the firms if the Lamajak settlement was jeopardized by the firms' new demand.

By e-mail dated November 7, 2007, Griffith notified Shawn that the firms had reconsidered and that Frazin would not have to sign a written release to obtain the fee reduction originally agreed

---

[72]Since Haynes and Boone was to be paid out of G&N's contingency fee recovery, if Haynes and Boone forfeited its fee, G&N would be the beneficiary of such reduction under the parties' agreements.

to on October 26, 2007.  Pre-Trial Order, ¶ 70.

On November 16, 2007, Frazin executed the Settlement Agreement with Lamajak to compromise and settle the State Court Action.  In accordance with the Litigation Proceeds Order, Haynes and Boone received the Litigation Proceeds from Lamajak on November 19, 2007, which were then placed into Haynes and Boone's trust account.  On that same date, Haynes and Boone filed the Distribution Motion, seeking further guidance from this Court regarding disbursements of the Litigation Proceeds upon the Court's approval of the Settlement Agreement, and a motion for expedited hearing on the Distribution Motion.  Not finding there to be a need for an expedited hearing, the Court denied that motion and the Distribution Motion was set for hearing on December 27, 2007.

It's here that the plot begins to thicken according to Frazin.  Zyne, Frazin's bankruptcy lawyer, testified that she got a call from a Haynes and Boone lawyer on November 16, 2007, advising her of the Lamajak settlement.  According to Zyne, the Haynes and Boone lawyer was a bit pushy, offering to "help her" get the Settlement Motion on file immediately.  Zyne was taken aback by this conduct since she was the Debtor's bankruptcy counsel (and was well qualified to file such a motion) and Haynes and Boone was simply Frazin's special appellate counsel for the Lamajak appeal.  Zyne also expressed some irritation at having not been advised of the settlement earlier – *i.e.*, prior to Frazin having signed the Settlement Agreement.  Because she "smelled a rat,"[73] Zyne called Shawn to ask what had happened and learned, for the first time, that questions had been raised about the quality of the Defendants' representation of Frazin on appeal.

---

[73]The Court's words, not Zyne's.

**Memorandum Opinion**                                                                  **Page 102**

Zyne filed the Settlement Motion on November 30, 2007 on negative notice, such that it could be granted by this Court without a hearing if no one objected to the motion.[74]  On that same date, Haynes and Boone filed its fee application, requesting approval of its fees pursuant to the contingency fee arrangement with the Debtor and G&N.  G&N filed its fee application on December 3, 2007, also seeking approval of its fees pursuant to its contingency fee arrangement with the Debtor.  No motion to expedite either fee application was filed, and they were both set for hearing on December 27, 2007, along with the Distribution Motion.

Frazin objected to the Haynes and Boone fee application on December 20, 2007 and filed a motion to continue the hearing on both fee applications.  Schepps filed the objection and the motion to continue on Frazin's behalf.  Frazin stated in his motion to continue the fee hearings that he was going to file an objection to the G&N fee application as well.  That objection was filed on December 26, 2007 and Griffith was served with it at the December 27, 2007 hearing.

The parties agreed prior to the commencement of the December 27, 2007 hearing to continue the fee applications to February 4, 2008, when the undersigned judge would be available to hear the now contested fee applications.  However, the hearing on the Distribution Motion went forward with Judge Hale presiding.  At that hearing, the Defendants argued to Judge Hale that Frazin had waived his right to object to their fees because of his agreement to accept a $92,000 fee reduction from them in connection with his decision to accept the Lamajak settlement offer.  While the fee applications were no longer being heard by Judge Hale on that date, this argument was advanced by the Defendants as part of their effort to persuade Judge Hale to withhold the $92,000 agreed fee

---

[74] *See* Rule 9007.1 of the Local Rules of the Bankruptcy Court for the Northern District of Texas.

**Memorandum Opinion**                                                      **Page 103**

reduction from the monies that would otherwise be paid to Frazin pursuant to the terms of the Distribution Motion. In other words, according to the Defendants, because Frazin had "waived" his right to object to the firms' fees by agreeing to accept a $92,000 fee reduction as part of the decision to accept the Lamajak settlement offer, if Frazin was going to be permitted to object to the firms' fee applications, he should not get the benefit of the $92,000 reduction.[75] Judge Hale ultimately decided to withhold the $92,000 from Frazin pending the hearing on the fee applications where the undersigned could sort out those issues on the merits.

However, in making their waiver argument, the Defendants failed to tell Judge Hale about the facts surrounding their prior demand for a release of claims by Frazin and Frazin's refusal to agree to grant them such a release. According to Frazin, each of these acts[76] constitute a breach of fiduciary duty by the Defendants.

In deciding whether a breach of fiduciary duty occurred here, the Court must first address whether Frazin enjoyed a fiduciary relationship with the Defendants. While the Defendants do not contest the existence of a fiduciary relationship between themselves and Frazin at some point in time, they do argue that they either owed no fiduciary duty or a reduced duty to Frazin at the time the Defendants requested a release of claims against them and thereafter.

Under Texas law, the relationship between client and attorney is one of principal and agent. *Dow Chemical Co. v. Benton*, 357 S.W.2d 565, 567 (Tex. 1962). The relationship is therefore a

---

[75]This waiver argument has evolved since it was first made. Haynes and Boone now argues it somewhat differently than it was argued on December 27, 2007. *See infra* at pp. 123-24.

[76]The acts again are demanding the release, arguing that Frazin had waived his right to assert claims against them or object to the fee applications by accepting a $92,000 fee reduction when in fact Frazin had specifically refused to sign the release, failing to inform Frazin that they would continue to make such a waiver argument, and representing to this Court that a waiver had occurred without revealing that Frazin had specifically rejected the proposed release.

fiduciary one. *Willis v. Maverick*, 760 S.W.2d 642, 645 (Tex. 1988). An attorney's fiduciary duties to a client are extremely important, but they "extend only to dealings within the scope of the underlying relationship of the parties." *Joe v. Two Thirty Nine Joint Venture*, 145 S.W.3d 150, 159-60 (Tex. 2004) (hereinafter *Joe*) (citing *Rankin v. Natalia*, 557 S.W.2d 940, 944 (Tex. 1977)); *Joseph v. State*, 3 S.W.3d 627, 639 (Tex. App. – Houston [14 Dist.] 1999); Restatement (Third) of the Law Governing Lawyers § 16 CMT. c; § 50 CMT. d (2000) (a lawyer's duties are ordinarily limited to matters covered by the representation)). To determine the scope of the parties' relationship, the Court must look to the contract between the parties. This is because, under Texas law, the attorney-client relationship is based solely on contract, whether express or implied. *Simpson v. James*, 903 F.2d 372, 376 (5th Cir. 1990) (applying Texas law); *Hill v. Bartlette*, 181 S.W.3d 541, 547 (Tex. App. – Texarkana 2005) (holding that there was no attorney-client relationship where the plaintiff believed a certain person was her attorney, but there was no express contract and no course of conduct that would imply a contractual relationship); *Parker v. Carnahan*, 772 S.W.2d 151, 156 (Tex. App. – Texarkana 1989); *Mellon Svc Co. v. Touche Ross & Co.*, 17 S.W.3d 432, 437 (Tex. App. – Houston [1st Dist.] 2000) (rejecting an argument that an attorney-client relationship existed between accountants—who were hired to perform accounting services only—and their client merely because the accountants were also lawyers).

The G&N Engagement Letter among Frazin, Frazin's mother, Lorrie Frazin,[77] and G&N specifies the "scope of employment" as representation "with respect to all claims against Lamajak . . . and Michael Cohen . . . relating to the agreement between [Frazin] and Lamajak and/or Cohen

---

[77]Lorrie Frazin was a party to the G&N Engagement Letter because she agreed to pay the first $5,000 of expenses.

. . . for the sale of Beanie Babies in 1998." DX 90:1, ¶1. In the G&N Engagement Letter, Frazin authorizes G&N to "try, compromise, settle and receive in [Frazin's] name all damages." *Id.* at ¶ 2. In exchange, the parties agreed that G&N would be retained on a contingency-fee basis and that G&N would receive 33 1/3% of any collection before trial, 40% of any collection after trial commenced, or 45% of any collection if there was an appeal. DX 90:2, ¶ 4. In turn, the Haynes and Boone Engagement Letter among Frazin, G&N, and Haynes and Boone limits Haynes and Boone's engagement "to the handling of the appeal of the current judgment in the [Lamajak] Case in the court of appeals and the Texas Supreme Court." DX 89:1, ¶ 1.

The "scope" of an attorney-client relationship has two aspects: a temporal aspect and a substantive aspect. To answer the question of whether the Defendants owed fiduciary duties to Frazin during November 2007, the Court looks first to the temporal aspect. Although there are some exceptions, an attorney's fiduciary duties do not generally extend beyond the time period of the representation. *Dillard v. Broyles*, 633 S.W.2d 636 (Tex. App. – Corpus Christi 1982) (attorney-client relationship terminated after sale closing where the clients did not attempt to retain the attorney for any other purpose).

Haynes and Boone argues that after Frazin settled with Lamajak on October 26, 2007, its fiduciary obligations to Frazin were limited to assistance in "effectuating the settlement and handl[ing] the settlement funds." Haynes and Boone's Br. in Supp of Partial MSJ, p. 38. G&N states that its representation of Frazin came to an end as early as November 16, 2007, when Frazin signed the Settlement Agreement, or November 19, 2007, when that agreement was funded. Griffith & Nixon's Br. in Supp. of Partial MSJ, ¶ 61. For the reasons explained below, the Court disagrees.

Frazin's settlement with Lamajak required bankruptcy court approval before it could be

effective. *See* DX 13:6 ("Once the Bankruptcy Court has approved this Agreement, this Settlement is final . . . Should the Bankruptcy Court . . . refus[e] to approve this Settlement, then . . . this Agreement shall become null and void."); 11 U.S.C. § 363(b)(1); Federal Rule of Bankruptcy Procedure 9019(a). That is why Zyne filed the Settlement Motion. During the December 27, 2007 hearing on the Distribution Motion, Zyne asked Judge Hale to grant the Settlement Motion and approve the Lamajak settlement. Of course, if the Settlement Motion was not approved, the Distribution Motion would have been moot.[78] It is clear from the transcript of the December 27, 2007 hearing that the Defendants thought they still represented Frazin, as they made their appearance as his special counsel at the outset of the hearing. Moreover, at the very conclusion of the hearing, a Haynes and Boone lawyer, Phelan, asked the Court to confirm that the Defendants' work for Frazin had terminated since the Settlement Motion had been approved. Judge Hale asked Zyne if she had a problem with that and she responded "No, Your Honor." Pre-Trial Order, ¶ 86. Frazin was also present and did not object. *Id*. Judge Hale then acknowledged the termination of the Defendants' representation of Frazin on the record. Accordingly, the Court concludes that the Defendants' representation of Frazin ended at the conclusion of the December 27, 2007 hearing.[79] Therefore,

---

[78]In that event, the Defendants would have been obligated to continue their representation of Frazin through an appeal to the Texas Supreme Court.

[79]Frazin argues that the Defendants remain his lawyers to this day because they have never formally moved to withdraw as his counsel in either this Court or the state court, and no order of withdrawal has been signed. While an order is normally required to evidence the formal withdrawal of an attorney in a bankruptcy case or in a state court lawsuit, that requirement is imposed when the client's need for legal services is ongoing and to insure that both the client and the court are aware of the attorney's cessation of services. Withdrawal is not at issue here because the Defendants' representation of Frazin concluded once the settlement was approved. In other words, upon this Court's approval of the Settlement Motion, the Defendants had fully performed all of the services they were required to perform pursuant to the terms of the G&N Engagement Letter and the Haynes and Boone Engagement Letter. While the parties could not agree on the terms of a written order evidencing the termination of the Defendants' representation of Frazin following the December 27, 2007 hearing, Frazin knew (as did Zyne) that the Court had orally accepted the termination of the Defendants' services. In fact, Frazin agreed to the termination of the Defendants' services through his counsel, Zyne. While the state court may not have been notified about the settlement or the termination of the Defendants' services, nothing substantive remained

**Memorandum Opinion**                                                                                           **Page 107**

during the time period when the Defendants' demand for a release from Frazin was in play –

November 2 to November 7, 2007 – the Defendants still owed fiduciary duties to Frazin.

Next, the Court must determine what those duties entailed and whether the Defendants

breached any duty by their conduct. Texas lawyers owe their clients a duty of: (i) care, (ii)

confidentiality, (iii) full disclosure, and (iv) loyalty. *Barcelo v. Elliott*, 923 S.W.2d 575, 577 (Tex.

1996) (duty of care); *Vinson & Elkins v. Moran*, 946 S.W.2d 381, 394 (Tex. App. – Houston [14

Dist.] 1997) (duty of confidentiality); *Willis v. Maverick*, 760 S.W.2d 642, 645 (Tex. 1988)

(hereinafter *Willis*) (duty of full disclosure); *Hoover Slovacek LLP v. Walton*, 206 S.W.3d 557, 561

(Tex. 2006) (hereinafter *Hoover*) (duty of loyalty). Only two of those duties are potentially

implicated here – *i.e.*, the duty of full disclosure and the duty of loyalty.[80]

The duty of full disclosure requires "absolute and perfect candor, openness and honesty, and

the absence of any concealment or deception" between the attorney and the client with respect to

all facts material to the client's representation. *Vickery v. Vickery*, 999 S.W.2d 342, 376 (Tex. 1999).

One aspect of this duty is that an attorney must disclose conflicts of interest to the client. *Goffney

v. Rabson*, 56 S.W.3d 186, 193 (Tex. App. – Houston [14 Dist.] 2001) (noting several examples of

---

to be done there either.

[80]The duty of care requires that an attorney act with the degree of care exercised by a reasonably prudent attorney. *Cosgrove v. Grimes*, 774 S.W.2d 662, 664 (Tex. 1989). In Texas, breach of the duty of care is an element of a malpractice claim. *Duerr v. Brown*, 2008 WL 2606713 (Tex. App. 2008). As noted previously, the Fiduciary Duty Allegations do not implicate the quality of the Defendants' work; rather, they allegedly implicate the furtherance of the Defendants' interests at the expense of Frazin's interests. Accordingly, the Court will leave an analysis of the duty of care to the Defendants' alleged acts of malpractice. *See supra* at pp. 40-70.

    The duty of confidentiality requires that, with certain exceptions, an attorney not reveal confidential information of a client or use that information to the disadvantage of the client. Texas Disciplinary Rule of Professional Conduct ("TDRPC") 1.05(b). This duty can come into play before an attorney-client relationship is formed, TDRPC Preamble ¶ 12, and exists after the relationship is terminated. *See, e.g., Reppert v. Hooks*, No. 07-97-0302-CV, 1998 WL 548784, at *9 (Tex. App. – Amarillo Aug. 28, 1998)*; Vinson & Elkins v. Moran*, 946 S.W.2d 381, 394 (Tex. App. – Houston [14 Dist.] 1997); *City of Garland v. Booth*, 895 S.W.2d 766, 772 (Tex. App. – Dallas 1995). However, Frazin has not alleged that the Defendants divulged information held in confidence.

---

**Memorandum Opinion** **Page 108**

breach of fiduciary duty, including an "attorney's failure to disclose conflicts of interest").

The duty of loyalty requires the attorney to place the client's interests ahead of the attorney's own interests. *Id.* (noting, as an example of breach of fiduciary duty, "placing personal interests over the client's interest"). The duty of loyalty is not unlimited, however. It does not extend beyond the subject matter of the representation. *Joe*, 145 S.W.3d at 159–60.

Having determined that the Defendants still owed fiduciary duties to Frazin in November 2007, the Court must next decide whether any such duty is implicated by the Defendants' request for a release and, if so, whether the Defendants breached that duty by requesting a release of claims from Frazin in exchange for what Frazin characterizes as a previously-volunteered fee reduction. After carefully considering the parties' arguments and authorities, the Court concludes that the Defendants' request for a release from Frazin is outside the scope of their representation of Frazin. The Defendants did not (and could not) represent Frazin in connection with his potential claims against them. Moreover, the duty of full disclosure is not implicated because the request for a release did not involve any act of concealment or deception between the Defendants and Frazin with respect to any fact material to the Defendants' representation of Frazin—*i.e.*, in connection with the Lamajak litigation or appeal.

However, even assuming that a duty was owed to Frazin, the Court concludes that the Defendants' request for a release was not a breach of any such duty. Texas Disciplinary Rule of Professional Conduct ("TDRPC" or "Rule") 1.08(g) states that "[a] lawyer shall not make an agreement prospectively limiting the lawyer's liability to a client for malpractice unless permitted by law and the client is independently represented in making the agreement, or settle a claim for such liability with an unrepresented client or former client without first advising that person in writing that

**Memorandum Opinion**                                                                                           **Page 109**

independent representation is appropriate in connection therewith." The Preamble to the Rules states that they do not define standards of civil liability for lawyers, Preamble to the Rules § 15, and several cases have so held. *See, e.g.*, *Dyer v. Shafer, Gilliland, Davis, McCollum & Ashley, Inc.*, 779 S.W.2d 474, 479 (Tex. App. – El Paso1989) ("[V]iolation of state bar rules does not create a private cause of action.") (cited in *The Relationship Between the Texas Disciplinary Rules of Professional Conduct and Legal Malpractice*, 43 Baylor L. Rev. 115, 116 (1991)). Nevertheless, Texas courts have used the Rules as standards for conduct in malpractice and breach of fiduciary duty cases. *Sealed Party v. Sealed Party*, No. CIV.A.H-04-2229, 2006 WL 1207732 (S.D. Tex. May 4, 2006) (stating that Texas Disciplinary Rules "may be considered evidence and significantly inform the analysis of the scope of fiduciary duties between attorneys and their clients"); *Two Thirty Nine Joint Venture v. Joe*, 60 S.W.3d 896, 905 (Tex. App. – Dallas 2001), *rev'd in part on other grounds*, 145 S.W.3d 150 (Tex. 2004) (stating that a trier of fact can use disciplinary rules as evidence of violation of an existing duty of care for claims of legal malpractice or breach of fiduciary duty) (citing Restatement (Third) of Law Governing Lawyers § 52(2) (2000) ("Proof of a violation of a rule or statute regulating the conduct of lawyers . . . (c) may be considered by a trier of fact as an aid in understanding and applying the standard of . . . § 49 [breach of fiduciary duty].")); *Stephenson v. LeBoeuf*, 16 S.W.3d 829, 828 (Tex. App. – Houston [14 Dist.] 2000) (agreeing that an attorney did not breach a fiduciary duty by claiming escrow funds because Rule 1.08(h)(1) allows an attorney to "acquire a lien granted by law to secure the lawyer's fee or expenses."). Accordingly, this Court concludes that it is appropriate to take Rule 1.08(g) into consideration when deciding whether the Defendants have breached a fiduciary duty they owed to Frazin by requesting the release.

While Frazin does not allege that the Defendants breached Rule 1.08(g), he does allege that

they breached their fiduciary duties to him by simply requesting the release, without citation to any specific legal authority.[81]  The Court cannot agree with this overly simplistic argument.  Lawyers should be able to request a release from their clients without that request amounting to a breach of fiduciary duty so long as certain safeguards are in place for the client's protection.  In Texas, Rule 1.08(g) allows for such requests and provides what those safeguards are—*i.e.*, to settle a claim with an unrepresented client, you must advise the client in writing that independent representation of the client is appropriate.

Here, the Defendants' request for a release from Frazin was made to Shawn (a lawyer) and the proposed release sent to Shawn contained language in bold capital letters advising Frazin to seek the advice of an attorney in regards to the release.  Pre-Trial Order, ¶ 68.  This conduct complies with the requirements of Rule 1.08(g).  Moreover, the Defendants never spoke to Frazin about the requested release, they spoke to Shawn instead.  Finally, Shawn rejected the proposed release within a few days of the request having been made.  While it may be possible that some acts that are consistent with the Texas Disciplinary Rules of Professional Conduct could constitute breaches of fiduciary duty, the Court does not believe that the Defendants' request for a release here is such an act.

Although the Court need not carry its analysis of this particular claim further, it finds that Frazin failed to prove any damages flowing to him as a result of the Defendants' request.  Because, at a minimum, there was no breach of duty and no damages to Frazin, Frazin's breach of fiduciary duty claim based upon the Defendants' request for a release fails.

---

[81]Frazin's legal analysis regarding his breach of fiduciary duty claims is quite general and not tailored to his specific alleged acts.  For example, in a 32-page Response to the Defendants' Joint Motion for Partial Summary Judgment (Docket No. 75), Frazin devotes 1 ½ pages to his breach of fiduciary duty claims.

Turning to the second and fourth acts alleged by Frazin to constitute a breach of fiduciary duty—*i.e.*, the failure to disclose to the Court in connection with their waiver argument on December 27, 2007 that the Defendants had demanded a release of claims from Frazin and that Frazin had refused to grant such a release to them—the Court concludes that these acts constitute a breach of a fiduciary duty the Defendants owed to Frazin. The Defendants' representation of Frazin included efforts to settle the Lamajak litigation on terms that Frazin would find acceptable. Once Frazin agreed to accept Lamajak's settlement offer, the Defendants had a duty to make sure their client received his share of the settlement proceeds. To facilitate Frazin's analysis of Lamajak's settlement offer, the Defendants itemized for Frazin what amount of money he would receive from the proposed settlement. That itemization included the $92,000 fee reduction the Defendants agreed to accept (or volunteered to give to Frazin, depending on whose version of the facts you accept). By making their waiver argument to Judge Hale on December 27, 2007, the Defendants asked the Court to withhold monies from Frazin that they had previously agreed he was entitled to receive. Irrespective of the merits of their legal argument, they should not have made this argument while still representing Frazin. By making this argument, they put their interests ahead of their client's interests, thus implicating the duty of loyalty.

However, Frazin failed to prove any damages to him caused by the Defendants' acts. The $92,000 impounded by Judge Hale has been held by Haynes and Boone since December 27, 2007 in a trust account pending further order of the Court. Frazin did not offer any evidence to establish that he has needed this money or that he has suffered any other consequential damages as a result of the impounding of these funds.

Because Frazin failed to prove any damages, Frazin's breach of fiduciary duty claim based

**Memorandum Opinion**                                                              **Page 112**

upon the waiver argument fails.

Similarly, Frazin argued at trial that the Defendants' request on December 27, 2007 that the Court withhold another $300,000 of the settlement monies from Frazin was a breach of fiduciary duty by the Defendants. For the reasons explained previously, the Court concludes that the Defendants continued to represent Frazin at the time this request was made of Judge Hale. Moreover, the Court concludes that ensuring that their client receive the monies to which he was legally entitled under the Settlement Agreement was within the scope of the Defendants' representation of Frazin. However, the impounding of the additional $300,000 is less troubling to the Court than the impounding of the $92,000 is. The reason why is relatively simple. While the Court does not find the Defendants' "waiver" argument persuasive with respect to the $92,000, *see infra* pp. 123-25, the Defendants do have a legitimate basis upon which to request the impounding of the $300,000. Specifically, the Defendants have administrative claims in Frazin's bankruptcy case for the fees they are owed by Frazin, assuming their fee applications are ultimately approved by the Court. Moreover, administrative fee claimants in a bankruptcy case may be legally entitled to recover the fees they incur in defending their fee applications from frivolous objections. *See In re Teraforce Technology Corp.*, 347 B.R. 838, 866–67 (Bankr. N.D. Tex. 2006) (rejecting a *per se* rule that would deny recovery of fees for defending fee applications in all situations; concluding that such fees could be recovered "where sanctions are appropriate for the filing of inappropriate objections") (citing *In re St. Rita's Assocs. Private Placement, L.P.*, 260 B.R. 650 (Bankr. W.D.N.Y. 2001)). Counsel for a debtor (whether general or special) or a creditors' committee (or any other estate professional) should be entitled to protect itself by seeking to ensure that its potential allowed administrative claim

can be paid in full by the debtor (as the Bankruptcy Code requires) without having to fear being subjected to a claim for breach of fiduciary duty by its client. In other words, by asking the Court to ensure that there were sufficient funds available to pay their potential allowed administrative claims in full upon ultimate allowance as the Bankruptcy Code requires, the Defendants did not breach any fiduciary duty they owed to Frazin.

However, even assuming that the Defendants' request that additional funds be set aside to ensure that their potential allowed administrative claims could be fully paid by Frazin was a breach of fiduciary duty, Frazin failed to prove any damages flowing to him as a proximate cause of the Defendants' act. The additional $300,000 impounded by Judge Hale has been held by Haynes and Boone since December 27, 2007 in a trust account pending further order of the Court. Frazin did not offer any evidence that he has needed this money or that he has suffered any other consequential damage as a result of the impounding of these additional funds. Because Frazin failed to prove any damages, this claim fails.

Turning to the third act alleged by Frazin to constitute a breach of fiduciary duty—*i.e.*, the failure to inform Frazin that the Defendants would continue to make their waiver argument—the Court concludes that this act constitutes a breach of fiduciary duty. As noted previously, the duty of full disclosure requires "absolute and perfect candor, openness and honesty, and the absence of any concealment or deception" between the attorney and the client with respect to all facts material to the client's representation. *Vickery v. Vickery*, 999 S.W.2d 342, 376 (Tex. 1999). By not advising Frazin that they no longer felt bound by their prior agreement to accept a $92,000 fee reduction, the Defendants concealed a material fact from Frazin that was within the scope of their representation of him.

However, once again, Frazin failed to prove any damages. Accordingly, this claim fails too.

The next alleged acts giving rise to breaches of fiduciary duty are interrelated and will be addressed together—*i.e.*, the Defendants' (i) request for an expedited fee hearing when they knew there was a dispute arising, (ii) failure to inform Frazin that a fee allowance would bar any future claims against them, and (iii) refusal to allow Frazin the right to place his Malpractice Claims in issue. These three acts are alleged to be part of a Machiavellian plot by the Defendants. Stated most harshly, according to Frazin, the Defendants hoped to rush their fee applications to hearing so quickly that Frazin could not (or did not) object and then, when Frazin later sued them for malpractice, they would spring the Fifth Circuit's decision in *In re Interlogic Trace, Inc.*, 200 F.3d 382 (5th Cir. 2000) (holding that malpractice claims against professionals retained by a bankruptcy debtor were barred by *res judicata* where the debtor was aware of the facts underlying the claims before the fee hearing but failed to object to the fee applications) on him to bar the assertion of the Malpractice Claims.[82]

However, Frazin's starting premise is factually inaccurate with respect to two of those alleged acts—*i.e.*, the Defendants never sought an expedited hearing on their fee applications and the Defendants did not refuse to allow Frazin the right to place the Malpractice Claims in issue. Rather, the Defendants' fee applications were set for hearing in accordance with the Bankruptcy Rules.[83] Frazin timely objected to the applications, the Court heard them and Frazin's objections in

---

[82]Although probably an unfair question by the Court in hindsight, Phelan essentially admitted as much to the Court at a hearing.

[83]Admittedly, the Defendants set their fee applications for hearing on the earliest possible date in accordance with the Bankruptcy Rules. Frazin argues that if the Distribution Motion had been set for expedited hearing, then the Defendants would have asked for an expedited hearing on their fee applications as well. This is pure speculation by Frazin as to what the Defendants might have done in other circumstances. As such, it requires no further response.

**Memorandum Opinion**                                                                                            **Page 115**

conjunction with the trial of the Malpractice Claims, and the Court has addressed all of those issues in this Memorandum Opinion. As is obvious by a 6-day trial and this opinion, Frazin filed his Malpractice Claims against the Defendants and has had his day in court on them. So, with respect to these two alleged acts, Frazin's breach of fiduciary duty claims fail because no such act occurred.

Turning to the last of these three alleged acts—*i.e.*, failing to inform Frazin that a failure to object would bar his later assertion of the Malpractice Claims—it is true that the Defendants did not advise Frazin about the potential res judicata effect of allowing their fee applications to be heard without objection. But, as you would expect, his bankruptcy lawyer, Zyne, did, and Frazin timely objected to the fee applications, thereby preserving the Malpractice Claims for adjudication. So, what is clear here is that Frazin failed to prove that he was damaged by the Defendants' alleged improper act, and his claim fails on this basis alone.

Although perhaps unnecessary to decide,[84] the harder question is whether the Defendants' failure to advise Frazin about the res judicata effect of a failure to object to the Defendants' fee applications was a breach of the duty of full disclosure. Frazin contends, without citation to specific legal authority, that the Defendants had a "non-delegable duty" to advise him about the need to object to their fee applications. The Court disagrees, because that act falls outside the scope of the Defendants' representation of Frazin. The Defendants did not (and could not) represent Frazin in connection with his objections to their fee applications. Frazin does not challenge the Defendants' calculations of their fees pursuant to their respective engagement letters. Rather, Frazin objects to the Defendants' fee applications based upon his belief that the Defendants are liable to him for

---

[84]The Court will decide it, however, because of Frazin's arguments about fee forfeiture, which will be discussed below. *See infra* at pp. 119-123.

**Memorandum Opinion**                                                        **Page 116**

malpractice, deceptive trade practices, and/or breaches of fiduciary duty. Frazin has independent counsel to represent him in connection with those matters. Because the Defendants' representation of Frazin did not include his objections to their fee applications, this claim also fails.

Next, Frazin contends that the Defendants' attempt to include their withdrawal from representation in a proposed order was a breach of fiduciary duty because withdrawal had not been ordered by the Court. Quite frankly, this claim is irritatingly silly. What happened factually is this. At the conclusion of the December 27, 2007 hearing, the Defendants asked the Court to confirm that their representation of Frazin had terminated (due to the Court's approval of the Settlement Agreement). Judge Hale asked Frazin's general bankruptcy counsel if she had any objection to the termination of the Defendants' representation of Frazin. She did not. Nor did Frazin who was present at the hearing. Judge Hale then said he was not sure the termination needed to be memorialized in an order, but the Defendants could submit one to him if they wanted to. Phelan stated that he would submit such an order.

Following the hearing, Haynes and Boone attempted to draft an order regarding the termination of the Defendants' representation of Frazin. Not surprisingly, a dispute arose between the Defendants and Zyne over the appropriate terms of the order and no agreement could be reached. According to Zyne, the Defendants tried to overreach and have the order contain terms different from what was discussed at the hearing. Although various drafts of an order went back and forth between the parties, no agreement could be reached. And, when no agreement was reached, the Defendants apparently decided that they did not need a written order, relying instead upon the Court's oral acknowledgment of the termination of their representation on the record at the hearing and Frazin's agreement on the record to that termination.

**Memorandum Opinion**                                                                    **Page 117**

However, the act Frazin complains about—*i.e.*, "attempting to have Judge Hale's order include an order allowing Defendants withdraw [sic] from representation when such had not been ordered," Complaint, ¶ 15(d), is simply factually inaccurate. No draft of the proposed order following the December 27, 2007 hearing addressed the Defendants' withdrawal from Frazin's representation. In fact, the word "withdraw" or "withdrawal" is not mentioned in any of the drafts. *See* DX 297:1, 12–14; 298; 299; 301:1, 8–12. Nor should it have been, as there was no representation to withdraw from once the Court approved the Settlement Agreement; rather, the representation ended because all required services had been performed. Accordingly, this claim fails because Frazin failed to prove the act allegedly underlying the claim.

Moreover, even if the Defendants had attempted to "slip" withdrawal into their proposed order following the December 27, 2007 hearing, that act would not give rise to a breach of fiduciary duty claim against them because at the time the proposed order was drafted by Haynes and Boone and tendered to Zyne, Frazin was no longer represented by the Defendants. No representation, no duty, no claim. It's just that simple.

Next, Frazin complains that the Defendants (i) induced him to settle with Lamajak by misrepresenting the quality of their work and the strength of the case on appeal, and (ii) misrepresented to Shawn what material was available for his review, apparently arguing that Shawn was thus unable to make an informed decision about whether to settle the Lamajak case or appeal it further. The problem with these alleged acts giving rise to a breach of fiduciary duty claim is the absence of credible evidence to support the existence of the acts. As the Court has previously found, Frazin failed to prove that the Defendants misrepresented (i) the quality of their work or the strength of the case on appeal to Frazin or (ii) the materials available to Shawn so that he could make an

informed decision about the proposed Lamajak settlement. *See supra* at pp. 88–96.  Moreover, Frazin did not testify at trial that he thought the Lamajak settlement was unfair or that he wished he had not settled with Lamajak.  Because there were no misrepresentations, there can be no breach of fiduciary duty and these claims fail.

Finally, Frazin complained at trial about the Defendants' attempts, beginning on February 4, 2008,  to "lock up" even more of the settlement monies after their distribution to him pursuant to Judge Hale's order.  The Court will not describe these events in detail because this breach of fiduciary duty claim can be disposed of summarily.  The Defendants' acts allegedly giving rise to this claim all occurred after the Defendants' representation of Frazin terminated, as Frazin himself agreed (through Zyne) on the record at the December 27, 2007 hearing. *See supra* at p. 107.  Once their representation of Frazin was concluded, the Defendants no longer owed Frazin any duties other than those duties owed to a former client, which are not implicated by the Defendants' conduct here. *See supra,* fn 80. Absent a duty, no breach of duty can occur.

Moreover, Frazin failed to prove any damages flowing to him as a proximate cause of the Defendants' act.  While the Defendants were successful in "freezing," temporarily, another several hundred thousand dollars, upon Frazin's motion for rehearing, these funds were once again released to him.  Frazin did not offer any evidence that he needed this money while it was frozen or that he suffered any other consequential damage as a result of the temporary freeze of these additional funds.

Because Frazin failed to prove several elements of his breach of fiduciary duty claim (duty, breach, damage), this claim fails as a matter of law.

One final argument must be addressed with respect to Frazin's breach of fiduciary duty claims—*i.e.*, fee forfeiture. Recognizing that he neither pled, nor offered proof of, any actual damages

proximately caused by the Defendants' alleged improper acts, Frazin contends instead that the Defendants' breaches of fiduciary duty here are so "clear and serious" as to trigger fee forfeiture as the appropriate legal remedy, relying on *Burrow v. Arce*, 997 S.W.2d 229 (Tex. 1999) (hereinafter *Burrow*) as his legal authority. In *Burrow*, the plaintiffs were clients who had been represented in wrongful-death and personal-injury lawsuits resulting from explosions at a chemical plant. *Id.* at 232. After their cases had been settled, the clients sued their attorneys and sought fee forfeiture, claiming that the attorneys had, among other things, failed to communicate offers received and entered into an aggregate settlement without their approval. *Id.* As relevant here, the Supreme Court of Texas held that: (i) actual damages is not a requirement for fee forfeiture due to an attorney's breach of fiduciary duty, *id.* at 240; (ii) the remedy of fee forfeiture is appropriate only for "clear and serious" breaches of duty, *id.* at 241; and (iii) partial forfeiture of fees is appropriate in some circumstances, *id.* at 241–42.

To determine whether fee forfeiture is appropriate here as Frazin contends, the Court must first decide whether the Defendants' breaches of fiduciary duty are "clear and serious." According to the Texas Supreme Court, "[a] violation is clear if a reasonable lawyer, knowing the relevant facts and law reasonably accessible to the lawyer, would have known that the conduct was wrongful." *Burrows* at 241 (quoting Restatement (Third) of The Law Governing Lawyers § 49 (Proposed Final Draft No. 1, 1996) [now Restatement (Third) of The Law Governing Lawyers § 37 (2000)] (hereinafter Restatement)). Factors to be considered in determining whether a violation is "clear and serious" include: (1) the gravity and timing of the violation, (2) the wilfulness of the violation, (3) its effect on the value of the attorney's work, (4) any other threatened or actual harm to the client, (5) the adequacy of other remedies, and (6) the public interest in maintaining the integrity of attorney-client

relationships. *Deutsch v. Hoover, Bax & Slovacek, L.L.P.*, 97 S.W.3d 179, 196 (Tex. App. – Houston [14 Dist.] 2002) (citing *Burrow* at 241–44). If the violation is found to be "clear and serious," the same factors are used to determine whether fee forfeiture is appropriate and, if so, in what amount. *Burrow* at 243.

The Court has previously determined that the Defendants breached their fiduciary duties to Frazin by arguing that he had waived his claims in exchange for the $92,000 fee reduction and by failing to inform Frazin that they would make this argument even after he rejected their proposed release (the "Breaches"). For the reasons stated below, the Court concludes that the Breaches are not "clear and serious," such that they warrant fee forfeiture.

Turning to the first and third factors— *i.e.*, the gravity and timing of the violation and its effect on the value of the attorney's work, the Court notes that Frazin signed the Settlement Agreement on November 16, 2007 and Haynes and Boone received the settlement proceeds on November 19, 2007. The Defendants argued waiver to the Court on December 27, 2007. Although the Defendants' representation of Frazin did not technically end until December 27, it was reasonable for them to assume—and in fact it was the case—that the substance of their representation was complete on November 19 once the settlement proceeds were received. As Zyne testified, it was her job, as Frazin's general bankruptcy counsel, to get the Settlement Motion on file and approved by this Court. Moreover, it was factually unlikely that any party-in-interest would object to the proposed settlement. The settlement was for an amount of money that would provide payment in full to Frazin's prepetition creditors, thus making it extraordinarily unlikely that the Chapter 13 Trustee or any creditor would object to the Settlement Motion. The settlement posed no danger of underpayment for the Defendants themselves, as their contingency fee was a percentage of Frazin's total recovery.

And Frazin, the debtor, had agreed to the settlement. No doubt, that is why Zyne filed the Settlement Motion on negative notice— *i.e.*, she didn't anticipate any objections to the Settlement Motion and it could then be granted by the Court without a formal hearing. Accordingly, while the Defendants' representation of Frazin did not formally conclude until December 27, 2007 when Judge Hale acknowledged the termination of the Defendants' representation,[85] as a practical matter, once the settlement proceeds were received on November 19, 2007, the Defendants' work for Frazin was substantially completed. Moreover, the Breaches in late December 2007 had little, if any, effect on the value of the Defendants' work for Frazin. The trial of the Lamajak lawsuit had resulted in a very favorable verdict in Frazin's favor. And, while the result of the appeal to the Dallas Court of Appeals was less than Frazin hoped for, the Defendants were able to settle the case on terms Frazin was willing to accept, and that settlement was not affected by the Breaches. Had the Breaches occurred earlier in the representation and affected the quality of the representation thereafter, the Court would be more likely to find a "clear and serious" breach of duty. But, as the Breaches occurred on or about December 27, within minutes of the formal termination of the Defendants' representation of Frazin, these factors weigh against a finding of "clear and serious" breach.

Furthermore, a consideration of fourth factor—*i.e.*, threatened or actual harm to Frazin, also weighs against a finding of "clear and serious" breach. Arguably, the "actual harm" to Frazin of the Breaches was the continued escrow of $392,000 of settlement proceeds pending the outcome of this

---

[85]A review of the December 27, 2007 hearing transcript reveals that Judge Hale was told by Zyne at the outset of the hearing on the Distribution Motion that there were no objections to the Settlement Motion on file, and then Zyne proceeded to discuss the Distribution Motion, which would have been moot if the Settlement Motion was not approved. Shortly thereafter, Phelan, while arguing about distribution of proceeds, notes that the Court had just approved the Settlement Motion. Although the transcript does not reveal any statement by Judge Hale that he would approve the settlement, he must have indicated non-verbally that he would approve it because everyone at the hearing acts as if it was already approved. A formal order granting the Settlement Motion was entered on the docket on January 3, 2008 (Docket No. 141).

litigation.  But even Frazin did not attempt to argue that he suffered any actual damage from the continued escrow of these monies.  The "threatened harm" to Frazin was the potential loss of the Malpractice Claims.[86]  The Court does not take this threatened harm lightly, but it did not come to fruition.  The Court concludes that the absence of actual harm, even when combined with the harm with which Frazin was threatened, weighs against a finding of "clear and serious" breach of duty.

This is not to say that no factors weigh in favor of a finding that the Breaches are "clear and serious" duty violations.  The violations were wilful, rather than inadvertent or accidental.  The Defendants concealed from their client their intention to make an argument against his interests.  They made the waiver argument with the intention of favoring their own interests over their client's.  And, it is certainly not in the public interest to allow attorneys to breach their duties to their clients with impunity.  However, on balance, after carefully considering all of the relevant factors and the evidence, the Court cannot conclude that the Breaches are "clear and serious" enough to warrant fee forfeiture.

For all of these reasons, Frazin's breach of fiduciary claims against the Defendants fail.

**D.     Defendants' Fee Applications**.

Frazin does not contend that the Defendants have miscalculated the amounts they are entitled to receive pursuant to the terms of the G&N Engagement Letter or the Haynes and Boone Engagement Letter.  Rather, Frazin objected to the Defendants' fee applications because he believed that (i) he had valid claims against them as pled in the Complaint, and (ii) if he failed to object, his

---

[86]Given the Defendants' current spin on their waiver argument, the "threatened harm" to Frazin was a loss of $92,000— *i.e.*, the agreed fee reduction.  However, the Court has rejected the Defendants' legal argument and has found that Frazin is entitled to these funds.  *See infra* at pp 123-26.

claims against the Defendants would be barred by *res judicata* in accordance with the Fifth Circuit's holding in *In re Intelogic Trace, Inc.*, 200 F.3d 382 (5th Cir. 2000).

For the reasons stated previously in this Memorandum Opinion, Frazin has failed to prove his claims against the Defendants by a preponderance of the evidence. For those same reasons, Frazin's objections to the Defendants' fee applications must be overruled.

However, one last issue must be decided before the Court can determine what amount of fees and expenses the Defendants are entitled to receive. Specifically, the Court must decide whether the Defendants are entitled to receive the fees and expenses requested in their original fee applications or their amended fee applications. The difference between those requests is the much discussed $92,000.00 reduction the Defendants' agreed to take in October, 2007 to facilitate the Lamajak Settlement. For the reasons explained below, the Court concludes that the Defendants are entitled to receive the amounts requested in their original fee applications.

The Defendants now assert that Frazin agreed to pay the balance of the contractual fees due to G&N and Haynes and Boone in exchange for a $92,000 fee reduction. According to the Defendants, because Frazin "reneged" on his end of the bargain – *i.e.*, he failed to pay them (by objecting to their fee applications) – they shouldn't have to give him the $92,000 reduction. Specifically, in its Response to Debtor's Motion for Continuance of the February 4, 2008 Hearings Set on Approvals for Compensation, Docket No. 147, Haynes and Boone argues that

> [t]he fee reductions of [Haynes and Boone] and G&N were specifically demanded by the Debtor and were an integral part of the overall $3.2 million settlement that allowed the Debtor to avoid a further appeal of the judgment to the Texas Supreme Court. The Debtor specifically agreed to payment of the remaining fees on October 26, 2007 in order to effectuate the settlement with Lamajak. . . . The Debtor would not have settled with Lamajak absent an agreement regarding the fee reductions and the specific fees to be paid to [Haynes and Boone] and G&N. Now that the Debtor has

**Memorandum Opinion**                                                    **Page 124**

> obtained a favorable settlement with Lamajak in part based on those agreed fee reductions, the Debtor seeks to renege on his agreements.  The Court should enforce the Debtor's fee-reduction agreements as a matter of law and equity.

*Id.* at p. 9.

As noted previously, whether Frazin "demanded" the $92,000 fee reduction or the Defendants "volunteered" it is in dispute.  Frazin contends that the Defendants knew the amount of money he required in order to agree to the Lamajak Settlement and the Defendants simply offered to take the fee reduction to facilitate the Lamajak settlement.  From the Court's perspective, even assuming the Defendants are correct (and they agreed to accept a $92,000 fee reduction in exchange for Frazin's agreement to pay them the balance of their contractual fees and expenses upon this Court's approval of the Settlement Motion), Frazin should not be charged with a breach of that agreement here, such that the Defendants are entitled to the additional $92,000 of fees.  This is so for two reasons.

First, at the time the $92,000 fee reduction agreement was made, Frazin and the Defendants simply never discussed any claims Frazin might have against the Defendants.  Shortly after the Lamajak Settlement was orally accepted by Frazin, the Defendants demanded a release of claims from Frazin, which Frazin refused to give.  *See supra* at pp. 100-101.  So, even assuming the parties agreed that the Defendants would be paid all of their remaining fees and expenses upon this Court's approval of the Settlement Motion, that payment was to be without prejudice to Frazin's later assertion of any claims he might have against the Defendants.

Second, as a result of prior legal precedent in this Circuit, Frazin could not let the Defendants' final fee applications get approved and paid or he ran the substantial risk that his claims against the Defendants would be barred by *res judicata*.  In *Interlogic Trace*, the Fifth Circuit held that a

**Memorandum Opinion**                                                                                     **Page 125**

chapter 7 trustee's malpractice claims against accountants and a management consultant who had represented the debtor in its prior chapter 11 case, arising from their bankruptcy-related services, were barred by *res judicata*, because the malpractice claims asserted by the trustee challenged the quality and value of the firms' work, and were based on the same nucleus of operative facts as the firm's final fee application, which had been approved during the prior chapter 11 case without objection.  The Fifth Circuit held that the award of fees in the chapter 11 case represented a determination of the nature, the extent, and the value of such services.  In light of the Fifth Circuit's decision in *Intelogic Trace*, Frazin's objection to the payment of the Defendants' fees and expenses (as requested in their original fee applications) pending the trial of this adversary proceeding was justified – *i.e.*, it was an appropriate response precipitated by a legitimate concern about the legal effect of his payment of the requested fees and expenses.  Frazin's act to protect himself from the potential loss of his claims against the Defendants should not be found to be a breach of any agreement with the Defendants.

For these reasons, the Court concludes that the fees and expenses requested by the Defendants in their original fee applications should be approved.

## IV.    CONCLUSION

Frazin failed to prove that the Defendants were negligent in their handling of the appeal of the State Court Action.  Moreover, Frazin failed to prove that the G&N Defendants were negligent at the trial of the State Court Action.

Frazin's DTPA/misrepresentation claims fail because (i) certain of them are fractured negligence claims and are not legally cognizable as DTPA claims, (ii) they are barred by the DTPA's "professional services" exemption, (iii) Frazin failed to prove that an express warranty was made or

**Memorandum Opinion**                                                                                          **Page 126**

breached, (iv) they are barred by DTPA Section 17.49(f) with respect to Haynes and Boone and G&N, (v) they are barred by DTPA Section 17.49(g) as to G&N, and (vi) Frazin failed to prove them by a preponderance of the evidence.

Frazin's breach of fiduciary duty claims fail because (i) certain of them are fractured negligence claims and are not legally cognizable as breach of fiduciary duty claims, and (ii) he failed to prove an essential element of the remaining claims. Moreover, fee forfeiture is not appropriate because there was no "clear and serious" breach of fiduciary duty.

Finally, the Defendants are entitled to receive the amounts requested in their original fee applications.

Defendants' counsel shall prepare a judgment and circulate it to Frazin's counsel for approval as to form within ten days of the entry of this Memorandum Opinion. The parties are directed to appear on October 6, 2008 at 1:15 p.m. for a status conference, at which a schedule for the disposition of the issues remaining as a result of the parties' agreement under Fed. R. Civ. P. 54 will be discussed.

### ### END OF MEMORANDUM OPINION ###