

U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described**.

Signed April 7, 2009                              **United States Bankruptcy Judge**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| TIMOTHY MICHAEL FRAZIN | § | Case No. 02-32351-bjh-13 |
| | § | |
| Debtor. | § | CHAPTER 13 |
| | § | |
| | § | |
| TIMOTHY MICHAEL FRAZIN, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | ADVERSARY NO. 08-3021-bjh |
| | § | |
| HAYNES AND BOONE, LLP, | § | |
| GRIFFITH & NIXON, P.C., | § | |
| SCOTT GRIFFITH, NINA CORTELL, | § | |
| AND WARREN DODSON, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM OPINION AND ORDER**

On November 3, 2008, Haynes and Boone, LLP ("Haynes and Boone") filed a Motion for

Attorneys' Fees and Expenses and Brief in Support (the "H&B Motion").[1] On November 4, 2008, Griffith & Nixon, P.C. ("G&N") filed a Motion for Attorneys' Fees and Expenses and Brief in Support (Docket No. 137) (the "G&N Motion") (the H&B Motion and the G&N Motion will be referred to collectively as the "Motions").[2] Timothy Michael Frazin ("Frazin" or "Debtor") filed opposition to the Motions on November 17, 2008,[3] and replies were filed on November 24, 2008, following which the Court took the Motions under advisement.

The Motions follow trial of an adversary proceeding in which Frazin sued Haynes and Boone, Nina Cortell ("Cortell"), and Warren Dodson ("Dodson") (collectively, the "H&B Defendants") and defendants G&N and Scott Griffith ("Griffith") (collectively, the "G&N Defendants") (the H&B Defendants and the G&N Defendants will be referred to collectively as the "Defendants") for negligence, misrepresentation/deceptive trade practices, and breach of fiduciary duty in connection with their representation of the Debtor as special trial and/or appellate counsel (collectively, the "Malpractice Claims"). The Defendants disputed the validity of the Malpractice Claims and sought the final allowance under 11 U.S.C. § 330 of the contingency fees and expenses provided for in their respective retention and fee agreements with the Debtor. The Defendants, by way of counterclaims,

---

[1] The Haynes and Boone Defendants' Motion for Attorneys' Fees and Expenses and Brief in Support (Docket No. 135) originally sought attorneys' fees in the amount of $1,441,188.45 or, alternatively, attorneys' fees in the amount of $1,066,959, and expert witness fees in the amount of $87,340.69. However, those numbers did not match the amounts set forth in the Unsworn Declaration of Robin Phelan in Supp. Of Haynes and Boone Defendants' Motion for Attorneys' Fees and Br. In Supp. (Docket No. 136, the "Phelan Declaration."). On January 8, 2009, the H&B Defendants filed a Notice of Errata (Docket No. 161) clarifying that the amounts sought are those set forth in the Phelan Declaration.

[2] The Court required the filing of the Motions by November 3, 2008. However, because G&N experienced problems with electronic filing of the lengthy documents, it sought and received leave of Court to file the G&N Motion on November 4, 2008.

[3] On November 19, 2008, Frazin filed a Motion for Leave to File Supplemental Response and Objection to Defendants' Fee Motions, for the purpose of clarifying his original response to the fee motions regarding Defendants' failure to segregate fees by cause of action. A copy of his Supplemental Response and Objection to Defendants' Motions for Attorney Fees and Expenses was attached to the motion as Exhibit A. Frazin's motion is hereby granted.

also sought to recover the fees and expenses they have incurred in defending themselves and their

fee applications in accordance with (1) Section 38.001 of the Texas Civil Practice and Remedies

Code, *see* Tex. Civ. Prac. & Rem. Code § 38.001 (Vernon 2008) ("Section 38.001"), (2) Section

17.50(c) of the Texas Deceptive Trade Practices-Consumer Protection Act, *see* Tex. Bus. & Comm.

Code § 17.50(c) (Vernon 2002 & Supp. 2008) (the "DTPA"), and (3) this Court's General Order 00-7

("Standing Order Concerning Guidelines for Compensation and Expense Reimbursement of

Professionals" – the "Standing Order") and 11 U.S.C. § 330.[4]

The Court has core jurisdiction over the Motions pursuant to 28 U.S.C. §§ 1334 and 157(b).

Pursuant to Federal Rule of Civil Procedure 52 and Federal Rule of Bankruptcy Procedure 7052, this

Memorandum Opinion and Order contains the Court's findings of fact and conclusions of law.   **I.**

**FACTUAL BACKGROUND**

The factual background underlying this Adversary Proceeding is set forth in the Court's prior

Memorandum Opinion entered September 23, 2008 (the "September Memorandum Opinion"), and

will not be repeated in its entirety here.  However, a truncated version follows.

On March 18, 2002, the Debtor filed his voluntary petition under Chapter 13 of the

Bankruptcy Code.  In his bankruptcy schedules, the Debtor represented that he held a claim against

Lamajak, Inc. ("Lamajak") worth $6,000,000.00.  During the pendency of his bankruptcy case, the

Debtor was involved in litigation with Lamajak styled *Tim Frazin v. Lamajak, Inc.,* 192nd District

Court, Dallas County, Texas, Case No. 03-5672-K (the "State Court Action").  In connection with

the State Court Action, the Debtor, with this Court's approval, hired G&N as his special counsel to

---

[4] For the reasons explained hereinafter, those counterclaims for attorneys' fees are now the subject of the Motions. *See infra*, pp. 10-11.

pursue the litigation pursuant to 11 U.S.C. § 327(e) on a contingency fee arrangement.

Pursuant to the terms of his confirmed Chapter 13 Plan, the Debtor was to use a portion of the proceeds from any recovery in the State Court Action (the "Litigation Proceeds") to satisfy claims in his bankruptcy case. On April 18, 2005, the Court entered its Order Discharging Debtor After Completion of Chapter 13 Plan. The bankruptcy case remained open to allow for the possibility of additional distributions to unsecured creditors pursuant to the Chapter 13 Plan in the event the Debtor recovered damages in the State Court Action. On June 13, 2005, a final judgment (the "Final Judgment") was entered in the State Court Action in favor of the Debtor, and the Debtor was awarded certain damages. Lamajak subsequently appealed the Final Judgment.

The Debtor, G&N, and Haynes and Boone thereafter signed an engagement letter pursuant to which Haynes and Boone was retained as special counsel to represent the Debtor in connection with Lamajak's challenge to the Final Judgment in the State Court Action, and on December 19, 2005, the Court entered its Order: (A) Approving Employment of Haynes and Boone, LLP as Special Appellate Counsel and (B) Regarding Disbursement of Anticipated Proceeds from Litigation (the "Litigation Proceeds Order"). *See* Docket No. 100 in Case. No. 02-32351. Pursuant to the Litigation Proceeds Order, the Court approved the retention of Haynes and Boone and ordered that

the firm's fees would be payable on the filing of a fee application and approval by the Court.  *Id.*[5]

### A.    *Overview of the State Court Action and Lamajak appeal*

G&N represented the Debtor in the State Court Action.  The Debtor's position at trial was that he had an oral agreement with Lamajak, based upon a January, 1998 conversation with Michael Cohen ("Cohen"), Lamajak's president, under which he was to provide certain services to Lamajak in an effort to maximize Lamajak's profits from the sale of Beanie Babies, in return for which Lamajak would pay him all gross profits in excess of $6,000,000.00 that were earned by Lamajak from the sale of Beanie Babies.  At trial, Cohen denied the existence of the claimed oral agreement. The State Court Action was hotly contested. After trial, the jury awarded the Debtor judgment on three alternative theories of recovery: (1) breach of contract; (2) promissory estoppel; and (3) quantum meruit.  The Final Judgment provided recovery on the breach of oral contract claim ($4,000,000 for damages, $1,600,000 for trial attorneys' fees and $50,000 for appellate fees), and

---

[5]    The Litigation Proceeds Order additionally memorialized "the procedures agreed to at the hearing for the ultimate disbursement of the Litigation Proceeds." To that end, the Court implemented the following procedures with respect to the Litigation Proceeds:

ORDERED, that the Litigation Proceeds, if and when the same become payable to the Debtor by virtue of a final nonappealable order, settlement or otherwise, shall be paid to and held in trust by the Firm, who shall promptly notify the Chapter 13 Trustee and Debtor's counsel of the receipt of the funds; and it is further

ORDERED, that the Chapter 13 Trustee shall, upon receipt of such notice, promptly calculate the portion of the Litigation Proceeds to which the estate is entitled, in order to satisfy the allowed claims in the case pursuant to the plan, plus interest on the claims as permitted by law, which portion is approximately $180,000 inclusive of the claim of Michael A. Cohen (and exclusive of interest on the claims as permitted by law), and will not exceed $200,000 (exclusive of interest on the claims as permitted by law), and shall file a report with the Court so indicating; and it is further

ORDERED that, by virtue of the Debtor having agreed in the confirmed plan to pay in a portion of the Litigation Proceeds to the estate, the Debtor has essentially assigned its rights in such portion of the proceeds to the estate and is deemed to have completed payments under the Plan, subject to complying with the mechanics set forth in this Order.

$1,508,383.10 in prejudgment interest.[6]  *Id*.

On appeal, Lamajak contended that Frazin was not entitled to recover on any of his theories. With some assistance from G&N, Haynes and Boone represented Frazin on appeal.  On July 6, 2007, the appellate court issued an opinion reversing and rendering in part and affirming in part the trial court judgment (*Lamajak, Inc. v. Frazin*, 230 S.W.3d 786 (Tex. App.–Dallas 2007)).[7]  The appellate court set aside the contract award for lack of evidence, found that Frazin could not personally recover promissory estoppel reliance damages incurred by his company, and reduced the prejudgment interest award, but awarded Frazin recovery on his quantum meruit claim, attorneys' fees and pre- and post-judgment interest, for a total recovery of approximately $3.4 million. *Id*.  Lamajak sought a rehearing, which was denied.  Thereafter, Lamajak began the process of seeking review in the Texas Supreme Court, but pending further review by the Texas Supreme Court, the parties agreed to settle the approximate $3.4 million appellate judgment for $3.2 million.   Frazin executed a formal settlement agreement and release with Lamajak.

**B.**    *Proceedings in this Court*

G&N did not receive or distribute the settlement proceeds.  Rather, under the Litigation Proceeds Order, Lamajak wired the funds into Haynes and Boone's trust account and Haynes and Boone notified the Chapter 13 Trustee and the Debtor's bankruptcy counsel, Rosemary Zyne ("Zyne"), of the receipt of the Litigation Proceeds.

---

[6]As subsequently determined by the Dallas Court of Appeals, the pre-judgment interest was improperly calculated because the accrual date was based upon the wrong statute; the correct pre-judgment interest calculation on a $4 million claim was $710,132.40 and not $1,508,383.10.

[7] On August 22, 2007, the court of appeals issued a judgment *nunc pro tunc* conforming the judgment to reflect the jury's award of quantum meruit damages of $1.125 million.  Pre-Trial Order, ¶ 30, n. 6.

On November 19, 2007, Haynes and Boone filed a Motion for Order in Furtherance of the Distribution of Lamajak Litigation Proceeds (the "Distribution Motion"), seeking further guidance from this Court regarding disbursements of the Litigation Proceeds upon the Court's approval of the Settlement Agreement. In the Distribution Motion (¶ 13), Haynes and Boone noted that it would file an application for approval of its fees. On November 19, 2007, Haynes and Boone also filed a request for an expedited hearing on the Distribution Motion. The Court denied the request to set the Distribution Motion for hearing on an expedited basis, and it was set for hearing on December 27, 2007.

Haynes and Boone and G&N filed their respective applications requesting approval of fees pursuant to their contingency fee arrangement with the Debtor, which were also set for hearing on December 27, 2007.

On November 30, 2007, Zyne filed, on Frazin's behalf, a motion to approve the Lamajak settlement (the "Settlement Motion"). The Settlement Motion was set for hearing on December 27, 2007.[8] On December 20, 2007, through his then-attorney, Gary Schepps ("Schepps), the Debtor filed an objection to the fee application of Haynes and Boone and a motion to continue the hearing on both fee applications. The Debtor filed an objection to the G&N fee application on December 26, 2007, also through his attorney, Schepps. On December 27, 2007, this Court, Judge Hale presiding, held a hearing on the Distribution Motion. Prior to the hearing, the parties agreed to continue the hearing on the fee applications to February 4, 2008, when the undersigned could hear them. At the

---

[8]While the parties stipulate to this fact in the Pre-Trial Order, the Court does not believe it to be accurate. Rather, as Zyne testified at trial, the Settlement Motion was served out on negative notice, which permitted it to be granted in accordance with Local Rule 9007.1 once the deadline for objections had passed and no objections had been filed. Because no objection was filed to the Settlement Motion, Zyne asked the Court to sign an order granting the Settlement Motion at the December 27, 2007 hearing on the Distribution Motion.

December 27 hearing, the Court approved the Settlement Motion. On January 7, 2008, the Debtor filed his second motion for continuance of the fee applications (the "Second Continuance Motion"), which were then scheduled for hearing on February 4, 2008. Minutes before the January 30, 2008 hearing on the Second Continuance Motion, the Debtor filed his first complaint against the Defendants asserting the Malpractice Claims.

### C.    *The Adversary Proceeding Complaint*

In his First Amended Original Complaint of Malpractice and to Determine Claim and Objection to Claim (the "Complaint"), Frazin asserted claims of (1) negligence (on appeal and, in the alternative, at trial), (2) misrepresentation/deceptive trade practices (pursuant to the DTPA), and (3) breach of fiduciary duty.[9]

Regarding his appellate negligence claims, Frazin asserted that (1) the Defendants breached the applicable standards of care in presenting his case on appeal, (2) the Dallas Court of Appeals' rejection of the oral agreement claim and the promissory estoppel damage claim was proximately caused by the Defendants' negligence, and (3) Frazin suffered over $3 million of damages as a result of the Defendants' negligence.

Regarding his alternative trial negligence claim, Frazin asserted that the G&N Defendants failed to ask Frazin a sufficiently specific question at trial so that Frazin could detail all of the things he orally promised to do during the January 1998 conversation with Cohen in exchange for Cohen's oral promise, on Lamajak's behalf, to pay Frazin all profits in excess of $6 million. Frazin asserted

---

[9]The Complaint included other counts which are essentially subsumed in Frazin's objection to the fee applications of Haynes and Boone and G&N. Specifically, Frazin asked this Court to (1) determine the amount of the Defendants' fee claims, after offset for the Debtor's claims against them, (2) find the Defendants estopped to claim a waiver of the Malpractice Claims, and (3) deny the Defendants' requested fees and costs because such fees and costs were excessive and unreasonable.

that by not asking this question at trial, the G&N Defendants breached the applicable standard of care, their negligence caused him to lose the breach of oral contract claim, and Frazin suffered over $3 million of damages as a result.

Frazin's DTPA claims asserted that the Defendants (1) made various misrepresentations to Frazin about the quality of their work, (2) made express misrepresentations of material fact and failed to disclose known information in violation of Section 17.46(b)(23) of the DTPA, and (3) otherwise engaged in unconscionable actions and courses of action, including (i) causing confusion or misunderstanding as to the source of the services, (ii) causing confusion or misunderstanding as to the affiliation, connection or association between two of the service providers, (iii) representing that the services would have certain characteristics and benefits that they did not have, (iv) representing that the services were of a particular standard and quality when they were of another, and (v) representing that work or services had been performed when they had not.

Frazin's breach of fiduciary duty claims asserted that certain of the Defendants' actions breached their fiduciary duties of honesty, loyalty and disclosure. Specifically, Frazin asserted that the Defendants breached duties owed to him when they (1) asserted that Frazin had waived his Malpractice Claims by accepting a $92,000 fee reduction on October 26, 2007, (2) failed to disclose to this Court the fact that Frazin had refused to sign a release of his Malpractice Claims in connection with the agreed fee reduction, (3) requested an expedited fee hearing when they knew there was a fee dispute arising, (4) failed to inform Frazin that a fee hearing would act as a bar to any future malpractice complaints, (5) tried to "sneak" language into an order allowing their withdrawal as counsel when that relief had not been sought or granted, (6) refused to allow Frazin to properly place his Malpractice Claims in issue, and (7) engaged in a pattern of practices and made a series of

representations intended to cover up their neglect and to convince the Debtor that a careful review of the record was conducted and all the evidence in the record which supported the Debtor's position in the appeal was briefed. Frazin did not allege that the Defendants' breaches of fiduciary duty were a proximate cause of any actual damage to him. Rather, Frazin sought to impose a complete fee forfeiture because the breaches of fiduciary duty were "clear and serious."

The Defendants denied all of Frazin's claims. Specifically, the Defendants denied (1) any trial or appellate negligence, (2) the applicability of the DTPA at all (claiming that the claims were "fractured" negligence claims and further claiming certain statutory defenses), (3) that they made any misrepresentations to Frazin or committed any DTPA violations, (4) that they owed a fiduciary duty to Frazin at the time of the alleged breaches, (5) that they took the claimed actions, even assuming that they owed Frazin a duty, and (7) that fee forfeiture was appropriate, even assuming a breach of duty occurred. Further, because Frazin's claims against them were without merit, the Defendants asserted that they were entitled to the approval of their respective fee applications in full. Finally, the Defendants sought to recover the fees and expenses they incurred in defending themselves and their fee applications under Section 38.001, Section 17.50(c) of the DTPA, the Standing Order and 11 U.S.C. § 330.

This Court tried the Malpractice Claims in July, 2008. Prior to the Defendants' resting their respective cases, Frazin's counsel objected to the Court hearing evidence regarding any potential recovery of attorneys' fees and/or expenses by the Defendants (other than their fee applications) at that stage of the case. In other words, while Frazin agreed that the Defendants were entitled to prove up their fee applications as part of their respective cases, Frazin asserted that the Defendants' requests to recover the fees and expenses they had incurred in defending against the Malpractice

Claims and Frazin's objections to the fee applications should be heard after trial pursuant to Federal Rule of Civil Procedure 54(d)(2) ("Rule 54").  While the Defendants were concerned about this procedure (in case their recovery of fees was by statute and might be considered a part of their substantive claims), Frazin's counsel stipulated that he would not make any such objections (even assuming such an objection might be appropriate) and that all such fee requests should be made once the parties had the benefit of the Court's determination of the Malpractice Claims and the Defendants' fee applications.  The Court accepted this stipulation and thus, Frazin's request to recover fees and expenses in bringing the Malpractice Claims and the Defendants' requests to recover their defensive fees and expenses were to be heard post-judgment pursuant to Rule 54.

After the trial concluded, the parties submitted post-trial briefs.  On September 23, 2008, this Court issued the September Memorandum Opinion.

**D.    *The Court's Rulings After Trial***

In summary form, the Court made the following rulings in its September Memorandum Opinion with respect to each of Frazin's pled claims.

1.    *The Negligence Claims*

(1) Because Frazin offered no expert testimony to support his appellate negligence claims against Cortell, Haynes and Boone, and the G&N Defendants, those claims failed as a matter of law.

(2) Even assuming Frazin's expert testimony, which opined only as to Dodson's conduct, could be extrapolated and applied to Cortell and Haynes and Boone, the Court concluded on the merits that the H&B Defendants acted in accordance with the standard of care.  Moreover, Frazin failed to establish that any claimed negligence proximately caused him any damages – *i.e.*, that he would have won on all of the other issues that Lamajak raised on appeal.  Accordingly, Frazin's

appellate negligence claim also failed for lack of causation.

(3)  Frazin did not, prior to trial in the State Court Action, tell the G&N Defendants about the more specific oral promises he allegedly made to Cohen.  On the merits, G&N's representation of Frazin did not fall below the applicable standard of care, and Frazin failed to prove that G&N did not provide the state court with all of the material, relevant, and credible evidence that could have been presented regarding the issue of contract formation.  Accordingly, Frazin's trial negligence claim failed.

            2.       *The DTPA Claims*

(1) The Court agreed with the Defendants that many of Frazin's DTPA claims were re-stated negligence claims and were thus not cognizable under the DTPA.  In addition, many of the DTPA claims were premised upon allegations relating to the quality of the Defendants' legal work, and were therefore claims based on the rendering of a professional service and thus were exempt under DTPA Section 17.49(c) and did not fall within the exception to the exemption set forth in Section 17.49(c)(1).  Frazin's claims of a failure to disclose information in violation of Section 17.46(b)(24) (which is exception (2) to the Section 17.49(c) exemption for professional services) were so closely related to the quality of legal work provided as to be both re-stated negligence claims and within the professional services exemption, thus barring their assertion.  Moreover, Frazin could not simply re-characterize a claim that the Defendants misrepresented a fact to him as a failure to disclose in order to bring it within the "failure to disclose" exception to the professional services exemption.  In addition, the Court found on the merits that Cortell *was* heavily involved in all aspects of the appeal, and Frazin was told that Dodson would be working on the appeal with her.  Frazin failed to prove at trial that the roles and qualifications of Cortell and Dodson were not disclosed to him or that

Haynes and Boone intended to induce Frazin into hiring the firm by virtue of their alleged nondisclosures.

(2) Frazin had not proven any conduct of the Defendants which was both unconscionable and which could not be characterized as "advice, judgment or opinion;" thus, the Defendants were protected by the DTPA's professional services exemption.

(3) Frazin's claim that the conduct alleged in the Complaint constituted breach of an express warranty under Section 17.50 was a re-stated negligence claim and fell within the DTPA's exemption for the rendition of professional services.

(4) Frazin's claim that the Defendants made express warranties about the quality of their work was not a re-stated negligence claim and could have formed the basis for breach of an express warranty under the DTPA and for an exception to the DTPA's exemption for professional services, but Frazin did not prove at trial that an express warranty was made or breached.

(5) Frazin's DTPA claims were further barred by § 17.49(f) of the DTPA, which removes from the DTPA's ambit contracts which are "related to a transaction, a project, or a set of transactions related to the same project involving total consideration by the consumer of more than $100,000."

(6) On the merits, Frazin failed to prove any of his DTPA claims. The Court found that the Defendants did not (i) cause confusion or misunderstanding as to the source of the services, (ii) cause confusion or misunderstanding as to the affiliation, connection, or association between the service providers, (iii) represent that the services would have, and did have, characteristics and benefits which they did not have, (iv) represent that the services were of a particular standard or quality when they were of another, (v) represent that work or services had been performed when they had not, (vi)

fail to disclose information concerning services, intending to induce Frazin into a transaction he would not have entered had the information been disclosed, (vii) withhold information from Frazin pertaining to the quality of the appellate work, the extent of the appellate work, or pertaining to the evidence in the reporter's record in the State Court Action, (viii) fail to disclose material information to Frazin, (ix) make any misrepresentation or omission of material fact in discussing with Frazin or his brother Shawn Frazin ("Shawn") whether to accept the Lamajak settlement offer, (x) make or breach any express or implied warranty, (xi) engage in unconscionable conduct, and/or (xi) knowingly or intentionally engage in any deceptive trade practices, commit a breach of warranty, or act unconscionably.

> 3. *The Breach of Fiduciary Duty Claims*

(1) Several of Frazin's breach of fiduciary duty claims were simply re-stated negligence claims and, as such, they were not legally cognizable as breach of fiduciary duty claims.

(2) However, Frazin's claims that the Defendants breached their fiduciary duties to him by: (i) requesting that he release claims against all of the Defendants in exchange for the previously-volunteered fee reduction; (ii) arguing that he had waived his claims against the Defendants by accepting a $92,000 fee reduction when in fact he had specifically refused to sign the release; (iii) failing to inform him that they would continue to make such a claim; (iv) representing to this Court that a waiver had occurred without revealing that Frazin had specifically rejected the release; (v) requesting an expedited fee hearing upon learning that Frazin was troubled by the quality of their work; (vi) failing to inform Frazin that a fee hearing would bar certain claims Frazin might wish to bring against the Defendants; (vii) attempting to include the Defendants' withdrawal from representation in a proposed order to be signed by Judge Hale, even though withdrawal had not been

ordered by Judge Hale; (viii) refusing to allow Frazin to properly place his claims against the Defendants in issue; (ix) inducing Frazin to settle by misrepresenting the quality of the Defendants' work and the strength of the case on appeal; and (x) misrepresenting to Shawn what material was available for his review, so he could make an informed decision on whether to settle the case or appeal it further, were not re-stated negligence claims and were proper breach of fiduciary duty claims.

(3) As to the request for a release, the Court concluded that although the Defendants owed Frazin a fiduciary duty, their request for the release was outside the scope of their representation of him and thus was not a breach of their duty.  The Court also found that Frazin failed to prove any damages.

(4) As to the Defendants' failure to disclose Frazin's refusal to sign a release in making their waiver argument, the Court found a breach of a fiduciary duty.  However, the claim failed because Frazin failed to prove any damages.

(5) As to the Defendants' request that the Court withhold certain of the settlement funds, the Court concluded that there was no breach of fiduciary duty.  In addition, Frazin failed to prove any damages.

(6) As to the Defendants' failure to inform Frazin that the Defendants would continue to make their waiver argument, the Court found a breach of fiduciary duty.  However, Frazin failed to prove any damages.

(7) As to the Defendants' (i) alleged request for an expedited fee hearing when they knew there was a dispute arising, and (ii) refusal to allow Frazin the right to place his Malpractice Claims in issue, the claims failed factually on the merits, because the Court found that the Defendants never

committed those acts. As to the Defendants' alleged failure to inform Frazin about the consequences of the Fifth Circuit's decision in *In re Intelogic Trace*, 200 F.3d 382 (5th Cir. 2000) ("*Intelogic Trace*"), the Court found that Frazin failed to prove damages.

(8) As to Frazin's claim that the Defendants breached a fiduciary duty by trying to include their withdrawal from representation in a proposed order, the Court found that Frazin failed to prove that this act occurred. Further, the Court concluded that even if Frazin had proven that the act occurred, there would be no breach of fiduciary duty because at the time the proposed order was drafted, the Defendants no longer represented Frazin.

(9) As to Frazin's claims that the Defendants (i) induced him to settle with Lamajak by misrepresenting the quality of their work and the strength of the case on appeal, and (ii) misrepresented to Shawn what material was available for his review, the Court concluded that these claims failed because there was no credible evidence to support the existence of the acts.

(10) As to Frazin's claim that the Defendants breached fiduciary duties to him by attempting to "lock up" settlement monies, the Court concluded that this claim failed because the acts giving rise to this claim all occurred after the Defendants' representation of Frazin terminated and because Frazin failed to prove any damages.

(11) Finally, with respect to the Defendants' breaches of fiduciary duty, the Court concluded that fee forfeiture was not appropriate as the breaches were not "clear and serious."

4.      *The Fee Applications*

Frazin objected to the Defendants' fee applications because he believed that (i) he had valid claims against them as pled in the Complaint, and (ii) if he failed to object, his claims against them would be barred by *res judicata* in accordance with the Fifth Circuit's decision in *Intelogic Trace*.

After trial, the Court concluded that the Defendants were entitled to receive the amounts requested in their original fee applications, but not the $92,000 they had previously agreed to reduce.

### E.    *The Remaining Issues*

After this Court entered the September Memorandum Opinion, it conducted a status conference with the parties on October 1, 2008, at which time an agreement was reached on the process and schedule for the disposition of the Rule 54 issues.  In sum, the parties agreed that there would be no further evidentiary hearings with respect to the attorneys' fees requests unless one was specifically requested by Frazin following the filing of the Motions, and the requests for fees would instead be submitted to the Court by motion and supporting affidavits.

As noted earlier, Haynes and Boone and G&N then filed the Motions.  Frazin opposed the Motions and the Defendants filed replies, all of which this Court has carefully considered.

## II.    THE PARTIES' ARGUMENTS

The H&B Defendants assert that they are entitled to recover attorneys' fees and expenses under several theories.  First, the H&B Defendants argue that they are entitled to their fees and expenses pursuant to this Court's Standing Order, which provides, in relevant part, that "reasonable fees for preparation of a fee application and responding to objections thereto may be requested." The H&B Defendants also cite to this Court's decision in *In re Teraforce Tech. Corp.*, 347 B.R. 838 (Bankr. N.D. Tex. 2006) (rejecting a *per se* rule that would deny recovery of fees for defending fee applications in all situations).  Citing *Teraforce*, the H&B Defendants argue that they are entitled to fees for defending the fee application "under federal law" in situations where sanctions are appropriate under Federal Rule of Bankruptcy Procedure 9011 ("Rule 9011").  They also argue that in addition to Section 330 of the Bankruptcy Code, a bankruptcy court has the inherent power to

award sanctions for bad-faith conduct in a bankruptcy proceeding, and authority under 11 U.S.C. § 105 to prevent Frazin's "abuse of the section 330 fee application process by awarding the Firm reasonable fees." *Haynes and Boone Defendants' Reply in Supp. Of their Mot. For Attorneys' Fees and Expenses*, p. 7. Moreover, they argue that

> an award under federal law is further warranted by the special circumstances presented here: Frazin is solvent and all of his creditors have been paid in full, due to the efforts of the Defendant law firms in procuring a successful outcome in the *Lamajak* case. Thus, an award of fees will not prejudice third-party creditors; only the Debtor, whose actions caused the fees to be incurred, will be responsible for the payment of the fees.

*H&B Motion*, p. 3.

Second, the H&B Defendants argue that there are two independent, state law bases for the recovery of fees. Because Frazin's Complaint asserted claims under the DTPA, the H&B Defendants filed a counterclaim for attorneys' fees under Section 17.50 of the DTPA. Under the DTPA, the court "shall award to the defendant reasonable and necessary attorneys' fees and court costs" "on a finding by the court that an action under this section" was groundless in fact or law or brought in bad faith, or for the purpose of harassment. Tex. Bus. & Comm. Code § 17.50(c) (Vernon 2002 & Supp. 2008). In addition, the H&B Defendants argue that Section 38.001 permits a recovery of attorneys' fees for claims based upon services rendered, labor performed, and oral and written contracts. They also assert that under Section 38.001, they can recover, and are not required to segregate, attorneys' fees incurred in overcoming Frazin's various claims, because Frazin's claims, if successful, would have prevented recovery on Haynes and Boone's claim for its fees in the *Lamajak* appeal. The H&B Defendants also argue that an exception to the duty to segregate attorneys' fees between recoverable and unrecoverable fees arises when the claims giving rise to those fees are inextricably intertwined.

Moreover, even if segregation is required, the H&B Defendants urge that the requirement is satisfied if the attorney testifies that a given percentage of time would have been necessary even if the claim for which attorneys' fees are unrecoverable had not been asserted, and that a "rough" estimate is sufficient.

No matter which theory the Court applies, the H&B Defendants argue that the cost of reasonable computerized legal research is recoverable as attorneys' fees. They therefore seek legal research fees in the amount of $20,039.88 in addition to the amounts sought as pure attorneys' fees.

Third, the H&B Defendants argue that although expert fees cannot generally be recovered as costs in civil litigation, courts maintain the discretion to award expert witness fees beyond those provided by statute where the expert's services were made necessary by the opposing party's bad faith, and that the limitations imposed by Rule 54 and 28 U.S.C. §§ 1821 and 1920 "should only be applied to good-faith proceedings and nothing in the rule or statues should impede or preclude a court from exercising its inherent equitable power to make whole a party injured by an egregious abuse of the judicial process." *H&B Motion*, p. 16. The H&B Defendants also argue that Rule 9011 provides an additional basis for the exercise of the court's discretion to award expert witness fees. The H&B Defendants seek expert witness fees in the amount of $75,050.07.

The H&B Defendants ultimately seek attorneys' fees in the amount of $1,441,188.45 under the Standing Order, this Court's *Teraforce* decision, and Section 38.001.[10] Alternatively, if the Court

---

[10] This amount does not include the expert witness fees or computerized legal research fees. The H&B Defendants argue that they have reduced their fee request by 10% to account for any fees attributable to the claims regarding the disputed $92,000 in fees. In addition, the H&B Defendants argue that they are not requesting (1) certain of Ms. Cortell's fees (including all fees for her time in Court) because of her status as a party; (2) fees by other timekeepers; and (3) fees that might be seen as duplicative by the Court. According to Phelan's declaration, these amounts total at least $120,871.50 ($86,310 for Cortell's time, $2,244.50 for pre-fee objection work, and $32,317 by other timekeepers). *See* Phelan Declaration, ¶ 35 (c), (d) and (e). Therefore, the H&B Defendants assert that the fees sought fall far short of the actual fees they incurred.

awards fees solely based upon the DTPA and determines that segregation is required, then the Firm seeks an award of attorneys' fees under the DTPA in the amount of $1,067,547.[11]

The G&N Defendants incorporate all of the H&B Defendants' legal arguments about the substantive basis for their entitlement to attorneys' fees and expenses, expert witness costs and charges for online legal research. They seek legal fees of $977,436 under the Standing Order, the *Teraforce* decision and Section 38.001.[12] Alternatively, if the Court awards fees solely based upon the DTPA and determines that segregation is required, then the G&N Defendants seek attorneys' fees of $727,596.80.[13] In addition, the G&N Defendants seek expert witness fees is the amount of $67,405.63.[14] G&N also seeks online legal research fees in the amount of $4,690.98.[15]

In response, Frazin first argues that the Defendants' pleadings are insufficient as a matter of

---

[11] This amount does not include the expert witness fees or computerized legal research fees. It does take into account the same reductions for Ms. Cortell's fees, those of other timekeepers and those which Haynes and Boone thinks the Court may view as duplicative. It further represents a 33% reduction in the amounts sought, which Haynes and Boone argues is appropriate because Frazin's claims fell into three categories: (1) negligence, (2) DPTA, and (3) breach of fiduciary duty. Haynes and Boone argues that "as the Court's Opinion repeatedly notes, there is vast overlap between the claims. To the extent that Frazin may claim a few distinct fiduciary claims, it is clear that relatively little time was spent on those claims. However, taking a very conservative approach – to the Firm's detriment and to Frazin's benefit – the Firm has decided to reduce its DTPA fee request by 33% because at least 66% of the fees would have been incurred without the claims for which fees are not recoverable." H&B Motion, p. 20, n.11.

[12] This consists of $790,236 for fees of G&N (net of a 10% reduction on the same basis that the H&B Defendants reduced their fee request by 10%), and $187,200 for the legal fees of Shackelford, Melton & McKinley, LLP (the "Shackelford Firm"), which the G&N Defendants hired to assist it (also net of a 10% reduction on the same basis that the H&B Defendants reduced their fee request by 10%).

[13] This amount consists of $588,236.80 for the fees of G&N and $139,360 for the fees of the Shackelford Firm (both net of a 33% reduction on the same basis that the H&B Defendants sought 33% less fees under the DTPA-only theory).

[14] Of this amount, $19,740 was paid to Richard Capshaw, Esq., $22,600 was paid to Russell Serafin, Esq., $12,775 was paid to Prof. Frederick Moss, and $12,290.63 was paid to Amon Burton, Esq. The G&N Defendants also expect to pay another $7,000 to Richard Capshaw for another 7 hours of work in connection with the G&N Motion.

[15] The G&N Motion states that the G&N Defendants seek $5,334.86 in online legal research fees – $2,651.87 incurred by G&N and $2,676.99 incurred by the Shackelford Firm. However, the time entries attached to the G&N Motion show total expenses in online legal research fees of $4,690.98 – $2,088.17 incurred by G&N and $2,602.81 incurred by the Shackelford Firm.

**Memorandum Opinion and Order**                                                          **Page 20**

law to support a counterclaim for attorneys' fees, because Federal Rule of Civil Procedure 8(a)

("Rule 8") requires a pleading to contain "a short and plain statement of the claim showing the

pleader is entitled to relief." Frazin argues that the Defendants do not plead in even the broadest

terms those facts or allegations which would give rise to any right to attorneys' fees.

Haynes and Boone's answer contains the following counterclaim (set forth in its entirety

here):

> Haynes and Boone seeks its attorneys fees and costs incurred in connection with this
> proceeding pursuant to (a) section 330 of the Bankruptcy Code; (b) this Court's
> General Order No. 00-7, Standing Order Concerning Guidelines for Compensation
> and Expense Reimbursement of Professionals, For Early Disposition of Assets in
> Chapter 11 Cases, and for Motions and Orders Pertaining to Use of Cash Collateral
> and Post-Petition Financing, and Section I.F of the Guidelines for Compensation and
> Expense Reimbursement of Professionals attached thereto; (c) Section 17.50(c) of the
> DTPA; and (d) Chapter 38 of the Texas Civil Practice and Remedies Code.

*Answer and Counterclaim of Haynes and Boone, LLP Parties to First Amended Compl. Of*

*Malpractice and to Determine Claim and Obj. to Claim*, p. 7. G&N's answer contains an identical

counterclaim, and the following additional counterclaim:

> G&N would show the Court that the Debtor's objection to G&N's fee application is
> tantamount to the Debtor's breach of the contingency fee agreement between the
> Debtor and G&N. As such, the Debtor is liable to G&N for G&N's: a) direct
> damages (i.e., the expenses and fees sought under the fee application); and b)
> consequential damages (i.e., any amount in excess of $425,000.00 G&N will be
> required to pay LawFinance Group, Inc., as referenced in G&N's fee application,
> which is incorporated by reference). In doing so, G&N would further show that it is
> entitled to recover its attorneys' fees and interest as allowed by law. G&N would
> show that it has fully performed its obligations and all conditions precedent to
> G&N's right to recover have been performed or have occurred, with the exception
> of the Court's approval of G&N's fee, said approval being delayed as a direct result
> of the Debtor's objection.

*Original Answer and Counterclaim of Griffith & Nixon, P.C. and Scott Griffith to Pltf's First*

*Amended Compl. Of Malpractice and to Determine Claim and Obj. to Claim*, pp. 6-7.

Frazin argues that these pleadings are insufficient because (1) the Defendants never pled that the services rendered defending their fee applications were services for the estate, as required by 11 U.S.C. § 330 and the Fifth Circuit's decision in *Matter of Pro-Snax Distributors, Inc.*, 157 F.3d 414 (5th Cir. 1998); (2) the Defendants never pled that Frazin's claims were frivolous, as would be required under the Standing Order, *Teraforce*, Rule 9011 or 11 U.S.C. § 105; (3) the Defendants never pled that the DTPA litigation was groundless, harassing or brought in bad faith, and (4) the Defendants never pled which part of Chapter 38 of the Texas Civil Practice and Remedies Code they were relying on, nor "even generally plead the procedural requirements of 38.002, i.e., retention of an attorney, presentment and demand or refusal to pay." *Pltf. Timothy Frazin's Resp. And Obj. to Defs.' Mot. For Attorney Fees and Expenses* ("*Frazin Resp.*"), p. 7. As to G&N's counterclaim for breach of contract, Frazin points out that the Court specifically rejected such a breach of contract claim in its opinion. Moreover, Frazin argues that the G&N Defendants never pled (i) that they had retained counsel, (ii) they made a demand, (iii) such demand was refused, and (iv) all conditions precedent to the collection of attorneys' fees under Section 38.001 were met. Frazin therefore asserts that the Defendants' pleadings did not put him on notice of the specific bases for affirmative relief, and all such claims should be denied.

Next, Frazin raises evidentiary objections to the Motions. First, he argues that the affidavits of Robin Phelan ("Phelan") and Griffith are conclusory[16] and must be disregarded.[17] Frazin also

---

[16] The term "conclusory" is defined as "expressing a factual inference without stating the underlying facts on which the inference is based." Black's Law Dictionary, (8th ed. 2004).

[17] Notably, Frazin did *not* object to the Unsworn Declaration of Nicole LeBoeuf in Support of the G&N Defendants' Motion for Attorneys' Fees and Expenses (attached as Ex. B to the G&N Motion), or to the Declaration of Richard A. Capshaw, Esq. (attached as Ex. C to the G&N Motion).

objects to the time records attached to Haynes and Boone's fee applications as "hearsay and no proper predicate has been established." *Frazin Resp.*, p. 8. He objects to the time records and invoices of the experts Ashley and Burton because they do "not even purport to set out the requirement for attorneys' fees in Texas or Federal Court." *Id.*, p. 9. He makes similar arguments with respect to the G&N Motion.

Substantively, Frazin responds to the Defendants' legal arguments as follows: Frazin argues that the Standing Order cannot be interpreted so broadly as to modify existing Fifth Circuit law, which requires a showing of benefit to the estate for fees to be allowed to an estate professional. Frazin argues that neither *Teraforce* nor the principal case upon which it relied, *In re St. Rita's Assoc. Private Placement, L.P.*, 260 B.R. 650 (Bankr. W.D. N.Y. 2001), "found an explicit right under Section 330 to attorneys' fees for defending a fee application." *Frazin Resp.*, p. 12. Frazin further points out that *Teraforce* was recently criticized by *In re Engman*, 389 B.R. 36, 46-48 (Bankr. W.D. Mich.2008). Further, Frazin argues that "state law and ethical rules are further barrier" to the Defendants' recovery, because the Defendants "have used the interim orders, each requested orally and without pleadings, to accomplish that which would be prohibited by Texas law and ethical rules, that is the withholding of the client's funds to force the client to give up his malpractice claim." *Frazin Resp.*, p. 15. Therefore, Frazin argues that "it is difficult to imagine the circumstances under which Movants could successfully contend that the client agreement would entitle them to hundreds of thousands of dollars in fees for acting adversely to their client." *Id.* (*citing Lee v. Daniels & Daniels*, 2008 Tex. App. LEXIS 1023 at *16-17 (Tex. Civ. App. 4th Dist. – San Ant. 2008).

With respect to the DTPA claims, Frazin argues that the Defendants failed to present any evidence at trial to support a claim that Frazin's claims had no basis in fact or law, were groundless,

or brought in bad faith or for the purpose of harassment. Frazin argues that the Defendants did not ask him at trial about the reasons for the filing of his claims and did not put on expert testimony. He further argues that this Court made no findings in its September Memorandum Opinion that would support an award of attorneys' fees, and simply prevailing on a DTPA claim is not a basis for an award of fees.

With respect to the claims for attorneys' fees under Section 38.001, Frazin argues that this Court did not find that Frazin breached any contract. Frazin also argues that the Defendants did not plead or prove (1) that they had a contract with Frazin, (2) that they presented to and demanded payment from Frazin, (3) that thirty days had passed since presentment and no payment was made, and (4) that they retained an attorney to pursue the claim. Frazin further argues that the Defendants did not prove that they have any contract for a set fee, because any such contractual fees required court approval and, moreover, the Defendants' contracts are actually with the estate and so Frazin can't be liable for attorneys' fees for any breach of them. Frazin also argues that he was in a unique position when bringing his claims, as a result of the Fifth Circuit's holding in *Intelogic Trace*, and that his options were to object to a fee application within days or forever be barred, and thus it would be unfair to judge his claims by the standards imposed for filing a malpractice action, where a plaintiff has a two-year window in which to decide whether a malpractice action is warranted. In a supplemental response, Frazin clarifies that he also objects to the Motions because the Defendants have not segregated their fees, and there has been no demonstration that the claims are "inextricably intertwined," removing the need to segregate fees.[18]

---

[18] To the extent that these arguments are not expressly discussed in this Memorandum Opinion and Order, they have been considered and rejected.

In reply, both Haynes and Boone and G&N argue that it is too late for Frazin to now complain about the adequacy of their pleadings and, in any event, their pleadings are sufficient to put Frazin on notice of the bases for their claims. The H&B Defendants also assert that their fee statements are admissible as business records, the expert witness fee statements of Ashley and Burton are not required to set out the requirements for attorneys' fees in Texas or Federal Court, and that Phelan testified about those requirements in his declaration and testified that the expert witness fees paid to Ashley and Burton satisfied those requirements. The H&B Defendants further argue that the Phelan Declaration is not conclusory. They argue that segregation of their fees is not required, but that even if it is, the Phelan Declaration adequately describes the basis for the proposed 33% reduction. The G&N Defendants essentially echo all of the H&B Defendants' arguments in response to Frazin's objections.

## III.    LEGAL ANALYSIS

### A.    *Procedural and Evidentiary Matters*

Several of Frazin's arguments can be disposed of summarily. First, the Court agrees that it is simply too late for Frazin to defeat the Defendants' claims to attorneys' fees on the ground that he lacked notice of the bases for their claims. *Great Am. Indemnity Co. v. Brown*, 307 F.2d 306 (5th Cir. 1962) (rejecting argument on appeal that special damages were not properly pleaded under Fed. R. Civ. P. 9(g) where litigant had ample opportunity before trial to file a motion for more definite statement or to use discovery procedures); Fed. R. Civ. P. 12(e) (a motion for a more definite statement "must be made before filing a responsive pleading").[19]

---

[19] Frazin filed answers to the counterclaims for attorneys' fees on March 1, 2008 (with respect to the H&B Defendants' counterclaim) and March 3, 2008 (with respect to the G&N Defendants' counterclaim).

Second, even if Frazin's complaints about the insufficiency of the pleadings were timely, the Court finds that the pleadings are sufficient under Rule 8's requirement of a short and plain statement of the claim showing that the pleader is entitled to relief. *Voest-Alpine Trading USA Corp. v. Bank of China*, 288 F.3d 262 (5th Cir. 2002) (permitting recovery of attorneys' fees under Section 38.001 where litigant "pled for recovery of 'attorney's fees payable under all applicable statutes'"); *Enserch Corp. v. Shand Morahan & Co.*, 952 F.2d 1485 (5th Cir. 1992) (permitting recovery of attorneys' fees under Section 38.001 where the statute was not cited in the complaint).[20] Here, the Defendants' counterclaims cited to Section 38.001, Section 330 of the Bankruptcy Code, and Section 17.50(c) of the DTPA. Further, the Defendants have argued for, and fully briefed, their alleged bases for entitlement to attorneys' fees in nearly every pleading they have filed. *See Haynes and Boone Defs' Reply in Supp. Of their Mot. For Attorneys' Fees and Expenses*, attachment 1. The issue was included in the Defendants' proposed findings of fact and conclusions of law submitted to the Court prior to trial, *see* Docket No. 92, and was included in the parties' Joint Pre-Trial Order. *See* Docket No. 95, p. 8, ¶ 10 (summarizing Defendants' claims for attorneys' fees); p. 40, ¶ 5 (listing contested issues of fact regarding Defendants' claims for attorneys' fees); p. 42, ¶ 6 (listing contested issues

---

[20] The *Enserch Corp.* court did mention that some Fifth Circuit authority has suggested that a party must plead entitlement to Section 38.001 fees with some particularity, citing *Ralston Oil & Gas Co. v. Gensco, Inc.*, 706 F.2d 685, 696 (5th Cir. 1983). The *Ralston Oil* court did make that statement, in the context of holding that a litigant had waived a claim to attorneys' fees under Section 38.001's predecessor statute by failing to plead entitlement to such fees after a jury denied its claim for attorneys' fees under the DTPA. The *Ralston Oil* case is distinguishable, however, because here, the Defendants clearly pled entitlement to attorneys' fees under Section 38.001 in their initial counterclaim and in almost every other motion filed in this adversary proceeding, in their proposed findings of fact and conclusions of law, and in the parties' joint pre-trial order. Moreover, the sole case relied upon by the *Ralston Oil* court was *Chiles v. Becker*, 608 S.W.2d 816 (Ct. App. – Dallas 1980). In that case, the court of appeals held it error to award attorneys' fees under Section 38.001's statutory predecessor where the litigant had never sought such fees in its pleadings, but instead pled for attorneys' fees under a provision in the promissory note at issue which permitted the recovery of attorneys' fees upon a successful suit for collection of the note. Such is not the case here. Further, as the Fifth Circuit noted in the *Voest-Alpine Trading* case, its decision in *Enserch* (which post-dated *Ralston Oil*) held that all Section 38.001 requires is "that the defendant be put on notice that the plaintiff is seeking attorney's fees"). *Voest-Alpine Trading*, 288 F.3d at 268.

of law regarding Defendants' claims for attorneys' fees). Therefore, Frazin may not now complain that the Defendants failed to comply with the requirements for notice pleadings. *McGehee v. Certainteed Corp.*, 101 F.3d 1078, 1080 (5th Cir. 1996) ("a joint pre-trial order signed by both parties supersedes all pleadings and governs the issues and evidence to be presented at trial"). There is simply no basis upon which to conclude that Frazin did not know the nature of the claims being asserted against him by the Defendants.

Next, the Court turns to Frazin's evidentiary objections. Frazin's objections to Exhibits A, B, and C of the Phelan Declaration (the Haynes and Boone time records) on hearsay grounds are overruled. The Court is satisfied from a review of the Phelan Declaration that the time records are "records of regularly conducted activity" within the meaning of Federal Rule of Evidence 803(6).[21] Phelan testifies in his declaration that the fee statements were prepared by him or others in the firm who were involved in the case under his supervision and control; they are accurate descriptions of the time spent on the case and the costs incurred; they were prepared in the regular course of business of the firm as part of the firm's regularly conducted business activity; it is the regular practice of the firm to create and to keep such fee statements; and they were prepared at or near the time of the events or conditions recorded. That testimony satisfies Rule 803(6) and Exhibits A, B,

---

[21] Federal Rule of Evidence 803(6) provides that

a memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation, all as shown by the testimony of the custodian or other qualified witness, or by certification that complies with Rule 902(11), Rule 902(12), or a statute permitting certification, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business . . . profession, occupation, and calling of every kind, whether or not conducted for profit.

and C are therefore admissible. For the same reasons, the Court overrules Frazin's objections to the fee statements of G&N.[22]

Frazin's objections to the fee statements of Ashley and Burton are also overruled. Although Frazin argues that the fee statements do "not even purport to set out the requirement for attorneys' fees in Texas or Federal Court," the H&B Defendants respond that there is no such requirement and, in any event, those fees are sought as *expenses*, not as attorneys' fees. The Court agrees and overrules Frazin's objection.

Frazin objects to paragraph 25 of the Phelan Declaration on the ground that it is conclusory. Paragraph 25 asserts that "at different periods during this litigation, the primary attorneys who worked on this file were precluded from devoting significant attention to other cases or getting involved in other cases, particularly as the trial date approached." The H&B Defendants assert that this fact is "self-evident" from the efforts required by this case. The Court agrees. The time records attached to the Phelan Declaration show, by the Court's count, that there were no less than 135

---

[22] Frazin further objects to paragraphs 8, 9, and 10 of the Griffith Declaration, which are the factual allegations which would "prove up" the time records as business records under Rule 803, on the ground that "as a result of striking [the time records] paragraphs 8, 9 and 10 must also be stricken as they rely upon hearsay without an adequate foundation." Frazin's Resp. And Obj. To Defs' Mot. For Attorney Fees and Expenses (Docket No. 153), p. 10. Since the Court is not striking the time records, this objection is overruled. To the extent that Frazin is arguing that paragraphs 8, 9 and 10 are themselves hearsay, that objection is likewise overruled. This objection, if sustained, would do away with affidavits entirely in federal practice. An affidavit containing material factual allegations which is submitted to the Court as evidence is, almost by definition, an out-of-court statement offered to prove the truth of the factual matter asserted. It is true that affidavits must set forth facts that would be admissible as evidence at trial. *Santos v. Murdock*, 243 F.3d 681 (2nd Cir. 2001); *Geiserman v. MacDonald*, 893 F.2d 787 (5th Cir. 1990). Affidavits must be made on personal knowledge, show that the affiant is competent to testify to the matters stated therein, and set forth facts as would be admissible in evidence at trial. *Santos,* 243 F.3d at 683; *Bortell v. Eli Lilly and Co.*, 406 F.Supp.2d 1 (D.D.C. 2005). When an affidavit complies with these requirements, a court may consider it, "even though a sworn declaration remains 'technically hearsay.'" *Bortell*, 406 F.Supp.2d at 8. Hearsay evidence produced in an affidavit may be considered if the out-of-court declarant could later present the evidence through direct testimony. *J.F. Feeser, Inc. v. Serv-A-Portion, Inc.*, 909 F.2d 1524 (3rd Cir. 1990). Moreover, Frazin waived an evidentiary hearing with respect to the attorneys' fee issues and consented to "trial by affidavit" and should not now be heard to complain that he wants the ability to cross-examine Griffith.

instances between December 3, 2007 and August 25, 2008 in which a Haynes and Boone attorney or paralegal expended eight or more hours to this case in a given day.[23] The same can be said with respect to Frazin's objection to the Griffith Declaration, as the time records disclose approximately 100 instances during roughly the same timeframe in which attorneys or staff expended more than 8 hours per day on this case.

Frazin objects to paragraph 34 of the Phelan Declaration on the ground that it is conclusory. Paragraph 34 states: "[t]he services the Firm rendered in this litigation were beneficial for the Haynes and Boone Defendants. The fees requested herein are in conformity with fees allowed in similar proceedings for similar services rendered and results obtained." The Court agrees with Frazin, to the extent that the Phelan Declaration concludes that the fees are in conformity with fees allowed in similar proceedings for similar services rendered and results obtained. The same can be said of the second sentence of paragraph 28 of the Griffith Declaration, which mirrors the second sentence of paragraph 34 of the Phelan Declaration. These statements contain no detailed facts and there is no evidence supporting them. And, the same is true with respect to the second sentence of paragraph 38 of the Phelan Declaration (stating that the firms' requested fees and expenses are within the range of reasonableness for comparable attorneys in the Northern District of Texas). Therefore, the second sentence of paragraph 34 of the Phelan Declaration and the second sentence of paragraph 38 of the Phelan Declaration are stricken, as is the second sentence of paragraph 28 of the Griffith Declaration. As to the first sentence of paragraph 34 of the Phelan Declaration and the first sentence of paragraph 28 of the Griffith Declaration, the Court, which presided over this case, is able to assess whether or

---

[23] The Court is not presently discussing the *reasonableness* of that time; the Court is merely noting that the Phelan Declaration and attached exhibits establish with detail that the attorneys who worked on this file were precluded from devoting significant attention to other cases.

not the services the firm rendered were of benefit to the Defendants. The Phelan and Griffith Declarations are crafted on personal knowledge, obtained as a partner of the respective law firm and are thus admissible.

As to the first sentence of paragraph 38 of the Phelan Declaration and the last sentence of paragraph 24 of the Griffith Declaration (both opining that the requested fees were both reasonable and necessary), the Court is the ultimate arbiter of whether the firms' work was "reasonable and necessary" and the two declarations add little to the analysis.[24] However, those statements are not conclusory, as the "facts" underlying them are set forth in the attached invoices, and the objection is therefore overruled.

Frazin objects to paragraph 35(b) of the Phelan Declaration and paragraphs 29 and 30 of the Griffith Declaration on the ground that they are conclusory and do not set forth why the percentage reductions are accurate in the event that segregation is required, and to Phelan's statement that the breach of fiduciary duty claims "permeated the entire case." The Court overrules this objection, as those paragraphs adequately set forth the bases for the Defendants' conclusions that the 33% and 10% reductions would account for the time spent on matters other than the DTPA claims and claims intertwined with those DTPA claims.

With these preliminary, primarily procedural objections disposed of, the Court now turns to the heart of the matter.

**B. *Entitlement to Attorneys' Fees under "Federal Law"***

---

[24] As noted later, *see infra* pp. 54-55, the testimony of an interested witness, such as a party, generally does nothing more than create a fact issue, and that rule has been applied to the testimony of an attorney respecting the reasonableness of his fees. Thus, the Phelan and Griffith Declarations do not establish the reasonableness of the fees as a matter of law. Moreover, even where the evidence is uncontradicted, the trial judge can still find some of the claimed fees to be unreasonable.

The Defendants claim a right to attorneys' fees under "federal law," citing the Standing Order, this Court's *Teraforce* decision, and Section 330 of the Bankruptcy Code. The general rule in federal courts is that a prevailing party cannot recover attorney's fees absent specific statutory authority, a contractual right,[25] or certain special circumstances. *See Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 255-60 (1975); *see also Galveston County Navigation Dist. No. 1 v. Hopson Towing Co., Inc.*, 92 F.3d 353, 356 (5th Cir. 1996) (noting that "[g]enerally, absent statute or enforceable contract, litigants must pay their own attorneys' fees"). The rule "is so venerable and ubiquitous in American courts it is known as the 'American Rule.'" *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 310-11 (Tex. 2006). Texas also follows the American Rule. *Id.*; *Crenshaw v. General Dynamics Corp.*, 940 F.2d 125 (5th Cir. 1991). Therefore, whether federal or state law governs (the claims asserted here were largely state law claims), the American Rule applies. Further, the American Rule applies to litigation in the bankruptcy courts. *In re S.S.*, 271 B.R. 240, 245 (Bankr. D.N.J. 2002).

The Defendants first assert entitlement to attorneys' fees under the Standing Order. However, the Standing Order cannot and does not create a substantive right to attorneys' fees. *Crenshaw v. General Dynamics Corp.*, 940 F.2d 125 (5th Cir. 1991) (local rule could not independently authorize the court to impose attorneys' fees because a local rule cannot create a substantive right); *In re Standing Order with Reasons Regarding Objections to the Discharge Under 11 U.S.C. § 727 and Purported Settlement of Actions*, 272 B.R. 917 (W.D. La. 2001) (standing order which prevented parties from settling a dischargeability action when it is combined

---

[25] There is no dispute that the original contracts between Frazin and the Defendants do not provide for the recovery of attorneys' fees in the event that collection or enforcement activity is required.

with a Section 727 complaint modified existing substantive rights and was improper); *In re Cena's Fine Furniture, Inc.*, 109 B.R. 575 (E.D.N.Y. 1990) (a standing order or "fee application checklist" cannot alter local rules, federal law or the more general Federal Rules of Bankruptcy Procedure); *see also Tiedel v. Northwestern Michigan College*, 865 F.2d 88, 94 (6th Cir. 1988) ("a district court is not empowered to enact a local rule giving itself the authority to award attorneys' fees"); *cf. In re Binion*, No. 05-69633, 2006 WL 2668464 (Bankr. N.D. Ohio Sept. 15, 2006) (unpublished decision) (standing order was permissible under Rules Enabling Act where it did not conflict with Federal Rules of Bankruptcy Procedure or modify substantive rights).

The Defendants also assert entitlement to attorneys' fees under this Court's decision in *Teraforce*. However, a judicial decision by a bankruptcy judge cannot create a substantive right to attorneys' fees. The Defendants' argument, however, is most likely a short-hand method of asserting an entitlement to attorneys' fees under Section 330 of the Bankruptcy Code, which was the statute before the Court in *Teraforce*. Section 330, which governs attorneys' fees for estate professionals in a bankruptcy case, does not explicitly provide for the recovery of attorneys' fees incurred in *defending* a fee application. Section 330(a)(6) of the Bankruptcy Code states that "[a]ny compensation awarded for the *preparation of* a fee application shall be based on the level and skill reasonably required to prepare the application." 11 U.S.C. § 330(a)(6). Some courts have held that attorneys in a bankruptcy case are entitled to fees not only incurred in preparing the fee application, but also for defense of that fee application. *See, e.g., Smith v. Edwards & Hale, Ltd. (In re Smith)*, 317 F.3d 918, 928 (9th Cir. 2002) (allowing recovery of fees incurred in defending fee application where fee applicant made showing that services satisfied requirements of Section 330(a)(4)(A) and that circumstances of case exemplified situation where costs incurred defending fee application were

necessary pursuant to Section 330(a)(1)); *In re Chavez,* 157 B.R. 30 (D. Colo.) *aff'd*, 13 F.3d 404 (10th Cir. 1993); *see also In re Wind N' Wave*, 509 F.3d 938 (9th Cir. 2007) (permitting an award of fees to counsel for petitioning creditors for litigating over the award where the *Smith* test was met). Those courts which have permitted recovery of attorneys' fees incurred in defending a fee application have ventured beyond the text of Section 330 and into the land occupied by its legislative history and the purpose underlying its enactment – *i.e.*, that professionals in a bankruptcy case should earn the same income as their non-bankruptcy counterparts, and that a bankruptcy professional's fee award would be unfairly diluted if he was not permitted to recover fees incurred in defending the fee application. *See, e.g., In re Worldwide Direct, Inc.*, 334 B.R. 108 (D. Del. 2005).

Other courts have held that because Section 330 permits "reasonable compensation for actual, necessary services" on behalf of the estate, no recovery of fees incurred in defending a fee application should be allowed because those services do not benefit the estate. *Grant v. George Schumann Tire & Battery Co.*, 908 F.2d 874, 882-83 (11th Cir. 1990) (denying attorney's request for fees incurred in defending against debtor's appeal of original fee award on grounds that fees were not reasonable nor necessary to administration of the bankruptcy estate); *Boldt v. Crake (In re Riverside-Linden Investment Co.)*, 945 F.2d 320, 323 (9th Cir. 1991) (district court's denial of fees incurred in defense of fee application was not an abuse of discretion because there is no statutory requirement to oppose objections to a fee application and thus the fees are not "necessary" within the meaning of Section 330); *In re DN Assoc.*, 165 B.R. 344 (Bankr. D. Me. 1994); *In re Courson*, 138 B.R. 928 (Bankr. N.D. Iowa 1992).

Neither the Fifth Circuit nor the Northern District of Texas has addressed this issue. This Court, in the *Teraforce* decision, previously ruled as follows:

This Court is disinclined to choose between a per se rule granting or denying recovery in all situations. A better disposition was announced in *In re St. Rita's Assocs. Private Placement, L.P.*, 260 B.R. 650 (Bankr. W.D.N.Y. 2001). In that case, it was held that while debtor's counsel was entitled to be compensated for the preparation of its fee application pursuant to section 330(a)(6), it was not entitled to compensation for defending its fee application against objections thereto, especially since the objections were filed in good faith and ultimately resulted in a partial disallowance of the requested fees. 260 B.R. at 652. The *St. Rita's* court reasoned that such a rule comported with the "American rule" of recovery, applicable to fee disputes occurring outside the realm of bankruptcy. *Id*. The court did not go so far as to preclude any recovery of attorney fees incurred in defending a fee application—in fact, it left open the door to recovery of such fees where sanctions are appropriate for the filing of inappropriate objections. *Id*. A careful reading of the *Riverside-Linden* and *Smith* cases, cited above for differing propositions, supports the *St. Rita's* compromising analysis. The Court is further convinced that *St. Rita's* analysis is proper when read in conjunction with the specific provisions of section 330(a)(3)(E), which requires the Court to consider "whether the compensation [sought] is reasonable based on the customary compensation charged by comparably skilled practitioners in cases *other than cases under this title*." (Emphasis added); *see also Anderson Grain*, 222 B.R. at 532 (noting that "bankruptcy courts need to be mindful that financial rewards to attorneys in bankruptcy court should be comparable to what they could achieve in other areas of commercial practice"). Because the American Rule applies absent explicit statutory or contractual authority, and because the Code contains no statutory provision for the recovery of attorney fees for *defending* a fee application, counsel should not normally be able to recover fees for defending a fee application in the bankruptcy court.

*Teraforce*, 347 B.R. 838 at 866-67 (Bankr. N.D. Tex. 2006). The Court in *Teraforce* did not explore the contours of any exceptions to the general rule; rather, it applied the American Rule and denied the recovery of fees because it found that the objections to the fee application before it in *Teraforce* were filed in good faith and were meritorious in significant part.

This case requires the Court to clarify its *Teraforce* decision and the circumstances under which an award of fees incurred in defending a fee application is appropriate. Since the American Rule denies recovery of attorneys' fees in the absence of *explicit* statutory or contractual authority, and since Section 330 does not explicitly provide for the recovery of fees incurred in defending a fee

application, the Court rules that Section 330 cannot serve as the statutory authority for a departure from the American Rule.

However, the American Rule itself has several historical and notable exceptions, the continuing vitality of which have been reaffirmed in recent years. *Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991); *Spring v. Beverly Enters. Mississippi, Inc.*, No. 99-60174, 2000 WL 178163, at *5 (5th Cir. Jan. 25, 2000) (unpublished decision). One of those exceptions is that a court may assess attorneys' fees as a sanction when a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons. The threshold for invoking this inherent power is high, *Spring*, 2000 WL 178163 at *5, and the Court should invoke it only when it finds that "a fraud has been practiced upon it or that the very temple of justice has been defiled." *Boland Marine & Mfg. Co. v. Rihner*, 41 F.3d 997, 1005 (5th Cir. 1995) (quoting *Chambers*, 501 U.S. at 46). Once invoked, it "must be exercised with restraint and discretion." *Spring*, 2000 WL 178163 at *5.

Moreover, while some courts have held that the underlying conduct may be considered in determining whether the losing party has acted in bad faith, the Fifth Circuit "has consistently held that the 'bad faith' actions must occur in the course of the litigation." *Rogers v. Airline Pilots Ass'n, Intern.*, 988 F.2d 607, 615 (5th Cir. 1993). The bad-faith exception "does not address conduct underlying the substance of the case; rather, it refers to the conduct of the party and the party's counsel during the litigation of the case." *Flanagan v. Havertys Furniture Co.*, 484 F.Supp.2d 580, 581 (W.D. Tex. 2006). The Fifth Circuit has described the conduct required to invoke the exception to the American Rule as conduct which is "callous and recalcitrant, arbitrary and capricious, or willful, callous and persistent." *Galveston County Nav. Dist. No. 1 v. Hopson Towing Co.*, 92 F.3d 353, 358 (5th Cir. 1996) (quoting *Morales v. Garijak, Inc.*, 829 F.2d 1355, 1358 (5th Cir. 1987) and

applying the exception to the American Rule in admiralty cases). "Not acting 'in an equitable manner' does not support an award of attorneys' fees." *Galveston County*, 92 F.3d at 359. A determination *after trial* that a witness was not credible and thus a claim was "unsupported factually," "contradictory factually," and "utterly incredible" does not support a finding that the claim was "so egregious and in bad faith as to authorize an award of attorneys' fee." *Id*.

Attorneys' fees will not be awarded under the bad faith exception even where a litigant's belief in the merits of his claim is unreasonable. *Butler v. U.S. Dept. Of Agriculture*, 826 F.2d 409 (5th Cir. 1987). The standards for a finding of bad faith are "stringent," *U.S. for Use and Ben. Of Howell Crane Serv. v. U.S. Fidelity & Guar. Co.*, 861 F.2d 110, 113 (5th Cir. 1988); *Batson v. Neal Spelce Assoc. Inc.,* 805 F.2d 546, 550 (5th Cir. 1986), and "defeat on the merits does not, by itself, justify an award of attorney's fees under the bad faith exception." *U.S. for Use and Ben. Of Howell Crane Serv.*, 861 F.2d at 113; *see also In re Owners of Harvey Oil Center*, 788 F.2d 275, 279 (5th Cir. 1986) ("The principle of compensation based on vexatiousness applies whenever the federal courts are made the tool of improper conduct, regardless whether state or federal law forms the rule of decision. Either the lack of legal foundation or the abusive nature of litigation tactics employed by a party could support an award of attorneys' fees . . . [d]efeat at trial, however, is not alone sufficient to justify a fee award to an opponent under the equitable rule"). Attorneys' fees will not be awarded even where a claim lacks merit, if there is no evidence of bad faith, improper motive, or reckless disregard of the duty owed to the court. *Flanagan,* 484 F.Supp. 2d at 581. Nor should a party be penalized for maintaining an aggressive litigation posture. *Batson*, 805 F.2d at 550.

This Court in *Teraforce* did not *expressly* apply these standards when it denied fees for defense of the fee application, but it *implicitly* applied them by finding that the objections to the fee

application were filed in good faith. Similarly, the *St. Rita's* court, upon which this Court relied, denied recovery of fees where the objections were interposed in good faith. The *St. Rita's* court further stated that "the court can discern no basis for sanctions, such as might be warranted under Bankruptcy Rule 9011. Nothing in this decision should be viewed as precluding an award of legal fees in situations where sanctions are appropriate." *St. Rita's*, 260 B.R. at 652.

When the standards set forth for invoking the exception to the American Rule are applied here, the Court does not believe that Frazin's conduct in this litigation warrants an exception to the American Rule. As to the negligence claims, Frazin simply lost them for failure of proof. Defeat at trial is not, however, alone sufficient to justify an award of attorneys' fees. *In re Owners of Harvey Oil Center*, 788 F.2d 275, 279 (5th Cir. 1986). As to the DTPA claims, some of them were not cognizable under the DTPA, but were cognizable under a different theory – *i.e.*, as negligence claims. Merely mis-labeling claims is an insufficient basis upon which to conclude that they were filed in bad faith. And, once again, the fact that Frazin did not prevail on those claims is an insufficient basis upon which to find that he or his counsel engaged in bad faith, oppressive or wanton conduct during the course of the litigation. *Flanagan v. Havertys Furniture Co.*, 484 F.Supp.2d 580, 581 (W.D. Tex. 2006) (the bad-faith exception does not address conduct underlying the substance of the case; it refers to conduct during the litigation of the case). As to other of the DTPA claims, they were barred by *defenses*, which does not mean that they were brought in bad faith, vexatiously, wantonly or for oppressive reasons. It simply means that legitimate defenses applied to bar the claims.[26] As to the

---

[26] The Court notes that application of the defenses set forth in Section 17.49(f) and (g) of the DTPA was a close call – there was no case law directly on point discussing the applicability of those statutory defenses to a contingency fee contract like the one at issue here. Where the law is unsettled, an action will not be found to be groundless. *Baroid Equipment, Inc. v. Odeco Drilling, Inc.*, 184 S.W.3d 1 (Tex. App. – Houston [1st Dist.] 2005).

breach of fiduciary claims, while several of them failed as a matter of proof and because the Court found that the attorney-client relationship terminated on December 27, 2007 (which was itself a hotly contested fact), the Court did, in fact, find several breaches of fiduciary duty.  Frazin did not ultimately win those claims, however, because the breaches were not so "clear and serious" as to warrant fee forfeiture and Frazin failed to prove damages.

The H&B Defendants argue that "[a]t best, Frazin filed his objections and this malpractice case based solely on the unfounded assumption that a reversal at the court of appeals necessarily means that either the appellate or trial team committed malpractice.  At worst, Frazin filed this case to try to extort from his counsel the amount of damages he lost on appeal, hoping that a malpractice suit would force his lawyers to pay off the amount of the judgment he thought was already his." *H&B Motion*, p. 25.  They then argue, essentially, that if Frazin had performed a "meaningful review" of the trial and appellate record in the State Court Action and the Haynes and Boone fee application, he could not in good faith have made some of his claims; that if Frazin had performed a "cursory review" of the fee application, he would have seen that Cortell billed nearly 300 hours on the appeal, such that his claim that she misrepresented that she would be heavily involved in the appeal would fail; that a "simple review" of the record would have revealed that Haynes and Boone made all the proper performance arguments; and that Frazin "stubbornly pursued numerous claims" despite his knowledge that his claims were groundless.

Most of the items the H&B Defendants point to, however, are claims that were found, *after discovery and trial*, not to have merit. For example, both the H&B Defendants and the G&N Defendants point out that this Court found Frazin's testimony incredible on several points. *See, e.g.*, *H&B Motion,* pp. 9-10; *G&N Motion*, pp. 6-7.  However, a determination after trial that a claim

lacked factual support or was incredible has not been sufficient to justify an award of attorneys' fees under the bad-faith exception to the American Rule. *Galveston County Nav. Dist. No. 1 v. Hopson Towing Co.*, 92 F.3d 353, 359 (5th Cir. 1996). The H&B Defendants and the G&N Defendants are both essentially arguing a "reasonableness" or "groundless" standard. However, as the Supreme Court has made clear, the bad-faith exception to the American Rule requires more:

> These other mechanisms [11 U.S.C. § 1927 and the Federal Rules of Civil Procedure], taken alone or together, are not substitutes for the inherent power, for that power is both broader and narrower than other means of imposing sanctions. First, whereas each of the other mechanisms reaches only certain individuals and conduct, the inherent power extends to a full range of litigation abuses. At the very least, the inherent power must continue to exist to fill in the interstices . . . . Second, while the narrow exceptions to the American Rule effectively limit a court's inherent power to impose attorneys' fees as a sanction to cases in which a litigant has engaged in bad-faith conduct or willful disobedience of a court's orders, many of the other mechanisms permit a court to impose attorney's fees as a sanction for conduct which merely fails to meet a reasonableness standard.

*Chambers v. NASCO, Inc.*, 501 U.S. 32, 50 (1991).

The *Chambers* case itself aptly illustrates the type of conduct to which the bad-faith exception to the American Rule is addressed. In that case, Chambers was the sole shareholder of Calcasius Television and Radio, Inc. ("CTR"), which operated a TV station in Lousiana. Chambers, in his individual capacity and on behalf of CTR, contracted to sell the station's facilities and broadcast license to NASCO, Inc. ("NASCO"). Chambers later changed his mind, and NASCO informed Chambers that it would file an action seeking specific performance in federal district court. In response, Chambers and his counsel took great pains to place the property at issue beyond the reach of the district court. They created a trust, naming Chambers' sister as trustee and his children as beneficiaries. They directed the President of CTR (who later became Chambers' wife) to execute a warranty deed conveying the property to the trust, and then recorded the deeds, notwithstanding

the facts that (1) the trustee as purchaser had not signed the deeds, (2) none of the consideration for the transfer had been paid, and (3) CTR retained possession of the property. When the district court action was filed, the district judge, with NASCO's counsel present, called Chambers' counsel, who later admitted that he intentionally withheld from the district court, in response to its inquiries, information about the transfer of the property to the trust and the recording of the deeds the day before. The following week, the district court granted a preliminary injunction against Chambers and CTR and entered a temporary restraining order enjoining a transfer of the property, and, upon learning of the creation of the trust and the transfer to it, issued a warning to Chambers and his counsel that their conduct had been unethical. In defiance of the injunction, Chambers refused to allow NASCO to inspect CTR's corporate records. He then filed "a series of meritless motions and pleadings and delaying actions." *Chambers*, 501 U.S. at 39. On the eve of trial, Chambers stipulated that the original purchase agreement was enforceable and that he had breached the same, but between the date of trial and entry of judgment, Chambers sought to render it meaningless by seeking permission from the FCC to build a new tower and relocate his facilities to that site, which was not governed by the purchase agreement. Chambers also directed CTR to file formal opposition to NASCO's application for FCC approval of the license transfer, in contravention of the district court's injunction and its judgment on the merits. When Chambers refused to close the sale, NASCO set a hearing to determine whether certain equipment was included in the sale. Before the court was able to conclude the hearing and rule upon the request, Chambers, without notice to the district court or NASCO, removed all of the equipment at issue.

Clearly, Frazin's conduct in this case does not rise to this level. In summary, the Court now clarifies its *Teraforce* decision and holds that fees incurred in defending a fee application may be

awarded under circumstances which satisfy the bad-faith exception to the American Rule. To be clear, when such fees are awarded, the award is pursuant to the Court's inherent power and the bad-faith exception to the American Rule, and not pursuant to Section 330 of the Bankruptcy Code.

This approach satisfies many of the concerns raised about a bankruptcy court's award of fees incurred in defense of a fee application. For example, the Court notes that its *Teraforce* decision was recently criticized in *In re Engman,* 389 B.R. 36 (Bankr. W.D. Mich. 2008). First, the *Engman* court was concerned that identifying the prevailing party can be tricky, where an application is seeking reimbursement for a broad array of tasks and the objections are many. That is not an issue in this case, where the objections to the Defendants' fee applications were premised entirely upon the Defendants' alleged tortious actions, and the Defendants clearly prevailed in full. The objections to the fee applications in this case were not on "traditional" Section 330 grounds (lumping, duplication, etc.), some of which were sustained and some not, making identification of the prevailing party difficult. Second, the *Engman* court was concerned that there is no specific statutory authority to award fees for defending a fee application or for recognizing exceptions, and thus the courts following a middle ground approach are filling a legislative void with their own notions of sound policy. *Engman*, 389 B.R. at 47. However, the American Rule "has not served . . . as an absolute bar to the shifting of attorneys' fees even in the absence of statute or contract." *F.D. Rich Co. v. U.S. for Use of Indus. Lumber Co.*, 417 U.S. 116, 129 (1974). The American rule itself has several long-standing exceptions, one of which is the bad-faith exception, which can fairly be raised in connection with fees incurred in defending a fee application in a bankruptcy case. Thus, the Court is not, in awarding fees incurred in defending a fee application, relying upon either statutory authority or notions of sound policy to award such fees under Section 330. Rather, the Court is relying upon a

judicially recognized exception to the American Rule itself.  Third, the *Engman* court was concerned that bankruptcy professionals should not be treated any differently than other persons with administrative claims against the estate, whose claims are also subject to objection.  This Court agrees.  However, the Court's ruling today would apply with equal force to *any* administrative claimant, professional or not, who was forced to incur attorneys' fees as a result of an objection which was filed in bad faith, vexatiously, wantonly, or for oppressive reasons.  The Court's current ruling does not preclude non-professional administrative claimants from seeking a recovery of fees.  Nor does the Court's ruling raise concerns about re-writing Section 330 through the use of judicial gloss.  If the Court were to award attorneys' fees here, it would merely be applying a long-standing historical exception to the American Rule and invoking its inherent power to award attorneys' fees.

1.    *The Fifth Circuit's Pro-Snax Decision*

Frazin cites to the Fifth Circuit's decision in *Matter of Pro-Snax Distributors, Inc.*, 157 F.3d 414 (5th Cir. 1998) for the proposition that the Defendants are not entitled to attorneys' fees in defending their fee application because such services do not benefit the estate.  In *Pro-Snax*, the Fifth Circuit held that a chapter 11 debtor's attorney may not be awarded compensation from the estate under Section 330 for work done as the debtor's attorney after the appointment of a chapter 11 trustee.  In addition, the Fifth Circuit held the proper standard by which to measure services rendered to a debtor-in-possession prior to the appointment of a trustee is whether the services resulted in an identifiable, tangible, and material benefit to the bankruptcy estate.  *Pro-Snax*, 157 F.3d at 426.  However, the *Pro-Snax* decision does not inform the Court's analysis here for several reasons.

First, *Pro-Snax* was a decision interpreting Section 330 of the Bankruptcy Code, which "speaks to the compensation of officers employed by the estate of the debtor," *Pro-Snax*, 157 F.3d

at 421, and the Fifth Circuit ruled that Congress clearly indicated "that the debtor's attorney may not be compensated *from the estate* after the appointment of a Chapter 11 Trustee." *Id*. at 425. Here, the Court has concluded that the Defendants' representation of the estate concluded on December 27, 2007. The services for which they were hired and retained, with Court approval, concluded on that date. All of the services for which the Defendants now seek monetary recovery were rendered *after* their representation of the estate concluded.

Moreover, the rationale underlying the requirement of court approval for fees under Section 330 does not apply here, where the estate itself was solvent and has concluded. All creditors have been paid in full and the Debtor has received his discharge. All of the services which the Defendants rendered in defending their fee application and against the Malpractice Claims were rendered on their own behalf, and not on behalf of the bankruptcy estate, and the estate will not be called upon to pay for those services. In addition, had the Defendants hired outside counsel to represent them in connection with the Malpractice Claims, instead of choosing to represent themselves, there is no question that the fees owing to that outside counsel would not be compensable from the estate under Section 330, and the Defendants would not have had to obtain court approval under Section 327 to employ that outside counsel. While it is true that the Defendants had to overcome the Malpractice Claims in order to prevail on their fee applications, that is the result of the overlay of bankruptcy law (the fee application approval process and *Intelogic Trace*) on what would normally occur outside of bankruptcy,[27] and by no stretch of the imagination can the defense of Frazin's tort claims be

---

[27] Outside of bankruptcy, the Defendants would likely have paid themselves their contractual fees out of the settlement proceeds and sent the balance to Frazin. As noted by Frazin's counsel, Frazin would have had more time to then decide whether to sue the Defendants for malpractice. At the very least, had Frazin expressed concern about the contractual fees, the Defendants would likely have placed the disputed portion into an IOLTA account for safekeeping until the dispute was resolved and sent the balance to Frazin.

considered as services rendered on behalf of the estate.  As noted by the *St. Rita's* court:

> Fee applications in bankruptcy have no counterpart in most areas of legal practice.
> For this reason, no reasonably comparable experiences provide guidance in setting
> a proper standard for compensating such effort.  As noted above, section 330(a)(6)
> fills this void, but only with respect to the preparation of fee applications.  In contrast,
> fee disputes are common to all areas of legal practice.  Thus, the standard in section
> 330(a)(3)(A, E) has application.  In bankruptcy, services rendered in connection with
> a fee dispute are to receive the same compensation as would be paid to skilled
> practitioners in a non-bankruptcy case.  Outside the field of bankruptcy, when clients
> refuse to pay a disputed bill, attorneys must choose either to "write off" the liability
> or to commence litigation for collection.  In that litigation, the "American rule"
> applies.  Each side generally assumes the cost of its own legal counsel.  Because
> skilled practitioners outside bankruptcy would customarily receive no compensation
> for the additional time spent on litigating a fee dispute, no further compensation is
> payable to [the attorneys] in the present instance."

*St. Rita's*, 260 B.R. at 652.

In short, *Pro-Snax* does not apply here, as *Pro-Snax* (1) governs compensation to be paid by

the estate, and the estate is paying none here; (2) governs services rendered on behalf of the estate,

and the services for which the Defendants now seek monetary recovery were rendered on behalf of

the Defendants, not the estate, and were rendered after their representation of the estate concluded

and the estate itself concluded; (3) interpreted Section 330 of the Bankruptcy Code, which does not

on its face permit an award for fees incurred in defending a fee application, and did not address the

bad-faith exception to the American Rule, which this Court now holds is the source of authority

under which fees incurred in defending a fee application may be awarded.[28]

---

[28] The Court expresses no view on whether Rule 9011, when properly invoked, can also serve as a source of authority for
an award of attorneys' fees incurred in defending a fee application.  First, the Defendants' counterclaims do not assert
entitlement to attorneys' fees under Rule 9011.  Rather, the Defendants obliquely mention Rule 9011 in their briefs,
asserting that legal fees are recoverable where sanctions are appropriate under Rule 9011 and citing *St. Rita's. See, e.g.,*
*H&B Motion*, p. 4.  However, Rule 9011 provides, as is relevant here, that a request for sanctions "may not be filed or
presented to the court unless, within 21 days after service of the motion, the challenged . . . claim . . . is not withdrawn
or appropriately corrected . . . ."  There is no evidence that Defendants complied with this "safe harbor" procedure.  *See*
*In re Wilson*, No. 06-3078, 2007 WL 1040565 (Bankr. S.D. Tex. Mar. 30, 2007) (unpublished decision) (declining to
award sanctions under Rule 9011 where there has no proof of compliance with the safe harbor provisions).  In addition,
Rule 9011(c)(2)(A) provides that monetary sanctions may not be awarded against a represented party (such as Frazin) for

Applying the above principles here, the Court concludes that the Defendants are not entitled to a recovery of their attorneys' fees under federal law, as Section 330 of the Bankruptcy Code is not explicit statutory authority for a departure from the American Rule and the bad-faith exception to the American Rule is not appropriately invoked in this case.

C.      *Fees under Section 38.001*

The Defendants also seek a recovery of their fees under Section 38.001.[29]  That Section provides, in relevant part:

> A person may recover reasonable attorney's fees from an individual or corporation, in addition to the amount of a valid claim and costs, if the claim is for:
>
>> (1) rendered services;
>> (2) performed labor; . . . or . . .
>> (8) an oral or written contract.

Under Texas law, a law firm representing itself in an action against a client to recover legal fees may recover its attorneys' fees, *Campbell, Athey & Zukowski v. Thomasson*, 863 F.2d 398 (5th Cir. 1989), where the law firm is represented by an attorney, presents the claim to the opposing party, and payment has not been tendered within thirty days after presentment.  Tx. Civ. Prac. & Rem. Code § 38.002 (Vernon 2008).  An attorney's services are "rendered services" or "labor done" within the meaning of Section 38.001. *McLeod, Alexander, Powel & Apffel v. Quarles*, 894 F.2d 1482 (5th

---

a violation of subdivision (b)(2) – which in turn requires that claims be warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law.  To the extent that the  Defendants are contending that Frazin violated subdivision (b)(2), monetary sanctions would not be appropriate.

[29] As noted earlier, Frazin initially contends that the Defendants have not shown that (1) they had a contract with Frazin, (2) that they presented to and demanded payment from Frazin, (3) that thirty days had passed since presentment and no payment was made, and (4) that they retained an attorney to pursue the claim.  Clearly, the Defendants have both proven that they had a contract with Frazin, and that they pursued the claim themselves.  Application of elements (2) and (3) is awkward, at best, in a bankruptcy case, where there is a required procedure for the collection of fees which requires court approval before they may be paid.  However, the Court believes that by analogy, the filing of a fee application is a demand for payment, and an objection to that fee application is a refusal to pay it, thus satisfying the requirements of Chapter 38.

Cir. 1990); *Magids v. Dorman*, 430 S.W.2d 910 (Tex. App. – Houston [14 Dist.] 1968). As a general

rule, the party seeking to recover attorneys' fees bears the burden of proof. *Stewart Title Guaranty*

*Co. v. Sterling*, 822 S.W.2d 1 (Tex. 1991). Although courts consider several factors when awarding

fees, a "short hand version of these considerations is that the trial court may award those fees that

are 'reasonable and necessary' for the prosecution of the suit." *Id*. at 10. In order to show

reasonableness and necessity, the party seeking such fees must show that the fees were incurred

while suing the party sought to be charged with the fees on a claim which allows recovery of such

fees.[30] *Id*.

The Defendants argue that they are entitled to recover *all* of their fees, "because overcoming

Frazin's claims was necessary to enable the Firm to recover on its claim for fees in the *Lamajak* suit,"

*H&B Motion*, p. 18, citing primarily in *Varner v. Cardena*, 218 S.W.3d 68 (Tex. 2007). In *Varner*,

the plaintiffs sold a ranch to the defendants in exchange for a promissory note payable in

installments. When the defendants failed to make payment on the note, the plaintiff sued on the

note. In response, the defendants filed a counterclaim asserting that the ranch was 180 acres less

than represented. After a bench trial, the trial court granted judgment for plaintiffs on the note, but

---

[30] With respect to the claims for attorneys' fees under Section 38.001, Frazin argues that this Court did not find that Frazin breached any contract and thus no fees are recoverable. The Court disagrees. In the September Memorandum Opinion, the Court concluded that Frazin should not be held to have breached an alleged oral agreement to pay the firms' contingency fees in exchange for a $92,000 reduction in those fees. The Court limited its pronouncement to breach of an alleged oral agreement to pay fees in exchange for a fee reduction, and the Court did not resolve any other contractual issues. As noted *supra*, the application of Section 38 is awkward in a bankruptcy context. However, by analogy, the filing of a fee application is a contractual demand for payment, and an objection to that fee application is a refusal to pay it. When the fee application is approved and the attorneys' are awarded their contractual payment, that is tantamount to awarding them their contractual payment over the objection of the client, and thus the attorneys are found to have a valid claim for rendered services, performed labor, and an oral or written contract. The fee applicant is clearly the prevailing party in that context. Moreover, in order to be awarded attorneys' fees under Section 38, a party must prevail on a cause of action for which attorneys' fees are recoverable, and must recover damages. The plain language of the statute does not require that a "breach" be found. It requires that recovery is permitted "if the claim is for . . . an oral or written contract," not that the claim is for "breach of an oral or written contract." It also permits recovery where the claim is for rendered services or performed labor, both of which are applicable here. The Court further notes that Section 38.001 is to be "liberally construed." Tex. Civ. Prac. & Rem Code § 38.005 (Vernon 2008).

reduced its balance to reflect a shortfall in acreage.  The trial court also awarded the plaintiff's $40,500 in attorney's fees for trial, but the court of appeals reversed, because the plaintiffs had failed to segregate fees incurred in their suit on the note from fees incurred in defending against the defendants' counterclaim.  The Texas Supreme Court pointed out that its decision in *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299 (Tex. 2006) held that attorneys' fees are recoverable only if necessary to recover on a contract or statutory claim allowing them.  The *Varner* court, however, disagreed that fees for defending against the counterclaim must be segregated, because by asserting a shortfall in acreage as a defense and counterclaim, the defendants sought to reduce the amount owed on the note.  Therefore, in order to collect the full amount owed on the note, the plaintiffs had to overcome the claim for misrepresentation.  Since the plaintiffs' attorney's efforts overcoming the defense and counterclaim were necessary to recover on their contract, the Texas Supreme Court ruled that those fees were recoverable under Section 38.001 and need not be segregated.

Similarly, in *Brockie v. Webb*, 244 S.W.3d 905 (Tex. App. – Dallas 2008), Webb represented Brockie in a divorce action, but withdrew from representation for nonpayment of fees.  Webb then intervened in the divorce action, seeking unpaid attorneys' fees, and Brockie filed a counterclaim against Webb for legal malpractice.  After trial, the trial court entered judgment for Webb, awarding it its unpaid attorneys' fees, and awarding it additional attorneys' fees incurred in defending Brockie's counterclaim for malpractice.  On appeal, Brockie argued that attorneys' fees were not recoverable for defending a counterclaim under Section 38.001.  Although the *Brockie* court noted that Section 38.001 does not provide for attorneys' fees in pure defense of a claim, it ruled that Webb's claim for unpaid attorneys' fees and Brockie's counterclaim required proof of the same facts, and thus attorneys' fees incurred in defending the counterclaim were recoverable.

In *7979 Airport Garage, LLC v. Dollar Rent a Car Systems, Inc.*, 245 S.W.3d 488 (Tex. App. – Houston [14 Dist.] 2007), the court noted, citing *Varner*, that when a defendant asserts a counterclaim that the plaintiff must overcome in order to fully recover on its contract claim, the attorneys' fees necessary to defeat that counterclaim are recoverable. The court awarded attorneys' fees for defense of a counterclaim where the claims and counterclaim depended on many of the same essential facts, required reliance upon the same documents and witnesses, and the plaintiff had to defeat the counterclaim in order to recover on his affirmative claim.

The *Varner*, *Brockie* and *Airport Garage* cases were distinguished in *Hooker v. Constellation Homebuilder Sys., Inc.*, No. V-06-77, 2008 WL 4057909 (S.D. Tex. Aug. 26, 2008). In *Hooker*, the plaintiff sued to recover sales commissions from his former employer in breach of the parties' employment contract. The employer filed a counterclaim for unjust enrichment, seeking to recover a paycheck and bonus that it alleged had been paid to the plaintiff in error. The *Hooker* court, citing *Varner*, noted that attorneys' fees expended in defending a counterclaim may be recovered (and need not be segregated, as discussed more fully below) where success on the counterclaim would defeat or reduce judgment on the claim. However, it found *Varner*, *Brockie* and *Airport Garage* distinguishable, because on the facts before it, the claim and counterclaim

> were two free-standing, independent causes of action. In other words . . . Defendant could have potentially recovered on its counterclaim even if Plaintiff had abandoned or failed to establish its own affirmative claim . . . in this case, Plaintiff's claim was made in an effort to collect an *unpaid* amount of commissions and/or other earnings. The counterclaim, on the other hand, was brought in an effort to collect on amounts allegedly *paid in error*. Although these two claims clearly intermingle and some evidence and witnesses would certainly overlap, an unavoidable consequence of any case involving both claims and counterclaims, had this case proceeded to summary judgment or trial, different evidence and witness testimony would be relied upon to support the parties contentions . . . accordingly, the Court cannot conclude that the two are sufficiently intertwined to grant attorneys' fees under section 38.001.

*Hooker*, 2008 WL 4057909, at *5.

The question thus becomes: are the claims and counterclaims asserted here intertwined as in *Varner*, *Brockie* and *Airport Garage*, or largely separate as in *Hooker*? The Fifth Circuit's decision in *Intelogic Trace* is instructive in answering this question. There, a chapter 11 debtor retained Ernst & Young to assist it in its reorganization and in preparing its financial projections. The debtor's plan was confirmed, but less than a month later, it experienced severe cash flow difficulties. Ernst and Young filed a fee application for services rendered during the chapter 11, and the debtor's board had "heightened concerns about [its] cash flow projections and whether there might have been a problem with the professional work in preparing these projections." *Intelogic Trace*, 200 F.3d at 384. Rather than raise those concerns at the fee application hearing and tip off the bankruptcy court to the problems with the reorganization, the debtor opted to raise its concerns with Ernst and Young in order to negotiate a reduction in the fees sought. Ernst and Young agreed to reduce their fees by some $37,000, and at the fee application hearing, the reduced amount was approved without objection from the debtor. However, the debtor's financial problems continued, and it filed a second chapter 11 case, which was later converted to one under chapter 7. The trustee in the chapter 7 case then sued Ernst & Young in state court, alleging claims for negligence, gross negligence, breach of warranty, breach of contract and DTPA violations, all arising out of Ernst & Young's provision of accounting services during the first chapter 11 case. The lawsuit was removed to the bankruptcy court, and Ernst & Young moved for summary judgment, contending that the trustee's claims were barred by *res judicata*. The bankruptcy court and district court agreed.

The Fifth Circuit noted that the only dispute between the parties with respect to the application of *res judicata* was whether the fourth element for application of the doctrine – namely,

that the same cause of action be involved in both cases – was satisfied. The Fifth Circuit applied the transactional test of the Restatement (Second) of Judgments, and noted that the critical issue was whether the two actions under consideration were based on the same nucleus of operative facts. The Fifth Circuit rejected the trustee's argument that the malpractice claim was based largely upon what Ernst & Young did not do, rather than upon what it did, which was the issue before the bankruptcy court at the fee application hearing. It noted:

> The central transaction involved in both Ernst & Young's fee application and the Trustee's present claim was the provision of accounting services during the Chapter 11 reorganization. Fee awards for professionals employed by the bankruptcy estate are governed by 11 U.S.C. § 330 . . . . Accordingly, an award of fees for professionals . . . represents a determination of the 'nature, extent, and the value of such services' . . . by granting Ernst & Young's fee application, the bankruptcy court implied a finding of quality and value in Ernst & Young's services. Similarly, the Trustee's claims in the present suit arise from Ernst & Young's alleged omissions in rendering the very same services considered by the bankruptcy court in the fee application hearing. The Trustee's malpractice claims, challenging the sufficiency and value of Ernst & Young's services, 'inevitably involve [] the nature of the services performed for the debtor's estate and the fees awarded under superintendence of the bankruptcy court; they cannot stand alone.'

*Intelogic Trace*, 200 F.3d at 387.

The Fifth Circuit also held that because the debtor was aware of the potential claims against Ernst & Young prior to the hearing on the fee application, and because the bankruptcy court possessed procedural mechanisms for asserting those claims (*i.e.,* the conversion of a contested matter into an adversary proceeding when affirmative relief is sought as in a malpractice claim), the claims were barred by *res judicata*. The Fifth Circuit also noted that the same result would be reached under Texas state law – if Ernst & Young had sued to recover its fees in Texas state court and the debtor had not asserted its malpractice claims by way of a counterclaim, then a subsequent suit by the debtor would be barred by *res judicata*.

Here, Frazin (asserting concerns about the quality of the Defendants' legal work) *had to and did* assert his "counterclaims."[31] The issue before the Court at trial, both on the fee application and on the "counterclaims," was the quality and extent of the Defendants' work. While certainly a fee applicant is not ordinarily required to present proof that it did not engage in malpractice at an uncontested fee hearing, it is required to provide proof that its services provided value to the estate. But once the issues of malpractice and tort claims are placed before the Court, the fee applicant must defeat those claims in order to recover on its fee application. Accordingly, the Court concludes that this case is more like *Varner* and its progeny than it is like *Hooker*. Frazin had to assert his claims here or be barred, and the Defendants had to overcome them in order to recover on their fee applications. Had Frazin been successful on his claims for malpractice, DTPA violations or, for that matter, breach of fiduciary duty, his success would have defeated or reduced the Defendants' claims for attorneys' fees. Therefore, the fees which the Defendants incurred in defending against Frazin's claims may be recovered under Section 38.001.

    1.    *Segregation*

Under Texas law, a party seeking to recover attorney's fees incurred in pursuit of multiple claims must generally segregate its fees as between claims which permit recovery of attorneys' fees and claims which do not.

For more than a century, Texas law has [held that] . . . absent a contract or statute,

---

[31] The Court notes that the parties in this case are aligned on opposite sides of the caption as normally occurs when these issues are raised. Specifically, the Texas cases speak in terms of an action by a plaintiff for recovery of fees under a contract or for services rendered or labor performed, in which counterclaims are raised for malpractice, DTPA violations or other tort claims. Here, however, by virtue of the fee application process in bankruptcy, the plaintiff is the one asserting the malpractice and tort claims, as essentially counterclaims to the Defendants' fee applications in the bankruptcy case. The styling of the case, however, is a mere matter of form; the substance of this adversary proceeding is that attorneys were seeking recovery of unpaid attorneys' fees under their contracts, and defending against "counterclaims" for malpractice.

trial courts do not have inherent authority to require a losing party to pay the prevailing party's fees.  As a result, fee claimants have always been required to segregate fees between claims for which they are recoverable and claims for which they are not.

*Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 310-11 (Tex. 2006).  However, in *Stewart Title*, the Texas Supreme Court noted an exception to the duty to segregate:  fees need not be segregated "when the attorney's fees rendered are in connection with claims arising out of the same transaction and are so interrelated that their prosecution or defense entails proof or denial of essentially the same facts.  Therefore, when the causes of action involved in the suit are dependent upon the same set of facts or circumstances and thus are 'intertwined to the point of being inseparable,' the party suing for attorney's fees may recover the entire amount covering all claims." *Stewart Title*, 822 S.W.2d at 11.  But, as the Supreme Court more recently noted, the *Stewart Title* exception, since its recognition in 1991, "has since threatened to swallow the rule."  *Chapa*, 212 S.W.3d at 311.  Noting that lower courts had been "flooded with claims that recoverable and unrecoverable fees are inextricably intertwined" and that the exceptions had "been hard to apply consistently," the *Chapa* court noted that "to the extent [*Stewart Title*] suggested that a common set of underlying facts necessarily made all claims arising therefrom 'inseparable' and all legal fees recoverable, it went too far."  Therefore, the *Chapa* court modified *Stewart Title*.  It stated:

[*Stewart Title*] was certainly correct that many if not most legal fees . . . cannot and need not be precisely allocated to one claim or the other.  Many of the services involved in preparing a contract or DTPA claim for trial must still be incurred if tort claims are appended to it; adding the latter claims does not render the former services unrecoverable.  Requests for standard disclosures, proof of background facts, depositions of the primary actors, discovery motions and hearings, voir dire of the jury, and a host of other services may be necessary whether a claim is filed alone or with others.  To the extent such services would have been incurred on a recoverable claim alone, they are not disallowed simply because they do double service.  Accordingly, we reaffirm the rule that if any attorney's fees relate solely to a claim

> for which such fees are unrecoverable, a claimant must segregate recoverable from
> unrecoverable fees. Intertwined facts do not make tort fees recoverable; it is only
> when discrete legal services advance both a recoverable and unrecoverable claim that
> they are so intertwined that they need not be segregated. . . . This standard does not
> require more precise proof for attorney's fees than for any other claims or expenses.

*Chapa*, 212 S.W.3d at 313-14. As applied to the case before it, the *Chapa* court noted that counsel did not have to keep separate time records when they drafted the fraud, contract or DTPA portions of the petition – rather, it would be sufficient if counsel testified that, for example, 95 percent of their time would have been necessary even if there had been no fraud claim.

The *Varner* case, discussed above, appears to represent another exception to the general rule requiring segregation. Briefly, *Varner* held that fees incurred in defending a misrepresentation counterclaim in an action on a promissory note were fully recoverable (even though fees would not normally be recoverable in defense of a tort claim) where the effect of success on the counterclaim would have been to reduce or eliminate recovery on the note. The *Varner* court further held that the fees for defending against the counterclaim need not be segregated, because in order to recover fully on its note, the plaintiff had to overcome the counterclaim. Since the plaintiffs' attorney's efforts overcoming the defense and counterclaim were necessary to recover on their note, the Texas Supreme Court ruled that those fees were recoverable in the first instance under Section 38.001, and segregation was therefore not required.

The same is true here. Because Haynes and Boone and G&N had to overcome Frazin's claims in order to recover the full amounts sought in their fee applications, the fees incurred in defending Frazin's claims were necessary to their recovery on their contingency fee contracts with Frazin, and their fees are accordingly recoverable under Section 38.001.

However, under Section 38.001, the Defendants may only recover *reasonable* attorneys' fees.

The burden is on the party seeking attorneys' fees to prove their reasonableness. *Sharif v. Wellness Int'l Network, Ltd.*, No. 3:05-CV-01367-B, 2008 WL 2885186 (N.D. Tex. July 22, 2008). The Fifth Circuit has made it clear that Texas law governs the reasonableness of fees awarded where Texas law governs the rule of decision. *Mathis v. Exxon Corp.*, 302 F.3d 448, 461 (5th Cir. 2002). Under Texas law, there is a rebuttable presumption that the usual and customary attorneys' fees are reasonable. Tex. Civ. Pract. & Rem. Code. § 38.003 (Vernon 2008). Further, the Court may take judicial notice of reasonable and customary fees, Tex. Civ. Prac. & Rem. Code § 38.004 (Vernon 2008), "along with the contents of the case file in evaluating a request for attorneys' fees." *Sharif*, 2008 WL 2885186 at *2 (citing *City of Fort Worth v. Groves*, 746 S.W.2d 907, 918 (Tex. App. – Fort Worth 1988)).

In *Arthur Anderson & Co. v. Perry Equipment Corp.*, 945 S.W.2d 812, 818 (Tex. 1997), the Texas Supreme Court identified eight factors to be considered in determining the reasonableness of an attorneys' fees request. Those factors are: (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill required to perform the legal service properly; (2) the likelihood that the acceptance of the particular employment will preclude other employment by the lawyer; (3) the fee customarily charged in the locality for similar legal services; (4) the amount involved and the results obtained; (5) the time limitations imposed by the client or by the circumstances; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and (8) whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered. *See also Fluorine on Call, Ltd. v. Fluorogas, Ltd.*, 380 F.3d 849 (5th Cir. 2004); *Sharif,* 2008 WL 2885186 at *2; *Petco Animal Supplies, Inc. v. Schuster*, 144 S.W.3d 554 (Tex. App

- Austin 2004).

In support of the reasonableness of their fees, the Defendants submitted the declarations of Phelan, Griffith, and Nicole LeBoeuf ("LeBoeuf"). Phelan and Griffith are both interested witnesses. The general rule in Texas is that the uncontroverted testimony of an interested witness, such as a party to the suit, generally does nothing more than create a fact issue to be determined by the trier of fact. *McGalliard v. Kuhlmann*, 722 S.W.2d 694 (Tex. 1986). That rule has been applied to testimony of an attorney respecting the reasonableness of his fees. However, there is an exception to this general rule: where the testimony of the interested witness "is not contradicted by any other witness,[32] or attendant circumstances, and the same is clear, direct and positive, and free from contradiction, inaccuracies, and circumstances tending to cast suspicion thereon, it is taken as true, as a matter of law." *Ragsdale v. Progressive Voters League*, 801 S.W.2d 880, 882 (Tex. 1990). The Texas Supreme Court further stated:

> We do not mean to imply that in every case when uncontradicted testimony is offered it mandates an award of the amount claimed. For example, even though the evidence might be uncontradicted, if it is unreasonable, incredible, or its belief is questionable, then such evidence would only raise a fact issue to be determined by the trier of fact . . . *the evidence may be uncontradicted, but the trial judge could find some of the claimed fees to be unreasonable, unwarranted, or some other circumstance which would make an award of the uncontroverted claim wrong.*"

*Ragsdale*, 801 S.W.2d at 882 (emphasis added); *Welch v. Hrabar*, 110 S.W.3d 601 (Tex. App. – Houston [14th Dist.] 2003).

Here, the Court concludes that it need not award the amounts claimed as a matter of law, and

---

[32] Frazin responded to the Defendants' counterclaims for attorneys' fees in part by contending that the fees "are excessive and unreasonable." Moreover, the issue of the amount of fees to be awarded was listed as a contested issue of fact in the parties' Joint Pre-Trial Order. *See* Pre-Trial Order, p. 40 (Contested Issues of Fact, ¶ 5(d) – "the amount of attorney's fees and costs to be awarded to Defendants"). He did not submit any evidence to contradict the Defendants' affidavits in support of their attorneys' fees, however.

that this case falls within the general rule (rather than the exception) because the time sheets attached to the Phelan and Griffith declarations and the Court's own observations during the litigation show that some of the fees sought are unreasonable and unwarranted. *See* Tex. Bus. & Comm. Code § 38.004 (Vernon 2008 )(the court may take judicial notice of the usual and customary attorney's fees and of the contents of the case file without receiving further evidence in a proceeding before the court). With respect to the fees incurred by the Shackelford Firm on G&N's behalf, the Court notes that LeBoeuf is not an interested witness. However, the Court does not believe that her testimony mandates an award of the full amount claimed because the Shackelford Firm's time sheets are redacted, making it impossible for the Court to assess the reasonableness of portions of its fees.

Further explanation is warranted. The G&N Defendants seek recovery of attorneys' fees for services provided by two firms – G&N and the Shackelford Firm. Both G&N and the Shackelford Firm submitted their time sheets in redacted form.[33] In other words, large portions of the time entries have been deleted. For example, a review of G&N's invoice dated June 17, 2008 shows the

---

[33] After reviewing the parties' submissions, conducting research and performing its legal analysis of the many issues raised by the Motions, the Court turned to its application of law to fact. The Court discovered that the time sheets which had been filed electronically by the G&N Defendants had been redacted. The Court's staff therefore sent, on February 5, 2009, an e-mail (copied to all counsel) inquiring whether unredacted versions had been provided to the Court in "hard" copy, since unredacted versions were not available electronically. The Court did *not* ask for them to be provided – it simply inquired whether they already had been provided. Within a few days, counsel for G&N delivered unredacted time sheets to the Clerk's Office. On February 17, the Court's staff informed counsel for G&N that if he wished to supplement the evidence which had been submitted with the G&N Motion, he would need to either obtain the consent of opposing counsel or a Court order on motion, and that the Court would not consider the unredacted time sheets in the absence of counsel satisfying one of these two requirements. The Court later received a telephone call that a motion would be filed. However, instead of filing a motion, the Court's staff received an e-mail on March 5, 2009, which stated

> in filing the motion for fees the G&N defendants did not want to waive any attorney-client or work product privileges, given the on-going nature of the case and the potential for appeal. Accordingly, redacted billings were submitted. Had opposing counsel objected to that motion based upon the redacted billings, and depending upon the Court's ruling on such objections, the G&N defendants would have been in a position to provide the unredacted statements before evidence closed. Since there were no objections to the fee motion based upon the redacted statements, rather than move to reopen evidence, the G&N defendants will rely upon the billing statements and expert affidavits as submitted.

E-mail from T. Jach to H. Meister dated 3/5/09, 11:40 am (on file with the Court). Since the G&N Defendants chose not to file a motion to re-open the evidence, the Court is left with only the redacted time sheets to review.

following time entries or portions thereof:

| Date | Staff | Description | Dur/Qty | Amount |
|------|-------|-------------|---------|--------|
| 1/31/08 | JHM | Compilation of [　] | 10.2 | $1,479 |
| 2/1/08 | ERC | Analyzed and briefed [　] | 6.7 | $1306.50 |
| 2/2/08 | APJ | Preparation of. [　] (.8); reviewed and revised [　] (2.1); continued preparation of [　] (2.8); reviewed and revised [　] (.8); multiple telephone conferences between Tony Jach and Scott Everett discussing [　] (.4); legal research regarding [　] (.7); began draft of [　] (2.2); office conference between Tony Jach and Scott Griffith regarding [　] (.6); reviewed and revised [　] (1.1) | 8.2 | $2419.00 |
| 2/5/08 | SG | Review of [　] (1.6); organized and assembled [　] (.7); office conference between Scott Griffith and Tony Jach regarding [　] (.6); receipt and review of multiple emails regarding [　] (.9); general preparation of [　] (1.7) | 5.5 | 2117.50 |

Similarly, a review of the Shackelford Firm's invoice dated August 11, 2008, shows the following time entries or portions thereof:

| Date | Staff | Description | Hrs/Rate | Amount |
|------|-------|-------------|----------|--------|
| 7/1/08 | TDW | Draft correspondence to N. LeBoeuf regarding [　] | .2 200.00/hr | 40.00 |
| 7/2/08 | SDJ | Study and analysis of relevant jurisprudence regarding [　] | 1.8 150.00/hr | 270.00 |
| 7/11/08 | TDZ | Legal research on [　] | 2.0 300.00/hr | 600 |
| 7/24/08 | NTL | Review and revise draft of post trial brief (6.7); review email communications between opposing counsel and the Court (.2); Telephone conference with Jeff Rusthoven with suggestions for [　] (.2); Communications with Phil Tellerine (.2); Attention to [　] (.4) | 7.7 200.00/hr | 1540.00 |

As a result of these (and other) redactions, the Court is simply unable to assess the reasonableness of vast amounts of the time expended by G&N and the Shackelford Firm. The Court cannot determine whether the services performed reasonably required the time expended, whether the services involved any novel or difficult questions, whether the services performed required the level of skill of the person performing them, whether the fees charged for the services are similar to

the customary charges of others performing similar services, whether the services were performed under any particular time constraints, which particular motion or pleading in the case the services related to, or which of Frazin's several theories of liability the services related to. In some instances, it is not possible to determine if the services relate to the Frazin case at all.

With respect to the attorneys' fees sought by the G&N Defendants, the Court has further evidence, however, in support of the fees in the form of an expert's declaration. Specifically, Richard Capshaw, Esq. ("Capshaw") submitted a declaration "as an expert to examine the services rendered in connection with a fee application and responses to objections thereto" dated November 3, 2008 (the "Capshaw Declaration"). *See* Ex. C to G&N Motion. The Capshaw Declaration states that

> [t]he testimony contained in this affidavit is based upon my experience in handling litigation in State and Federal Courts, my review of the services provided, my interviews with representatives of [G&N] and [the Shackelford Firm] which provided the services, my review of the *redacted* bills which reflect what services were rendered and who rendered those services and why the services were rendered, my review of the claims, defenses and substantive legal and factual issues presented by the case, and my understanding of reasonable attorneys fees usually and customarily charged by attorneys in Dallas County, Texas in relation to a matter like this case.

*Capshaw Declaration*, p. 1. Capshaw opines, among other things, that the work described in the redacted billing statements was reasonable and was in keeping with the average rates charged by attorneys of comparable reputation and experience, performing the same or similar work in Dallas, Texas.

The Court notes that Capshaw is not an interested witness in the same sense that Griffith is, and thus his uncontradicted testimony might, in other circumstances, entitle the G&N Defendants to the full amount of recovery sought as a matter of law under Texas law. However, the Court concludes that Capshaw's testimony does *not* compel that result, because Capshaw reviewed the

same redacted time sheets that this Court has, and thus his testimony is incredible on its face. There are very few courts or lawyers who review fee applications as frequently as a bankruptcy court does, or who have acquired such expertise by sheer repetition of the task. It is simply not credible that even an experienced expert witness could review the redacted time entries in this case and form an opinion that the fees sought are reasonable – the information necessary to form such an opinion has simply been deleted. Thus, to the extent Capshaw opines as to redacted time entries, his testimony is entitled to little weight. *Cole Chemical & Distributing, Inc. v. Gowing*, 228 S.W.3d 684, 690 (Tex. App. – Houston [14 Dist.] 2005) ("the fact finder is not bound by expert testimony on attorneys' fees and may award a lesser amount . . . to determine an appropriate fee award, the trial judge is entitled to look at the entire record and to view the matter in light of the amount in controversy, the nature of the case, and his or her personal experience as a lawyer and judge;" holding that trial court did not abuse its discretion in awarding $2,500 in attorneys' fees where expert testified that reasonable attorneys' fees were $27,100).

The burden of proof is on the party seeking attorneys' fees to prove their reasonableness. *Sharif v. Wellness Int'l Network, Ltd.*, No. 3:05-CV-01367-B, 2008 WL 2885186 (N.D. Tex. July 22, 2008). The Court concludes that the G&N Defendants have failed in their burden of proof to the extent that they have redacted their time entries. With respect to G&N, the Court will therefore reduce the amount sought by $424,426.70 (the value of the redacted time entries that the Court was unable to assess). With respect to the Shackelford Firm, the Court will therefore reduce the amount sought by $8,235.00 (again, the value of the redacted time entries that the Court was unable to assess).

The Court now turns to its analysis of the reasonableness of the remaining fees sought in this

case.

### 2.    *Preliminary Observations*

For the reasons explained below, the Court first observes that its review of the Defendants'

requests for attorneys' fees has been made exceedingly difficult by their decisions to largely

represent themselves.[34] First, it is difficult to differentiate between a particular attorney acting in the

capacity of counsel, for which fees would be recoverable, and that same attorney acting in the

capacity of client, for which fees would not be recoverable. The H&B Defendants recognized this

difficulty when they voluntarily reduced their fee request by some $86,310.00 for fees incurred by

Cortell, "because of Ms. Cortell's status as a party." *Phelan Declaration*, ¶ 35(c).

Second, it is apparent to the Court that both firms were unable to remain objective

throughout the litigation. That lack of objectivity contributed significantly, in this Court's view, to

the high cost of defending against Frazin's claims.[35] It also created a sense of urgency that would

not otherwise have existed in this case.[36] Almost every motion was heard on an "emergency" basis

---

[34] The G&N Defendants represented themselves until April 21, 2008, at which point they hired the Shackelford Firm to assist them. The H&B Defendants represented themselves throughout the litigation.

[35] As the Supreme Court has noted, "even a skilled lawyer who represents himself is at a disadvantage in contested litigation. Ethical considerations may make it inappropriate for him to appear as a witness. He is deprived of the judgment of an independent third party in framing the theory of the case, evaluating alternative methods of presenting the evidence, cross-examining hostile witnesses, formulating legal arguments, and in making sure that reason, rather than emotion, dictates the proper tactical response to unforeseen developments in the courtroom." *Kay v. Ehrler*, 499 U.S. 432, 437(1991).

[36] For example, in arguing on February 4, 2008 that the fee application hearings should proceed on the merits notwithstanding the recent filing of the Complaint, the H&B Defendants argued:

> Because they waited to file a malpractice adversary should not preclude us from going forward on the fee application. They have sat there and said we did a lousy job on an appeal and that is not even close to being right. We want to refute that and we want to refute it fast. This is really, really getting to my partner here when she has been practicing for a long, long time. One of the top appellate lawyers in the country; and, somebody says she screwed up on an appeal not to mention Mr. Dodson who is a really good lawyer. It does not matter whether he is a 2, 9, or 38 year lawyer. What got in those briefs is

---

**Memorandum Opinion and Order**                                                    **Page 60**

and was hotly contested.   Discovery was difficult.  Scheduling was difficult.   While the Court acknowledges the importance of vigorous advocacy, it may ordinarily be achieved without a forceful contest at nearly every turn.  Moreover, the Court notes that the attorneys at Haynes and Boone who defended this adversary proceeding were attorneys who normally specialize in bankruptcy and appellate law, not Texas state tort law.[37]

Third, Haynes and Boone simply "over-staffed" the case.  The time entries show that a total of eight lawyers and four para-professionals worked on the case, with partners accounting for nearly 65% of the time expended (and 78% of the fees incurred), associates accounting for 19% of the time expended (and 15% of the fees incurred), and para-professionals accounting for only 16% of the time expended (and 6% of the fees incurred).  Haynes and Boone attorneys and para-professionals spent more than 3,300 hours on this case.  The blended rate for attorneys was $557, and the blended rate for para-professionals was $193.[38]   This over-staffing will be discussed more fully in connection with the Court's more detailed analysis set forth below.

Fourth, there are some time entries that are so vague as to preclude analysis of the reasonableness of the time expended on the tasks described.  With respect to Haynes and Boone,[39]

---

what counts and did we do right and we are prepared to defend that and defend it well.  I have not seen one 'expert' on their side yet who has said anything about why any of this was done in an incorrect fashion.  We want to hear what they have to say and we think we are entitled to do it right now."
Tr. 2/4/08, p. 98: 3-17. Of thirteen motions filed in the adversary proceeding, expedited hearing was sought on ten of them, and some motions were heard on as little as four days' notice.

[37] An attorney specializing in malpractice defense work may well have spent less time, and incurred less cost, in defending Frazin's claims.

[38] The combined blended rate was $499.12, prior to voluntary reductions.  After the voluntary reductions, the combined blended rate dropped to $425.67.

[39] The Court has already considered this issue with respect to the attorneys' fees sought by the G&N Defendants in its discussion of the redacted time entries.  *See supra* pp. 56-57.

**Memorandum Opinion and Order**                                                      **Page 61**

those entries total 29.2 hours, at a cost of $16,782. For example, on December 19, 2007, an attorney billed 4.7 hours to "work on outstanding issues." On January 2, 2008, a senior partner billed 1.3 hours at a cost of $1,007.50 for "further analysis of issues and potential discovery." The Court simply cannot tell whether the tasks performed reasonably required 4.7 hours and 1.3 hours of attorney time, whether the services involved novel or difficult legal issues, whether the fees incurred were usual fees customarily charged for performance of those services, whether the services were performed under time constraints, or whether the services required experience and ability commensurate with that of the lawyers who performed them. Time entries in this category total $16,782, and the fees sought will be reduced by that amount.[40]

Against this backdrop, the Court turns to a more detailed level of analysis.

3. *Multiple Attendance at Hearings*

Multiple Haynes and Boone attorneys almost always attended hearings in this case. A review of the time sheets shows that there were eleven hearings between December 27 and trial. In all but one of them, at least two attorneys billed for attendance (Scott Everett ("Everett") and Phelan, both partners with the firm). At two of them, three attorneys billed (Everett, Phelan, and Jeremy Kernodle, an associate). The Phelan Declaration states that "the Firm believed that the presence of each attorney attending was reasonably necessary given the seriousness and ever-changing thrust of the allegations and the different responsibilities each attorney had." *Phelan Declaration*, ¶ 21. However, without knowing what those differing responsibilities were, and noting that on several occasions, at least one of the billing attorneys remained silent, the Court is unable to conclude that

---

[40] This reduction consists of time entries or portions of time entries on 12/19/07, 12/20, 12/23, 12/24, 12/25, 12/26, 1/2/08, 1/3, 1/26, 1/27, 3/2, 3/4, 3/29, 3/31, 4/5, 4/6, 5/10, 5/11, 5/18, and 6/16.

attendance by multiple attorneys at nearly every hearing was reasonable or necessary.    The attendance of multiple attorneys at nearly every hearing resulted in fees of $102,448.  The Court will reduce that amount by half, or $51,224.

Multiple attorneys also attended on behalf of the G&N Defendants.  Of the eleven hearings between December 27 and trial, at least two attorneys billed for attendance at ten of them.[41]  At three of the hearings, three attorneys billed - two from G&N, and one from the Shackelford Firm.[42]  At one hearing, four attorneys billed – two from G&N, and two from the Shackelford Firm.[43]  The Griffith Declaration states that the presence of each attorney attending was reasonably necessary, "given the seriousness of the allegations, the amounts in controversy, and the different responsibilities each attorney had."  *Griffith Declaration*, ¶ 16.    Once again, the Court is unable to conclude that attendance at nearly every hearing by multiple attorneys was reasonable and necessary.  The Court will reduce the time billed ($26,486.50) by half, or $13,243.25.

### 4. *Fees Incurred by Cortell and Griffith*

As noted above, Cortell acted in two capacities in this litigation – as client and as counsel.  Clearly, time expended in her capacity as client is not recoverable under Section 38.001.  While the H&B Defendants voluntarily reduced their request for recovery of fees by approximately $86,000 with respect to fees which she incurred, the Court concludes that a further reduction of $54,306 is

---

[41] *See* entries 12/27/07, 1/30/08, 2/4, 3/27, 4/8, 4/14, 4/22, 5/8, 6/24 and 6/26.

[42] *See* entries 4/22/08, 5/8 and 6/24.

[43] *See* entries on 6/26/08.  The Court notes, however, that it has already reduced the time billed by Griffith and Anthony Jach on other grounds, and so has not double-counted these entries when calculating the reduction.  The Court further notes that many of the hearings were also attended by multiple attorneys from Haynes and Boone.  On June 24, 2008, for example, seven attorneys appeared on behalf of the Defendants – six of them billed their time (Cortell did not).  On June 26, 2008, the date of argument on the summary judgment motions, eight attorneys attended on behalf of the Defendants, and seven of them billed their time (Cortell did not bill her time).

**Memorandum Opinion and Order**                                              **Page 63**

appropriate. A review of the time sheets leads the Court to find that an additional 86.2 hours are properly viewed as being incurred in the capacity of client, rather than as counsel. For example, Cortell did not argue any of the motions heard in the case. She did, however, attend most hearings – and the Court concludes that she did so in her capacity as client. Although Haynes and Boone reduced their request by the time she spent in the courtroom, it did not reduce her time incurred in preparing for various hearings or in working with other Haynes and Boone attorneys post-hearing.[44] The Court finds that Cortell's time incurred in preparing for, and de-briefing after, hearings is most appropriately characterized as having been incurred in her capacity as litigant, not counsel.

Similarly, a review of the time entries shows that Griffith, who was also sued individually and thus served as both counsel and client, billed for time which is more appropriately considered to have been incurred in his capacity as client. Griffith billed a total of 17.2 hours to prepare for and attend his own deposition – time which was clearly expended in his capacity as client and therefore not recoverable. The Court will reduce G&N's time by $6,622 (the value of this time at Griffith's billing rate).[45] In addition, a review of the trial record shows that Griffith spent some 10 hours on the witness stand, on July 7, 8 and 16, for which he billed. The Court will therefore further reduce G&N's fees by $3,850 (the value of this time).

>    5.    *Fees Incurred on the Motion to Compel*

On April 3, 2008, Haynes and Boone filed a Motion to Compel and Expedited Request for Discovery Conference Pursuant to 11 U.S.C. § 105(d), Federal Civil Rule 37 and Federal Bankruptcy

---

[44] The $54,306 reduction consists of portions of Cortell's time entries for 2/1/08, 2/3, 2/4, 3/4, 3/26, 4/8, 4/20, 4/21, 6/2, 6/20, 6/24, 6/25, 6/27, 7/1, 7/2, 7/3, 7/4, 7/17, 7/18, and 7/19.

[45] The $6,622 reduction consists of portions of Griffith's time entries for 4/18/08, 4/21, 4/22, 4/23 and 4/24.

Rule 7037 (the "Motion to Compel"). The H&B Defendants alleged that in order to keep the scheduled trial dates in July, they would need to depose Frazin and his mother by the end of April, but they had been notified that those witnesses or their counsel would be unavailable until May 2. The H&B Defendants asked this Court to compel the Debtor and witnesses under his control to make themselves available for deposition in April. Further, the H&B Defendants asked that this Court order the Debtor to produce his brother, Shawn, who resides in Israel, for a live deposition in Dallas, Texas over Shawn's objection. The Motion to Compel consisted of 4 pages with 11 paragraphs and citation to one case. By the time of the hearing (which lasted just over 90 minutes) five days later, the parties had reached an agreement with respect to the scheduling of depositions of the Debtor and his mother. However, the ability of this Court to compel the Debtor to produce his brother for deposition in Dallas remained a contested issue. At the conclusion of the hearing, the Court denied that relief, on the ground that "at least so far, you've not cited me to a rule, a statute, or anything that gives me the ability to do that . . . I don't think I have the power to do what you want me to do." Tr. 4/8/08, p. 65:3-5, 67:17-18.

A review of the time sheets shows that the H&B Defendants expended 49 hours in connection with the Motion to Compel, at a cost of $25,869.50 at a blended rate of $527.95. Three partners, two associates and a paralegal billed time, with partners billing over 40 of the 49 hours. The Court does not find $25,869.50 to be a reasonable fee. The issues were relatively simple, and did not raise any difficult issues of law or fact. With respect to the foreign deposition issue, there was little or no law supporting Haynes and Boone's novel position, but arguably authority to the contrary. The Court finds, in its discretion, that a reasonable fee for the Motion to Compel is half of what was billed, or $12,934.75, and the amount sought will be reduced by that sum.

With respect to the recovery of fees by G&N respecting the Motion to Compel, the Court concludes that no further reduction is required. Their time entries during this timeframe are so heavily redacted that the Court has already reduced the fees significantly.

6.    *Fees Incurred in Opposing Telephonic Deposition*

Since the Court ruled that it could not compel Shawn to come to the United States for deposition over his objection, and because the Debtor also wanted to depose Shawn, the Debtor thereafter filed a motion to conduct the deposition of Shawn by telephone. The Defendants opposed that motion, and it was ultimately denied. However, the Court concludes that the amount of fees incurred in opposing the Debtor's request was neither reasonable nor necessary. The Debtor's 4-page, 10-paragraph motion was met with a 16-page response. The time sheets disclose that Haynes and Boone billed over 92 hours in a span of thirteen days, for total fees of $40,653.50. Once again, three partners, one associate and one paralegal billed time on this matter. Fifty-five percent of the time was billed by partners; 35.9% by the associate, and 8.7% by the paralegal. Both Phelan and Everett attended the hearing, which lasted just over one-half hour, billing more than 13 hours on that day for preparation and attendance.

The Court finds that this matter did not require the time expended, nor the participation of so many attorneys at such a high level of experience and expertise, as it did not involve any novel or difficult questions of law or fact. The Court does not believe that had the Defendants chosen outside counsel to represent them, outside counsel would have assigned so many attorneys at such a high level, or expended such a significant amount of time on this issue. Accordingly, the Court will reduce the fees incurred by Haynes and Boone in connection with this motion by $20,000. With

respect to the fees incurred by G&N, the unredacted time entries on this motion total only $5,978.[46] The Court finds that amount to be reasonable, and no further reduction is required.

7.    *Fees Incurred in Attempting to "Freeze" Settlement Proceeds*

On December 27, 2007, the Court was asked to approve the Settlement Motion. At that time, the Defendants orally requested that all of the settlement proceeds after payment to the Chapter 13 Trustee and LawFinance "be held pending a determination by Judge Houser on the fee applications. That number is $2,018,473.66." *Tr.* 12/27/07, p. 9:1-5. Judge Hale ruled that pending the February 4, 2008 hearing on the fee applications, the Chapter 13 Trustee and LawFinance could be paid. He further ruled that Haynes and Boone should continue to hold in its trust account amounts equal to the fee applications, as well as $92,000 in disputed "agreed" reductions in fees, and an additional $300,000 to protect the firms in the event they had to litigate their fees, but that the balance of the settlement proceeds should be delivered to the Debtor.

By February 4, 2008, the Debtor had filed this adversary proceeding and sought a continuance of the fee application hearing so that they could be heard together, which the Defendants vehemently opposed. The Court did grant the continuance, but ruled that the adversary proceeding should be tried on an expedited basis. The Court further directed, upon oral request of the Defendants, that whatever funds were still in the Debtor's account be held pending further order.

On February 27, 2008, the Court entered an Order that stated:

that the funds remaining in the first Frazin account into which the settlement funds

---

[46] $400 was incurred by the Shackelford Firm on 5/8/08 – the balance was incurred by G&N.

were distributed by wire transfer from Haynes & Boone IOLTA Account to the Debtor or to Lorraine Frazin as his attorney-in-fact under the *Order Granting in Part the Motion for Order in Furtherance of Distribution of Lamajak Litigation Proceeds* entered on January 22, 2008 (approximate balance of $256,000.00), and not disbursed as of February 4, 2008, shall be held in trust and not disbursed or otherwise disposed of pending further order of this Court. Debtor and Lorraine Frazin further agree that the second Frazin account containing distributions from the first Frazin account shall maintain a balance of $258,000 pending further order of this Court.

On March 7, 2008, the Debtor filed a motion for reconsideration, alleging, among other things, that

a.   A prejudgment garnishment under FED. R. CIV. P. 64 (Rule 64) is extraordinary relief which can be granted only on specific pleadings and in extraordinary circumstances;

b.   The orders granting Rule 64 relief at the conclusion of the December 27, 2007, and February 4, 2008, hearings were not based on a pleading before the court at those times;

c.   Griffith & Nixon, P.C. ("G&N") and Haynes & Boone, LLP ("H&B") ha[d] not presented evidence that would justify relief under Rule 64.

*Expedited Mot. To Reconsider or Alter Order* (Docket No. 173, the "Motion to Reconsider"), p. 2. The Motion to Reconsider was scheduled for hearing on March 27, 2008.[47] Haynes and Boone filed opposition, in which it argued that (1) the Debtor could not seek relief from interlocutory orders under Rule 59, (2) the Court had the inherent authority to impose reasonable conditions on a continuance order, and that is what it did on February 4, (3) Haynes and Boone would ultimately be entitled to recover its attorneys fees, and (4) Haynes and Boone was not improperly seeking a prejudgment garnishment, but that even if it were, Haynes and Boone had satisfied the standards necessary to impose a pre-judgment remedy. G&N joined in that opposition.

The Court agreed with Frazin's argument that the Defendants, by arguing that the settlement

---

[47] The reconsideration motion was initially scheduled for March 24, 2008, but prior to that hearing, it was re-set to March 27, 2008 because Haynes and Boone had a conflict on March 24, 2008.

proceeds should remain in their trust account pending resolution of the claims against them, were essentially seeking a pre-judgment remedy or injunctive relief, without the burden of having filed written pleadings seeking that extraordinary relief.  The Court therefore directed the Defendants to file written pleadings specifying the relief they sought and the statutory authority supporting that relief.  Frazin agreed that the funds could be held pending the filing of such written pleadings and a prompt hearing thereon, subject to his ability to make a request for specific funds if he should need them prior to the contemplated future hearing.

On April 10, 2008, the Defendants jointly filed a "Motion Regarding Disbursement and to Maintain Status Quo" (the "Motion to Maintain Status Quo").  In essentially 3 paragraphs (which also incorporated their prior opposition to the Motion to Reconsider), the Defendants advanced no new arguments, cited no case law, and relied upon 11 U.S.C. § 105 as their sole statutory authority supporting the relief they sought.  At the conclusion of the April 22, 2008 hearing, the Court vacated that portion of its prior order which directed that the funds be held.

In litigating this issue, Haynes and Boone incurred $83,026.58 in fees in opposing the Motion to Reconsider (at a blended rate of $508.74), and another $58,615 in filing the Motion to Maintain Status Quo (at a blended rate of $561.98).  The Court finds that the $141,641.58 incurred in connection with opposing the Motion to Reconsider and in pursuing the Motion to Maintain Status Quo is unreasonable.  Haynes and Boone expended a total of 267.50 hours on this issue, at a blended rate of $529.   The time spent is unreasonable given the relative simplicity of the issue, which did not raise any novel or difficult questions of law or fact.  Moreover, the most experienced partner assigned to the case expended the most time – over 100 of the hours were billed by Phelan at the rate of $775 per hour.  Nor does the Court believe that this issue required the participation of

three partners billing at rates between $480 and $775 per hour, plus two associates and a paralegal, all of whom billed significant time on the "freeze" issue. Together, the hearings lasted a little over 3 hours. The Motion to Maintain Status Quo, while costing nearly $60,000, did not raise any new facts or legal argument. A review of the time sheets shows that after Haynes and Boone's response to the Motion to Reconsider was researched, discussed, drafted, revised and re-revised and then finalized and filed, an additional 39.4 hours was expended on "preparation" for the hearing, at a cost of $26,257.50.

Accordingly, the Court, in its discretion, finds that a reasonable fee for opposing the Motion to Reconsider would be two-thirds of the time incurred, or $55,350.49, and a reasonable fee for prosecution of the Motion to Maintain Status Quo is one-third of the time incurred, or $19,539, for a total fee of $74,888.49. Therefore, the amount sought by Haynes and Boone will be reduced by $66,751.09.

Review of the time spent by G&N on this issue is difficult, because its time sheets have been so heavily redacted. However, the Court notes that at least $9,019 was incurred in opposing the Motion to Reconsider.[48] Further, at least $4,479.50 was incurred in prosecuting the Motion to Maintain Status Quo. The Court finds the sum of $13,498.50 for these two matters to be reasonable, and no further reduction is required.

8.    *Fees Incurred in Preparing the Post-Trial Brief*

At the conclusion of trial, the Court asked for further briefs on a limited evidentiary issue.[49]

_____

[48] *See* entries 3/14/08, 3/25, 3/26, and 3/27.

[49] The Court asked the parties to file briefs on the effect of the potential exclusion of certain expert testimony if the Court ruled that the expert's trial testimony should be stricken for failure of the expert's report to comply with Fed. R. Civ. P. 26.

**Memorandum Opinion and Order**                                                                **Page 70**

In response, the H&B Defendants filed a twenty-nine page brief that went well beyond the Court's request for briefing and which re-hashed many of the arguments made in connection with the summary judgment briefing and during trial.  While the filing was permissible, the time spent in preparing the brief was excessive.  A review of the time entries shows that between July 17 and July 24, 2008, four partners, two associates and three para-professionals billed over 150 hours in connection with the brief, at a cost of $75,530 and with a blended rate of $502.52.  Between July 17 and July 23, the date the brief was filed, the Haynes and Boone attorneys and staff expended 21 hours per day in the aggregate working on the brief.  On July 17, no less than six Haynes and Boone attorneys (four of them partners) were working on the brief, billing a total of 39 hours and fees of $20,307.50 on that day alone.  Stated quite simply, this was excessive.  The fees sought in connection with the preparation of the post-trial brief will be reduced by $50,000.

In comparison, a review of the time sheets (to the extent the entries are not redacted) shows that the G&N Defendants seek recovery of 42.9 hours at a cost of $8,042.50 at a blended rate of $187.47 in connection with the preparation of a post-trial brief.  The Court finds that amount reasonable, and no further reduction is required.[50]

9.      *Fees Incurred in Connection with Summary Judgment*

The time sheets show that on February 6, 2008, five days after the Complaint was filed, Haynes and Boone first started thinking about filing a motion for summary judgment.  The time entries further show that Haynes and Boone understood that scheduling issues would impact their ability to receive summary judgment prior to trial.  *See Haynes and Boone Motion*, Ex. A, p. 10,

---

[50] *All* of this time was incurred by the Shackelford Firm.  G&N's time entries during this time period are so heavily redacted that the Court has previously disallowed all of the fees sought during this time period.

entry 2/6/08 by Phelan ("analysis of scheduling and effect of scheduling on potential summary judgment"); entry 2/8/08 by Phelan ("further analysis of potential summary judgment and relationship of scheduling to summary judgment").  The Court also recognized that the scheduling of trial would adversely impact its ability to hear and determine a dispositive motion prior to trial, and therefore cautioned the parties on April 14, 2008 as follows:

> [L]et's just be realistic. I mean, no offense to anybody. But even under the current schedule, the likelihood of me being able to meaningfully address dispositive motions before trial is virtually nonexistent.  I find summary judgment motions to be the most difficult thing that I do. They always seem to be packaged with tons of appendices. Now, maybe this will be an exception, but I have yet to have had what I would call an easy summary judgment  motion. And the thought that, if we hear them June 18th-ish, just which is theoretically the last date by which they're supposed to be heard under the current schedule, and we have trial docket call on July 3rd, and then trial the week of July 7th, I mean, it's virtually impossible for me to really address dispositive motions in this case. I mean, I hate to say that, but that's just a fact that everybody ought to be aware of as you're contemplating whether dispositive motions are going to be terribly helpful . . . So the reality is, even if the current timetable remained in place, you're already crunched on the summary judgments, and the likelihood of you getting a ruling from me prior to trial is uncertain. I'll put it that way. I was going to say remote, but that may not be true. But I do have other cases, and I just don't have any way to predict how much time I will have to devote to the dispositive motions when we have such a short time between the dispositive motion deadline and trial.

*Tr.* 4/14/08, p. 17:12-18:23.  Nevertheless, the Defendants continued to press for a July 7 trial date.  On May 30, 2008, the Defendants jointly filed a 41-page motion for summary judgment supported by a 45-page brief and 109 exhibits spanning over 4,300 pages.  The motion was scheduled for hearing six business days prior to the start of trial.  A review of the time sheets shows that Haynes and Boone billed over 824 hours, at a cost of $381,794, in connection with the summary judgment motion.  Only 28.1 hours, at a cost of just over $11,000, was incurred in connection with a possible summary judgment motion prior to the hearing on April 14, 2008, when the Court informed the

parties that it was "virtually impossible" for the Court to meaningfully address summary judgment motions on the parties' chosen trial schedule.

This is one of the instances in which the Defendants' sense of urgency adversely impacted the time and expense incurred in this case. The Defendants, quite understandably, were anxious to have this case resolved (hopefully in their favor), and quickly. They therefore pressed for a fast-track discovery and trial schedule, and Frazin agreed to such a schedule. By doing so, however, the Defendants increased costs in the case, because nearly every motion was filed on an expedited basis in light of impending discovery deadlines, an impending dispositive motion deadline, and a looming trial date. By proceeding to file a summary judgment motion notwithstanding the fast trial track they chose, much of the time spent in preparing that motion was less than fruitful, because the motion was filed on the eve of trial and the Court was simply unable to rule upon it prior to trial. Moreover, the Defendants had been warned of that potential outcome well prior to incurring the lion's share of that expense.

That is not to say that *all* of the time spent preparing the motion for summary judgment was for naught. Instead, some of that preparation necessarily reduced trial preparation. For example, the legal research performed in connection with the summary judgment motion was equally useful when the merits were tried and briefed. Therefore, the Court finds that one-third of the time spent by Haynes and Boone in connection with the summary judgment motion ($127,264.67) was reasonable and necessary, and the balance ($254,539.33) was not. Quite simply, too many attorneys billed too much time in connection with a motion that (1) was rendered "urgent" simply by the Defendants' desire to vindicate themselves quickly, and (2) had very little likelihood of advancing

the case at the time that it was filed.[51]

Review of the time expended by G&N and the Shackelford Firm in connection with the motion for summary judgment they filed is difficult, given the heavily-redacted time sheets. Nevertheless, the Court is able to identify a total of 51.20 hours expended by G&N, at a cost of $12,239.50. Similarly, the Court is able to identify a total of 154.7 hours expended by the Shackelford Firm, at a cost of $29,852.50. In light of the already significant reductions resulting from the redactions, the Court finds these sums to be reasonable and no further reductions are required.

The Court now returns to its preliminary observations. The foregoing analysis leads the Court to find that the potentially reasonable and necessary fees incurred in this case by Haynes and Boone total $914,651.28 ($1,441,188.45 sought, less reductions discussed above totaling $526,537.17). However, when this sum is viewed in light of the Court's preliminary observations, *see supra*, pp. 59-62, a further reduction is appropriate.

As noted earlier, the Defendants' decision to largely represent themselves has made the Court's analysis difficult, because it resulted in a lack of objectivity which then contributed to high costs and a sense of urgency. While not individually named as defendants, some of the attorneys defending this case as counsel were the very same attorneys whose alleged acts gave rise to some of the claims. The litigation thus became, by definition, very personal. The attorneys involved understandably wanted to defend themselves vigorously, thoroughly, and immediately. However, the incremental increased cost of doing so should not be borne by their opponent. Frazin should

---

[51] In the week before the summary judgment motion was filed, three partners, two associates and two para-professionals billed significant time nearly every day. Specifically, Haynes and Boone employees billed 37.98 hours a day at an average cost of $18,214.28 per day.

**Memorandum Opinion and Order**                                    **Page 74**

only be required to pay the attorneys' fees that would have been generated by an objective, disinterested attorney defending the claims.

As found previously, Haynes and Boone overstaffed the case. The firm also incurred extra expense as a result of performing most of its services on an emergency basis. There was extensive motion practice. The Court has considered some of those motions above; however, there were many others which this Court has not individually addressed, yet which also suffered from some of the same infirmities. Accordingly, the Court finds that 80% of the remaining fees are reasonable and warranted, but 20% are not. The Court will therefore award the H&B Defendants $731,721.02 (80% of $914,651.28) in reasonable and necessary attorneys' fees under Section 38.001.

The same may be said of G&N with respect to the lack of objectivity, which contributed to excessive costs and involvement of no less than ten G&N attorneys working and billing time on the case. However, because the Court has already reduced so many of its fees as a result of the heavy redaction of its time sheets, the Court does not believe that a further, across-the-board reduction is required. The remaining unredacted fees are reasonable and necessary, and the prior reductions adequately compensate for any remaining infirmities in the fees sought. Therefore, the Court will award the G&N Defendants $342,094.05 of reasonable and necessary attorneys' fees under Section 38.001 with respect to the fees incurred by G&N.

The Court does not believe that the Shackelford Firm overstaffed the case. Nor did the attorneys at the Shackelford Firm act in the dual capacity of client and counsel, thus losing objectivity. Therefore, the Court concludes that its prior reductions already adequately address any remaining issues and no further, across-the-board reduction is required. The remaining unredacted fees are reasonable. Therefore, the Court will award the G&N Defendants $178,965 of reasonable

and necessary attorneys' fees under Section 38.001 with respect to the fees incurred by the Shackelford Firm.  The G&N Defendants are therefore awarded attorneys' fees in the aggregate amount of $521,059.05 ($342,094.05 incurred by G&N and $178,965 incurred by the Shackelford Firm) under Section 38.001.

      **D**.     ***Fees under the DPTA***

Because the Court has found that the Defendants are entitled to recover their reasonable and necessary  attorneys' fees in defense of Frazin's claims under Section 38.001, the Court need not reach whether they are alternatively entitled to recover their fees under Section 17.50(c) of the DTPA.  However, to facilitate appellate review, the Court will address the Defendants' claims for fees under the DTPA as well.

Section 17.50(c) of the DTPA provides that "[o]n a finding by the court that an action under this section was groundless in fact or law or brought in bad faith, or brought for the purpose of harassment, the court shall award to the defendant reasonable and necessary attorneys' fees and court costs."  The burden of proof rests with the Defendants on this issue.  *Dairyland County Mut. Ins. Co. Of Texas v. Childress*, 650 S.W.2d 770 (Tex. 1983); *Gonzalez v. American Title Co. of Houston*, 104 S.W.3d 588 (Tex. App. – Houston [1st Dist.] 2003).  The purpose of an award of costs and fees is to "deter similar conduct in the future and to compensate the aggrieved party by reimbursing the costs incurred in responding to baseless pleadings."  *Klein v. Dooley,* 949 S.W.2d 307, 308 (Tex. 1997).  Whether an action is groundless and brought in bad faith or for the purpose of harassment is a question of law.  *Black v. Dallas County Child Welfare Unit*, 835 S.W.2d 626 (Tex. 1992).

The term "groundless" under the DTPA means a claim that has no basis in law or fact, and

is not warranted by any good faith argument for extension, modification, or reversal of existing law. *Donwerth v. Preston II Chrysler-Dodge, Inc.*, 775 S.W.2d 634 (Tex. 1989). The term "groundless" does *not* mean no evidence. *Id*. "To equate groundlessness with no evidence would preclude the award of attorneys' fees in obviously fraudulent or malicious actions when some evidence was presented, yet discourage legitimately wronged consumers from seeking the protections afforded by the Act for fear of failure in court." *Id*. at 637. Rather, even evidence that is legally inadmissible or subject to other defects may be considered by a court in determining whether an arguable basis existed for the suit, provided there is some good faith basis for the belief that the tendered evidence might be admissible or that it could reasonably lead to the discovery of admissible evidence. *Id*. The standard for determining whether an action is groundless is "whether the totality of the tendered evidence demonstrates an arguable basis in fact and law for the consumer's claim." *Kang v. Keen*, 2005 WL 1704840 (Tex. App. – Houston [1st Dist.] July 21, 2005). A case is not groundless "simply because a plaintiff failed to convince a jury of the truth of her allegations." *Rutherford v. Riatta Cadillac Co.*, 809 S.W. 2d 535, 538 (Tex. App. – San Antonio 1991). Moreover, where the law relative to the applicability of the DTPA is unsettled, an action will not be found to be groundless. *Baroid Equipment, Inc. v. Odeco Drilling, Inc.*, 184 S.W.3d 1 (Tex. App. – Houston [1st Dist.] 2005).

The requirement that a suit be brought for purposes of harassment "must mean it was brought for the *sole* purpose of harassment." *Donwerth v. Preston II Chrysler-Dodge, Inc.*, 775 S.W.2d 634 (Tex. 1989). To find that a lawsuit was brought in bad faith, a defendant must show that the suit was motivated by a malicious or discriminatory purpose. *Baroid Equipment, Inc. v. Odeco Drilling, Inc.*, 184 S.W.3d at 20. "Bad faith" is the conscious doing of a wrong for

dishonest, discriminatory, or malicious purposes. *Medical Specialist Group, P.A. v. Radiology Assoc. LLP*, 171 S.W.3d 727 (Tex. App. – Corpus Christi, 2005). Bad faith does not exist simply because a party exercises bad judgment or is negligent. *Id*.

Here, the Defendants have not shown that Frazin's suit was motivated by a malicious or discriminatory purpose, or that it was brought for the sole purpose of harassment. At most, the Defendants have shown that portions of the Complaint may have been groundless. However, having successfully argued with respect to most of Frazin's allegations that the DTPA does not apply because the claims were re-stated negligence claims, it would seem odd to then award fees under the very statute that the Defendants successfully argued does not govern. Merely mis-labeling claims should not subject Frazin to the payment of attorneys' fees when those fees would not otherwise be recoverable.

Specifically, in its September Memorandum Opinion, the Court found that many of Frazin's DTPA claims were re-stated negligence claims and were thus not cognizable under the DTPA or, alternatively, were claims based upon the rendition of a professional service and thus exempt under DTPA Section 17.49(c) and did not fall within any of the exceptions to the exemption for professional services. As an alternative basis for denial of Frazin's claims, the Court found that on the merits, Frazin failed to prove his DTPA claims by a preponderance of the evidence. However, as noted above, the Court's primary reason for rejecting Frazin's DTPA claims was that they were re-stated negligence claims.

The only factual allegation in the Complaint that the Court found could support a DTPA claim was Frazin's allegation that the Defendants made and breached express warranties about the quality of their work. But, Frazin did not prove at trial that an express warranty was made or

breached. Failure to prove a case at trial, however, is not enough – the Defendants must show that the action was *groundless*.

The Defendants argue, of course, that Frazin's DTPA claim was groundless. To determine whether a pleading is groundless, "it must be determined objectively whether the party and counsel made a reasonable inquiry into the legal and factual basis of the claim at the time the suit was filed." *Ubinas-Brache v. Dallas County Med. Soc.*, 261 S.W.3d 800, 804 (Tex. App. – Dallas 2008). Here, the Defendants point to the following facts as evidence of "groundlessness" at the time the Complaint was filed:

(1) "Days after October 26, when Frazin claims that he had not yet formulated any malpractice claim, Frazin asked that Haynes and Boone forfeit its entire fee." *H&B Motion*, p. 6.

(2) On December 18, Shawn told Griffith that Frazin would not object to G&N's fee application (because Shawn was satisfied with G&N's trial work) if the firm would amend its fee application to delete references to its work in connection with the appeal.

(3) On December 20 and 26, Frazin filed objections to both law firms' fee applications through his attorney, Schepps. Schepps later admitted that at the time of the filing of the objections, he had not formed an opinion about the quality of the legal work performed on the appeal, had not reviewed the trial record, and was trying to find counsel who could determine if there was a basis for the malpractice action.

(4) A key allegation of Frazin's pleadings was that Cortell misrepresented that she would be heavily involved in all aspects of the appeal, but Dodson did much of the work. A cursory review of the Haynes and Boone fee application shows that Cortell did indeed work on all aspects of the appeal, ultimately billing almost 300 hours.

(5) the Complaint asserts that Haynes and Boone neglected to order the record in a computer searchable format, but Frazin later argued that Haynes and Boone breached a fiduciary duty by not producing a computer searchable record, which Haynes and Boone asserts was an inconsistent position.

(6) the Complaint alleges that Haynes and Boone failed to raise the issue of performance as a means to prove contract, but a simple review of the record shows that the performance argument was made in Frazin's primary appellate brief as well as in pre- and post-argument letter briefs.

However, from the Court's perspective, none of these "groundlessness" arguments relate specifically to the DTPA breach of warranty claim, which is the only DTPA claim found by the Court. All other alleged DTPA claims were found to be mis-labeled negligence claims. Therefore, even assuming all of these allegations establish groundlessness, they establish groundlessness as to the *negligence claims* or *breach of fiduciary duty claims*, and not as to the DTPA breach of warranty claim.[52] Of course, the DTPA only permits the recovery of attorneys' fees for *DTPA actions* brought groundlessly, not for negligence or other actions brought groundlessly. Therefore, the Court concludes that the Defendants have not established that Frazin's DTPA claim was groundless.

In addition, even assuming that the one DTPA claim asserted by Frazin was groundless, the Court concludes that the Defendants would be entitled to only a small portion of the attorneys' fees they seek, as set forth in detail below. In short, the Defendants failed to segregate their fees

---

[52] G&N merely adopts Haynes and Boone's arguments with respect to groundlessness under the DTPA. When G&N does discuss the alleged groundlessness of the claims asserted against the G&N Defendants, it discusses groundlessness of the *trial negligence* claims. However, the DTPA does not permit recovery of attorneys' fees for defending groundless negligence claims – only the recovery of attorneys' fees for defending groundless DTPA claims.

appropriately.[53]

By way of background, the Defendants make several arguments in support of their recovery of fees under the DTPA. First, the Defendants argue that *all* of their fees are recoverable under the DTPA because the DTPA claim is "inextricably intertwined with Frazin's other claims." *H&B Motion*, p. 19. As previously discussed, the Texas Supreme Court has abandoned that approach to segregation of legal fees. *Chapa*, 212 S.W.3d at 313-14. The *Chapa* court framed the relevant inquiry as follows:

> Many of the services involved in preparing a contract or DTPA claim for trial must still be incurred if tort claims are appended to it; adding the latter claims does not render the former services unrecoverable. Requests for standard disclosures, proof of background facts, depositions of the primary actors, discovery motions and hearings, voir dire of the jury, and a host of other services may be necessary whether a claim is filed alone or with others. To the extent such services would have been incurred on a recoverable claim alone, they are not disallowed simply because they do double service. Accordingly, we reaffirm the rule that if any attorney's fees related solely to a claim for which such fees are unrecoverable, a claimant must segregate recoverable from unrecoverable fees. Intertwined facts do not make tort fees recoverable; it is only when discrete legal services advance both a recoverable and unrecoverable claim that they are so intertwined that they need not be segregated.

*Chapa*, 212 S.W.3d at 313-14. Therefore, the Court concludes that the Defendants may not simply recover all of their fees by arguing that Frazin's DTPA claim was "inextricably intertwined" with his other claims.

The Defendants next argue that they are not required to proffer precise proof in the form of separate time records to establish which fees and expenses were incurred on recoverable versus

---

[53] The Court has concluded in this Memorandum Opinion and Order that segregation as to the fees incurred in defending *any* of Frazin's claims is not required if the attorneys' fees are awarded pursuant to Section 38.001, since the Defendants had to overcome *all* of those claims in order to recover on their original fee contracts with Frazin and in order to recover for their labor performed and/or services rendered. However, if the fees are awarded solely pursuant to Section 17.50(c), then segregation is clearly required, as the fees would not otherwise be recoverable for defending against either the negligence claims or the breach of fiduciary duty claims.

unrecoverable claims. Instead, they argue that fees are sufficiently segregated if the attorney testifies that a given percentage of time would have been necessary despite the presence of claims for which attorneys' fees are unrecoverable. The Court agrees. That approach has sufficed for segregation under the case law. *See, e.g., Chapa*, 212 S.W.3d at 313; *Navigant Consulting, Inc. v. Wilkinson*, No. 3:02-CV-2186, 2008 WL 2765334 (N.D. Tex. July 16, 2008).[54] As the *Chapa* court noted:

> This standard does not require more precise proof for attorney's fees than for any other claims or expenses. Here, Chapa's attorneys did not have to keep separate time records when they drafted the fraud, contract, or DTPA paragraphs of her petition; an opinion would have sufficed stating that, for example, 95 percent of their drafting time would have been necessary even if there had been no fraud claim.

*Chapa*, 212 S.W.3d at 314. Therefore, the Defendants need not provide this Court with separate time entries for the DTPA claim and a declaration, like Phelan's, which provides evidence in the form of a percentage of time spent on the DTPA claim, can be legally sufficient.

However, the Court has several problems with the evidence as set forth in the Phelan Declaration. The Phelan Declaration states:

> If the Court awards fees solely based upon the DTPA and determines that segregation is required, then the Firm suggests a 33% reduction. Such a reduction resolves any doubts in Frazin's favor because easily more than two-thirds of the Firm's work is attributable to Frazin's DTPA claims *and the overlapping negligence claims.*

*Phelan Declaration*, ¶ 35(b) (emphasis added). The second sentence is ambiguous, because it may fairly be read in one of two ways. First, it could mean that two-thirds of the firm's work is attributable to defense of the DTPA claim and the negligence claims together, in which case it would fail to satisfy the *Chapa* test, because it would not provide a percentage of fees incurred to defend the DTPA claim alone plus a portion of fees which advanced the defense of both the DTPA claim

---

[54] The Court notes that *Navigant Consulting* made no mention of the *Varner* case, discussed above.

and the negligence claims. Or, it could mean that two-thirds of the firm's services were attributable to the defense of the DTPA claim and to the defense of the negligence claims *to the extent that the services advanced the defense of both the DTPA claim and the negligence claims*, in which case it would satisfy the *Chapa* test, because it would provide evidence of the amount of fees which advanced the defense of the DTPA claim but which also did "double service" by advancing the defense of the negligence claims.

The next sentence of the Phelan Declaration attempts to provide further explanation:

> In other words, it is my opinion that at least 66% of the Firm's fees would have been incurred had there been no fiduciary claims; a 33% reduction represents far more time than was spent on the fiduciary claims . . .

By excluding only the breach of fiduciary duty claims and not the negligence claims (or any portion thereof), this sentence suggests that the sentence preceding it should be read as first suggested: that 66% of the firm's fees were incurred in defending the DTPA claim and the negligence claims together, which in turn assumes, in order to satisfy *Chapa*, that the fees incurred in defending both theories of claim were completely coterminous.[55]

The Phelan Declaration continues:

> the Firm's work on the DTPA claims and the overlapping negligence and breach of fiduciary duty claims permeated the entire case, and *to the extent that attorneys' work advanced other claims for which fees are not available, that work served a double purpose by also advancing the DTPA claims.*

Phelan Decl, ¶ 35(b) (emphasis added). This sentence is internally inconsistent with the other two:

---

[55] The H&B Defendants' brief also supports this reading. It states that "[t]he 33% figure was chosen based upon the fact that Frazin's claims fall into three categories: (1) negligence, (2) DTPA, and (3) breach of fiduciary duty. As the Court's Opinion repeatedly notes, there is vast overlap between the claims. To the extent that Frazin may claim a few distinct fiduciary claims, it is clear that relatively little time was spent on those claims. However, taking a very conservative approach – to the Firm's detriment and to Frazin's benefit – the Firm has decided to reduce its DTPA fee request by 33% because at least 66% of the fees would have been incurred without the claims for which fees were not recoverable." *H&B Motion*, p. 20, n. 11.

it describes the DTPA, negligence and breach of fiduciary duty claims as all overlapping, and then opines that to the extent that the H&B Defendants incurred fees in the defense of the negligence and breach of fiduciary duty claims, those same fees were also incurred in the defense of the DTPA claim. First, if that were true, then there would be no need to take *any* reduction for the breach of fiduciary duty claims. In addition, the notion that *all* fees which were incurred advanced the defense of *all* of the claims is simply wrong. For example, over $188,000 in fees were incurred between December 3, 2007 and February 1, 2008 - before the DTPA and breach of fiduciary duty claims were even on file.[56] Similarly, nearly $45,000 was incurred in connection with the H&B Defendants' motion to strike Frazin's expert reports, when those experts opined only as to the negligence and/or breach of fiduciary duty claims, and did not examine the Defendants' conduct in light of the DTPA.

Finally, it appears that the H&B Defendants are applying a slightly altered version of the *Chapa* test. As applied here, *Chapa* holds that the Defendants' services in defending the DTPA claim are recoverable even though negligence and breach of fiduciary claims were appended. It further holds that to the extent the services would have been incurred on the DTPA claim alone, they are not disallowed simply because those same services also advanced the defense of the negligence and breach of fiduciary duty claims. But, if any of the fees relate solely to the negligence and breach of fiduciary duty claims, then they must be segregated and are not recoverable. The H&B Defendants, however, argue that to the extent the firms' fees advanced the negligence and

---

[56] Frazin's initial complaint was filed on January 30, 2008, and asserted claims for negligence, estoppel, misrepresentation, attorneys' fees, and objections to claims. That initial complaint was amended on February 1, 2008 to, among other things, add claims under the DTPA and for breach of fiduciary duty. The fees incurred prior to the filing of the DTPA claim were incurred in defending the fee application and are thus recoverable under Section 38.001 and *Varner*. However, there is simply no basis to conclude that any of those fees advanced the defense of claims which had not yet been filed.

breach of fiduciary duty claims, they also advanced the DTPA claim and are recoverable. That is the inverse of *Chapa's* holding. *Chapa* held that to the extent the fees advanced the DTPA claim but also advanced the negligence and breach of fiduciary claims, they are recoverable. Moreover, in order to accept the Defendants' argument and simultaneously satisfy *Chapa*, one would have to assume that the fees incurred in defending against all three theories were completely coterminous – a highly unlikely proposition.[57] Moreover, as just noted, Haynes and Boone's fee request includes a request for recovery of $188,726.50 (327.50 hours) incurred between December 3, 2007 and February 1, 2008 – before the Complaint was even on file. Clearly, those fees could not have been incurred defending a claim which had not yet been filed. The same may be said of the fees sought by G&N – 74.20 hours at a cost of $23,259 was expended before the Complaint was even on file.

In sum, the Court finds the evidence – *i.e.*, the Phelan Declaration, to be equivocal and internally inconsistent.[58] However, when coupled with the time sheets, it is some evidence of the services which were incurred in connection with the DTPA claim. *Stewart Title*, 822 S.W.2d at 12 ("evidence of unsegregated attorney's fees is more than a scintilla of evidence of segregated

---

[57] A review of the time sheets shows fourteen time entries which can be specifically identified as being incurred solely in connection with the DTPA claim, for a total of 53.9 hours, and fees of $23,290. *See* entries 2/20/08, 2/26, 3/7, 3/10, 3/19, 3/21, 5/15, 5/24, 5/28, 7/18, and 7/19. Similarly, there are twelve entries which appear to be related solely to the breach of fiduciary duty claims, for a total of 43.1 hours and fees of $22,802. *See* entries 4/15/08, 4/30, 5/9, 5/12, 5/16, 6/27, 6/28, 7/14, 7/17, 7/18 and 7/19.

[58] The Court's discussion applies with equal force to the Griffith Declaration, the LeBoeuf Declaration, and the Capshaw Declaration. The Griffith Declaration states that "because the facts underlying such claims were inextricably intertwined and the attorneys' time spent in defending the claims cannot be accurately broken down by claim, a reasonable method of ascribing time to the defense of the breach of fiduciary duty claims is to assign a 1/3 percentage to them." *Griffith Declaration*, ¶ 30. The LeBoeuf Declaration states that "the basis for the 33% reduction is the fact that Frazin asserted three general categories of claims . . . because the facts underlying such claims were intertwined, and the attorneys' time spent in defending the claims cannot be accurately broken down by claim, a reasonable method of ascribing time to the defense of the breach of the fiduciary duty claims is to assign a 1/3 percentage to them. In such event, the amount of $139,360.00 is appropriately assessed against Frazin for reasonable and necessary attorneys fees . . . in the defense of the negligence claims and the claims of violation of the DTPA asserted against the G&N Defendants." *LeBoeuf Declaration*, ¶ 28. Similarly, Capshaw opines that "it is my opinion that at least 67% of the fees incurred . . . would have been incurred had there not been any fiduciary claims." *Capshaw Declaration*, ¶ 5.

attorney's fees, *i.e.*, what a reasonable attorney's fee would be for the entire case indicates what the segregated amounts should be"). As the trier of fact, this Court must now determine what portion of the attorneys' fees are recoverable in this case.

Here, the Court notes that time entries specifically identified by Haynes and Boone as being incurred solely in connection with the DTPA claim total only 53.9 hours, resulting in fees of $23,290. Nevertheless, some of the time entries that are not specifically identified as being related to the DTPA claim undoubtedly advanced that claim and are properly recoverable. For example, some portion of discovery motions, the motion for summary judgment and time incurred in preparation for hearings necessarily was incurred in connection with the DTPA claim, although it was not so identified in the time entries. Conversely some of the attorneys' fees incurred cannot possibly have been incurred in connection with the DTPA claim, because the time was expended before that claim was ever on file.

The Court has concluded above that the reasonable and necessary attorneys' fees incurred by Haynes and Boone in defending all of Frazin's claims total $731,721.02. The Court finds that it is reasonable to assign one-third of that sum, or $243,907 to the DTPA claim. It is also reasonable to assign one-third each to the negligence and breach of fiduciary duty claims (*i.e.*, $243,907 to the negligence claims and $243,907 to the breach of fiduciary duty claims). Although the breach of fiduciary claims as initially pled in the Complaint related somewhat to the negligence claims, the breach of fiduciary duty claims, and the factual allegations underpinning them, changed significantly during discovery and trial, such that the alleged conduct underlying the breach of fiduciary claims as tried had very little to do with the conduct underlying the allegations of negligence and the DTPA claim. Thus, the Court does not believe that any of the work performed in defense of the breach

of fiduciary duty claims would necessarily have overlapped with the work performed in defense of the DTPA claim. However, the Court notes that some of the work performed in defense of the negligence claims would be coterminous with the work performed to advance the defense of the DTPA claim. To account for the fact that some of the fees incurred in connection with the summary judgment and discovery motions and trial preparation necessarily were incurred in connection with the DTPA claim, the Court concludes that one-half of the one-third assigned to defense of the negligence claims will be awarded as reasonable and necessary fees incurred in the defense of the DTPA claim – *i.e.*, $121,953.50. This award adequately accounts for the fact that some of the fees incurred in connection with work that advanced the defense of both the DTPA claim and the negligence claims together necessarily advanced the DTPA claim. Therefore, the Court concludes that a reasonable fee for defense of the DTPA claim alone is $365,860.50 – *i.e.*, $243,907 + $121,953.50.

The Court has concluded above that the reasonable and necessary attorneys' fees incurred by the G&N Defendants in defending all of Frazin's claims, with respect to the fees incurred by G&N, total $342,094.05. The Court finds that it is reasonable to assign one-third of that sum, or $114,031.35 to the DTPA claim. It is also reasonable to assign one-third each to the negligence and breach of fiduciary duty claims. For the same reasons just discussed with respect to the Haynes and Boone fees, *see supra* p. 86, the Court concludes that one-half of the one-third assigned to defense of the negligence claims will be awarded as reasonable and necessary fees incurred in the defense of the DTPA claim. This award adequately accounts for the fact that some of the fees incurred in connection with work that advanced the defense of both the DTPA claim and the negligence claims together necessarily advanced the defense of the DTPA claim. Therefore, the Court concludes that

a reasonable fee for defense of the DTPA claim alone is $171,047.02 of the fees incurred by G&N – *i.e.*, $114,031.35 + $57,015.67.

The Court has concluded above that the reasonable and necessary attorneys' fees incurred by the G&N Defendants in defending all of Frazin's claims, with respect to the fees incurred by the Shackelford Firm, total $178,965. The Court finds that it is reasonable to assign one-third of that sum, or $59,654.99, to the DTPA claim. It is also reasonable to assign one-third each to the negligence and breach of fiduciary duty claims. And, for the same reasons just discussed with respect to the Haynes and Boone fees and the G&N fees, *see supra* pp. 86-87, the Court concludes that one-half of the one-third assigned to defense of the negligence claims will be awarded as reasonable and necessary fees incurred in the defense of the DTPA claim. This award adequately accounts for the fact that some of the fees incurred in connection with work that advanced the defense of both the DTPA claim and the negligence claims together necessarily advanced the defense of the DTPA claim. Therefore, the Court concludes that a reasonable fee for defense of the DTPA claim alone is $89,482.49 of the fees incurred by the Shackelford Firm – *i.e.*, $59,654.99 + $29,827.50.

The Court therefore awards the G&N Defendants aggregate attorneys' fees of $260,529.51 in defense of the DTPA claim.

### E. Expert Witness Fees

The Defendants concede that expert witness fees beyond the statutory allowances provided for in 28 U.S.C. §§ 1821 and 1920[59] cannot ordinarily be recovered as costs in civil litigation.

---

[59] Section 1920 of Title 28, United States Code, provides that a judge may tax as costs, among other things, fees and disbursements for printing and witnesses. Section 1821 of title 28, United States Code, provides that witnesses may be paid an attendance fee of $40 per day, plus actual expenses of travel, tolls, cab fares, parking fees, normal travel expenses,

However, citing *Chambers v. NASCO*, 501 U.S. 32 (1991), they assert that the Court maintains discretion to award expert witness fees where the expert's services were made necessary by the opposing party's bad faith. They further argue that Rule 9011 provides an additional basis for the exercise of a court's discretion to award expert witness fees. *H&B Boone Motion*, p. 16.

For the reasons previously discussed, *see supra* pp. 34-40, the Court concludes that the bad-faith exception to the American Rule as discussed in *Chambers* is not properly invoked here; thus, the Defendants' requests for expert witness fees beyond the statutory allowances are denied.

For the reasons previously discussed, *see supra* p. 44, n. 28, the Court also concludes that Rule 9011 was not properly invoked in this adversary proceeding. Nor does the Court conclude that 11 U.S.C. § 105 warrants such an award, and thus the Defendants' requests for expert witness fees beyond the statutory allowances are denied.

### F. Computerized Legal Research

The Defendants assert that the cost of reasonable computerized legal research is recoverable as attorney's fees. Although the Fifth Circuit has yet to address this issue, several other circuit courts of appeal have agreed. *U.S. v. Merritt Meridian Constr. Corp.*, 95 F.3d 153 (2d Cir. 1996); *Haroco, Inc. v. American Nat'l Bank and Trust Co. Of Chicago*, 38 F.3d 1429 (7th Cir. 1994); *Johnson v. College of the Univ. Of Ala. In Birmingham*, 706 F.2d 1205 (11th Cir. 1983); *see also Camargo v. Trammell Crow Interest Co.*, 318 F.Supp.2d 448 (E.D. Tex. 2004) (allowing fees for computerized legal research as attorneys' fees). The rationale for the allowance of the cost of computerized legal research as attorneys' fees is as follows:

Computerized legal research involves an attorney sitting down in front of a

---

a subsistence allowance when an overnight stay is required, and certain other nominal fees.

computer and researching legal issues by searching through a database which now includes almost every resource one would find in the country's largest law libraries. In addition to the attorney charging the client for the time he or she spends doing this research, the companies that offer the computerized legal research services also charge a fee. Theoretically, even though the clients now pay two fees, their ultimate bill should be lower because the attorney should be able to do the research more quickly and efficiently. If this research had been done manually by an attorney sitting in the library reading through books rather than sitting before a computer screen, nobody would dispute that the attendant fees would be properly classified as attorney's fees and not costs.

*Haroco, Inc.*, 38 F.3d at 1440.

This Court agrees with this analysis, and thus holds that the cost of *reasonable* computerized legal research is recoverable as attorneys' fees. The H&B Defendants seek reimbursement for $20,039.88 in Westlaw and Lexis charges as attorneys' fees. The Court finds that sum to be reasonable, and their request is therefore granted pursuant to Section 38.001. In the alternative, to the extent that the Defendants are entitled to recover their attorneys' fees for the defense of the DTPA claim alone, the Court awards $10,019.94 (one-third of the legal research charges, which the Court assigns to the DTPA claim, and one-half of the one-third incurred in connection with the defense of the negligence claims, which the Court concludes advanced both types of claims equally and thus also advanced the DTPA claim).

The G&N Defendants seek reimbursement for $4,690.98 in online legal research fees – $2,088.17 incurred by G&N and $2,602.81 incurred by the Shackelford Firm.[60] The Court finds this sum to be reasonable, and their request is therefore granted pursuant to Section 38.001. In the alternative, to the extent that the Defendants are entitled to recovery of their attorneys' fees for

---

[60] As noted earlier, *see supra* p. 20, the G&N Motion states that the G&N Defendants seek $5,334.86 in online legal research fees – $2,651.87 incurred by G&N and $2,676.99 incurred by the Shackelford Firm. However, the time entries attached to the G&N Motion show total expenses in online legal research fees of $4,690.98 – $2,088.17 incurred by G&N and $2,602.81 incurred by the Shackelford Firm.

defense of the DTPA claim alone, the Court awards $1,044.09 of legal research fees incurred by G&N (one-third of the legal research charges, which the Court assigns to the DTPA claim, and one-half of the one-third incurred in connection with the defense of the negligence claims, which the Court concludes advanced both types of claims equally and thus also advanced the DTPA claim), and $1,301.40 for legal research fees incurred by the Shackelford Firm (one-third of the legal research charges, which the Court assigns to the DTPA claim, and one-half of the one-third incurred in connection with the defense of the negligence claims, which the Court concludes advanced both types of claims equally and thus advanced the DTPA claim).  Thus, the G&N Defendants are awarded aggregate computerized legal research fees for the DTPA claim alone of $2,345.49.

## IV.    CONCLUSION

It is simply too late for Frazin to complain that he lacked notice of the bases for the Defendants' claims to attorneys' fees.  In addition, the Court finds that the Defendants' pleadings for attorneys' fees are sufficient under Rule 8.

Frazin's objections to the admission of the Defendants' time sheets are overruled.  Frazin's objections to certain paragraphs of the Phelan and Giffith Declarations are granted in part and denied in part, and the Declarations are admitted subject to the portions which the Court has stricken by its prior rulings herein.

The Defendants are not entitled to recover attorneys' fees under the Standing Order, this Court's *Teraforce* decision, or 11 U.S.C. § 330.  The Defendants would, however, be entitled to recover attorneys' fees for their defense of their fee applications under the bad-faith exception to the American Rule.  However, the Court concludes that the bad-faith exception is not properly invoked here; thus, the Defendants are not entitled to recover their fees under federal law.

The Defendants are, however, entitled to recover their reasonable and necessary attorneys' fees incurred in defending their fee applications and in defending Frazin's tort and DTPA claims under Section 38.001. Those attorneys' fees need not be segregated, because overcoming all of Frazin's claims was necessary in order to recover on a claim for which attorneys' fees are recoverable under Section 38.001 (*i.e.*, a claim for services rendered or labor performed or on a contingency fee contract). The amount of fees awarded to the H&B Defendants as reasonable and necessary is $731,721.02, plus $20,039.88 for computerized legal research. The amount of fees awarded to the G&N Defendants as reasonable and necessary is $521,059.05, plus $4,690.98 for computerized legal research. The Defendants' requests for reimbursement of expert witness fees beyond that provided by statute is denied, and only the amount permitted by 28 U.S.C. §§ 1821 and 1920 may be recovered. The Defendants have not identified for the Court, however, what that amount might be. Accordingly, the Defendants are directed to file a further pleading identifying that amount within seven days of the entry of this Memorandum Opinion and Order on the Court's docket, so that Frazin may review same and lodge objections, if any, within ten days after service of that further pleading.

The Defendants are not entitled to recover their reasonable and necessary attorneys' fees under the DTPA, because Frazin's action was not groundless in fact or law or brought in bad faith, or brought for the purpose of harassment. In the alternative, in the event that an appellate tribunal rules that the Defendants are entitled to recovery of their attorneys' fees under the DTPA because the DTPA claim was groundless, then segregation is required. However, the Defendants did not segregate their fees appropriately, and thus would be entitled to only a portion of the fees they seek. The Court would award to the H&B Defendants $365,860.50 as a reasonable fee for defense of the

DTPA claim alone, assuming segregation is required as between the DTPA claim on the one hand, and the negligence/breach of fiduciary duty claims on the other.  The Court would also award $10,019.94 for computerized legal research, but would deny the request for reimbursement of expert witness fees beyond the statutory allowance. The Court would award to the G&N Defendants $260,529.51 as a reasonable fee for defense of the DTPA claim alone, assuming segregation is required as between the DTPA claim on the one hand, and the negligence/breach of fiduciary duty claims on the other.  The Court would also award $2,345.49  for computerized legal research, but would deny the request for reimbursement of expert witness fees beyond the statutory allowance.

The Defendants are directed to promptly prepare a judgment and circulate it to Frazin's counsel for approval as to form, and thereafter submit it to the Court within twenty days of the entry of this Memorandum Opinion and Order on the Court's docket.  In the event that no agreement can be reached as to the form of the judgment, a further hearing will be held or the Court will enter its own form of judgment.

SO ORDERED.

### # # # END OF MEMORANDUM OPINION and ORDER # # #