

**CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS**

# ENTERED

**THE DATE OF ENTRY IS ON
THE COURT'S DOCKET**

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed December 22, 2017**

**United States Bankruptcy Judge**

_____

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| IN RE:<br><br>TIMOTHY MICHAEL FRAZIN,<br><br>        Debtor. | Case No. 02-32351-bjh-13<br><br>CHAPTER 13 |
| TIMOTHY MICHAEL FRAZIN,<br><br>        Plaintiff,<br><br>v.<br><br>HAYNES AND BOONE, LLP,<br>GRIFFITH & NIXON, P.C.,<br>SCOTT GRIFFITH, NINA CORTELL,<br>AND WARREN DODSON,<br><br>        Defendants. | ADVERSARY NO. 08-3021-bjh |

**MEMORANDUM OPINION AND ORDER**

On November 3, 2008, Haynes and Boone, LLP ("**Haynes and Boone**") filed a Motion for Attorneys' Fees and Expenses and Brief in Support (the "**H&B Motion**").[1]  On November 4, 2008, Griffith & Nixon, P.C. ("**G&N**") filed a Motion for Attorneys' Fees and Expenses and Brief in Support (Docket No. 137) (the "**G&N Motion**" and, together with the H&B Motion, the "**Motions**").[2]  Timothy Michael Frazin ("**Frazin**" or the "**Debtor**") filed an opposition to the Motions on November 17, 2008,[3] and the Defendants filed replies on November 24, 2008, following which the Court took the Motions under advisement.

The Motions followed trial of an adversary proceeding in which Frazin sued Haynes and Boone, Nina Cortell ("**Cortell**"), and Warren Dodson ("**Dodson**") (collectively, the "**H&B Defendants**") and defendants G&N and Scott Griffith ("**Griffith**") (collectively, the "**G&N Defendants**") (the H&B Defendants and the G&N Defendants will be referred to collectively as the "**Defendants**") for negligence, misrepresentation/deceptive trade practices, and breach of fiduciary duty in connection with their representation of the Debtor as special trial and/or appellate counsel (collectively, the "**Malpractice Claims**").  The Defendants disputed the validity of the Malpractice Claims and sought the final allowance under 11 U.S.C. § 330 of the contingency fees and expenses provided for in their respective retention and fee agreements with the Debtor.  The Defendants, by

---

[1] The H&B Defendants' Motion for Attorneys' Fees and Expenses and Brief in Support (Docket No. 135) originally sought attorneys' fees of $1,441,188.45 or, alternatively, attorneys' fees of $1,066,959, and expert witness fees of $87,340.69. However, those numbers did not match the amounts set forth in the Unsworn Declaration of Robin Phelan in Supp. of Haynes and Boone Defendants' Motion for Attorneys' Fees and Br. In Supp. (Docket No. 136) (the "**Phelan Declaration**").  On January 8, 2009, the H&B Defendants filed a Notice of Errata (Docket No. 161) clarifying that the amounts sought are those set forth in the Phelan Declaration.

[2] The Court required the filing of the Motions by November 3, 2008.  However, because G&N experienced problems with electronic filing of the lengthy documents, it sought and received leave of Court to file the G&N Motion on November 4, 2008.

[3] On November 19, 2008, Frazin filed a Motion for Leave to File Supplemental Response and Objection to Defendants' Fee Motions, to clarify his original response to the fee motions regarding Defendants' failure to segregate fees by cause of action.  A copy of his Supplemental Response and Objection to Defendants' Motions for Attorney Fees and Expenses

way of counterclaims, also sought to recover the fees and expenses they incurred in defending themselves and their fee applications in accordance with (1) Section 38.001 of the Texas Civil Practice and Remedies Code, *see* TEX. CIV. PRAC. & REM. CODE § 38.001 (Vernon 2008) ("**Section 38.001**"), (2) Section 17.50(c) of the Texas Deceptive Trade Practices-Consumer Protection Act, *see* Tex. Bus. & Comm. Code § 17.50(c) (Vernon 2002 & Supp. 2008) (the "**DTPA**"), and (3) this Court's General Order 00-7 ("Standing Order Concerning Guidelines for Compensation and Expense Reimbursement of Professionals" – the "**Standing Order**") and 11 U.S.C. § 330.

The Court entered its Memorandum Opinion and Order on April 7, 2009 (Docket No. 162) (the "**Original Fee-Defense Memorandum Opinion**"), which was followed by the Final Judgment on Fees and Expenses entered July 7, 2009 that fully resolved the Motions (Docket No. 191) (the "**Original Fee-Defense Judgment**"). Pursuant to the Original Fee-Defense Judgment, the H&B Defendants were awarded $751,760.90 under Section 38.001 (consisting of $731,721.02 for reasonable and necessary fees, plus $20,039.88 for reasonable and necessary computerized legal research) and the G&N Defendants were awarded $525,750.03 under Section 38.001 (consisting of $521,059.05 for reasonable and necessary fees, plus $4,690.98 for reasonable and necessary computerized legal research). The Court also awarded the Defendants post-judgment interest from the date of the judgment at the maximum legal rate until paid in full.

On July 17, 2009, Frazin filed the Motion Pursuant to Rule 59 Regarding Final Judgment on Fees and Expenses Entered 07/07/09 (Docket No. 195) (the "**Rule 59 Motion**") requesting that the Court alter the portion of the Original Fee-Defense Judgment holding him liable for the fees incurred by Haynes and Boone and G&N in defending their fee applications under Section 38.001, arguing

---

was attached to the motion as Exhibit A. Frazin's motion is hereby granted.

**Memorandum Opinion and Order**        3

that the firms had not properly presented their claims for serving as Frazin's special counsel during the bankruptcy case and that, until the Court ruled on the firms' fee applications, there could be no "just amount owed," each as required to recover under Section 38.001. The Defendants each filed an objection to the Rule 59 Motion (Docket Nos. 209 and 210) and Frazin filed replies (Docket Nos. 212 and 213). No party, however, requested that the Rule 59 Motion be set for hearing or otherwise brought its filing to the Court's attention. The Rule 59 Motion remained pending on the Court's docket when the adversary proceeding was closed on July 13, 2015 following the conclusion of appeals of the Liability Judgment (as defined on p. 12, *infra*).

Over two years later, Frazin filed his Motion for Ruling on Rule 59 Motion (Docket No. 293) (the "**Motion for Ruling**"). Frazin's counsel has not adequately explained why he did not set the Rule 59 Motion for hearing in the first instance, and no counsel has explained why the Court was not notified that the Rule 59 Motion remained pending when the adversary proceeding was closed. And, due to the passage of time, the Court has been unable to determine why the Clerk's Office closed the adversary proceeding with a motion pending.[4]

The Court held a hearing on the Rule 59 Motion on November 3, 2017. For the reasons explained below, the Court finds that it committed a manifest error of law when it held in the Original Fee-Defense Memorandum Opinion and in the Original Fee-Defense Judgment that Frazin was liable to the Defendants for the payment of their fee-defense fees under Section 38.001. Accordingly, the Rule 59 Motion is granted and the Original Fee-Defense Memorandum Opinion is amended and superseded by this Memorandum Opinion and Order. A separate Judgment will

---

[4] Frazin failed to file a motion to reopen the adversary proceeding prior to filing his Motion for Ruling. With the consent of the parties expressed orally at the hearing held November 3, 2017, the Court re-opened the adversary proceeding so that the Rule 59 Motion and any other motions pending when the adversary proceeding was closed may be addressed

follow.

## I.    JURISDICTION AND VENUE

As explained further below, *see* pp. 29-32, *infra*, the Court has core jurisdiction over the Motions pursuant to 28 U.S.C. §§ 1334 and 157(b).  Pursuant to Federal Rule of Civil Procedure 52 and Federal Rule of Bankruptcy Procedure 7052, this Memorandum Opinion and Order contains the Court's findings of fact and conclusions of law.[5]

## II.    FACTUAL AND PROCEDURAL HISTORY

The factual background underlying this adversary proceeding is set forth in the Court's prior Memorandum Opinion entered September 23, 2008 (Docket No. 132) (the "**September Memorandum Opinion**"), and will not be repeated in its entirety here.  However, a truncated version follows.

On March 18, 2002, the Debtor filed his voluntary petition under Chapter 13 of the Bankruptcy Code.  In his bankruptcy schedules, the Debtor represented that he held a claim against Lamajak, Inc. ("**Lamajak**") worth $6,000,000.00.  During the pendency of his bankruptcy case, the Debtor was involved in litigation with Lamajak styled *Tim Frazin v. Lamajak, Inc.,* 192nd District Court, Dallas County, Texas, Case No. 03-5672-K (the "**State Court Action**").  In connection with the State Court Action, the Debtor, with this Court's approval, hired G&N as his special counsel to pursue the litigation pursuant to 11 U.S.C. § 327(e).

Pursuant to the terms of his confirmed Chapter 13 Plan, the Debtor was to use a portion of the proceeds from any recovery in the State Court Action (the "**Litigation Proceeds**") to satisfy

---

(Docket No. 303).

[5] To the extent that a finding of fact is more properly considered a conclusion or law, or a conclusion of law a finding of fact, they should be so considered.

claims in his bankruptcy case. On April 18, 2005, the Court entered its Order Discharging Debtor After Completion of Chapter 13 Plan. The bankruptcy case remained open to allow for the possibility of additional distributions to unsecured creditors pursuant to the Chapter 13 Plan in the event the Debtor recovered damages in the State Court Action. On June 13, 2005, a final judgment (the "**Final Judgment**") was entered in the State Court Action in favor of the Debtor, and the Debtor was awarded certain damages. Lamajak subsequently appealed the Final Judgment.

The Debtor, G&N, and Haynes and Boone thereafter signed an engagement letter pursuant to which Haynes and Boone was retained as special counsel to represent the Debtor in connection with Lamajak's challenge to the Final Judgment in the State Court Action, and on December 19, 2005, the Court entered its Order: (A) Approving Employment of Haynes and Boone, LLP as Special Appellate Counsel and (B) Regarding Disbursement of Anticipated Proceeds from Litigation (02-32351, Docket No. 100) (the "**Litigation Proceeds Order**"). Pursuant to the Litigation Proceeds Order, the Court approved the retention of Haynes and Boone and ordered that the firm's fees would be payable on the filing of a fee application and approval by the Court. *Id.*

A. **Overview of the State Court Action and Lamajak Appeal**

G&N represented the Debtor in the State Court Action. The Debtor's position at trial was that he had an oral agreement with Lamajak based upon a January 1998 conversation with Michael Cohen ("**Cohen**"), Lamajak's president, under which he was to provide certain services to Lamajak in an effort to maximize Lamajak's profits from the sale of Beanie Babies, in return for which Lamajak would pay him all gross profits in excess of $6,000,000.00 that were earned by Lamajak from the sale of Beanie Babies. At trial, Cohen denied the existence of the claimed oral agreement. The State Court Action was hotly contested. After trial, the jury awarded the Debtor judgment on

three alternative theories of recovery: (1) breach of contract, (2) promissory estoppel, and (3) quantum meruit. The Final Judgment provided recovery on the breach of oral contract claim ($4,000,000 for damages, $1,600,000 for trial attorneys' fees, and $50,000 for appellate fees), and $1,508,383.10 in prejudgment interest.[6]

On appeal, Lamajak contended that Frazin was not entitled to recover on any of his theories. With some assistance from G&N, Haynes and Boone represented Frazin on appeal. On July 6, 2007, the appellate court issued an opinion reversing and rendering in part and affirming in part the trial court judgment (*Lamajak, Inc. v. Frazin*, 230 S.W.3d 786 (Tex. App.–Dallas 2007)).[7] The appellate court set aside the contract award for lack of evidence, found that Frazin could not personally recover promissory estoppel reliance damages incurred by his company, and reduced the prejudgment interest award, but awarded Frazin recovery on his quantum meruit claim, attorneys' fees and pre- and post-judgment interest, for a total recovery of approximately $3.4 million. *Id.* Lamajak sought a rehearing, which was denied. Thereafter, Lamajak began the process of seeking review in the Texas Supreme Court, but pending further review by the Texas Supreme Court, the parties agreed to settle the approximate $3.4 million appellate judgment for $3.2 million. Frazin executed a formal settlement agreement and release with Lamajak.

---

[6] As the Dallas Court of Appeals subsequently determined, the pre-judgment interest was improperly calculated because the accrual date was based upon the wrong statute; the correct pre-judgment interest calculation on a $4 million claim was $710,132.40 and not $1,508,383.10.

[7] On August 22, 2007, the court of appeals issued a judgment nunc pro tunc conforming the judgment to reflect the jury's award of quantum meruit damages of $1.125 million. Pre-Trial Order ¶ 30, n.6.

**Memorandum Opinion and Order** 7

**B.    Proceedings in this Court**

G&N did not receive or distribute the settlement proceeds.  Rather, under the Litigation Proceeds Order, Lamajak wired the funds into Haynes and Boone's trust account and Haynes and Boone notified the Chapter 13 Trustee and the Debtor's bankruptcy counsel, Rosemary Zyne ("**Zyne**"), of the receipt of the Litigation Proceeds.

On November 19, 2007, Haynes and Boone filed a Motion for Order in Furtherance of the Distribution of Lamajak Litigation Proceeds (02-32351, Docket No. 117) (the "**Distribution Motion**"), seeking further guidance from this Court regarding disbursements of the Litigation Proceeds upon the Court's approval of the Settlement Agreement.  In the Distribution Motion (¶ 13), Haynes and Boone noted that it would file an application for approval of its fees.  On November 19, 2007, Haynes and Boone also filed a request for an expedited hearing on the Distribution Motion. The Court denied the request to set the Distribution Motion for hearing on an expedited basis, and it was set for hearing on December 27, 2007.

Haynes and Boone and G&N filed their respective applications requesting approval of fees pursuant to their contingency fee arrangement with the Debtor, which were also set for hearing on December 27, 2007.

On November 30, 2007, Zyne filed, on Frazin's behalf, a motion to approve the Lamajak settlement (02-32351, Docket No. 123) (the "**Settlement Motion**").  The Settlement Motion was set for hearing on December 27, 2007.[8]  On December 20, 2007, through his then-attorney, Gary

---

[8] While the parties stipulate to this fact in the Pre-Trial Order, the Court does not believe it to be accurate.  Rather, as Zyne testified at trial, the Settlement Motion was served on negative notice, which permitted it to be granted in accordance with Local Rule 9007.1 once the deadline for objections had passed and no objections had been filed. Because no objection was filed to the Settlement Motion, Zyne asked the Court to sign an order granting the Settlement Motion at the December 27, 2007 hearing on the Distribution Motion.

Schepps ("**Schepps**"), the Debtor filed an objection to the fee application of Haynes and Boone and a motion to continue the hearing on both fee applications. The Debtor filed an objection to the G&N fee application on December 26, 2007, also through his attorney, Schepps. On December 27, 2007, this Court, Judge Hale presiding, held a hearing on the Distribution Motion. Prior to the hearing, the parties agreed to continue the hearing on the fee applications to February 4, 2008, when the above-signed could hear them. At the December 27 hearing, the Court approved the Settlement Motion. On January 7, 2008, the Debtor filed his second motion for continuance of the fee applications (Docket No. 143) (the "**Second Continuance Motion**"), which were then scheduled for hearing on February 4, 2008. Minutes before the January 30, 2008 hearing on the Second Continuance Motion, the Debtor filed his first complaint against the Defendants asserting the Malpractice Claims.

## C. The Adversary Proceeding Complaint

In his First Amended Original Complaint of Malpractice and to Determine Claim and Objection to Claim (the "**Complaint**"), Frazin asserted claims of (1) negligence (on appeal and, in the alternative, at trial), (2) misrepresentation/deceptive trade practices (pursuant to the DTPA), and (3) breach of fiduciary duty.[9]

Regarding his appellate negligence claims, Frazin asserted that (1) the Defendants breached the applicable standards of care in presenting his case on appeal, (2) the Dallas Court of Appeals' rejection of the oral agreement claim and the promissory estoppel damage claim was proximately caused by the Defendants' negligence, and (3) Frazin suffered over $3 million of damages as a result

---

[9] The Complaint included other counts that are essentially subsumed in Frazin's objection to the fee applications of Haynes and Boone and G&N. Specifically, Frazin asked this Court to (1) determine the amount of the Defendants' fee claims, after offset for the Debtor's claims against them, (2) find the Defendants estopped to claim a waiver of the Malpractice Claims, and (3) deny the Defendants' requested fees and costs because such fees and costs were excessive and unreasonable.

**Memorandum Opinion and Order** 9

of the Defendants' negligence.

Regarding his alternative trial negligence claim, Frazin asserted that the G&N Defendants failed to ask Frazin a sufficiently specific question at trial so that Frazin could detail all of the things he orally promised to do during the January 1998 conversation with Cohen in exchange for Cohen's oral promise, on Lamajak's behalf, to pay Frazin all profits in excess of $6 million. Frazin asserted that, by not asking this question at trial, the G&N Defendants breached the applicable standard of care, their negligence caused him to lose the breach of oral contract claim, and Frazin suffered over $3 million of damages as a result.

Frazin's DTPA claims asserted that the Defendants (1) made various misrepresentations to Frazin about the quality of their work, (2) made express misrepresentations of material fact and failed to disclose known information in violation of Section 17.46(b)(23) of the DTPA, and (3) otherwise engaged in unconscionable actions and courses of action, including (i) causing confusion or misunderstanding as to the source of the services, (ii) causing confusion or misunderstanding as to the affiliation, connection, or association between two of the service providers, (iii) representing that the services would have certain characteristics and benefits that they did not have, (iv) representing that the services were of a particular standard and quality when they were of another, and (v) representing that work or services had been performed when they had not.

Frazin's breach of fiduciary duty claims asserted that certain of the Defendants' actions breached their fiduciary duties of honesty, loyalty, and disclosure.  Specifically, Frazin asserted that the Defendants breached duties owed to him when they (1) asserted that Frazin had waived his Malpractice Claims by accepting a $92,000 fee reduction on October 26, 2007, (2) failed to disclose to this Court the fact that Frazin had refused to sign a release of his Malpractice Claims in

connection with the agreed fee reduction, (3) requested an expedited fee hearing when they knew there was a fee dispute arising, (4) failed to inform Frazin that a fee hearing would act as a bar to any future malpractice complaints, (5) tried to "sneak" language into an order allowing their withdrawal as counsel when that relief had not been sought or granted, (6) refused to allow Frazin to properly place his Malpractice Claims in issue, and (7) engaged in a pattern of practices and made a series of representations intended to cover up their neglect and to convince the Debtor that a careful review of the record was conducted and all the evidence in the record that supported the Debtor's position in the appeal was briefed. Frazin, however, did not allege that the Defendants' breaches of fiduciary duty were a proximate cause of any actual damage to him. Rather, Frazin sought to impose a complete fee forfeiture because the breaches of fiduciary duty were "clear and serious."

The Defendants denied all of Frazin's claims. Specifically, the Defendants denied (1) any trial or appellate negligence, (2) the applicability of the DTPA at all (claiming that the claims were "fractured" negligence claims and further claiming certain statutory defenses), (3) that they made any misrepresentations to Frazin or committed any DTPA violations, (4) that they owed a fiduciary duty to Frazin at the time of the alleged breaches, (5) that they took the claimed actions, even assuming that they owed Frazin a duty, and (6) that fee forfeiture was appropriate, even assuming a breach of duty occurred. Further, because Frazin's claims against them were without merit, the Defendants asserted that they were entitled to the approval of their respective fee applications in full. Finally, the Defendants sought to recover the fees and expenses they incurred in defending themselves and their fee applications under Section 38.001, Section 17.50(c) of the DTPA, the Standing Order, and 11 U.S.C. § 330.

This Court tried the Malpractice Claims in July 2008. Prior to the Defendants' resting their

respective cases, Frazin's counsel objected to the Court hearing evidence regarding any potential recovery of attorneys' fees and/or expenses by the Defendants (other than their fee applications) at that stage of the case. In other words, while Frazin agreed that the Defendants were entitled to prove up their fee applications as part of their respective cases, Frazin asserted that the Defendants' requests to recover the fees and expenses they had incurred in defending against the Malpractice Claims and Frazin's objections to the fee applications should be heard after trial pursuant to Federal Rule of Civil Procedure 54(d)(2) ("**Rule 54**"). While the Defendants were concerned about this procedure (in case their recovery of fees was by statute and might be considered a part of their substantive claims), Frazin's counsel stipulated that he would not make any such objections (even assuming such an objection might be appropriate) and that all such fee requests should be made once the parties had the benefit of the Court's determination of the Malpractice Claims and the Defendants' fee applications. The Court accepted this stipulation, and thus Frazin's request to recover fees and expenses in bringing the Malpractice Claims and the Defendants' requests to recover their defensive fees and expenses were to be heard post-judgment pursuant to Rule 54.

After the trial concluded, the parties submitted post-trial briefs. On September 23, 2008, this Court issued the September Memorandum Opinion, which was followed by a Judgment (Docket No. 163) (the "**Liability Judgment**").[10]

---

[10] Frazin appealed the Liability Judgment to the district court, the Fifth Circuit, and the U.S. Supreme Court, then back to the district court and Fifth Circuit. In the first round of appeals, the Fifth Circuit affirmed the take-nothing judgment with respect to Frazin's malpractice and fiduciary duty claims, upheld the Court's findings of fact regarding the DTPA claim, and, under *Stern v. Marshall*, 564 U.S. 462 (2011), reversed and remanded only with respect to the Court's entering final judgment on the DTPA claim. *See Frazin v. Haynes & Boone, LLP (In re Frazin)*, 732 F.3d 313 (5th Cir. 2013), *cert. denied* 134 S. Ct. 1770 (2014). In the second round of appeals, following remand and entry of a take-nothing judgment on Frazin's DTPA claim by the district court, the Fifth Circuit affirmed. *Frazin v. Haynes & Boone, LLP (In re Frazin)*, 598 F. App'x 335 (5th Cir. 2015).

**Memorandum Opinion and Order**                                                                                          **12**

### D. The Court's Rulings After Trial

In summary form, the Court made the following rulings in its September Memorandum Opinion with respect to each of Frazin's pled claims, which are reflected in the Liability Judgment.

### 1. The Negligence Claims

(1) Because Frazin offered no expert testimony to support his appellate negligence claims against Cortell, Haynes and Boone, and the G&N Defendants, those claims failed as a matter of law.

(2) Even assuming Frazin's expert testimony, which opined only as to Dodson's conduct, could be extrapolated and applied to Cortell and Haynes and Boone, the Court concluded on the merits that the H&B Defendants acted in accordance with the standard of care. Moreover, Frazin failed to establish that any claimed negligence proximately caused him any damages – *i.e.*, that he would have won on all of the other issues that Lamajak raised on appeal. Accordingly, Frazin's appellate negligence claim also failed for lack of causation.

(3) Frazin did not, prior to trial in the State Court Action, tell the G&N Defendants about the more specific oral promises he allegedly made to Cohen. On the merits, G&N's representation of Frazin did not fall below the applicable standard of care, and Frazin failed to prove that G&N did not provide the state court with all of the material, relevant, and credible evidence that could have been presented regarding the issue of contract formation. Accordingly, Frazin's trial negligence claim failed.

### 2. The DTPA Claims

(1) The Court agreed with the Defendants that many of Frazin's DTPA claims were re-stated negligence claims and were thus not cognizable under the DTPA. In addition, many of the DTPA claims were premised upon allegations relating to the quality of the Defendants' legal work, and

were therefore claims based on the rendering of a professional service and thus were exempt under DTPA Section 17.49(c) and did not fall within the exception to the exemption set forth in Section 17.49(c)(1).  Frazin's claims of a failure to disclose information in violation of Section 17.46(b)(24) (which is exception (2) to the Section 17.49(c) exemption for professional services) were so closely related to the quality of legal work provided as to be both re-stated negligence claims and within the professional services exemption, thus barring their assertion.  Moreover, Frazin could not simply re-characterize a claim that the Defendants misrepresented a fact to him as a failure to disclose in order to bring it within the "failure to disclose" exception to the professional services exemption.  In addition, the Court found on the merits that Cortell *was* heavily involved in all aspects of the appeal, and Frazin was told that Dodson would be working on the appeal with her.  Frazin failed to prove at trial that the roles and qualifications of Cortell and Dodson were not disclosed to him or that Haynes and Boone intended to induce Frazin into hiring the firm by virtue of their alleged nondisclosures.

(2) Frazin had not proven any conduct of the Defendants which was both unconscionable and which could not be characterized as "advice, judgment or opinion;" thus, the Defendants were protected by the DTPA's professional services exemption.

(3) Frazin's claim that the conduct alleged in the Complaint constituted breach of an express warranty under Section 17.50 was a re-stated negligence claim and fell within the DTPA's exemption for the rendition of professional services.

(4) Frazin's claim that the Defendants made express warranties about the quality of their work was not a re-stated negligence claim and could have formed the basis for breach of an express warranty under the DTPA and for an exception to the DTPA's exemption for professional services, but Frazin did not prove at trial that an express warranty was made or breached.

(5) Frazin's DTPA claims were further barred by Section 17.49(f) of the DTPA, which removes from the DTPA's ambit contracts that are "related to a transaction, a project, or a set of transactions related to the same project involving total consideration by the consumer of more than $100,000."

(6) On the merits, Frazin failed to prove any of his DTPA claims. The Court found that the Defendants did not (i) cause confusion or misunderstanding as to the source of the services, (ii) cause confusion or misunderstanding as to the affiliation, connection, or association between the service providers, (iii) represent that the services would have, and did have, characteristics and benefits which they did not have, (iv) represent that the services were of a particular standard or quality when they were of another, (v) represent that work or services had been performed when they had not, (vi) fail to disclose information concerning services, intending to induce Frazin into a transaction he would not have entered had the information been disclosed, (vii) withhold information from Frazin pertaining to the quality of the appellate work, the extent of the appellate work, or pertaining to the evidence in the reporter's record in the State Court Action, (viii) fail to disclose material information to Frazin, (ix) make any misrepresentation or omission of material fact in discussing with Frazin or his brother Shawn Frazin ("**Shawn**") whether to accept the Lamajak settlement offer, (x) make or breach any express or implied warranty, (xi) engage in unconscionable conduct, and/or (xii) knowingly or intentionally engage in any deceptive trade practices, commit a breach of warranty, or act unconscionably.

### 3. The Breach of Fiduciary Duty Claims

(1) Several of Frazin's breach of fiduciary duty claims were simply re-stated negligence claims and, as such, they were not legally cognizable as breach of fiduciary duty claims.

(2) However, Frazin's claims that the Defendants breached their fiduciary duties to him by: (i) requesting that he release claims against all of the Defendants in exchange for the previously-volunteered fee reduction, (ii) arguing that he had waived his claims against the Defendants by accepting a $92,000 fee reduction when in fact he had specifically refused to sign the release, (iii) failing to inform him that they would continue to make such a claim, (iv) representing to this Court that a waiver had occurred without revealing that Frazin had specifically rejected the release, (v) requesting an expedited fee hearing upon learning that Frazin was troubled by the quality of their work, (vi) failing to inform Frazin that a fee hearing would bar certain claims Frazin might wish to bring against the Defendants, (vii) attempting to include the Defendants' withdrawal from representation in a proposed order to be signed by Judge Hale, even though withdrawal had not been ordered by Judge Hale, (viii) refusing to allow Frazin to properly place his claims against the Defendants in issue, (ix) inducing Frazin to settle by misrepresenting the quality of the Defendants' work and the strength of the case on appeal, and (x) misrepresenting to Shawn what material was available for his review, so he could make an informed decision on whether to settle the case or appeal it further, were not re-stated negligence claims and were proper breach of fiduciary duty claims.

(3) As to the request for a release, the Court concluded that although the Defendants owed Frazin a fiduciary duty, their request for the release was outside the scope of their representation of him and thus was not a breach of their duty. The Court also found that Frazin failed to prove any damages.

(4) As to the Defendants' failure to disclose Frazin's refusal to sign a release in making their waiver argument, the Court found a breach of a fiduciary duty. However, the claim failed because

Frazin failed to prove any damages.

(5) As to the Defendants' request that the Court withhold certain of the settlement funds, the Court concluded that there was no breach of fiduciary duty. In addition, Frazin failed to prove any damages.

(6) As to the Defendants' failure to inform Frazin that the Defendants would continue to make their waiver argument, the Court found a breach of fiduciary duty. However, Frazin failed to prove any damages.

(7) As to the Defendants' (i) alleged request for an expedited fee hearing when they knew there was a dispute arising, and (ii) refusal to allow Frazin the right to place his Malpractice Claims in issue, the claims failed factually on the merits, because the Court found that the Defendants never committed those acts. As to the Defendants' alleged failure to inform Frazin about the consequences of the Fifth Circuit's decision in *In re Intelogic Trace*, 200 F.3d 382 (5th Cir. 2000) ("***Intelogic Trace***"), the Court found that Frazin failed to prove damages.

(8) As to Frazin's claim that the Defendants breached a fiduciary duty by trying to include their withdrawal from representation in a proposed order, the Court found that Frazin failed to prove that this act occurred. Further, the Court concluded that even if Frazin had proven that the act occurred, there would be no breach of fiduciary duty because at the time the proposed order was drafted, the Defendants no longer represented Frazin.

(9) As to Frazin's claims that the Defendants (i) induced him to settle with Lamajak by misrepresenting the quality of their work and the strength of the case on appeal, and (ii) misrepresented to Shawn what material was available for his review, the Court concluded that these claims failed because there was no credible evidence to support the existence of the acts.

**Memorandum Opinion and Order**                                                                          **17**

(10) As to Frazin's claim that the Defendants breached fiduciary duties to him by attempting to "lock up" settlement monies, the Court concluded that this claim failed because the acts giving rise to this claim all occurred after the Defendants' representation of Frazin terminated and because Frazin failed to prove any damages.

(11) Finally, with respect to the Defendants' breaches of fiduciary duty, the Court concluded that fee forfeiture was not appropriate, as the breaches were not "clear and serious."

### 4.     The Fee Applications

Frazin objected to the Defendants' fee applications because he believed that (1) he had valid claims against them as pled in the Complaint, and (2) if he failed to object, his claims against them would be barred by *res judicata* in accordance with the Fifth Circuit's decision in *Intelogic Trace*. After trial, the Court concluded that the Defendants were entitled to receive the amounts requested in their original fee applications, but not the $92,000 they had previously agreed to reduce. *See* Liability Judgment at 2-3.

After this Court entered the September Memorandum Opinion, it conducted a status conference with the parties on October 1, 2008, at which time an agreement was reached on the process and schedule for the disposition of the Rule 54 issues. In sum, the parties agreed that there would be no further evidentiary hearings with respect to the attorneys' fees requests unless one was specifically requested by Frazin following the filing of the Motions, and the additional requests for fees would instead be submitted to the Court by motion and supporting affidavits. The Defendants filed their Motions on November 3-4, 2008, Frazin filed his oppositions on November 17, 2008, and the last reply was filed November 24, 2008. The Motions are ripe for ruling.

With this background, the Court will now rule on Frazin's evidentiary objections before

turning to the merits of the Motions.

## III.   EVIDENTIARY RULINGS

Frazin's objections to Exhibits A, B, and C of the Phelan Declaration (the Haynes and Boone

time records) on hearsay grounds are overruled.  The Court is satisfied from a review of the Phelan

Declaration that the time records are "records of regularly conducted activity" within the meaning of

Federal Rule of Evidence 803(6).[11]  Phelan testifies in his declaration that the fee statements were

prepared by him or others in the firm who were involved in the case under his supervision and

control; they are accurate descriptions of the time spent on the case and the costs incurred; they were

prepared in the regular course of business of the firm as part of the firm's regularly conducted

business activity; it is the regular practice of the firm to create and to keep such fee statements; and

they were prepared at or near the time of the events or conditions recorded.  That testimony satisfies

Rule 803(6) and Exhibits A, B, and C are therefore admissible.  For the same reasons, the Court

overrules Frazin's objections to the fee statements of G&N.[12]

---

[11] Federal Rule of Evidence 803(6) provides that:

> a memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation, all as shown by the testimony of the custodian or other qualified witness, or by certification that complies with Rule 902(11), Rule 902(12), or a statute permitting certification, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.  The term "business" as used in this paragraph includes business . . . profession, occupation, and calling of every kind, whether or not conducted for profit.

[12] Frazin further objects to paragraphs 8, 9, and 10 of the Griffith Declaration, which are the factual allegations which would "prove up" the time records as business records under Rule 803, on the ground that "as a result of striking [the time records] paragraphs 8, 9 and 10 must also be stricken as they rely upon hearsay without an adequate foundation." Frazin's Resp. and Obj. To Defs' Mot. for Attorney Fees and Expenses (Docket No. 153) at 10.  Since the Court is not striking the time records, this objection is overruled.  To the extent that Frazin is arguing that paragraphs 8, 9 and 10 are themselves hearsay, that objection is likewise overruled.  This objection, if sustained, would do away with affidavits entirely in federal practice.  An affidavit containing material factual allegations which is submitted to the Court as evidence is, almost by definition, an out-of-court statement offered to prove the truth of the factual matter asserted.  It is true that affidavits must set forth facts that would be admissible as evidence at trial.  *Santos v. Murdock*, 243 F.3d 681 (2nd Cir. 2001); *Geiserman v. MacDonald*, 893 F.2d 787 (5th Cir. 1990).  Affidavits must be made on personal

Frazin's objections to the fee statements of Ashley and Burton are also overruled.  Although Frazin argues that the fee statements do "not even purport to set out the requirement for attorneys' fees in Texas or Federal Court," the H&B Defendants respond that there is no such requirement and, in any event, those fees are sought as *expenses*, not as attorneys' fees.  The Court agrees and overrules Frazin's objection.

Frazin objects to paragraph 25 of the Phelan Declaration on the ground that it is conclusory. Paragraph 25 asserts that "at different periods during this litigation, the primary attorneys who worked on this file were precluded from devoting significant attention to other cases or getting involved in other cases, particularly as the trial date approached."  The H&B Defendants assert that this fact is "self-evident" from the efforts required by this case.  The Court agrees.  The time records attached to the Phelan Declaration show, by the Court's count, that there were no less than 135 instances between December 3, 2007 and August 25, 2008 in which a Haynes and Boone attorney or paralegal expended eight or more hours to this case in a given day.[13]  The same can be said with respect to Frazin's objection to the Griffith Declaration, as the time records disclose approximately 100 instances during roughly the same timeframe in which attorneys or staff expended more than eight hours per day on this case.

Frazin objects to paragraph 34 of the Phelan Declaration on the ground that it is conclusory.

---

knowledge, show that the affiant is competent to testify to the matters stated therein, and set forth facts as would be admissible in evidence at trial.  *Santos,* 243 F.3d at 683; *Bortell v. Eli Lilly and Co.*, 406 F.Supp.2d 1 (D.D.C. 2005). When an affidavit complies with these requirements, a court may consider it, "even though a sworn declaration remains 'technically hearsay.'"  *Bortell*, 406 F.Supp.2d at 8.  Hearsay evidence produced in an affidavit may be considered if the out-of-court declarant could later present the evidence through direct testimony.  *J.F. Feeser, Inc. v. Serv-A-Portion, Inc.*, 909 F.2d 1524 (3rd Cir. 1990).  Moreover, Frazin waived an evidentiary hearing with respect to the attorneys' fee issues and consented to "trial by affidavit" and should not now be heard to complain that he wants the ability to cross-examine Griffith.

[13] The Court is not presently discussing the *reasonableness* of that time; the Court is merely noting that the Phelan Declaration and attached exhibits establish with detail that the attorneys who worked on this file were precluded from

**Memorandum Opinion and Order**                                                                                       **20**

Paragraph 34 states: "[t]he services the Firm rendered in this litigation were beneficial for the Haynes and Boone Defendants. The fees requested herein are in conformity with fees allowed in similar proceedings for similar services rendered and results obtained." The Court agrees with Frazin, to the extent that the Phelan Declaration concludes that the fees are in conformity with fees allowed in similar proceedings for similar services rendered and results obtained. The same can be said of the second sentence of paragraph 28 of the Griffith Declaration, which mirrors the second sentence of paragraph 34 of the Phelan Declaration. These statements contain no detailed facts and there is no evidence supporting them. And, the same is true with respect to the second sentence of paragraph 38 of the Phelan Declaration (stating that the firms' requested fees and expenses are within the range of reasonableness for comparable attorneys in the Northern District of Texas). Therefore, the second sentence of paragraph 34 of the Phelan Declaration and the second sentence of paragraph 38 of the Phelan Declaration are stricken, as is the second sentence of paragraph 28 of the Griffith Declaration. As to the first sentence of paragraph 34 of the Phelan Declaration and the first sentence of paragraph 28 of the Griffith Declaration, the Court, which presided over this case, is able to assess whether or not the services the firm rendered were of benefit to the Defendants. The Phelan and Griffith Declarations are crafted on personal knowledge, obtained as a partner of the respective law firm and are thus admissible.

As to the first sentence of paragraph 38 of the Phelan Declaration and the last sentence of paragraph 24 of the Griffith Declaration (both opining that the requested fees were both reasonable and necessary), the Court is the ultimate arbiter of whether the firms' work was "reasonable and

---

devoting significant attention to other cases.

necessary" and the two declarations add little to the analysis.[14] However, those statements are not conclusory, as the "facts" underlying them are set forth in the attached invoices, and the objection is therefore overruled.

Frazin objects to paragraph 35(b) of the Phelan Declaration and paragraphs 29 and 30 of the Griffith Declaration on the ground that they are conclusory and do not set forth why the percentage reductions are accurate in the event that segregation is required, and to Phelan's statement that the breach of fiduciary duty claims "permeated the entire case." The Court overrules this objection, as those paragraphs adequately set forth the bases for the Defendants' conclusions that the 33% and 10% reductions would account for the time spent on matters other than the DTPA claims and claims intertwined with those DTPA claims.

## IV.  LEGAL ANALYSIS

### A.  The Defendants Have Adequately Pled an Entitlement to Payment of the Fee-Defense Fees

As a preliminary matter, Frazin argues that the Defendants' pleadings are insufficient as a matter of law to support a counterclaim for attorneys' fees, because Federal Rule of Civil Procedure 8(a) ("**Rule 8**") requires a pleading to contain "a short and plain statement of the claim showing the pleader is entitled to relief." FED. R. CIV. P. 8(a)(1), as incorporated by FED. R. BANKR. P. 7008. Frazin argues that the Defendants did not plead in even the broadest terms those facts or allegations that would give rise to any right to attorneys' fees.

---

[14] As noted later, *see* pp. 56-57, *infra*, the testimony of an interested witness, such as a party, generally does nothing more than create a fact issue, and that rule has been applied to the testimony of an attorney respecting the reasonableness of his fees. Thus, the Phelan Declaration and the Griffith Declaration do not establish the reasonableness of the fees as a matter of law. Moreover, even where the evidence is uncontradicted, the trial judge can still find some of the claimed fees to be unreasonable.

Haynes and Boone's answer contains the following counterclaim (set forth in its entirety here):

> Haynes and Boone seeks its attorneys fees and costs incurred in connection with this proceeding pursuant to (a) section 330 of the Bankruptcy Code; (b) this Court's General Order No. 00-7, Standing Order Concerning Guidelines for Compensation and Expense Reimbursement of Professionals, For Early Disposition of Assets in Chapter 11 Cases, and for Motions and Orders Pertaining to Use of Cash Collateral and Post-Petition Financing, and Section I.F of the Guidelines for Compensation and Expense Reimbursement of Professionals attached thereto; (c) Section 17.50(c) of the DTPA; and (d) Chapter 38 of the Texas Civil Practice and Remedies Code.

Answer and Counterclaim of Haynes and Boone, LLP Parties to First Amended Compl. of Malpractice and to Determine Claim and Obj. to Claim (Docket No. 9) at 7. G&N's answer contains an identical counterclaim, and the following additional counterclaim:

> G&N would show the Court that the Debtor's objection to G&N's fee application is tantamount to the Debtor's breach of the contingency fee agreement between the Debtor and G&N. As such, the Debtor is liable to G&N for G&N's: a) direct damages (i.e., the expenses and fees sought under the fee application); and b) consequential damages (i.e., any amount in excess of $425,000.00 G&N will be required to pay LawFinance Group, Inc., as referenced in G&N's fee application, which is incorporated by reference). In doing so, G&N would further show that it is entitled to recover its attorneys' fees and interest as allowed by law. G&N would show that it has fully performed its obligations and all conditions precedent to G&N's right to recover have been performed or have occurred, with the exception of the Court's approval of G&N's fee, said approval being delayed as a direct result of the Debtor's objection.

Original Answer and Counterclaim of Griffith & Nixon, P.C. and Scott Griffith to Pltf's First Amended Compl. of Malpractice and to Determine Claim and Obj. to Claim (Docket No. 10) at 6-7.

First, the Court agrees with the Defendants that it is simply too late for Frazin to defeat their claims to attorneys' fees on the ground that he lacked notice of the bases for their claims. *Great Am. Indemnity Co. v. Brown*, 307 F.2d 306 (5th Cir. 1962) (rejecting argument on appeal that special damages were not properly pled under Fed. R. Civ. P. 9(g) where litigant had ample opportunity

before trial to file a motion for more definite statement or to use discovery procedures); FED. R. CIV. P. 12(e) (a motion for a more definite statement "must be made before filing a responsive pleading").[15]

Second, even if Frazin's complaints about the insufficiency of the pleadings were timely, the Court finds that the pleadings are sufficient under Rule 8's requirement of a short and plain statement of the claim showing that the pleader is entitled to relief. *Voest-Alpine Trading USA Corp. v. Bank of China*, 288 F.3d 262 (5th Cir. 2002) (permitting recovery of attorneys' fees under Section 38.001 where litigant "pled for recovery of 'attorney's fees payable under all applicable statutes'"); *Enserch Corp. v. Shand Morahan & Co.*, 952 F.2d 1485 (5th Cir. 1992) (permitting recovery of attorneys' fees under Section 38.001 where the statute was not cited in the complaint).[16] Here, the Defendants' counterclaims cited to Section 38.001, Section 330 of the Bankruptcy Code, and Section 17.50(c) of the DTPA. Further, the Defendants have argued for, and fully briefed, their alleged bases for entitlement to attorneys' fees in nearly every pleading they have filed. *See* Haynes and Boone Defendants' Reply in Supp. of Their Mot. for Attorneys' Fees and Expenses (Docket No. 155),

---

[15] Frazin filed answers to the counterclaims for attorneys' fees on March 1, 2008 (with respect to the H&B Defendants' counterclaim) and March 3, 2008 (with respect to the G&N Defendants' counterclaim).

[16] The *Enserch Corp.* court did mention that some Fifth Circuit authority has suggested that a party must plead entitlement to Section 38.001 fees with some particularity, citing *Ralston Oil & Gas Co. v. Gensco, Inc.*, 706 F.2d 685, 696 (5th Cir. 1983). The *Ralston Oil* court did make that statement in the context of holding that a litigant had waived a claim to attorneys' fees under Section 38.001's predecessor statute by failing to plead entitlement to such fees after a jury denied its claim for attorneys' fees under the DTPA. The *Ralston Oil* case is distinguishable, however, because here, the Defendants clearly pled entitlement to attorneys' fees under Section 38.001 in their initial counterclaim and in almost every other motion filed in this adversary proceeding, in their proposed findings of fact and conclusions of law, and in the parties' joint pre-trial order. Moreover, the sole case relied upon by the *Ralston Oil* court was *Chiles v. Becker*, 608 S.W.2d 816 (Tex. App.–Dallas 1980). In that case, the court of appeals held it error to award attorneys' fees under Section 38.001's statutory predecessor where the litigant had never sought such fees in its pleadings, but instead pled for attorneys' fees under a provision in the promissory note at issue which permitted the recovery of attorneys' fees upon a successful suit for collection of the note. Such is not the case here. Further, as the Fifth Circuit noted in the *Voest-Alpine Trading* case, its decision in *Enserch* (which post-dated *Ralston Oil*) held that all Section 38.001 requires is "that the defendant be put on notice that the plaintiff is seeking attorney's fees"). *Voest-Alpine Trading*, 288 F.3d at 268.

attachment 1. The issue was included in the Defendants' proposed findings of fact and conclusions of law submitted to the Court prior to trial, *see* Docket No. 92, and was included in the parties' Joint Order, *see* Docket No. 95 at 8, ¶ 10 (summarizing Defendants' claims for attorneys' fees); 40, ¶ 5 (listing contested issues of fact regarding Defendants' claims for attorneys' fees); 42, ¶ 6 (listing contested issues of law regarding Defendants' claims for attorneys' fees). Therefore, Frazin may not now complain that the Defendants failed to comply with the requirements for notice pleadings. *McGehee v. Certainteed Corp.*, 101 F.3d 1078, 1080 (5th Cir. 1996) ("a joint pre-trial order signed by both parties supersedes all pleadings and governs the issues and evidence to be presented at trial"). There is simply no basis upon which to conclude that Frazin did not know the nature of the claims being asserted against him by the Defendants.

### B. Entitlement to Fees Under Section 38.001 and the Rule 59 Motion

Among other means discussed further below, the Defendants seek recovery of their fee-defense fees under Section 38.001. That section provides, in relevant part, that:

> A person may recover reasonable attorney's fees from an individual or corporation, in addition to the amount of a valid claim and costs, if the claim is for:
>
> (1) rendered services;
> (2) performed labor; . . . or . . .
> (8) an oral or written contract.

TEX. CIV. PRAC. REM. CODE § 38.001 (Vernon 2008). To recover such fees,

> (1) the claimant must be represented by an attorney;
> (2) the claimant must present the claim to the opposing party or to a duly authorized agent of the opposing party; and
> (3) payment for the just amount owed must not have been tendered before the expiration of the 30th day after the claim is presented.

*Id.* § 38.002. A law firm representing itself in an action against a client to recover legal fees may

recover its attorneys' fees under Section 38.001. *Campbell, Athey & Zukowski v. Thomasson*, 863 F.2d 398 (5th Cir. 1989).

Frazin initially contends that the Defendants have not shown that (1) they had a contract with Frazin, (2) they presented to and demanded payment from Frazin, (3) thirty days had passed since presentment and no payment was made, and (4) they retained an attorney to pursue the claim. In addressing these arguments in its Original Fee-Defense Memorandum Opinion, the Court held that:

> Clearly, the Defendants have both proven that they had a contract with Frazin, and that they pursued the claim themselves. Application of elements (2) and (3) is awkward, at best, in a bankruptcy case, where there is a required procedure for the collection of fees which requires court approval before they may be paid. However, the Court believes that by analogy, the filing of a fee application is a demand for payment, and an objection to that fee application is a refusal to pay it, thus satisfying the requirements of Chapter 38.

Original Fee-Defense Memorandum Opinion at 45 n.29. The Original Fee-Defense Memorandum Opinion went on to conclude, among other things, that (1) the Defendants were entitled to recover their reasonable and necessary attorneys' fees incurred in defending their fee applications and in defending Frazin's tort and DTPA claims under Section 38.001, and (2) despite Frazin's allegations to the contrary, those attorneys' fees need not be segregated because overcoming all of Frazin's claims was necessary in order to recover on a claim for which attorneys' fees are recoverable under Section 38.001 (*i.e.,* a claim for services rendered, for labor performed, or on a contingency fee contract). The Court ultimately awarded the H&B Defendants $731,721.02 in reasonable and necessary fees, plus $20,039.88 for computerized legal research, incurred in defense of its fee application. Liability Judgment at 2-3. The amount of fees awarded to the G&N Defendants as reasonable and necessary was $521,059.05, plus $4,690.98 for computerized legal research. *Id.*

**Memorandum Opinion and Order**                                                                    **26**

On July 17, 2009, Frazin filed the Rule 59 Motion in which he alleged that the Court erred in finding that the Defendants had met the procedural requirements for an award of attorneys' fees under Section 38.001 because, contrary to Section 38.002, (1) the Defendants failed to properly present their fee claims, and (2) in any event, there could be no "just amount owing" until after the Court entered its Liability Judgment approving the fee applications, which did not occur until April 7, 2009.  Frazin also argues, for the first time in the Rule 59 Motion, that the Court lacked subject matter jurisdiction to enter a final order resolving the Defendants' fee-defense claims.

The Defendants each filed a response to the Rule 59 Motion and Frazin a reply, but no party requested that the Rule 59 Motion be set for hearing. Then, on July 13, 2015 following the conclusion of the appeals of the Liability Judgment, the Clerk's Office closed the adversary proceeding, despite the fact that the Rule 59 Motion remained pending.  No party brought the Rule 59 Motion to the Court's attention until over eight years after its filing when, on September 20, 2017, Frazin filed the Motion for Ruling.  In addition to the grounds previously alleged in the Rule 59 Motion, the Motion for Ruling alleges two new grounds for reconsideration, including that:  (1) the Court committed a manifest error of law in finding that no breach is required to recover fees under Section 38.001, and (2) federal preemption mandates that the Court not look to state law when awarding estate professionals' fees because not all states have a statute similar to Section 38.001; thus, looking to Section 38.001 to compensate estate professionals would lead to inconsistent results.

In their Joint Response to Plaintiff's Motion for Ruling on Rule 59 Motion (Docket No. 297) the Defendants state that, although they do not object to Frazin's request for a ruling on the Rule 59 Motion, they do object to Frazin's attempt to allege new grounds for reconsideration.  The

Defendants also argue that the Rule 59 Motion fails on the merits because the Court had previously considered and correctly denied each of the alleged grounds of error.

As an initial matter, the Court agrees with the Defendants that Frazin may not supplement the timely filed Rule 59 Motion with new arguments, as the time to do so passed over eight years ago. *See Conner v. Memphis Publishing Co.*, 2008 WL 11318323, *2 (W.D. Tenn. 2008) ("Plaintiff cannot amend his Rule 59(e) motion because the proposed amendment would be untimely.  The time for filing a timely motion under Rule 59(e) expired on May 1, 2008, ten (10) days after the entry of judgment, and, pursuant to Fed. R. Civ. P. 6(b)(2), that time cannot be extended."); *Demasse v. ITT Corp.*, 915 F.Supp. 1040, 1049 (D. Ariz. 1995) (denying as untimely under Rule 59(e) a motion to amend a prior Rule 59(e) motion by adding new grounds to those originally asserted), *affirmed in part and reserved in part on other grounds,* 185 F.3d 866 (9th Cir. 1999).  As explained by the Fifth Circuit:

> The time limit fixed by Rule 59(e) is jurisdictional: it may not be extended by waiver of the parties or by rule of the district court. The mover's failure to serve the motion within the ten day limit deprives the district court of jurisdiction to alter or reconsider its earlier judgment.

*Flores v. Procunier*, 745 F.2d 338, 339 (5th Cir. 1984).  Thus, the Court finds that the new grounds raised in the Motion for Ruling are untimely.  Moreover, even if the Court considers the Motion for Ruling as a motion under Federal Rule of Civil Procedure 60 as permitted in the Fifth Circuit,[17] Frazin cannot prove (nor has he alleged in the Motion for Ruling) any of the available grounds to grant such a motion after the passage of one year:  (1) fraud, misrepresentation, or misconduct by an

---

[17] *See Benson v. St. Joseph Regional Heath Center*, 575 F.3d 542, 547 (5th Cir. 2009) (finding that the court may treat an untimely Rule 59(e) motion to alter or amend the judgment as if it were a Rule 60(b) motion if the grounds asserted in support of the Rule 59(e) motion would also support Rule 60(b) relief.).

opposing party; (2) the judgment is void; (3) the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or (4) any other reason that justified relief. FED. R. CIV. P. 60(b), as incorporated by FED. R. BANK. P. 9024. Accordingly, the Court will not consider the new grounds for reconsideration first raised in the Motion for Ruling.

Turning to the timely raised grounds for reconsideration contained in the Rule 59 Motion, the Court will first consider Frazin's argument that the Defendants' requests for attorneys' fees under Section 38.001 are non-core claims over which this Court lacks subject matter jurisdiction. Although Frazin did not elaborate as to why the Section 38.001 claims are not core in his Rule 59 Motion, Frazin's Reply in Support of Motion for Ruling (Docket No. 298) argues that the claims could have no conceivable effect on the bankruptcy estate because all creditors have been paid in full and he received his discharge on April 28, 2005, making this a two-party, postpetition dispute between Frazin and his former attorneys. According to Frazin, the claims therefore fail the conceivable-effects test for related-to jurisdiction set forth in *Wood v. Wood (In re Wood),* 825 F.2d 90 (5th Cir. 1987).

To address Frazin's argument, a brief overview of bankruptcy court jurisdiction is required. The District Court for the Northern District of Texas has subject matter jurisdiction over bankruptcy cases and proceedings under 28 U.S.C. § 1334. Although bankruptcy courts do not have independent subject matter jurisdiction over bankruptcy cases and proceedings, 28 U.S.C. § 151 grants bankruptcy courts the power to exercise certain "authority conferred" upon the district courts by title 28. Under 28 U.S.C. § 157, the district courts may refer bankruptcy cases and proceedings to

the bankruptcy courts for either entry of a final judgment (core proceedings) or proposed findings and conclusions (noncore, related-to proceedings).  Thus, the bankruptcy court exercises authority over bankruptcy cases and adversary proceedings pursuant to the Order of Reference of Bankruptcy Cases and Proceedings Nunc Pro Tunc adopted in this district on August 3, 1984.

28 U.S.C. § 1334(b) lists three types of proceedings over which the District Court has jurisdiction – those "arising under title 11," those "arising in" a case under title 11, and those "related to" a case under title 11.  The classification of a proceeding under § 1334 depends on the connection of the proceeding to the bankruptcy case.  "Arising under" jurisdiction involves "causes of action created or determined by a statutory provision of title 11." *Faulkner v. Eagle View Capital Mgt. (In re The Heritage Org., L.L.C.)*, 454 B.R. 353, 360 (Bankr. N.D. Tex. 2011) (citing *Wood*, 825 F.2d at 96).  "Arising in" jurisdiction is "not based on a right expressly created by title 11, but is based on claims that have no existence outside of bankruptcy." *Faulkner*, 454 B.R. at 360 (citing *Wood*, 825 F.2d at 97). "Arising under" and "arising in" proceedings are "core" proceedings. 28 U.S.C. § 157(b); *Stern v. Marshall*, 564 U.S. 462, 476 (2011); *U.S. Brass Corp. v. Travelers Ins. Grp., Inc. (In re U.S. Brass Corp.)*, 301 F.3d 296, 304 (5th Cir. 2002).

In comparison, "related to" jurisdiction exists if "the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy." *Celotex Corp. v. Edwards*, 514 U.S. 300, 308 n.6 (1995) (quoting *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984)); see also *U.S. Brass*, 301 F.3d at 304.  "That state law may affect a proceeding's resolution cannot be the sole basis by which a proceeding is excluded from the otherwise large net cast by 'related to' jurisdiction." *Hartley v. Wells Fargo Bank, N.A. (In re Talsma)*, 509 B.R. 535, 542

(Bankr. N.D. Tex. 2014) (citing 28 U.S.C. § 157(b)(3)).  Proceedings that involve merely "related to" jurisdiction and do not otherwise arise under the Bankruptcy Code or arise in a bankruptcy case are "non-core."  *Faulkner*, 454 B.R. at 360.

With this precedent in mind, the Court returns to Frazin's argument that the Defendants' claims for attorneys' fees under Section 38.001 are non-core because they could have no conceivable effect on the bankruptcy estate.  The Court agrees with Frazin in that his Chapter 13 plan is fully consummated and he has received his discharge; thus, the outcome of this dispute will have no conceivable effect on the administration of the underlying bankruptcy case (which was previously closed) or the distribution to creditors (which has already occurred).  What Frazin overlooks, however, is that the dispute over the Defendants' fee-defense fees would not exist but for this Court authorizing Frazin, as a Chapter 13 debtor, to employ the Defendants as his special counsel under 11 U.S.C. § 327(e).  Moreover, pursuant to the terms of their respective employment orders, approval of the Defendants' fees and expenses were expressly subject to this Court's review for reasonableness. Although the Court appreciates that the Defendants incurred the fees at issue here after their representation of Frazin ended, those fees arose from the firms' Court-approved employment and their defense of the fees ultimately approved by this Court under 11 U.S.C. § 330.  Accordingly, the Court concludes that it has core (arising under) jurisdiction to consider the Defendants' respective requests for attorneys' fees under Section 38.001. Alternatively, if the claims are non-core, the Court concludes that the issue of the Defendants' entitlement to fee-defense fees was tried by consent due to Frazin's failure to raise this issue until after the Court had entered its Original Fee-Defense

Judgment. *See Wellness Int'l Network, Ltd. v. Sharif,* 135 S. Ct. 1932, 1948 (2015).[18]

Having established its jurisdiction over this matter, the Court will now turn to Frazin's argument that this Court committed a manifest error of law in previously holding that the Defendants were entitled to an award of fee-defense fees under Section 38.001.

To prevail on a motion to alter or amend judgment under Rule 59(e), the moving party must show (1) an intervening change in controlling law, (2) the availability of new evidence not previously available, or (3) a manifest error of law or fact. *See Schiller v. Physicians Res. Grp., Inc.*, 342 F.3d 563, 567 (5th Cir. 2003). A Rule 59(e) motion is "not the proper vehicle for rehashing evidence, legal theories, or arguments that could have been offered or raised before the entry of judgment." *Templet v. HydroChem Inc.*, 367 F.3d 473, 479 (5th Cir. 2004). Although courts have "considerable discretion" to grant or to deny a Rule 59(e) motion, Rule 59(e) relief is an extraordinary remedy that should be used sparingly. *Id.* at 479, 483. When considering a motion to alter or amend a judgment, "[t]he court must strike the proper balance between two competing imperatives: (1) finality, and (2) the need to render just decisions on the basis of all the facts." *Edward H. Bohlin Co. v. Banning Co.*, 6 F.3d 350, 355 (5th Cir. 1993). In the context of Rule 59(e),

> "manifest error" is generally understood as "[e]vident to the senses, especially to the sight, obvious to the understanding, evident to the mind, not obscure or hidden, and is synonymous with open, clear, visible, unmistakable, indubitable, indisputable, evident, and self-evident." *Bank One, Texas, N.A. v. F.D.I.C.*, 16 F.Supp.2d 698, 713 (N.D. Tex. 1998) (quoting Black's Law Dictionary 962 (6th ed.1990)). "Error" is generally understood as "[a] mistaken judgment or incorrect belief as to the existence or effect of matters of fact, or a false or mistaken conception or application of the law" and "[a]n act involving a departure from truth or accuracy; a mistake; an

---

[18] Further in the alternative, should a higher court find that this matter is a non-core proceeding and that the parties did not consent to this Court entering a judgment, this Memorandum Opinion and Order should be considered proposed findings of fact and conclusions of law for consideration by the district court.

inaccuracy; as, an error in calculation." *Id.* (quoting Black's Law Dictionary at 542–34 (6th ed.1990)). "Under these definitions, a 'manifest error' is an obvious mistake or departure from the truth." *Id.*

*In re Good*, 413 B.R. 552, 557 (Bankr. N.D. Tex. 2009); *see also Cooper v. Ocwen Loan Servicing, LLC*, 2016 WL 4440485, *2 (N.D. Tex. July 29, 2016), *adopted by* 2016 WL 4429248 (Aug. 22, 2016).

In the Rule 59 Motion, Frazin first asks that this Court reconsider its award of attorneys' fees under Section 38.001 based on an alleged lack of presentment, arguing that the filing of a fee application cannot be constructed as presentment under Section 38.002 because: (1) initiating a court proceeding is not presentment as a matter of law, and (2) absent court order, the Defendants' fees for services performed as special counsel were not due and owing and liability arising from the entry of a future court order cannot support presentment. Frazin echoes this argument in his reply brief filed July 29, 2009 (Docket No. 212), arguing that presentment can only occur after a payment is legally due.

The purpose of presentment is to allow the person against whom the claim is asserted an opportunity to pay a claim within thirty days after notice of the claim without incurring an obligation for attorneys' fees. *Jones v. Kelley*, 614 S.W.2d 95, 100 (Tex. 1981) (analyzing predecessor statute). The statute is to be liberally construed to promote its underlying purpose. TEX. CIV. PRAC. & REM. CODE § 38.005; *Jones*, 614 S.W.2d at 100. In furtherance of this liberal construction, courts have held a wide range of actions sufficient to satisfy the requirement of presentment. *See, e.g., Jones*, 614 S.W.2d at 100 (holding under predecessor statute that letter and telephone conversation informing sellers of buyers' intentions to go through with sale of property met requirements of

presentment); *Welch v. Gammag*e, 545 S.W.2d 223, 226 (Tex. App. – Austin 1976) (holding that response to request for admission admitting refusal to pay claim sufficient to establish presentment). No particular form of presentment is required; it may be informal, even oral. *Jones*, 614 S.W.2d at 100; *Harrison v. Gemdrill Int'l, Inc.*, 981 S.W.2d 714, 719 (Tex. App. – Houston [1st Dist.] 1998).

Frazin cites *Jim Howe Homes, Inc. v. Rogers*, 818 S.W.2d 901, 904 (Tex. App.—Austin 1991) for the proposition that "the filing of court proceedings does not establish presentment." Rule 59 Motion ¶ 1. *Jim Howe Homes*, however, stands for the limited proposition that, in the absence of *any* evidence of presentment, the filing of a lawsuit cannot, standing alone, suffice. *Id.* at 904. *Jim Howe Homes* is clearly distinguishable from the facts at hand. Here, neither Haynes and Boone nor G&N commenced an adversary proceeding seeking to collect their fees prior to giving Frazin an opportunity to pay. To the contrary, in compliance with the Bankruptcy Code, the Local Bankruptcy Rules, and their respective employment orders, the firms filed their fee applications with the Court, which contained accurate and detailed information regarding the services performed and the amounts due. Frazin was then given an opportunity to review the fee applications and lodge any formal or informal objection he had. Thus, in a bankruptcy context, the filing of a fee application with the Court is clearly different than filing a lawsuit prior to presentment. Here, the Court is satisfied that presentment occurred.

However, the Court finds Frazin's second argument more persuasive. Section 38.002 not only requires presentment, it requires that there be a failure to timely tender the "just amount owed." Therefore, it is not enough that Haynes and Boone and G&N presented their claims by filing fee applications, the presentment must be for an amount that is currently due and owing. In this regard

**Memorandum Opinion and Order**                                                                                    **34**

Frazin cites to the case of *Brainard v. Trinity Universal Ins. Co.*, 216 S.W.3d 818 (Tex. 2006).  In

*Brainard*, the Texas Supreme Court held that an under/uninsured motorist insurer is under no

contractual duty to pay attorneys' fees until the insured motorist obtains a judgment establishing the

liability and under/uninsured status of the other motorist.  *Id.* at 818.  Because the insured motorist in

*Brainard* never obtained such a judgment, the court held that there was no contractual duty to pay

and thus no just amount owed.  *Id.* at 818-19.  Frazin analogizes the holding in *Brainard* to the facts

at hand to argue that there could be no "just amount owed" until after the Court entered its Liability

Judgment on April 7, 2009.

> In response, the H&B Defendants argue that *Brainard* is distinguishable because:

> [U]nder the Haynes and Boone fee agreement, Frazin owed the Firm immediately
> upon settlement with Lamajak.  The amount of Haynes and Boone's fees was subject
> to Court approval for reasonableness, but that review did not prevent Haynes and
> Boone from having a just, due debt at that time under the contract. When Haynes and
> Boone filed its fee application and Frazin then filed suit against the Firm, the just-
> due-debt requirement was met and the policies underlying the statute were satisfied.

Response to Timothy Frazin's Motion Pursuant to Rule 59 Regarding Final Judgment on Fees and

Expenses (Docket No. 209) ¶ 7.  The G&N Defendants make a similar argument, alleging that

"[o]nce the Lamajak litigation reached a successful conclusion, and the settlement was funded, the

G&N Defendants had earned their fee under the fee agreement with Frazin, and the fees were due

and owing."  G&N Defendants' Response to Timothy Frazin's Motion Pursuant to Rule 59

Regarding Final Judgment on Fees and Expenses (Docket No. 210) at 6.  Under the Defendants'

arguments, their fees were due and owing upon settlement and subsequent Court approval amounted

to a ministerial act.

> The Court disagrees.  According to Section 330(a) of the Bankruptcy Code:

(a)(1) After notice to the parties in interest … and a hearing, and subject to sections 326, 328, and 329, the court may award … a professional person employed under section 327 or 1103—

(A) reasonable compensation for actual, necessary serviced rendered by the …attorney … employed by such person; and (B) reimbursement for actually, necessary expenses.

(2) The court may, on its own motion or on the motion of [listed parties] award compensation that is less than the amount of compensation that is requested.

11 U.S.C. § 330(a). Thus, although the Court is statutorily permitted to award fees, it is not required to do so. Moreover, Frazin's payment of fees to the Defendants in their capacity as special counsel was expressly subject to Court approval per the terms of G&N's and H&B's respective employment orders, which contain the following identical language –

ORDERED, that the Debtor is authorized to employ the Firm pursuant to 11 U.S.C. § 327(e); and it is further

ORDERED, that the Firm may *seek* fees under the proposed contingency arrangement as set forth in the Application, but the Court does not currently approve such arrangement. The Court reserves the right to review the reasonableness of the fees claimed under the proposed contingency arrangement in light of the standard set forth in 11 U.S.C. § 330(a). Thus, fees will be payable on application and after approval by this Court[.]

Order (02-2351, Docket No. 85) at 1 (emphasis in original); Litigation Proceeds Order (02-32351, Docket No. 100) at 2 (emphasis in original).

Thus, the contractual agreements between Frazin and his counsel are not dispositive of the issue. And, due to the express limitations on Haynes and Boone's and G&N's compensation, including subsequent Court review for reasonableness, the firms were not legally entitled to demand, nor could Frazin voluntarily pay, the fees and expenses until *after* entry of a Court order approving the fee applications. Therefore, even if the firms presented their fee claims to Frazin when they filed

their fee applications, there was no "just amount owed" until the Court entered its Liability Judgment on April 7, 2009.[19]

The Court is sympathetic to the Defendants' argument that this outcome is unfair. This case involves a discharged debtor and a solvent estate where all creditors have been paid in full with the Litigation Proceeds obtained through the firms' efforts. If fee-defense fees were awarded, they would not be paid by the estate at the expense of creditors, but by Frazin personally – the party who sought to retain the firms' services and who benefitted from the work performed. In an analogous situation outside of bankruptcy, there is little doubt that the firms would be entitled to payment of their fee-defense fees under Section 38.001, assuming that, after presentment and non-payment, the firms filed suit to collect their fees.

This case, however, did not arise outside of bankruptcy and the Court cannot overlook that distinction and the implications that it carries. Among these implications is the requirement that estate professionals receive court approval of their fees and expenses before such amounts are legally due and owing. Because of this, there is the distinct possibility that bankruptcy and non-bankruptcy professionals will stand on different footing when seeking fee-defense fees, but that inequality cannot change the outcome of this case in light of the applicable statutory requirements and the express terms of the firms' employment orders.

Accordingly, the Court finds and concludes that the Defendants are not entitled to the payment of their fee-defense fees under Section 38.001 due to their failure to comply with all of the requirements of Section 38.002.

---

[19] There is nothing in the record indicating that, after entry of the Liability Judgment, Frazin refused to timely tender the Court-awarded amounts.

### C.    Entitlement to Attorneys' Fees under "Federal Law"

The Defendants also claim a right to attorneys' fees under "federal law," citing the Standing Order, this Court's decision in *In re Teraforce Tech. Corp.* 347 B.R. 838 (Bankr. N.D. Tex. 2006), and Section 330 of the Bankruptcy Code.  The general rule in federal courts is that a prevailing party cannot recover attorney's fees absent specific statutory authority, a contractual right,[20] or certain special circumstances.  *See Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 255-60 (1975); *see also Galveston County Navigation Dist. No. 1 v. Hopson Towing Co., Inc.*, 92 F.3d 353, 356 (5th Cir. 1996) (noting that "[g]enerally, absent statute or enforceable contract, litigants must pay their own attorneys' fees"). The rule "is so venerable and ubiquitous in American courts it is known as the 'American Rule.'" *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 310-11 (Tex. 2006).  Texas also follows the American Rule.  *Id.*; *Crenshaw v. General Dynamics Corp.*, 940 F.2d 125 (5th Cir. 1991).  Therefore, whether federal or state law governs (the claims asserted here were largely state law claims), the American Rule applies.  Further, the American Rule applies to litigation in the bankruptcy courts.  *In re S.S.*, 271 B.R. 240, 245 (Bankr. D.N.J. 2002).

The Defendants first assert entitlement to attorneys' fees under the Standing Order, which provides, in relevant part, that "reasonable fees for preparation of a fee application and responding to objection thereto may be requested."  However, the Standing Order cannot and does not create a substantive right to attorneys' fees.  *Crenshaw v. General Dynamics Corp.*, 940 F.2d 125 (5th Cir. 1991) (local rule could not independently authorize the court to impose attorneys' fees because a local rule cannot create a substantive right);  *In re Standing Order with Reasons Regarding*

---

[20] There is no dispute that the original contracts between Frazin and the Defendants do not provide for the recovery of attorneys' fees in the event that collection or enforcement activity is required.

**Memorandum Opinion and Order**                                                                                    **38**

*Objections to the Discharge Under 11 U.S.C. § 727 and Purported Settlement of Actions*, 272 B.R. 917 (W.D. La. 2001) (standing order which prevented parties from settling a dischargeability action when it is combined with a Section 727 complaint modified existing substantive rights and was improper); *In re Cena's Fine Furniture, Inc.*, 109 B.R. 575 (E.D.N.Y. 1990) (a standing order or "fee application checklist" cannot alter local rules, federal law, or the more general Federal Rules of Bankruptcy Procedure); *see also Tiedel v. Northwestern Michigan College*, 865 F.2d 88, 94 (6th Cir. 1988) ("a district court is not empowered to enact a local rule giving itself the authority to award attorneys' fees"); *cf. In re Binion*, 2006 WL 2668464 (Bankr. N.D. Ohio Sept. 15, 2006) (unpublished decision) (standing order was permissible under Rules Enabling Act where it did not conflict with Federal Rules of Bankruptcy Procedure or modify substantive rights).

The Defendants also assert entitlement to attorneys' fees under this Court's decision in *Teraforce*. However, a judicial decision by a bankruptcy judge cannot create a substantive right to attorneys' fees. The Defendants' argument, however, is most likely a shorthand method of asserting an entitlement to attorneys' fees under Section 330 of the Bankruptcy Code, which was the statute before the Court in *Teraforce*. Section 330, which governs attorneys' fees for estate professionals in a bankruptcy case, does not explicitly provide for the recovery of attorneys' fees incurred in *defending* a fee application. Section 330(a)(6) of the Bankruptcy Code states that "[a]ny compensation awarded for the *preparation of* a fee application shall be based on the level and skill reasonably required to prepare the application." 11 U.S.C. § 330(a)(6) (emphasis added).

Some courts have held that attorneys in a bankruptcy case are entitled to fees not only incurred in preparing the fee application, but also for defense of that fee application. *See, e.g., Smith*

*v. Edwards & Hale, Ltd. (In re Smith)*, 317 F.3d 918, 928 (9th Cir. 2002) (allowing recovery of fees incurred in defending fee application where fee applicant made showing that services satisfied requirements of Section 330(a)(4)(A) and that circumstances of case exemplified situation where costs incurred defending fee application were necessary pursuant to Section 330(a)(1)); *In re Chavez,* 157 B.R. 30 (D. Colo.) *aff'd*, 13 F.3d 404 (10th Cir. 1993); *see also In re Wind N' Wave*, 509 F.3d 938 (9th Cir. 2007) (permitting an award of fees to counsel for petitioning creditors for litigating over the award where the *Smith* test was met).   Those courts which have permitted recovery of attorneys' fees incurred in defending a fee application have ventured beyond the text of Section 330 and into the land occupied by its legislative history and the purpose underlying its enactment – *i.e.*, that professionals in a bankruptcy case should earn the same income as their non-bankruptcy counterparts, and that a bankruptcy professional's fee award would be unfairly diluted if he was not permitted to recover fees incurred in defending the fee application.   *See, e.g., In re Worldwide Direct, Inc.*, 334 B.R. 108 (D. Del. 2005).

Other courts have held that because Section 330 permits "reasonable compensation for actual, necessary services" on behalf of the estate, no recovery of fees incurred in defending a fee application should be allowed because those services do not benefit the estate.[21] *Grant v. George Schumann Tire & Battery Co.*, 908 F.2d 874, 882-83 (11th Cir. 1990) (denying attorney's request for fees incurred in defending against debtor's appeal of original fee award on grounds that fees were

---

[21] Frazin cites to the Fifth Circuit's decision in *Andrews & Kurth L.L.P. v. Family Snacks, Inc. (In re Pro-Snax Distributors, Inc.)*, 157 F.3d 414 (5th Cir. 1998), for the proposition that the Defendants are not entitled to attorneys' fees in defending their fee application because such services did not benefit the estate.  The Fifth Circuit, however, has since overruled the *Pro-Snax* decision.  *See Barron & Newberger, P.C. v. Texas Skyline, Ltd. (In re Woerner)*, 783 F.3d 266 (5th Cir. 2015) (apply a prospective, "reasonable at the time" standard to the review of professional fee applications under Section 330).

**Memorandum Opinion and Order**                                                                    **40**

not reasonable nor necessary to administration of the bankruptcy estate); *Boldt v. Crake (In re Riverside-Linden Investment Co.)*, 945 F.2d 320, 323 (9th Cir. 1991) (district court's denial of fees incurred in defense of fee application was not an abuse of discretion because there is no statutory requirement to oppose objections to a fee application and thus the fees are not "necessary" within the meaning of Section 330); *In re DN Assoc.*, 165 B.R. 344 (Bankr. D. Me. 1994); *In re Courson*, 138 B.R. 928 (Bankr. N.D. Iowa 1992).

This split in authority was recently resolved by *Baker Botts, L.L.P. v. ASARCO LLC*, 135 S. Ct. 2158 (2015), where the Supreme Court analyzed the issue of whether Section 330 permits an award of attorneys' fees incurred by an estate professional in defending its fee application. Answering in the negative, the Supreme Court held that:

> As we long ago observed, "The general practice of the United States is in opposition" to forcing one side to pay the other's attorney's fees, and "even if that practice [is] not strictly correct in principle, it is entitled to the respect of the court, till it is changed, or modified, by statute." *Arcambel*, 3 Dall., at 306 (emphasis deleted). We follow that approach today. Because § 330(a)(1) does not explicitly override the American Rule with respect to fee-defense litigation, it does not permit bankruptcy courts to award compensation for such litigation. We therefore affirm the judgment of the Court of Appeals.

*Id.* at 2169.

After the November 3, 2017 hearing here, the Court requested that the parties submit post-hearing briefs regarding the application of *ASARCO*.[22] In their post-hearing brief, the Defendants

---

[22] The briefs were filed November 13, 2017 (Docket Nos. 299 and 300). When filing his post-hearing brief, Frazin also filed a Request for Judicial Notice (Docket No. 301), requesting that this Court take judicial notice of (1) the Fifth Circuit's ruling in *In re Frazin*, 732 F.3d 313 (5th Cir. 2013), and (2) the Defendants' prior briefing before the Fifth Circuit. The Defendants objected (Docket No. 302), arguing that the request goes well beyond judicial notice and instead relies on portions of the documents, out of context, to improperly request the application of judicial estoppel. The Court will take judicial notice of the pleadings, however, they did not affect the Court's findings and conclusions set forth in this Memorandum Opinion and Order.

argue that (1) ASARCO's ruling is narrow and only held that fee-defense fees may not be awarded under Section 330, it did not address Section 38.001 or rule that fee-shifting statutes cannot apply to estate professionals, (2) the fee-defense fees were incurred *after* the firms' representation of Frazin had ended, so that Section 330 does not apply, and (3) policy considerations support compensating bankruptcy professionals in the same manner as their non-bankruptcy peers. Notably, however, the Defendants did not argue that a scenario exists where fees incurred by estate professionals in defending their fee applications are compensable under Section 330 in light of *ASARCO*. Accordingly, the Court concludes, consistent with the Supreme Court's decision in *ASARCO,* that Section 330 cannot serve as the statutory authority for a departure from the American Rule.[23]

However, the American Rule itself has several historical and notable exceptions, the continuing vitality of which have been reaffirmed in recent years. *ASARCO*, 135 S. Ct. at 2168 n.4; *Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991); *Spring v. Beverly Enters. Mississippi, Inc.*, 2000 WL 178163, at *5 (5th Cir. Jan. 25, 2000) (unpublished decision). One of those exceptions is that a court may assess attorneys' fees as a sanction when a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons. The threshold for invoking this inherent power is high, *Spring*, 2000 WL 178163 at *5, and the Court should invoke it only when it finds that "a fraud has been practiced upon it or that the very temple of justice has been defiled." *Boland Marine & Mfg. Co. v. Rihner*, 41 F.3d 997, 1005 (5th Cir. 1995) (quoting *Chambers*, 501 U.S. at 46). Once invoked, it "must be exercised with restraint and discretion." *Spring*, 2000 WL 178163 at *5.

Moreover, while some courts have held that the underlying conduct may be considered in

---

[23] Nor does the Court accept the Defendants' other arguments.

determining whether the losing party has acted in bad faith, the Fifth Circuit "has consistently held that the 'bad faith' actions must occur in the course of the litigation." *Rogers v. Airline Pilots Ass'n, Intern.*, 988 F.2d 607, 615 (5th Cir. 1993). The bad-faith exception "does not address conduct underlying the substance of the case; rather, it refers to the conduct of the party and the party's counsel during the litigation of the case." *Flanagan v. Havertys Furniture Co.*, 484 F.Supp.2d 580, 581 (W.D. Tex. 2006). The Fifth Circuit has described the conduct required to invoke the exception to the American Rule as conduct that is "callous and recalcitrant, arbitrary and capricious, or willful, callous and persistent." *Galveston County Nav. Dist. No. 1*, 92 F.3d at 358 (quoting *Morales v. Garijak, Inc.*, 829 F.2d 1355, 1358 (5th Cir. 1987) and applying the exception to the American Rule in admiralty cases). "Not acting 'in an equitable manner' does not support an award of attorneys' fees." *Galveston County Nav. Dist. No. 1*, 92 F.3d at 359. A determination *after trial* that a witness was not credible and thus a claim was "unsupported factually," "contradictory factually," and "utterly incredible" does not support a finding that the claim was "so egregious and in bad faith as to authorize an award of attorneys' fee." *Id.*

Attorneys' fees will not be awarded under the bad faith exception even where a litigant's belief in the merits of his claim is unreasonable. *Butler v. U.S. Dept. of Agriculture*, 826 F.2d 409, 414 (5th Cir. 1987). The standards for a finding of bad faith are "stringent," *U.S. for Use and Ben. of Howell Crane Serv. v. U.S. Fidelity & Guar. Co.*, 861 F.2d 110, 113 (5th Cir. 1988); *Batson v. Neal Spelce Assoc. Inc.*, 805 F.2d 546, 550 (5th Cir. 986), and "defeat on the merits does not, by itself, justify an award of attorney's fees under the bad faith exception." *U.S. for Use and Ben. of Howell Crane Serv.*, 861 F.2d at 113; *see also In re Owners of Harvey Oil Center*, 788 F.2d 275, 279 (5th Cir. 1986) ("The principle of compensation based on vexatiousness applies whenever the

**Memorandum Opinion and Order** 43

federal courts are made the tool of improper conduct, regardless whether state or federal law forms the rule of decision. Either the lack of legal foundation or the abusive nature of litigation tactics employed by a party could support an award of attorneys' fees . . . [d]efeat at trial, however, is not alone sufficient to justify a fee award to an opponent under the equitable rule"). Attorneys' fees will not be awarded even where a claim lacks merit, if there is no evidence of bad faith, improper motive, or reckless disregard of the duty owed to the court. *Flanagan,* 484 F.Supp.2d at 581. Nor should a party be penalized for maintaining an aggressive litigation posture. *Batson*, 805 F.2d at 550.

This Court in *Teraforce* did not expressly apply these standards when it denied fees for defense of the fee application, but it implicitly applied them by finding that the objections to the fee application were filed in good faith. Similarly, the *St. Rita's* court, upon which this Court relied in *Teraforce*, denied recovery of fees where the objections were interposed in good faith. The *St. Rita's* court further stated that "the court can discern no basis for sanctions, such as might be warranted under Bankruptcy Rule 9011. Nothing in this decision should be viewed as precluding an award of legal fees in situations where sanctions are appropriate." *St. Rita's*, 260 B.R. at 652.

When the standards set forth for invoking the exception to the American Rule are applied here, the Court does not believe that Frazin's conduct in this litigation warrants an exception to the American Rule. As to the negligence claims, Frazin simply lost them for failure of proof. Defeat at trial is not, however, alone sufficient to justify an award of attorneys' fees. *In re Owners of Harvey Oil Center*, 788 F.2d at 279. As to the DTPA claims, some of them were not cognizable under the DTPA, but were cognizable under a different theory – *i.e*., as negligence claims. Merely mislabeling claims is an insufficient basis upon which to conclude that they were filed in bad faith. And, once again, the fact that Frazin did not prevail on those claims is an insufficient basis upon which to find

**Memorandum Opinion and Order**                                                                     **44**

that he or his counsel engaged in bad faith, oppressive, or wanton conduct during the course of the litigation. *Flanagan*, 484 F.Supp.2d at 581 (the bad-faith exception does not address conduct underlying the substance of the case; it refers to conduct during the litigation of the case). As to other of the DTPA claims, they were barred by *defenses*, which does not mean that they were brought in bad faith, vexatiously, wantonly, or for oppressive reasons. It simply means that legitimate defenses applied to bar the claims.[24] As to the breach of fiduciary claims, while several of them failed as a matter of proof and because the Court found that the attorney-client relationship terminated on December 27, 2007 (which was itself a hotly contested fact), the Court did, in fact, find several breaches of fiduciary duty. Frazin did not ultimately win those claims, however, because the breaches were not so "clear and serious" as to warrant fee forfeiture and Frazin failed to prove damages.

The H&B Defendants argue that "[a]t best, Frazin filed his objections and this malpractice case based solely on the unfounded assumption that a reversal at the court of appeals necessarily means that either the appellate or trial team committed malpractice. At worst, Frazin filed this case to try to extort from his counsel the amount of damages he lost on appeal, hoping that a malpractice suit would force his lawyers to pay off the amount of the judgment he thought was already his." H&B Motion at 6. They then argue, essentially, that if Frazin had performed a "meaningful review" of the trial and appellate record in the State Court Action and the Haynes and Boone fee application, he could not in good faith have made some of his claims; that if Frazin had performed a "cursory

---

[24] The Court notes that application of the defenses set forth in Section 17.49(f) and (g) of the DTPA was a close call – there was no case law directly on point discussing the applicability of those statutory defenses to a contingency fee contract like the one at issue here. Where the law is unsettled, an action will not be found to be groundless. *Baroid Equip., Inc. v. Odeco Drilling, Inc.*, 184 S.W.3d 1 (Tex. App. – Houston [1st Dist.] 2005).

review" of the fee application, he would have seen that Cortell billed nearly 300 hours on the appeal, such that his claim that she misrepresented that she would be heavily involved in the appeal would fail; that a "simple review" of the record would have revealed that Haynes and Boone made all the proper performance arguments; and that Frazin stubbornly pursued numerous claims despite his knowledge that his claims were groundless. *Id.* at 6-7.

Most of the items the H&B Defendants point to, however, are claims that were found, *after discovery and trial*, not to have merit. For example, both the H&B Defendants and the G&N Defendants point out that this Court found Frazin's testimony incredible on several points. *See, e.g.*, H&B Motion at 9-10; G&N Motion at 6-7. However, a determination after trial that a claim lacked factual support or was incredible has not been sufficient to justify an award of attorneys' fees under the bad-faith exception to the American Rule. *Galveston County Nav. Dist. No. 1*, 92 F.3d at 359. The H&B Defendants and the G&N Defendants are both essentially arguing a "reasonableness" or "groundless" standard. However, as the Supreme Court has made clear, the bad-faith exception to the American Rule requires more:

> These other mechanisms [11 U.S.C. § 1927 and the Federal Rules of Civil Procedure], taken alone or together, are not substitutes for the inherent power, for that power is both broader and narrower than other means of imposing sanctions. First, whereas each of the other mechanisms reaches only certain individuals and conduct, the inherent power extends to a full range of litigation abuses. At the very least, the inherent power must continue to exist to fill in the interstices . . . . Second, while the narrow exceptions to the American Rule effectively limit a court's inherent power to impose attorneys' fees as a sanction to cases in which a litigant has engaged in bad-faith conduct or willful disobedience of a court's orders, many of the other mechanisms permit a court to impose attorney's fees as a sanction for conduct which merely fails to meet a reasonableness standard.

*Chambers v. NASCO, Inc.*, 501 U.S. 32, 50 (1991).

The *Chambers* case itself aptly illustrates the type of conduct to which the bad-faith exception to the American Rule is addressed. In that case, Chambers was the sole shareholder of Calcasius Television and Radio, Inc. ("**CTR**"), which operated a TV station in Louisiana. Chambers, in his individual capacity and on behalf of CTR, contracted to sell the station's facilities and broadcast license to NASCO, Inc. ("**NASCO**"). Chambers later changed his mind, and NASCO informed Chambers that it would file an action seeking specific performance in federal district court. In response, Chambers and his counsel took great pains to place the property at issue beyond the reach of the district court. They created a trust, naming Chambers' sister as trustee and his children as beneficiaries. They directed the President of CTR (who later became Chambers' wife) to execute a warranty deed conveying the property to the trust, and then recorded the deeds, notwithstanding the facts that (1) the trustee as purchaser had not signed the deeds, (2) none of the consideration for the transfer had been paid, and (3) CTR retained possession of the property. When the district court action was filed, the district judge, with NASCO's counsel present, called Chambers' counsel, who later admitted that he intentionally withheld from the district court, in response to its inquiries, information about the transfer of the property to the trust and the recording of the deeds the day before. The following week, the district court granted a preliminary injunction against Chambers and CTR and entered a temporary restraining order enjoining a transfer of the property, and, upon learning of the creation of the trust and the transfer to it, issued a warning to Chambers and his counsel that their conduct had been unethical. In defiance of the injunction, Chambers refused to allow NASCO to inspect CTR's corporate records. He then filed "a series of meritless motions and pleadings and delaying actions." *Chambers*, 501 U.S. at 39. On the eve of trial, Chambers

stipulated that the original purchase agreement was enforceable and that he had breached the same, but between the date of trial and entry of judgment, Chambers sought to render it meaningless by seeking permission from the FCC to build a new tower and relocate his facilities to that site, which was not governed by the purchase agreement. Chambers also directed CTR to file formal opposition to NASCO's application for FCC approval of the license transfer, in contravention of the district court's injunction and its judgment on the merits. When Chambers refused to close the sale, NASCO set a hearing to determine whether certain equipment was included in the sale. Before the court was able to conclude the hearing and rule upon the request, Chambers, without notice to the district court or NASCO, removed all of the equipment at issue. Clearly, Frazin's conduct in this case did not rise to this level.

In summary, the Court now clarifies its *Teraforce* decision and holds that fees incurred in defending a fee application may be awarded under circumstances that satisfy the bad-faith exception to the American Rule. To be clear, when such fees are awarded, the award is pursuant to the Court's inherent power and the bad-faith exception to the American Rule, and not pursuant to Section 330 of the Bankruptcy Code. [25]

This approach satisfies many of the concerns raised about a bankruptcy court's award of fees

---

[25] The Court expresses no view on whether Rule 9011, when properly invoked, can also serve as a source of authority for an award of attorneys' fees incurred in defending a fee application. First, the Defendants' counterclaims do not assert entitlement to attorneys' fees under Rule 9011. Rather, the Defendants obliquely mention Rule 9011 in their briefs, asserting that legal fees are recoverable where sanctions are appropriate under Rule 9011 and citing *St. Rita's. See, e.g.*, H&B Motion at 4. However, Rule 9011 provides, as is relevant here, that a request for sanctions "may not be filed or presented to the court unless, within 21 days after service of the motion, the challenged . . . claim . . . is not withdrawn or appropriately corrected . . . ." There is no evidence that Defendants complied with this "safe harbor" procedure. *See In re Wilson*, 2007 WL 1040565 (Bankr. S.D. Tex. Mar. 30, 2007) (unpublished decision) (declining to award sanctions under Rule 9011 where there has no proof of compliance with the safe harbor provisions). In addition, Rule 9011(c)(2)(A) provides that monetary sanctions may not be awarded against a represented party (such as Frazin) for a violation of subdivision (b)(2) – which in turn requires that claims be warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law. To the extent that

incurred in defense of a fee application. For example, the Court notes that its *Teraforce* decision was criticized in In re *Engman*, 389 B.R. 36 (Bankr. W.D. Mich. 2008). First, the *Engman* court was concerned that identifying the prevailing party can be tricky, where an application is seeking reimbursement for a broad array of tasks and the objections are many. That is not an issue in this case, where the objections to the Defendants' fee applications were premised entirely upon the Defendants' alleged tortious actions, and the Defendants clearly prevailed in full. The objections to the fee applications in this case were not on "traditional" Section 330 grounds (lumping, duplication, etc.), some of which were sustained and some not, making identification of the prevailing party difficult.

Second, the *Engman* court was concerned that there is no specific statutory authority to award fees for defending a fee application or for recognizing exceptions, and thus the courts following a middle ground approach are filling a legislative void with their own notions of sound policy. *Engman*, 389 B.R. at 47. However, the American Rule "has not served . . . as an absolute bar to the shifting of attorneys' fees even in the absence of statute or contract." F.*D. Rich Co. v. U.S. for Use of Indus. Lumber Co.*, 417 U.S. 116, 129 (1974). The American Rule itself has, as noted previously, several long-standing exceptions, one of which is the bad-faith exception, which can fairly be raised in connection with fees incurred in defending a fee application in a bankruptcy case. Thus, the Court is not, in awarding fees incurred in defending a fee application, relying upon either statutory authority or notions of sound policy to award such fees under Section 330. Rather, the Court is relying upon a judicially recognized exception to the American Rule itself.

---

the Defendants are contending that Frazin violated subdivision (b)(2), monetary sanctions would not be appropriate.

Third, the *Engman* court was concerned that bankruptcy professionals should not be treated any differently than other persons with administrative claims against the estate, whose claims are also subject to objection. This Court agrees. However, the Court's ruling today would apply with equal force to any administrative claimant, professional or not, who was forced to incur attorneys' fees as a result of an objection which was filed in bad faith, vexatiously, wantonly, or for oppressive reasons. The Court's current ruling does not preclude non-professional administrative claimants from seeking a recovery of fees.

In summary, the Court concludes that the Defendants are not entitled to a recovery of their attorneys' fees under federal law, as Section 330 of the Bankruptcy Code is not explicit statutory authority for a departure from the American Rule and the bad-faith exception to the American Rule is not appropriately invoked in this case.

### D. Entitlement to Fees under the DPTA

Section 17.50(c) of the DTPA provides that "[o]n a finding by the court that an action under this section was groundless in fact or law or brought in bad faith, or brought for the purpose of harassment, the court shall award to the defendant reasonable and necessary attorneys' fees and court costs." TEX. BUS. & COMM. CODE § 17.50(c) (Vernon 2002 & Supp. 2008). The burden of proof rests with the Defendants on this issue. *Dairyland County Mut. Ins. Co. of Texas v. Childress*, 650 S.W.2d 770 (Tex. 1983); *Gonzalez v. American Title Co. of Houston*, 104 S.W.3d 588 (Tex. App. – Houston [1st Dist.] 2003). The purpose of an award of costs and fees is to "deter similar conduct in the future and to compensate the aggrieved party by reimbursing the costs incurred in responding to baseless pleadings." *Klein v. Dooley,* 949 S.W.2d 307, 308 (Tex. 1997).

Whether an action is groundless or brought in bad faith or for the purpose of harassment is a question of law. *Black v. Dallas County Child Welfare Unit*, 835 S.W.2d 626 (Tex. 1992).

The term "groundless" under the DTPA means a claim that has no basis in law or fact, and is not warranted by any good faith argument for extension, modification, or reversal of existing law. *Donwerth v. Preston II Chrysler-Dodge, Inc.*, 775 S.W.2d 634 (Tex. 1989). The term "groundless" does *not* mean no evidence. *Id.* "To equate groundlessness with no evidence would preclude the award of attorneys' fees in obviously fraudulent or malicious actions when some evidence was presented, yet discourage legitimately wronged consumers from seeking the protections afforded by the Act for fear of failure in court." *Id.* at 637. Rather, even evidence that is legally inadmissible or subject to other defects may be considered by a court in determining whether an arguable basis existed for the suit, provided there is some good faith basis for the belief that the tendered evidence might be admissible or that it could reasonably lead to the discovery of admissible evidence. *Id.*

The standard for determining whether an action is groundless is "whether the totality of the tendered evidence demonstrates an arguable basis in fact and law for the consumer's claim." *Kang v. Keen*, 2005 WL 1704840 (Tex. App. – Houston [1st Dist.] July 21, 2005). A case is not groundless "simply because a plaintiff failed to convince a jury of the truth of her allegations." *Rutherford v. Riatta Cadillac Co.*, 809 S.W. 2d 535, 538 (Tex. App. – San Antonio 1991). Moreover, where the law relative to the applicability of the DTPA is unsettled, an action will not be found to be groundless. *Baroid Equip., Inc. v. Odeco Drilling, Inc.*, 184 S.W.3d 1 (Tex. App. – Houston [1st Dist.] 2005).

The requirement that a suit be brought for purposes of harassment "must mean it was

brought for the *sole* purpose of harassment." *Donwerth*, 775 S.W.2d at 638.  To find that a lawsuit was brought in bad faith, a defendant must show that the suit was motivated by a malicious or discriminatory purpose. *Baroid Equip., Inc.*, 184 S.W.3d at 20.  "Bad faith" is the conscious doing of a wrong for dishonest, discriminatory, or malicious purposes. *Medical Specialist Group, P.A. v. Radiology Assoc. LLP*, 171 S.W.3d 727 (Tex. App. – Corpus Christi 2005).  Bad faith does not exist simply because a party exercises bad judgment or is negligent. *Id*.

Here, the Defendants have not shown that Frazin's suit was motivated by a malicious or discriminatory purpose, or that it was brought for the sole purpose of harassment.  At most, the Defendants have shown that portions of the Complaint may have been groundless.  However, having successfully argued with respect to most of Frazin's allegations that the DTPA does not apply because the claims were re-stated negligence claims, it would seem odd to then award fees under the very statute that the Defendants successfully argued does not govern.  Merely mis-labeling claims should not subject Frazin to the payment of attorneys' fees when those fees would not otherwise be recoverable.

Specifically, in its September Memorandum Opinion, the Court found that many of Frazin's DTPA claims were re-stated negligence claims and were thus not cognizable under the DTPA or, alternatively, were claims based upon the rendition of a professional service and thus exempt under DTPA Section 17.49(c) and did not fall within any of the exceptions to the exemption for professional services.  As an alternative basis for denial of Frazin's claims, the Court found that, on the merits, Frazin failed to prove his DTPA claims by a preponderance of the evidence.

The only factual allegation in the Complaint that the Court found could support a DTPA

claim was Frazin's allegation that the Defendants made and breached express warranties about the quality of their work. September Memorandum Opinion at 81-82. But, Frazin did not prove at trial that an express warranty was made or breached. *Id.* Failure to prove a case at trial, however, is not enough – the Defendants must show that the action was *groundless*.

The Defendants argue, of course, that Frazin's DTPA claim was groundless. To determine whether a pleading is groundless, "it must be determined objectively whether the party and counsel made a reasonable inquiry into the legal and factual basis of the claim at the time the suit was filed." *Ubinas-Brache v. Dallas County Med. Soc.*, 261 S.W.3d 800, 804 (Tex. App. – Dallas 2008). Here, the Defendants point to the following facts as evidence of "groundlessness" at the time the Complaint was filed:

(1) "Days after October 26, when Frazin claims that he had not yet formulated any malpractice claim, Frazin asked that Haynes and Boone forfeit its entire fee." H&B Motion at 6.

(2) On December 18, Shawn told Griffith that Frazin would not object to G&N's fee application (because Shawn was satisfied with G&N's trial work) if the firm would amend its fee application to delete references to its work in connection with the appeal.

(3) On December 20 and 26, Frazin filed objections to both law firms' fee applications through his attorney, Schepps. Schepps later admitted that at the time of the filing of the objections, he had not formed an opinion about the quality of the legal work performed on the appeal, had not reviewed the trial record, and was trying to find counsel who could determine if there was a basis for the malpractice action.

(4) A key allegation of Frazin's pleadings was that Cortell misrepresented that she would be

heavily involved in all aspects of the appeal, but Dodson did much of the work. A cursory review of the Haynes and Boone fee application shows that Cortell did indeed work on all aspects of the appeal, ultimately billing almost 300 hours.

(5) The Complaint asserts that Haynes and Boone neglected to order the record in a computer searchable format, but Frazin later argued that Haynes and Boone breached a fiduciary duty by not producing a computer searchable record, which Haynes and Boone asserts was an inconsistent position.

(6) The Complaint alleges that Haynes and Boone failed to raise the issue of performance as a means to prove contract, but a simple review of the record shows that the performance argument was made in Frazin's primary appellate brief as well as in pre- and post-argument letter briefs.

From the Court's perspective, however, none of these allegedly "groundlessness" arguments relate specifically to the DTPA breach of warranty claim, which is the only DTPA claim found by the Court. All other alleged DTPA claims were found to be mis-labeled negligence claims. Therefore, even assuming all of these allegations establish groundlessness, they establish groundlessness as to the *negligence claims* or *breach of fiduciary duty claims*, and not as to the DTPA breach of warranty claim.[26] Of course, the DTPA only permits the recovery of attorneys' fees for *DTPA actions* brought groundlessly, not for negligence or other actions brought groundlessly. Therefore, the Court concludes that the Defendants have not established that Frazin's DTPA claim was groundless.

---

[26] G&N merely adopts Haynes and Boone's arguments with respect to groundlessness under the DTPA. When G&N does discuss the alleged groundlessness of the claims asserted against the G&N Defendants, it discusses groundlessness of the *trial negligence* claims. However, the DTPA does not permit recovery of attorneys' fees for defending groundless negligence claims – only the recovery of attorneys' fees for defending groundless DTPA claims.

### E.    Alternative Fee-Defense Ruling on the DTPA Claims

Alternatively, in the event that a higher court finds that even one DTPA claim asserted by Frazin was groundless, the Court concludes that the Defendants would be entitled to only a small portion of the attorneys' fees they seek, as set forth in detail below.  In short, although a substantial portion of the fees requested are facially reasonable, the Defendants failed to segregate their fees as required by applicable law.

### 1.    Analysis of the Fees Requested

In *Arthur Anderson & Co. v. Perry Equipment Corp.*, 945 S.W.2d 812, 818 (Tex. 1997), the Texas Supreme Court identified eight factors to be considered in determining the reasonableness of an attorneys' fees request.  Those factors are: (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill required to perform the legal service properly; (2) the likelihood that the acceptance of the particular employment will preclude other employment by the lawyer; (3) the fee customarily charged in the locality for similar legal services; (4) the amount involved and the results obtained; (5) the time limitations imposed by the client or by the circumstances; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and (8) whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered.  *See also Fluorine on Call, Ltd. v. Fluorogas, Ltd.*, 380 F.3d 849 (5th Cir. 2004); *Sharif v. Wellness Int'l Network, Ltd.*, 2008 WL 2885186, *2 (N.D. Tex. July 22, 2008); *Petco Animal Supplies, Inc. v. Schuster*, 144 S.W.3d 554 (Tex. App - Austin 2004).

---

In support of the reasonableness of their fees, the Defendants submitted the declarations of Phelan, Griffith, and Nicole LeBoeuf ("**LeBoeuf**"). Phelan and Griffith are both interested witnesses. The general rule in Texas is that the uncontroverted testimony of an interested witness, such as a party to the suit, generally does nothing more than create a fact issue to be determined by the trier of fact. *McGalliard v. Kuhlmann*, 722 S.W.2d 694 (Tex. 1986). That rule has been applied to testimony of an attorney respecting the reasonableness of his fees. However, there is an exception to this general rule: where the testimony of the interested witness "is not contradicted by any other witness,[27] or attendant circumstances, and the same is clear, direct and positive, and free from contradiction, inaccuracies, and circumstances tending to cast suspicion thereon, it is taken as true, as a matter of law." *Ragsdale v. Progressive Voters League*, 801 S.W.2d 880, 882 (Tex. 1990). The Texas Supreme Court further stated:

> We do not mean to imply that in every case when uncontradicted testimony is offered it mandates an award of the amount claimed. For example, even though the evidence might be uncontradicted, if it is unreasonable, incredible, or its belief is questionable, then such evidence would only raise a fact issue to be determined by the trier of fact . . . *the evidence may be uncontradicted, but the trial judge could find some of the claimed fees to be unreasonable, unwarranted, or some other circumstance which would make an award of the uncontroverted claim wrong*."

*Ragsdale*, 801 S.W.2d at 882 (emphasis added); *Welch v. Hrabar*, 110 S.W.3d 601 (Tex. App. – Houston [14th Dist.] 2003).

Here, the Court concludes that it need not award the amounts claimed as a matter of law, and

---

[27] Frazin responded to the Defendants' counterclaims for attorneys' fees in part by contending that the fees "are excessive and unreasonable." Moreover, the issue of the amount of fees to be awarded was listed as a contested issue of fact in the parties' Joint Pre-Trial Order. *See* Pre-Trial Order at 40 (Contested Issues of Fact, ¶ 5(d) – "the amount of attorney's fees and costs to be awarded to Defendants"). He did not submit any evidence to contradict the Defendants' affidavits in support of their attorneys' fees, however.

that this case falls within the general rule (rather than the exception) because the time sheets attached to the Phelan and Griffith declarations and the Court's own observations during the litigation show that some of the fees sought are unreasonable and unwarranted. With respect to the fees incurred by the Shackelford Firm on G&N's behalf, the Court notes that LeBoeuf is not an interested witness. However, the Court does not believe that her testimony mandates an award of the full amount claimed because the Shackelford Firm's time sheets are redacted, making it impossible for the Court to assess the reasonableness of portions of its fees.

Further explanation is warranted. The G&N Defendants seek recovery of attorneys' fees for services provided by two firms – G&N and the Shackelford Firm. Both G&N and the Shackelford Firm submitted their time sheets in redacted form.[28] In other words, large portions of the time entries have been deleted. For example, a review of G&N's invoice dated June 17, 2008 shows the following time entries or portions thereof:

---

[28] After reviewing the parties' submissions, conducting research and performing its legal analysis of the many issues raised by the Motions, the Court turned to its application of law to fact. The Court discovered that the time sheets which had been filed electronically by the G&N Defendants had been redacted. The Court's staff therefore sent, on February 5, 2009, an e-mail (copied to all counsel) inquiring whether unredacted versions had been provided to the Court in "hard" copy, since unredacted versions were not available electronically. The Court did *not* ask for them to be provided – it simply inquired whether they already had been provided. Within a few days, counsel for G&N delivered unredacted time sheets to the Clerk's Office. On February 17, the Court's staff informed counsel for G&N that if he wished to supplement the evidence which had been submitted with the G&N Motion, he would need to either obtain the consent of opposing counsel or a Court order on motion, and that the Court would not consider the unredacted time sheets in the absence of counsel satisfying one of these two requirements. The Court later received a telephone call that a motion would be filed. However, instead of filing a motion, the Court's staff received an e-mail on March 5, 2009, which stated

> in filing the motion for fees the G&N defendants did not want to waive any attorney-client or work product privileges, given the on-going nature of the case and the potential for appeal. Accordingly, redacted billings were submitted. Had opposing counsel objected to that motion based upon the redacted billings, and depending upon the Court's ruling on such objections, the G&N defendants would have been in a position to provide the unredacted statements before evidence closed. Since there were no objections to the fee motion based upon the redacted statements, rather than move to reopen evidence, the G&N defendants will rely upon the billing statements and expert affidavits as submitted.

E-mail from T. Jach to H. Meister dated 3/5/09, 11:40 am (on file with the Court). Since the G&N Defendants chose not to file a motion to re-open the evidence, the Court is left with only the redacted time sheets to review.

| Date | Staff | Description | Dur/Qty | Amount |
|------|-------|-------------|---------|--------|
| 1/31/08 | JHM | Compilation of [    ] | 10.2 | $1,479 |
| 2/1/08 | ERC | Analyzed and briefed [    ] | 6.7 | $1306.50 |
| 2/2/08 | APJ | Preparation of. [    ] (.8); reviewed and revised [    ] (2.1); continued preparation of [    ] (2.8); reviewed and revised [    ] (.8); multiple telephone conferences between Tony Jach and Scott Everett discussing [    ] (.4); legal research regarding<br><br>[    ] (.7); began draft of [    ] (2.2); office conference between Tony Jach and Scott Griffith regarding [    ] (.6); reviewed and revised [    ] (1.1) | 8.2 | $2419.00 |
| 2/5/08 | SG | Review of [    ] (1.6); organized and assembled [    ] (.7); office conference between Scott Griffith and Tony Jach regarding<br><br>[    ] (.6); receipt and review of multiple emails regarding [    ] (.9); general preparation of [    ] (1.7) | 5.5 | 2117.50 |

Similarly, a review of the Shackelford Firm's invoice dated August 11, 2008 shows the following time entries or portions thereof:

| | | | Hrs/Rate | Amount |
|------|------|------|----------|--------|
| 7/1/08 | TDW | Draft correspondence to N. LeBoeuf regarding [    ] | .2<br>200.00/hr | 40.00 |
| 7/2/08 | SDJ | Study and analysis of relevant jurisprudence regarding [    ] | 1.8<br>150.00/hr | 270.00 |
| 7/11/08 | TDZ | Legal research on [    ] | 2.0<br>300.00/hr | 600 |
| 7/24/08 | NTL | Review and revise draft of post trial brief (6.7); review email communications between opposing counsel and the Court (.2); Telephone conference with Jeff Rusthoven with suggestions for<br><br>[    ] (.2); Communications with Phil Tellerine (.2); Attention to<br><br>[    ] (.4) | 7.7<br>200.00/hr | 1540.00 |

As a result of these (and other) redactions, the Court is simply unable to assess the reasonableness of vast amounts of the time expended by G&N and the Shackelford Firm.

    With respect to the attorneys' fees sought by the G&N Defendants, the Court has further

**Memorandum Opinion and Order**                                                          **58**

evidence, however, in support of the fees in the form of an expert's declaration. Specifically, Richard Capshaw, Esq. ("**Capshaw**") submitted a declaration "as an expert to examine the services rendered in connection with a fee application and responses to objections thereto" dated November 3, 2008 (the "**Capshaw Declaration**"). *See* Ex. C to G&N Motion. The Capshaw Declaration states that

> [t]he testimony contained in this affidavit is based upon my experience in handling litigation in State and Federal Courts, my review of the services provided, my interviews with representatives of [G&N] and [the Shackelford Firm] which provided the services, my review of the *redacted* bills which reflect what services were rendered and who rendered those services and why the services were rendered, my review of the claims, defenses and substantive legal and factual issues presented by the case, and my understanding of reasonable attorneys fees usually and customarily charged by attorneys in Dallas County, Texas in relation to a matter like this case.

Capshaw Declaration at 1. Capshaw opines, among other things, that the work described in the redacted billing statements was reasonable and was in keeping with the average rates charged by attorneys of comparable reputation and experience, performing the same or similar work in Dallas, Texas.

The Court notes that Capshaw is not an interested witness in the same sense that Griffith is, and thus his uncontradicted testimony might, in other circumstances, entitle the G&N Defendants to the full amount of recovery sought as a matter of law under Texas law. However, the Court concludes that Capshaw's testimony does *not* compel that result, because Capshaw reviewed the same redacted time sheets that this Court has, and thus his testimony is incredible on its face. There are very few courts or lawyers who review fee applications as frequently as a bankruptcy court does, or who have acquired such expertise by sheer repetition of the task. It is simply not credible that

even an experienced expert witness could review the redacted time entries in this case and form an opinion that the fees sought are reasonable – the information necessary to form such an opinion has simply been deleted. Thus, to the extent Capshaw opines as to redacted time entries, his testimony is entitled to little weight. *Cole Chemical & Distributing, Inc. v. Gowing*, 228 S.W.3d 684, 690 (Tex. App. – Houston [14 Dist.] 2005) ("the fact finder is not bound by expert testimony on attorneys' fees and may award a lesser amount . . . to determine an appropriate fee award, the trial judge is entitled to look at the entire record and to view the matter in light of the amount in controversy, the nature of the case, and his or her personal experience as a lawyer and judge;" holding that trial court did not abuse its discretion in awarding $2,500 in attorneys' fees where expert testified that reasonable attorneys' fees were $27,100).

The burden of proof is on the party seeking attorneys' fees to prove their reasonableness. *Sharif*, 2008 WL 2885186 at *2 (N.D. Tex. July 22, 2008). The Court concludes that the G&N Defendants have failed in their burden of proof to the extent that they have redacted their time entries. With respect to G&N, the Court will therefore reduce the amount sought by $424,426.70 (the value of the redacted time entries that the Court was unable to assess). With respect to the Shackelford Firm, the Court will therefore reduce the amount sought by $8,235.00 (again, the value of the redacted time entries that the Court was unable to assess).

The Court now turns to its analysis of the reasonableness of the remaining fees sought in this case.

### a. Preliminary Observations

For the reasons explained below, the Court first observes that its review of the Defendants' requests for attorneys' fees has been made exceedingly difficult by their decisions to largely

represent themselves.[29] First, it is difficult to differentiate between a particular attorney acting in the capacity of counsel, for which fees would be recoverable, and that same attorney acting in the capacity of client, for which fees would not be recoverable. The H&B Defendants recognized this difficulty when they voluntarily reduced their fee request by some $86,310.00 for fees incurred by Cortell, "because of Ms. Cortell's status as a party." Phelan Declaration ¶ 35(c).

Second, it is apparent to the Court that both firms were unable to remain objective throughout the litigation. That lack of objectivity contributed significantly, in this Court's view, to the high cost of defending against Frazin's claims.[30] It also created a sense of urgency that would not otherwise have existed in this case.[31] Almost every motion was heard on an "emergency" basis and was hotly contested. Discovery was difficult. Scheduling was difficult. While the Court acknowledges the importance of vigorous advocacy, it may ordinarily be achieved without a forceful

---

[29] The G&N Defendants represented themselves until April 21, 2008, at which point they hired the Shackelford Firm to assist them. The H&B Defendants represented themselves throughout the litigation.

[30] As the Supreme Court has noted, "even a skilled lawyer who represents himself is at a disadvantage in contested litigation. Ethical considerations may make it inappropriate for him to appear as a witness. He is deprived of the judgment of an independent third party in framing the theory of the case, evaluating alternative methods of presenting the evidence, cross-examining hostile witnesses, formulating legal arguments, and in making sure that reason, rather than emotion, dictates the proper tactical response to unforeseen developments in the courtroom." *Kay v. Ehrler*, 499 U.S. 432, 437(1991).

[31] For example, in arguing on February 4, 2008 that the fee application hearings should proceed on the merits notwithstanding the recent filing of the Complaint, the H&B Defendants argued:

> Because they waited to file a malpractice adversary should not preclude us from going forward on the fee application. They have sat there and said we did a lousy job on an appeal and that is not even close to being right. We want to refute that and we want to refute it fast. This is really, really getting to my partner here when she has been practicing for a long, long time. One of the top appellate lawyers in the country; and, somebody says she screwed up on an appeal not to mention Mr. Dodson who is a really good lawyer. It does not matter whether he is a 2, 9, or 38 year lawyer. What got in those briefs is what counts and did we do right and we are prepared to defend that and defend it well. I have not seen one 'expert' on their side yet who has said anything about why any of this was done in an incorrect fashion. We want to hear what they have to say and we think we are entitled to do it right now."

Hr'g Tr. 2/4/08 (02-32351, Docket No. 172) 98: 3-17. Of thirteen motions filed in the adversary proceeding, expedited hearing was sought on ten of them, and some motions were heard on as little as four days' notice.

contest at nearly every turn. Moreover, the Court notes that the attorneys at Haynes and Boone who defended this adversary proceeding were attorneys who normally specialize in bankruptcy and appellate law, not Texas state tort law.[32]

Third, Haynes and Boone simply "over-staffed" the case. The time entries show that a total of eight lawyers and four para-professionals worked on the case, with partners accounting for nearly 65% of the time expended (and 78% of the fees incurred), associates accounting for 19% of the time expended (and 15% of the fees incurred), and para-professionals accounting for only 16% of the time expended (and 6% of the fees incurred). Haynes and Boone attorneys and para-professionals spent more than 3,300 hours on this case. The blended rate for attorneys was $557, and the blended rate for para-professionals was $193.[33] This over-staffing will be discussed more fully in connection with the Court's more detailed analysis set forth below.

Fourth, there are some time entries that are so vague as to preclude analysis of the reasonableness of the time expended on the tasks described. With respect to Haynes and Boone, those entries total 29.2 hours, at a cost of $16,782. For example, on December 19, 2007, an attorney billed 4.7 hours to "work on outstanding issues." On January 2, 2008, a senior partner billed 1.3 hours at a cost of $1,007.50 for "further analysis of issues and potential discovery." The Court simply cannot tell whether the tasks performed reasonably required 4.7 hours and 1.3 hours of attorney time, whether the services involved novel or difficult legal issues, whether the fees incurred were usual fees customarily charged for performance of those services, whether the services were

---

[32] An attorney specializing in malpractice defense work may well have spent less time, and incurred less cost, in defending Frazin's claims.

[33] The combined blended rate was $499.12, prior to voluntary reductions. After the voluntary reductions, the combined blended rate dropped to $425.67.

performed under time constraints, or whether the services required experience and ability commensurate with that of the lawyers who performed them. Time entries in this category total $16,782, and the fees sought will be reduced by that amount.[34]

Against this backdrop, the Court turns to a more detailed level of analysis.

### b. Multiple Attendance at Hearings

Multiple Haynes and Boone attorneys almost always attended hearings in this case. A review of the time sheets shows that there were eleven hearings between December 27 and trial. In all but one of them, at least two attorneys billed for attendance (Scott Everett ("**Everett**") and Phelan, both partners with the firm). At two of them, three attorneys billed (Everett, Phelan, and Jeremy Kernodle, an associate). The Phelan Declaration states that "the Firm believed that the presence of each attorney attending was reasonably necessary given the seriousness and ever-changing thrust of the allegations and the different responsibilities each attorney had." Phelan Declaration ¶ 21. However, without knowing what those differing responsibilities were, and noting that on several occasions, at least one of the billing attorneys remained silent, the Court is unable to conclude that attendance by multiple attorneys at nearly every hearing was reasonable or necessary. The attendance of multiple attorneys at nearly every hearing resulted in fees of $102,448. The Court will reduce that amount by half, or $51,224.

Multiple attorneys also attended on behalf of the G&N Defendants. Of the eleven hearings between December 27 and trial, at least two attorneys billed for attendance at ten of them.[35] At three

---

[34] This reduction consists of time entries or portions of time entries on 12/19/07, 12/20, 12/23, 12/24, 12/25, 12/26, 1/2/08, 1/3, 1/26, 1/27, 3/2, 3/4, 3/29, 3/31, 4/5, 4/6, 5/10, 5/11, 5/18, and 6/16.

[35] *See* entries 12/27/07, 1/30/08, 2/4, 3/27, 4/8, 4/14, 4/22, 5/8, 6/24, and 6/26.

of the hearings, three attorneys billed - two from G&N, and one from the Shackelford Firm.[36] At one

hearing, four attorneys billed – two from G&N, and two from the Shackelford Firm.[37] The Griffith

Declaration states that the presence of each attorney attending was reasonably necessary, "given the

seriousness of the allegations, the amounts in controversy, and the different responsibilities each

attorney had." Griffith Declaration ¶ 16. Once again, the Court is unable to conclude that

attendance at nearly every hearing by multiple attorneys was reasonable and necessary. The Court

will reduce the time billed ($26,486.50) by half, or $13,243.25.

### c.      Fees Incurred by Cortell and Griffith

As noted above, Cortell acted in two capacities in this litigation – as client and as counsel.

Clearly, time expended in her capacity as client is not recoverable. While the H&B Defendants

voluntarily reduced their request for recovery of fees by approximately $86,000 with respect to fees

which she incurred, the Court concludes that a further reduction of $54,306 is appropriate. A review

of the time sheets leads the Court to find that an additional 86.2 hours are properly viewed as being

incurred in the capacity of client, rather than as counsel. For example, Cortell did not argue any of

the motions heard in the case. She did, however, attend most hearings – and the Court concludes

that she did so in her capacity as client. Although Haynes and Boone reduced their request by the

time she spent in the courtroom, it did not reduce her time incurred in preparing for various hearings

---

[36] *See* entries 4/22/08, 5/8, and 6/24.

[37] *See* entries on 6/26/08. The Court notes, however, that it has already reduced the time billed by Griffith and Anthony Jach on other grounds, and so has not double-counted these entries when calculating the reduction. The Court further notes that many of the hearings were also attended by multiple attorneys from Haynes and Boone. On June 24, 2008, for example, seven attorneys appeared on behalf of the Defendants – six of them billed their time (Cortell did not). On June 26, 2008, the date of argument on the summary judgment motions, eight attorneys attended on behalf of the Defendants, and seven of them billed their time (Cortell did not bill her time).

or in working with other Haynes and Boone attorneys post-hearing.[38] The Court finds that Cortell's time incurred in preparing for, and de-briefing after, hearings is most appropriately characterized as having been incurred in her capacity as litigant, not counsel.

Similarly, a review of the time entries shows that Griffith, who was also sued individually and thus served as both counsel and client, billed for time which is more appropriately considered to have been incurred in his capacity as client. Griffith billed a total of 17.2 hours to prepare for and attend his own deposition – time which was clearly expended in his capacity as client and therefore not recoverable. The Court will reduce G&N's time by $6,622 (the value of this time at Griffith's billing rate).[39] In addition, a review of the trial record shows that Griffith spent some 10 hours on the witness stand, on July 7, 8 and 16, for which he billed. The Court will therefore further reduce G&N's fees by $3,850 (the value of this time).

### d. Fees Incurred on the Motion to Compel

On April 3, 2008, Haynes and Boone filed a Motion to Compel and Expedited Request for Discovery Conference Pursuant to 11 U.S.C. § 105(d), Federal Civil Rule 37 and Federal Bankruptcy Rule 7037 (Docket No. 13) (the "**Motion to Compel**"). The H&B Defendants alleged that in order to keep the scheduled trial dates in July, they would need to depose Frazin and his mother by the end of April, but they had been notified that those witnesses or their counsel would be unavailable until May 2. The H&B Defendants asked this Court to compel the Debtor and witnesses under his control to make themselves available for deposition in April. Further, the H&B Defendants asked that this Court order the Debtor to produce his brother, Shawn, who resided in

---

[38] The $54,306 reduction consists of portions of Cortell's time entries for 2/1/08, 2/3, 2/4, 3/4, 3/26, 4/8, 4/20, 4/21, 6/2, 6/20, 6/24, 6/25, 6/27, 7/1, 7/2, 7/3, 7/4, 7/17, 7/18, and 7/19.

[39] The $6,622 reduction consists of portions of Griffith's time entries for 4/18/08, 4/21, 4/22, 4/23, and 4/24.

Israel, for a live deposition in Dallas, Texas over Shawn's objection. The Motion to Compel consisted of 4 pages with 11 paragraphs and citation to one case. By the time of the hearing (which lasted just over 90 minutes) five days later, the parties had reached an agreement with respect to the scheduling of depositions of the Debtor and his mother. However, the ability of this Court to compel the Debtor to produce his brother for deposition in Dallas remained a contested issue. At the conclusion of the hearing, the Court denied that relief, on the ground that "at least so far, you've not cited me to a rule, a statute, or anything that gives me the ability to do that . . . I don't think I have the power to do what you want me to do." Hr'g Tr. 4/8/08 (Docket No. 44) 65:3-5, 67:17-18.

A review of the time sheets shows that the H&B Defendants expended 49 hours in connection with the Motion to Compel, at a cost of $25,869.50 at a blended rate of $527.95. Three partners, two associates and a paralegal billed time, with partners billing over 40 of the 49 hours. The Court does not find $25,869.50 to be a reasonable fee. The issues were relatively simple, and did not raise any difficult issues of law or fact. With respect to the foreign deposition issue, there was little or no law supporting Haynes and Boone's novel position, but there was arguably authority to the contrary. The Court finds, in its discretion, that a reasonable fee for the Motion to Compel is half of what was billed, or $12,934.75, and the amount sought will be reduced by that sum.

With respect to the recovery of fees by G&N respecting the Motion to Compel, the Court concludes that no further reduction is required. Their time entries during this timeframe are so heavily redacted that the Court has already reduced the fees significantly.

### e. Fees Incurred in Opposing Telephonic Deposition

Since the Court ruled that it could not compel Shawn to come to the United States for deposition over his objection, and because the Debtor also wanted to depose Shawn, the Debtor

thereafter filed a motion to conduct the deposition of Shawn by telephone. The Defendants opposed that motion, and it was ultimately denied. However, the Court concludes that the amount of fees incurred in opposing the Debtor's request was neither reasonable nor necessary. The Debtor's 4-page, 10-paragraph motion was met with a 16-page response. The time sheets disclose that Haynes and Boone billed over 92 hours in a span of thirteen days, for total fees of $40,653.50. Once again, three partners, one associate and one paralegal billed time on this matter. Fifty-five percent of the time was billed by partners; 35.9% by the associate, and 8.7% by the paralegal. Both Phelan and Everett attended the hearing, which lasted just over one-half hour, billing more than 13 hours on that day for preparation and attendance.

The Court finds that this matter did not require the time expended, nor the participation of so many attorneys at such a high level of experience and expertise, as it did not involve any novel or difficult questions of law or fact. The Court does not believe that had the Defendants chosen outside counsel to represent them, outside counsel would have assigned so many attorneys at such a high level, or expended such a significant amount of time on this issue. Accordingly, the Court will reduce the fees incurred by Haynes and Boone in connection with this motion by $20,000. With respect to the fees incurred by G&N, the unredacted time entries on this motion total only $5,978.[40] The Court finds that amount to be reasonable, and no further reduction is required.

### f. Fees Incurred in Attempting to "Freeze" Settlement Proceeds

On December 27, 2007, the Court was asked to approve the Settlement Motion. At that time, the Defendants orally requested that all of the settlement proceeds after payment to the Chapter 13 Trustee and LawFinance "be held pending a determination by Judge Houser on the fee applications.

That number is $2,018,473.66."  Hr'g Tr. 12/27/07 (02-32351, Docket No. 161) 9:1-5.  Judge Hale

ruled that pending the February 4, 2008 hearing on the fee applications, the Chapter 13 Trustee and

LawFinance could be paid.  He further ruled that Haynes and Boone should continue to hold in its

trust account amounts equal to the fee applications, as well as $92,000 in disputed "agreed"

reductions in fees, and an additional $300,000 to protect the firms in the event they had to litigate

their fees, but that the balance of the settlement proceeds should be delivered to the Debtor.

By February 4, 2008, the Debtor had filed this adversary proceeding and sought a

continuance of the fee application hearing so that they could be heard together, which the

Defendants vehemently opposed.  The Court did grant the continuance, but ruled that the adversary

proceeding should be tried on an expedited basis.  The Court further directed, upon oral request of

the Defendants, that whatever funds were still in the Debtor's account be held pending further order.

On February 27, 2008, the Court entered an Order that stated:

> that the funds remaining in the first Frazin account into which the settlement funds
> were distributed by wire transfer from Haynes & Boone IOLTA Account to the
> Debtor or to Lorraine Frazin as his attorney-in-fact under the *Order Granting in Part
> the Motion for Order in Furtherance of Distribution of Lamajak Litigation Proceeds*
> entered on January 22, 2008 (approximate balance of $256,000.00), and not
> disbursed as of February 4, 2008, shall be held in trust and not disbursed or
> otherwise disposed of pending further order of this Court. Debtor and Lorraine
> Frazin further agree that the second Frazin account containing distributions from the
> first Frazin account shall maintain a balance of $258,000 pending further order of
> this Court.

On March 7, 2008, the Debtor filed a motion for reconsideration, alleging, among other

things, that

---

[40] $400 was incurred by the Shackelford Firm on 5/8/08 – the balance was incurred by G&N.

a.  A prejudgment garnishment under FED. R. CIV. P. 64 (Rule 64) is extraordinary relief which can be granted only on specific pleadings and in extraordinary circumstances;

b.  The orders granting Rule 64 relief at the conclusion of the December 27, 2007, and February 4, 2008, hearings were not based on a pleading before the court at those times;

c.  Griffith & Nixon, P.C. ("G&N") and Haynes & Boone, LLP ("H&B") ha[d] not presented evidence that would justify relief under Rule 64.

Expedited Mot. To Reconsider or Alter Order (Docket No. 173) (the "**Motion to Reconsider**") at 2.

The Motion to Reconsider was scheduled for hearing on March 27, 2008.[41]  Haynes and Boone filed opposition, in which it argued that (1) the Debtor could not seek relief from interlocutory orders under Rule 59, (2) the Court had the inherent authority to impose reasonable conditions on a continuance order, and that is what it did on February 4, (3) Haynes and Boone would ultimately be entitled to recover its attorneys fees, and (4) Haynes and Boone was not improperly seeking a prejudgment garnishment, but that even if it were, Haynes and Boone had satisfied the standards necessary to impose a pre-judgment remedy.  G&N joined in that opposition.

The Court agreed with Frazin's argument that the Defendants, by arguing that the settlement proceeds should remain in their trust account pending resolution of the claims against them, were essentially seeking a pre-judgment remedy or injunctive relief, without the burden of having filed written pleadings seeking that extraordinary relief.  The Court therefore directed the Defendants to file written pleadings specifying the relief they sought and the statutory authority supporting that relief.  Frazin agreed that the funds could be held pending the filing of such written pleadings and a prompt hearing thereon, subject to his ability to make a request for specific funds if he should need

---

[41] The reconsideration motion was initially scheduled for March 24, 2008, but prior to that hearing, it was re-set to March 27, 2008 because Haynes and Boone had a conflict on March 24, 2008.

them prior to the contemplated future hearing.

On April 10, 2008, the Defendants jointly filed the Motion Regarding Disbursement and to Maintain Status Quo (02-32351, Docket No. 194) (the "**Motion to Maintain Status Quo**"). In essentially three paragraphs (which also incorporated their prior opposition to the Motion to Reconsider), the Defendants advanced no new arguments, cited no case law, and relied upon 11 U.S.C. § 105 as their sole statutory authority supporting the relief they sought. At the conclusion of the April 22, 2008 hearing, the Court vacated that portion of its prior order which directed that the funds be held.

In litigating this issue, Haynes and Boone incurred $83,026.58 in fees in opposing the Motion to Reconsider (at a blended rate of $508.74), and another $58,615 in filing the Motion to Maintain Status Quo (at a blended rate of $561.98). The Court finds that the $141,641.58 incurred in connection with opposing the Motion to Reconsider and in pursuing the Motion to Maintain Status Quo is unreasonable. Haynes and Boone expended a total of 267.50 hours on this issue, at a blended rate of $529. The time spent is unreasonable given the relative simplicity of the issue, which did not raise any novel or difficult questions of law or fact. Moreover, the most experienced partner assigned to the case expended the most time – over 100 of the hours were billed by Phelan at the rate of $775 per hour. Nor does the Court believe that this issue required the participation of three partners billing at rates between $480 and $775 per hour, plus two associates and a paralegal, all of whom billed significant time on the "freeze" issue. Together, the hearings lasted a little over 3 hours. The Motion to Maintain Status Quo, while costing nearly $60,000, did not raise any new facts or legal argument. A review of the time sheets shows that after Haynes and Boone's response

to the Motion to Reconsider was researched, discussed, drafted, revised and re-revised and then finalized and filed, an additional 39.4 hours was expended on "preparation" for the hearing, at a cost of $26,257.50.

Accordingly, the Court, in its discretion, finds that a reasonable fee for opposing the Motion to Reconsider would be two-thirds of the time incurred, or $55,350.49, and a reasonable fee for prosecution of the Motion to Maintain Status Quo is one-third of the time incurred, or $19,539, for a total fee of $74,888.49. Therefore, the amount sought by Haynes and Boone will be reduced by $66,751.09.

Review of the time spent by G&N on this issue is difficult, because its time sheets have been so heavily redacted. However, the Court notes that at least $9,019 was incurred in opposing the Motion to Reconsider.[42] Further, at least $4,479.50 was incurred in prosecuting the Motion to Maintain Status Quo. The Court finds the sum of $13,498.50 for these two matters to be reasonable, and no further reduction is required.

### g.    Fees Incurred in Preparing the Post-Trial Brief

At the conclusion of trial, the Court asked for further briefs on a limited evidentiary issue.[43] In response, the H&B Defendants filed a twenty-nine page brief that went well beyond the Court's request for briefing and which re-hashed many of the arguments made in connection with the summary judgment briefing and during trial. While the filing was permissible, the time spent in preparing the brief was excessive. A review of the time entries shows that between July 17 and

---

[42] *See* entries 3/14/08, 3/25, 3/26, and 3/27.

[43] The Court asked the parties to file briefs on the effect of the potential exclusion of certain expert testimony if the Court ruled that the expert's trial testimony should be stricken for failure of the expert's report to comply with Federal Rule of Civil Procedure 26.

July 24, 2008, four partners, two associates and three para-professionals billed over 150 hours in connection with the brief, at a cost of $75,530 and with a blended rate of $502.52. Between July 17 and July 23, the date the brief was filed, the Haynes and Boone attorneys and staff expended 21 hours per day in the aggregate working on the brief. On July 17, no less than six Haynes and Boone attorneys (four of them partners) were working on the brief, billing a total of 39 hours and fees of $20,307.50 on that day alone. Stated quite simply, this was excessive. The fees sought in connection with the preparation of the post-trial brief will be reduced by $50,000.

In comparison, a review of the time sheets (to the extent the entries are not redacted) shows that the G&N Defendants seek recovery of 42.9 hours at a cost of $8,042.50 at a blended rate of $187.47 in connection with the preparation of a post-trial brief. The Court finds that amount reasonable, and no further reduction is required.[44]

### h.     Fees Incurred in Connection with Summary Judgment

The time sheets show that on February 6, 2008, five days after the Complaint was filed, Haynes and Boone first started thinking about filing a motion for summary judgment. The time entries further show that Haynes and Boone understood that scheduling issues would impact their ability to receive summary judgment prior to trial. *See* H&B Motion, Ex. A at 10, entry 2/6/08 by Phelan ("analysis of scheduling and effect of scheduling on potential summary judgment"); entry 2/8/08 by Phelan ("further analysis of potential summary judgment and relationship of scheduling to summary judgment"). The Court also recognized that the scheduling of trial would adversely impact its ability to hear and determine a dispositive motion prior to trial, and therefore cautioned

---

[44] *All* of this time was incurred by the Shackelford Firm. G&N's time entries during this time period are so heavily redacted that the Court has previously disallowed all of the fees sought during this time period.

the parties on April 14, 2008 as follows:

> [L]et's just be realistic. I mean, no offense to anybody. But even under the current schedule, the likelihood of me being able to meaningfully address dispositive motions before trial is virtually nonexistent. I find summary judgment motions to be the most difficult thing that I do. They always seem to be packaged with tons of appendices. Now, maybe this will be an exception, but I have yet to have had what I would call an easy summary judgment motion. And the thought that, if we hear them June 18th-ish, just which is theoretically the last date by which they're supposed to be heard under the current schedule, and we have trial docket call on July 3rd, and then trial the week of July 7th, I mean, it's virtually impossible for me to really address dispositive motions in this case. I mean, I hate to say that, but that's just a fact that everybody ought to be aware of as you're contemplating whether dispositive motions are going to be terribly helpful . . . So the reality is, even if the current timetable remained in place, you're already crunched on the summary judgments, and the likelihood of you getting a ruling from me prior to trial is uncertain. I'll put it that way. I was going to say remote, but that may not be true. But I do have other cases, and I just don't have any way to predict how much time I will have to devote to the dispositive motions when we have such a short time between the dispositive motion deadline and trial.

Hr'g Tr. 4/14/08 (Docket No. 43) 17:12-18:23. Nevertheless, the Defendants continued to press for a July 7 trial date. On May 30, 2008, the Defendants jointly filed a 41-page motion for summary judgment supported by a 45-page brief and 109 exhibits spanning over 4,300 pages. The motion was scheduled for hearing six business days prior to the start of trial. A review of the time sheets shows that Haynes and Boone billed over 824 hours, at a cost of $381,794, in connection with the summary judgment motion. Only 28.1 hours, at a cost of just over $11,000, was incurred in connection with a possible summary judgment motion prior to the hearing on April 14, 2008, when the Court informed the parties that it was "virtually impossible" for the Court to meaningfully address summary judgment motions on the parties' chosen trial schedule.

This is one of the instances in which the Defendants' sense of urgency adversely impacted the time and expense incurred in this case. The Defendants, quite understandably, were anxious to

have this case resolved (hopefully in their favor), and quickly. They therefore pressed for a fast-track discovery and trial schedule, and Frazin agreed to such a schedule. By doing so, however, the Defendants increased costs in the case, because nearly every motion was filed on an expedited basis in light of impending discovery deadlines, an impending dispositive motion deadline, and a looming trial date. By proceeding to file a summary judgment motion notwithstanding the fast trial track they chose, much of the time spent in preparing that motion was less than fruitful, because the motion was filed on the eve of trial and the Court was simply unable to rule upon it prior to trial. Moreover, the Defendants had been warned of that potential outcome well prior to incurring the lion's share of that expense.

That is not to say that *all* of the time spent preparing the motion for summary judgment was for naught. Instead, some of that preparation necessarily reduced trial preparation. For example, the legal research performed in connection with the summary judgment motion was equally useful when the merits were tried and briefed. Therefore, the Court finds that one-third of the time spent by Haynes and Boone in connection with the summary judgment motion ($127,264.67) was reasonable and necessary, and the balance ($254,539.33) was not. Quite simply, too many attorneys billed too much time in connection with a motion that (1) was rendered "urgent" simply by the Defendants' desire to vindicate themselves quickly, and (2) had very little likelihood of advancing the case at the time that it was filed.[45]

Review of the time expended by G&N and the Shackelford Firm in connection with the

---

[45] In the week before the summary judgment motion was filed, three partners, two associates and two para-professionals billed significant time nearly every day. Specifically, Haynes and Boone employees billed 37.98 hours a day at an average cost of $18,214.28 per day.

motion for summary judgment they filed is difficult, given the heavily-redacted time sheets. Nevertheless, the Court is able to identify a total of 51.20 hours expended by G&N, at a cost of $12,239.50. Similarly, the Court is able to identify a total of 154.7 hours expended by the Shackelford Firm, at a cost of $29,852.50. In light of the already significant reductions resulting from the redactions, the Court finds these sums to be reasonable and no further reductions are required.

The Court now returns to its preliminary observations. The foregoing analysis leads the Court to find that the potentially reasonable and necessary fees incurred in this case by Haynes and Boone total $914,651.28 ($1,441,188.45 sought, less reductions discussed above totaling $526,537.17). However, when this sum is viewed in light of the Court's preliminary observations, *see* pp. 61-63, *supra*, a further reduction is appropriate.

As noted earlier, the Defendants' decision to largely represent themselves has made the Court's analysis difficult, because it resulted in a lack of objectivity which then contributed to high costs and a sense of urgency. While not individually named as defendants, some of the attorneys defending this case as counsel were the very same attorneys whose alleged acts gave rise to some of the claims. The litigation thus became, by definition, very personal. The attorneys involved understandably wanted to defend themselves vigorously, thoroughly, and immediately. However, the incremental increased cost of doing so should not be borne by their opponent. Frazin should only be required to pay the attorneys' fees that would have been generated by an objective, disinterested attorney defending the claims.

As found previously, Haynes and Boone overstaffed the case. The firm also incurred extra

expense as a result of performing most of its services on an emergency basis. There was extensive motion practice. The Court has considered some of those motions above; however, there were many others which this Court has not individually addressed, yet which also suffered from some of the same infirmities. Accordingly, the Court finds that 80% of the remaining fees are reasonable and necessary, but 20% are not, resulting in necessary fees incurred by the H&B Defendants of $731,721.02 (80% of $914,651.28).

The same may be said of G&N with respect to the lack of objectivity, which contributed to excessive costs and involvement of no less than ten G&N attorneys working and billing time on the case. However, because the Court has already reduced so many of its fees as a result of the heavy redaction of its time sheets, the Court does not believe that a further, across-the-board reduction is required. The remaining unredacted fees are reasonable and necessary, and the prior reductions adequately compensate for any remaining infirmities in the fees sought. Therefore, the Court finds $342,094.05 of the G&N Defendants fees as reasonable and necessary.

The Court does not believe that the Shackelford Firm overstaffed the case. Nor did the attorneys at the Shackelford Firm act in the dual capacity of client and counsel, thus losing objectivity. Therefore, the Court concludes that its prior reductions already adequately address any remaining issues and no further, across-the-board reduction is required. The remaining unredacted fees are reasonable. Therefore, the Court finds $178,965 of the Shackelford fees reasonable and necessary. Overall, of the fees incurred by the G&N Defendants, the Court finds that $521,059.05 ($342,094.05 incurred by G&N and $178,965 incurred by the Shackelford Firm) were reasonable and necessary.

**Memorandum Opinion and Order**                                    **76**

## 2.    The Defendants' Failure to Appropriately Segregate their Fees

By way of background, the Defendants make several arguments in support of their recovery of fees under the DTPA.  First, the Defendants argue that *all* of their fees are recoverable under the DTPA because the DTPA claim is "inextricably intertwined with Frazin's other claims."  H&B Motion at 19.  However, the Texas Supreme Court has abandoned that approach to segregation of legal fees.  *Chapa*, 212 S.W.3d at 313-14.  The *Chapa* court framed the relevant inquiry as follows:

> Many of the services involved in preparing a contract or DTPA claim for trial must still be incurred if tort claims are appended to it; adding the latter claims does not render the former services unrecoverable.  Requests for standard disclosures, proof of background facts, depositions of the primary actors, discovery motions and hearings, voir dire of the jury, and a host of other services may be necessary whether a claim is filed alone or with others.  To the extent such services would have been incurred on a recoverable claim alone, they are not disallowed simply because they do double service.  Accordingly, we reaffirm the rule that if any attorney's fees related solely to a claim for which such fees are unrecoverable, a claimant must segregate recoverable from unrecoverable fees.  Intertwined facts do not make tort fees recoverable; it is only when discrete legal services advance both a recoverable and unrecoverable claim that they are so intertwined that they need not be segregated.

*Id.* at 313-14.  Therefore, the Court concludes that the Defendants may not simply recover all of their fees by arguing that Frazin's DTPA claim was "inextricably intertwined" with his other claims.    The Defendants next argue that they are not required to proffer precise proof in the form of separate time records to establish which fees and expenses were incurred on recoverable versus unrecoverable claims.  Instead, they argue that fees are sufficiently segregated if the attorney testifies that a given percentage of time would have been necessary despite the presence of claims for which attorneys' fees are unrecoverable.  The Court agrees.  That approach has sufficed for segregation under the case law.  *See, e.g., Chapa*, 212 S.W.3d at 313; *Navigant Consulting, Inc. v. Wilkinson*, 2008 WL 2765334 (N.D. Tex. July 16, 2008).  As the *Chapa* court noted:

> This standard does not require more precise proof for attorney's fees than for any other claims or expenses. Here, Chapa's attorneys did not have to keep separate time records when they drafted the fraud, contract, or DTPA paragraphs of her petition; an opinion would have sufficed stating that, for example, 95 percent of their drafting time would have been necessary even if there had been no fraud claim.

*Chapa*, 212 S.W.3d at 314. Therefore, the Defendants need not provide this Court with separate time entries for the DTPA claim and a declaration, like Phelan's, which provides evidence in the form of a percentage of time spent on the DTPA claim, can be legally sufficient.

However, the Court has several problems with the evidence as set forth in the Phelan Declaration. The Phelan Declaration states:

> If the Court awards fees solely based upon the DTPA and determines that segregation is required, then the Firm suggests a 33% reduction. Such a reduction resolves any doubts in Frazin's favor because easily more than two-thirds of the Firm's work is attributable to Frazin's DTPA claims *and the overlapping negligence claims.*

Phelan Declaration ¶ 35(b) (emphasis added). The second sentence is ambiguous, because it may fairly be read in one of two ways. First, it could mean that two-thirds of the firm's work is attributable to defense of the DTPA claim and the negligence claims together, in which case it would fail to satisfy the *Chapa* test because it would not provide a percentage of fees incurred to defend the DTPA claim alone plus a portion of fees which advanced the defense of both the DTPA claim and the negligence claims. Or, it could mean that two-thirds of the firm's services were attributable to the defense of the DTPA claim and to the defense of the negligence claims *to the extent that the services advanced the defense of both the DTPA claim and the negligence claims*, in which case it would satisfy the *Chapa* test, because it would provide evidence of the amount of fees which advanced the defense of the DTPA claim but which also did "double service" by advancing the defense of the negligence claims.

**Memorandum Opinion and Order** **78**

The next sentence of the Phelan Declaration attempts to provide further explanation:

> In other words, it is my opinion that at least 66% of the Firm's fees would have been incurred had there been no fiduciary claims; a 33% reduction represents far more time than was spent on the fiduciary claims . . .

Phelan Declaration ¶ 35(b). By excluding only the breach of fiduciary duty claims and not the negligence claims (or any portion thereof), this sentence suggests that the sentence preceding it should be read as first suggested: that 66% of the firm's fees were incurred in defending the DTPA claim and the negligence claims together, which in turn assumes, in order to satisfy *Chapa*, that the fees incurred in defending both theories of claim were completely coterminous.[46]

The Phelan Declaration continues:

> the Firm's work on the DTPA claims and the overlapping negligence and breach of fiduciary duty claims permeated the entire case, and *to the extent that attorneys' work advanced other claims for which fees are not available, that work served a double purpose by also advancing the DTPA claims.*

*Id.* (emphasis added). This sentence is internally inconsistent with the other two—it describes the DTPA, negligence, and breach of fiduciary duty claims as all overlapping, and then opines that to the extent that the H&B Defendants incurred fees in the defense of the negligence and breach of fiduciary duty claims, those same fees were also incurred in the defense of the DTPA claim. First, if that were true, then there would be no need to take *any* reduction for the breach of fiduciary duty claims. In addition, the notion that *all* fees that were incurred advanced the defense of *all* of the claims is simply wrong. For example, over $188,000 in fees were incurred between December 3,

---

[46] The H&B Defendants' brief also supports this reading. It states that "[t]he 33% figure was chosen based upon the fact that Frazin's claims fall into three categories: (1) negligence, (2) DTPA, and (3) breach of fiduciary duty. As the Court's Opinion repeatedly notes, there is vast overlap between the claims. To the extent that Frazin may claim a few distinct fiduciary claims, it is clear that relatively little time was spent on those claims. However, taking a very conservative approach – to the Firm's detriment and to Frazin's benefit – the Firm has decided to reduce its DTPA fee request by 33% because at least 66% of the fees would have been incurred without the claims for which fees were not recoverable."

2007 and February 1, 2008—before the DTPA and breach of fiduciary duty claims were even on file. Similarly, nearly $45,000 was incurred in connection with the H&B Defendants' motion to strike Frazin's expert reports, when those experts opined only as to the negligence and/or breach of fiduciary duty claims, and did not examine the Defendants' conduct in light of the DTPA.

Finally, it appears that the H&B Defendants are applying a slightly altered version of the *Chapa* test. As applied here, *Chapa* holds that the Defendants' services in defending the DTPA claim are recoverable even though negligence and breach of fiduciary claims were appended. It further holds that to the extent the services would have been incurred on the DTPA claim alone, they are not disallowed simply because those same services also advanced the defense of the negligence and breach of fiduciary duty claims. But, if any of the fees relate solely to the negligence and breach of fiduciary duty claims, then they must be segregated and are not recoverable. The H&B Defendants, however, argue that to the extent the firms' fees advanced the negligence and breach of fiduciary duty claims, they also advanced the DTPA claim and are recoverable. That is the inverse of *Chapa's* holding. *Chapa* held that to the extent the fees advanced the DTPA claim but also advanced the negligence and breach of fiduciary claims, they are recoverable. Moreover, in order to accept the Defendants' argument and simultaneously satisfy *Chapa*, one would have to assume that the fees incurred in defending against all three theories were completely coterminous – a highly unlikely proposition.[47] Moreover, as just noted, Haynes and

---

H&B Motion at 20 n.11.

[47] A review of the time sheets shows fourteen time entries which can be specifically identified as being incurred solely in connection with the DTPA claim, for a total of 53.9 hours, and fees of $23,290. *See* entries 2/20/08, 2/26, 3/7, 3/10, 3/19, 3/21, 5/15, 5/24, 5/28, 7/18, and 7/19. Similarly, there are twelve entries which appear to be related solely to the breach of fiduciary duty claims, for a total of 43.1 hours and fees of $22,802. *See* entries 4/15/08, 4/30, 5/9, 5/12, 5/16, 6/27, 6/28, 7/14, 7/17, 7/18, and 7/19.

Boone's fee request includes a request for recovery of $188,726.50 (327.50 hours) incurred between December 3, 2007 and February 1, 2008—before the Complaint was even on file. Clearly, those fees could not have been incurred defending a claim that had not yet been filed. The same may be said of the fees sought by G&N—74.20 hours at a cost of $23,259 was expended before the Complaint was even on file.

In sum, the Court finds the evidence, *i.e.*, the Phelan Declaration, to be equivocal and internally inconsistent.[48] However, when coupled with the time sheets, it is some evidence of the services that were incurred in connection with the DTPA claim. *Stewart Title*, 822 S.W.2d 1, 12 (Tex. 1992) ("evidence of unsegregated attorney's fees is more than a scintilla of evidence of segregated attorney's fees, *i.e.*, what a reasonable attorney's fee would be for the entire case indicates what the segregated amounts should be"). As the trier of fact, this Court must now determine what portion of the attorneys' fees are recoverable in this case.

Here, the Court notes that time entries specifically identified by Haynes and Boone as being incurred solely in connection with the DTPA claim total only 53.9 hours, resulting in fees of $23,290. Nevertheless, some of the time entries that are not specifically identified as being related to the DTPA claim undoubtedly advanced that claim and are properly recoverable. For example,

---

[48] The Court's discussion applies with equal force to the Griffith Declaration, the LeBoeuf Declaration, and the Capshaw Declaration. The Griffith Declaration states that "because the facts underlying such claims were inextricably intertwined and the attorneys' time spent in defending the claims cannot be accurately broken down by claim, a reasonable method of ascribing time to the defense of the breach of fiduciary duty claims is to assign a 1/3 percentage to them." Griffith Declaration ¶ 30. The LeBoeuf Declaration states that "the basis for the 33% reduction is the fact that Frazin asserted three general categories of claims . . . because the facts underlying such claims were intertwined, and the attorneys' time spent in defending the claims cannot be accurately broken down by claim, a reasonable method of ascribing time to the defense of the breach of the fiduciary duty claims is to assign a 1/3 percentage to them. In such event, the amount of $139,360.00 is appropriately assessed against Frazin for reasonable and necessary attorneys fees . . . in the defense of the negligence claims and the claims of violation of the DTPA asserted against the G&N Defendants." LeBoeuf Declaration ¶ 28. Similarly, Capshaw opines that "it is my opinion that at least 67% of the fees incurred . . . would have been incurred had there not been any fiduciary claims." Capshaw Declaration ¶ 5.

some portion of discovery motions, the motion for summary judgment, and time incurred in preparation for hearings  necessarily was incurred in connection with the DTPA claim, although it was not so identified in the time entries.  Conversely, some of the attorneys' fees incurred cannot possibly have been incurred in connection with the DTPA claim, because the time was expended before that claim was ever on file.

The Court previously concluded that the reasonable and necessary attorneys' fees incurred by Haynes and Boone in defending all of Frazin's claims total $731,721.02.  The Court finds that it is reasonable to assign one-third of that sum, or $243,907 to the DTPA claim.  It is also reasonable to assign one-third each to the negligence and breach of fiduciary duty claims (*i.e.*, $243,907 to the negligence claims and $243,907 to the breach of fiduciary duty claims).  Although the breach of fiduciary claims as initially pled in the Complaint related somewhat to the negligence claims, the breach of fiduciary duty claims, and the factual allegations underpinning them, changed significantly during discovery and trial, such that the alleged conduct underlying the breach of fiduciary claims as tried had very little to do with the conduct underlying the allegations of negligence and the DTPA claim.  Thus, the Court does not believe that any of the work performed in defense of the breach of fiduciary duty claims would necessarily have overlapped with the work performed in defense of the DTPA claim.  However, the Court notes that some of the work performed in defense of the negligence claims would be coterminous with the work performed to advance the defense of the DTPA claim.  To account for the fact that some of the fees incurred in connection with the summary judgment and discovery motions and trial preparation necessarily were incurred in connection with the DTPA claim, the Court concludes that one-half of the one-third assigned to defense of the negligence claims will be awarded as reasonable and necessary fees incurred in the defense of the

DTPA claim—*i.e.*, $121,953.50. This award adequately accounts for the fact that some of the fees incurred in connection with work that advanced the defense of both the DTPA claim and the negligence claims together necessarily advanced the DTPA claim. Therefore, in the alternative, the Court concludes that a reasonable fee for defense of the DTPA claim alone is $365,860.50 of the fees incurred by Haynes and Boone—*i.e.*, $243,907 + $121,953.50.

The Court previously concluded that the reasonable and necessary attorneys' fees incurred by the G&N Defendants in defending all of Frazin's claims, with respect to the fees incurred by G&N, total $342,094.05. The Court finds that it is reasonable to assign one-third of that sum, or $114,031.35 to the DTPA claim. It is also reasonable to assign one-third each to the negligence and breach of fiduciary duty claims. For the same reasons discussed immediately above with respect to the Haynes and Boone fees, the Court concludes that one-half of the one-third assigned to defense of the negligence claims will be awarded as reasonable and necessary fees incurred in the defense of the DTPA claim. This award adequately accounts for the fact that some of the fees incurred in connection with work that advanced the defense of both the DTPA claim and the negligence claims together necessarily advanced the defense of the DTPA claim. Therefore, in the alternative, the Court concludes that a reasonable fee for defense of the DTPA claim alone is $171,047.02 of the fees incurred by G&N – *i.e.*, $114,031.35 + $57,015.67.

The Court has concluded above that the reasonable and necessary attorneys' fees incurred by the G&N Defendants in defending all of Frazin's claims, with respect to the fees incurred by the Shackelford Firm, total $178,965. The Court finds that it is reasonable to assign one-third of that sum, or $59,654.99, to the DTPA claim. It is also reasonable to assign one-third each to the negligence and breach of fiduciary duty claims. And, for the same reasons discussed immediately

above with respect to the Haynes and Boone fees and the G&N fees, the Court concludes that one-half of the one-third assigned to defense of the negligence claims will be awarded as reasonable and necessary fees incurred in the defense of the DTPA claim. This award adequately accounts for the fact that some of the fees incurred in connection with work that advanced the defense of both the DTPA claim and the negligence claims together necessarily advanced the defense of the DTPA claim. Therefore, in the alternative, the Court concludes that a reasonable fee for defense of the DTPA claim alone is $89,482.49 of the fees incurred by the Shackelford Firm – *i.e.*, $59,654.99 + $29,827.50.

The Court therefore, in the alternative, awards the G&N Defendants aggregate attorneys' fees of $260,529.51 in defense of the DTPA claim—*i.e.,* $171,047.02 + $89,482.49.

### F. Entitlement to Expert Witness Fees

Because the Court concludes that Frazin is not liable for payment of the Defendants' fee-defense fees under any of the alleged theories, it also concludes that the Defendants are not entitled to expert witness fees.

In the event that a higher court rules that Frazin is liable for certain fee-defense fees incurred in relation to his DTPA claim, the Court will address the Defendants' request for expert fees beyond the statutory allowance provided for in 28 U.S.C. §§ 1821 and 1920.[49] The Defendants concede that parties generally cannot recover expert fees above the statutory allowance. However, citing *Chambers v. NASCO*, 501 U.S. 32 (1991), they assert that the Court maintains discretion to

---

[49] Section 1920 of Title 28, United States Code, provides that a judge may tax as costs, among other things, fees and disbursements for printing and witnesses. Section 1821 of title 28, United States Code, provides that witnesses may be paid an attendance fee of $40 per day, plus actual expenses of travel, tolls, cab fares, parking fees, normal travel expenses, a subsistence allowance when an overnight stay is required, and certain other nominal fees.

award expert witness fees where the expert's services were made necessary by the opposing party's bad faith. They further argue that Rule 9011 provides an additional basis for the exercise of a court's discretion to award expert witness fees. H&B Boone Motion at 16.

For the reasons previously discussed, *see* p. 42-48, *supra*, the Court concludes that the bad-faith exception to the American Rule as discussed in *Chambers* is not properly invoked here. Thus, the Defendants' requests for expert witness fees beyond the statutory allowances are denied.

For the reasons previously discussed, *see* pp. 48-49 n.25, *supra*, the Court also concludes that Rule 9011 was not properly invoked in this adversary proceeding. Nor does the Court conclude that 11 U.S.C. § 105 warrants such an award. Thus, the Defendants' requests for expert witness fees beyond the statutory allowances are denied.

### G.    Entitlement to Costs of Computerized Legal Research

The Defendants assert that the cost of reasonable computerized legal research is recoverable as attorney's fees. Although the Fifth Circuit has yet to address this issue, several other circuit courts of appeal have agreed. *U.S. v. Merritt Meridian Constr. Corp.*, 95 F.3d 153 (2d Cir. 1996); *Haroco, Inc. v. American Nat'l Bank and Trust Co. of Chicago*, 38 F.3d 1429 (7th Cir. 1994); *Johnson v. College of the Univ. of Ala. In Birmingham*, 706 F.2d 1205 (11th Cir. 1983); *see also Camargo v. Trammell Crow Interest Co.*, 318 F.Supp.2d 448 (E.D. Tex. 2004) (allowing fees for computerized legal research as attorneys' fees). The rationale for the allowance of the cost of computerized legal research as attorneys' fees is as follows:

> Computerized legal research involves an attorney sitting down in front of a computer and researching legal issues by searching through a database which now includes almost every resource one would find in the country's largest law libraries. In addition to the attorney charging the client for the time he or she spends doing

> this research, the companies that offer the computerized legal research services also charge a fee. Theoretically, even though the clients now pay two fees, their ultimate bill should be lower because the attorney should be able to do the research more quickly and efficiently. If this research had been done manually by an attorney sitting in the library reading through books rather than sitting before a computer screen, nobody would dispute that the attendant fees would be properly classified as attorney's fees and not costs.

*Haroco, Inc.*, 38 F.3d at 1440.

This Court agrees with this analysis, and thus holds that the cost of *reasonable* computerized legal research is recoverable as attorneys' fees. The H&B Defendants seek reimbursement for $20,039.88 in Westlaw and Lexis charges as attorneys' fees. However, because the Court denied the H&B Defendants' request for fee-defense fees, it must similarly deny the request for reimbursement of reasonable computerized research.

In the alternative, to the extent that the H&B Defendants are entitled to recover their attorneys' fees for the defense of the DTPA claim alone, the Court awards $10,019.94 (one-third of the legal research charges that the Court assigns to the DTPA claim ($20,039.88/3=$6,679.96) plus one-half of the one-third incurred in connection with the defense of the negligence claims ($6,679.96/2=$3,339.98) that the Court concludes advanced both types of claims equally and thus also advanced the DTPA claim).

The G&N Defendants seek reimbursement for $4,690.98 in online legal research fees – $2,088.17 incurred by G&N and $2,602.81 incurred by the Shackelford Firm.[50] However, because the Court denied the G&N Defendants' request for fee-defense fees, it must similarly deny the

---

[50] The G&N Motion states that the G&N Defendants seek $5,334.86 in online legal research fees – $2,651.87 incurred by G&N and $2,676.99 incurred by the Shackelford Firm. However, the time entries attached to the G&N Motion show total expenses in online legal research fees of $4,690.98 – $2,088.17 incurred by G&N and $2,602.81 incurred by the Shackelford Firm.

request for reimbursement of reasonable computerized research.

In the alternative, to the extent that the G&N Defendants are entitled to recovery of their attorneys' fees for defense of the DTPA claim alone, the Court awards $1,044.09 of legal research fees incurred by G&N (one-third of the legal research charges that the Court assigns to the DTPA claim ($2,088.17/3=$696.06) plus one-half of the one-third incurred in connection with the defense of the negligence claims ($696.06/2=$348.03) that the Court concludes advanced both types of claims equally and thus also advanced the DTPA claim), and $1,301.40 for legal research fees incurred by the Shackelford Firm (one-third of the legal research charges that the Court assigns to the DTPA claim ($2,602.81/3=$867.60) plus one-half of the one-third incurred in connection with the defense of the negligence claims ($867.60/2=$433.80) that the Court concludes advanced both types of claims equally and thus advanced the DTPA claim).  Thus, the G&N Defendants are awarded, in the alternative, aggregate computerized legal research fees for the DTPA claim alone of $2,345.49.

## V.    CONCLUSION

It is simply too late for Frazin to complain that he lacked notice of the bases for the Defendants' claims to attorneys' fees.  In addition, the Court finds that the Defendants' pleadings for attorneys' fees are sufficient under Rule 8.

Frazin's objections to the admission of the Defendants' time sheets are overruled.  Frazin's objections to certain paragraphs of the Phelan Declaration and the Griffith Declaration are granted in part and denied in part, and the Declarations are admitted subject to the portions that the Court has stricken by its prior rulings herein.

The Defendants are not entitled to recover fee-defense fees or related computerized legal

research under the Standing Order, this Court's *Teraforce* decision, or 11 U.S.C. § 330. While the Defendants would be entitled to recover attorneys' fees for their defense of their fee applications under the bad-faith exception to the American Rule, the Court concludes that the bad-faith exception is not properly invoked here. Thus, the Defendants are not entitled to recover their fees under federal law.

The Defendants are not entitled to recover fee-defense fees or related computerized legal research under Section 38.001 due to their failure to comply with the express requirements of TEX. CIV. PRAC. REM. CODE § 38.002.

The Defendants are not entitled to recover their reasonable and necessary attorneys' fees or related computerized legal research under the DTPA because Frazin's action was not groundless in fact or law, brought in bad faith, or brought for the purpose of harassment. The Defendants' requests for reimbursement of expert witness fees, including fees beyond that provided by statute, are denied.

In the alternative, in the event that an appellate court rules that the Defendants are entitled to recovery of their attorneys' fees under the DTPA because a DTPA claim was groundless, then segregation is required. However, the Defendants did not segregate their fees appropriately, and thus would be entitled to only a portion of the fees they seek. The Court would award to the H&B Defendants $365,860.50 as a reasonable fee for defense of the DTPA claim alone, assuming segregation is required as between the DTPA claim on the one hand, and the negligence/breach of fiduciary duty claims on the other. The Court would also award $10,019.94 for computerized legal research, but would deny the request for reimbursement of expert witness fees beyond the statutory

allowance. The Court would award to the G&N Defendants $260,529.51 as a reasonable fee for defense of the DTPA claim alone, assuming segregation is required as between the DTPA claim on the one hand, and the negligence/breach of fiduciary duty claims on the other.  The Court would also award $2,345.49 for computerized legal research, but would deny the request for reimbursement of expert witness fees beyond the statutory allowance.

All other arguments not expressly addressed in this Memorandum Opinion and Order are hereby denied on the merits.  A separate judgment will follow.

SO ORDERED.

# # # END OF MEMORANDUM OPINION AND ORDER # # #